**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

**Case No. 14-CIV-62610-BLOOM/Valle**

SUN LIFE ASSURANCE COMPANY OF
CANADA,

       Plaintiff,

v.

U.S. BANK NATIONAL ASSOCIATION, and
LARRY BRYAN,

       Defendants.

_____/

**MEMORANDUM OF LAW OF SUN LIFE ASSURANCE COMPANY OF CANADA IN
OPPOSITION TO MOTION OF U.S. BANK TO PRECLUDE THE EXPERT REPORTS
<u>AND TESTIMONY OF JEFFREY A. BASKIES AND PAUL A. MARCUS</u>**

**TABLE OF CONTENTS**

I.  Introduction ..................................................................................................................1

II.  Factual Background ........................................................................................................2

III.  Legal Standard ................................................................................................................2

IV.  The reports of Messrs. Baskies and Marcus properly include a relevant and correct recitation of the facts and data on which their opinions are based, and neither witness is being proffered to give a factual narrative. ...............................................2

    A.  The Reports comply with the applicable rules. ........................................................3

    B.  Both experts properly apply their expertise to reach opinions based on the facts of record. ................................................................................................4

        1.  Mr. Baskies's opinions are based on the facts of record ..............................5

        2.  Mr. Marcus's opinions are also based on the facts of record .......................8

    C.  Sun Life is not proffering Messrs. Baskies and Marcus to offer factual narratives, and the cases U.S. Bank cites do not support its position. ...................10

V.  Messrs. Baskies and Marcus are not offering opinions about knowledge, intent, or state of mind ................................................................................................13

    A.  U.S. Bank mischaracterizes Mr. Baskies's opinions. .............................................15

    B.  U.S. Bank mischaracterizes Mr. Marcus's opinions ..............................................17

VI.  Mr. Baskies is not offering legal conclusions. ..............................................................18

VII.  Mr. Marcus's testimony clearly relates to relevant issues that are beyond the understanding of the average lay person ........................................................................20

VIII.  Conclusion ....................................................................................................................23

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Arista Records LLC v. Lime Group LLC*,
    784 F. Supp. 2d 398 (S.D.N.Y. 2011)..................................................................14

*Capitol Records, LLC v. Escape Media Group, Inc.*,
    2014 U.S. Dist. LEXIS 183098 (S.D.N.Y. May 28, 2014)....................................13

*Drake v. Allergan, Inc.*,
    2014 U.S. Dist. LEXIS 151830 (D. Vt. Oct. 23, 2014) .........................................12

*In re Fosamax Prods. Liab. Litig.*,
    645 F. Supp. 2d 164 (S.D.N.Y. 2009)..................................................................11

*Hanson v. Waller*,
    888 F.2d 806 (11th Cir. 1989) ...............................................................................19

*Micro Chem., Inc. v. Lextron, Inc.*,
    317 F.3d 1387 (Fed. Cir. 2003)..............................................................................13

*Morgan v. N. Miss. Med. Ctr., Inc.*,
    458 F. Supp. 2d 1341 (S.D. Ala. 2006)..................................................................18

*Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*,
    2011 U.S. Dist. LEXIS 62969 (S.D. Fla. June 7, 2011) .......................................14

*In re Rezulin Prods. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004)...................................................................14

*In re Seroquel Prods. Liab. Litig.*,
    2009 U.S. Dist. LEXIS 126995 (M.D. Fla. July 17, 2009).............................11, 12

*Tillman v. C.R. Bard, Inc.*,
    96 F. Supp. 3d 1307 (M.D. Fla. 2015) ...........................................................11, 12

*In re Trasylol Prods. Liab. Litig.*,
    709 F. Supp. 2d 1323 (S.D. Fla. 2010) ..................................................................11

*United States SEC v. Big Apple Consulting U.S.A., Inc.*,
    2011 U.S. Dist. LEXIS 95292 (M.D. Fla. Aug. 25, 2011) .....................................18

*United States v. Masferrer*,
    367 F. Supp. 2d 1365 (S.D. Fla. 2005) .............................................................20, 21

*United States v. Moran*,
   493 F.3d 1002 (9th Cir. 2007) ................................................................................................19


**STATUTES, RULES & REGULATIONS**

FED. R. CIV. P. 26 ...................................................................................................................3

FED. R. EVID. 702 ................................................................................................................2, 3

FED. R. EVID. 704 ................................................................................................................19


**OTHER AUTHORITIES**

31A Am Jur 2d Expert and Opinion Evidence § 22 .......................................................3

A. Hinderaker, *Expert Testimony: Holy Water or Vinegar?*, 2011 Emerging Issues
   5766...................................................................................................................................4

## I.      <u>INTRODUCTION</u>

In seeking to preclude testimony from Jeffrey Baskies and Paul Marcus, U.S. Bank does not challenge their qualifications or the relevance or reliability of their opinions.  Instead, it relies on largely pedantic arguments, for instance claiming as its lead argument that these experts are supposedly being called to offer "factual narratives" when clearly they are not.

But even this lead argument misses the point – while it is true that both experts submitted a report containing a detailed recitation of the record evidence on which their opinions are based, this is exactly what is required under the Rules of Civil Procedure and the Rules of Evidence.  Moreover, neither is being presented simply to regurgitate facts – indeed, both go on at length in their reports to actually set forth opinions that are based on the record evidence.  And U.S. Bank doesn't contend that the facts relied upon by Messrs. Baskies and Marcus are wrong or irrelevant.  Rather, U.S. Bank just doesn't like the facts of this case, and especially doesn't like how Messrs. Baskies and Marcus properly apply their expertise to those facts to reach well-founded, relevant opinions that will assist the jury in unraveling the complex, multi-layered transactions through with the life insurance policy at issue was manufactured.

And despite a rather weak attempt to argue that the issues in this case are "straightforward" and don't require expert testimony, U.S. Bank undoubtedly realizes that the opposite is true.  This case, as alleged, and as now proven, involves a massively complex scheme that was intentionally designed that way for the purpose of concealing the true nature of the transactions.  Without the assistance of experts, a jury would be lost in the complexity of the transactions through which the life insurance policy at issue was procured.

For these and the other reasons explained below, U.S. Bank's motion should be denied.

## II.   FACTUAL BACKGROUND

For the sake of brevity, Sun Life incorporates herein by reference its Rule 56.1 Statement of

Undisputed Material Facts and Motion for Summary Judgment (Docket Nos. 51 and 56), as well as

its Motion to Preclude the Expert Report and Testimony of Hal Singer and Incorporated

Memorandum of Law (Docket No. 57).

## III.   LEGAL STANDARD

Federal Rule of Evidence 702, which controls the admission of expert testimony, states:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized
> knowledge will help the trier of fact to understand the evidence or
> to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods;
> and
>
> (d) the expert has reliably applied the principles and methods to the
> facts of the case.

Fed. R. Evid. 702.

## IV.   THE REPORTS OF MESSRS. BASKIES AND MARCUS PROPERLY INCLUDE A RELEVANT AND CORRECT RECITATION OF THE FACTS AND DATA ON WHICH THEIR OPINIONS ARE BASED, AND NEITHER WITNESS IS BEING PROFFERED TO GIVE A FACTUAL NARRATIVE.

Mr. Baskies submitted a 16-page expert report, plus attachments.  *See* Exhibit A

("Baskies Report").  Pages 1 through 7 of the Baskies Report contain a detailed factual

background section in which Mr. Baskies discusses his "present understanding of the facts that

may be relevant to the matter at hand."  *Id*. at 1-7.  This is followed, at pages 7 through 15 of the

report, with a detailed discussion of Mr. Baskies's opinions based upon the facts included on the

prior pages of his report.  *Id*. at 7-15.

2

Mr. Marcus submitted a 19-page expert report, plus attachments. *See* Exhibit B ("Marcus Report").[1]  Paragraphs 10 through 29 of the Marcus Report consist of the "Background Information" Mr. Marcus took from the factual record in this case.  These paragraphs are followed by a detailed discussion of Mr. Marcus's opinions based upon the facts included earlier in his report. *Id*. ¶¶ 30-52.

U.S. Bank now contends that, despite the reality that both experts actually render opinions based on the factual record, they somehow are simply being proffered to recite improper factual narratives.  This argument is wrong on many levels.

      A.      **The Reports comply with the applicable rules.**

Despite U.S. Bank's complaints, the factual background sections of the Reports fully comply with the expert disclosure requirements of Federal Rule of Civil Procedure 26(a)(2)(B), which provides that expert reports "***must contain***: (i) a complete statement of all opinions the witness will express and ***the basis and reasons for them***; [and] (ii) ***the facts or data considered*** by the witness in forming them."  Fed. R. Civ. P. 26(a)(2)(B) (emphasis added).  Likewise, Rule of Evidence 702 requires that expert testimony be "***based on sufficient facts or data***."  Fed. R. Evid. 702(b) (emphasis added).

Requiring experts to actually base their opinions on the facts at issue in the case – which clearly Messrs. Baskies and Marcus have both done – is rooted in the principle of ensuring that the expert's testimony will be helpful to the trier of fact.  Indeed, "[e]xpert opinion which is speculative, conclusory, or unsubstantiated by facts in the record is of no assistance to the jury in rendering its verdict and therefore is inadmissible."  31A Am Jur 2d Expert and Opinion Evidence § 22.  Thus, as one commentator has explained, "expert testimony should detail the

---

[1] The Baskies Report and the Marcus Report are sometimes referred to collectively as the "Reports."

facts or data upon which the opinion is based to enable the court, in the first instance as

gatekeeper, and the fact finder to conclude the opinion is based on 'good grounds' and is

persuasive.  Properly presented, the expert can (and should) concisely and cogently present the

case facts that are the factual basis for her opinion."  A. Hinderaker, *Expert Testimony: Holy

Water or Vinegar?*, 2011 Emerging Issues 5766 (internal citations omitted).

U.S. Bank does not contend that either of the Reports fails to meet the requirements of

the Rules.  Instead, U.S. Bank seems really to be arguing that Messrs. Baskies and Marcus set

forth facts U.S. Bank does not like, but can't actually dispute.  This is hardly a basis to object, let

alone to strike an expert's testimony.[2]  In short, Messrs. Baskies and Marcus have both properly

used the record evidence as the basis for their relevant and reliable opinions – which is mandated

by the Rules of Civil Procedure and the Rules of Evidence – and there is no basis to preclude any

portion of their Reports or testimony.[3]

### B.   Both experts properly apply their expertise to reach opinions based on the facts of record.

U.S. Bank not only overlooks the Rules, but it misconstrues the Reports by focusing on

the factual background sections in isolation, thus ignoring that both experts go on at length to

apply their unchallenged expertise to the actual record evidence, and both reach a series of

---

[2] By contrast, U.S. Bank's expert, Hal Singer, offered two reports that have nothing to do with this case.  Mr. Singer did not read a single one of the many underlying transactional documents; his reports do not rely upon any of the facts of record; and he has offered opinions that are truly speculative, conclusory, and unsubstantiated by facts in the record, and thus of no assistance to the factfinder in rendering a verdict.  *See* Sun Life's Motion to Preclude Expert Report and Testimony of Hal Singer and Incorporated Memorandum of Law, Docket No. 57.

[3] Perhaps U.S. Bank would have grounds to complain if Mr. Baskies ended his report at page 7 and Mr. Marcus ended his at paragraph 29; however, a full reading of the Reports proves that both experts properly set forth the factual basis for the opinions they intend to offer at trial, and then proceeded to detail those specific opinions and the evidence that supports them.  Notably, U.S. Bank deposed Messrs. Baskies and Marcus, and thus had a chance to question them as to how they use and rely upon the record evidence cited in the Reports.  U.S. Bank now fails to cite any deposition testimony that would support its bald conclusion that Sun Life is attempting to use either of these experts simply to offer a factual narrative at trial.  This bald assertion is further belied by the fact that both experts reach independent, detailed, well-founded opinions that go beyond merely restating the evidence.

detailed, well-founded, relevant opinions on topics that are helpful to, and outside the general understanding of, a jury. U.S. Bank also claims both experts are attempting to "restate the facts of the case in a light favorable to Sun Life," but U.S. Bank fails to substantiate this bald claim with even a single example of an incorrect fact or a statement that is somehow not objective.

### 1.    Mr. Baskies's opinions are based on the facts of record.

Mr. Baskies's first opinion is that "Mrs. Malkin does not appear to have had a legitimate estate planning need for the $5 million Sun Life policy." Exhibit A, p. 9. In support of this opinion, he discusses undisputed facts concerning Mrs. Malkin (such as her age, marital status, and dependents) and information provided on an insurance application to Sun Life related to the policy supposedly being for purposes of "estate plan[ning]." *Id*., p. 10.

In his second opinion, Mr. Baskies concludes that "even assuming there was a legitimate [estate planning] for the $5 million policy, the transaction was not structured in such a way to satisfy that need." *Id*., p. 11. Here, he discusses the details of the trust that was formed to apply for and own the policy, and whether it has the characteristics of an irrevocable life insurance trust. *Id*., p. 12. Among other things, he quotes provisions of certain trust agreements and concludes that, based on the referenced language, they "did not further any legitimate estate tax planning objective." *Id*. He then bolsters this particular opinion with additional record evidence. *Id*., p. 13 (discussing the fact that the policy was minimally funded and thus did not provide for tax-free growth or supplemental future income; the fact that Mrs. Malkin signed an agreement to sell the policy; and the fact that one of the underlying documents (CC448) contains an acknowledgement that the various trusts were "not intended to satisfy [her] estate planning needs and have not been designed as an estate planning tool.").

In his third opinion, Mr. Baskies concludes that "the policy appears to have been acquired from the start by investors other than Mrs. Malkin and her family." *Id*. He cites to other facts,

such as: (a) the existence of two additional life insurance policies taken on Mrs. Malkin's life; (b) the various "estate planning documents" he reviewed; (c) the fact that Mrs. Malkin had a relationship with a respected estate planning lawyer, but this lawyer was not involved in the transaction; and (d) the fact that Coventry, an entity that does not engage in estate planning, was not just involved in this transaction, but among other things, Coventry also acquired a power of attorney over Mrs. Malkin; Coventry provided all of the forms for the various trusts; Coventry took control of the trusts and therefore the policy; and Coventry ultimately flipped the policy to AIG Life Settlements.  *Id.*, pp. 13-15.

Although U.S. Bank cites six specific examples of facts noted in the Baskies Report which U.S. Bank contends amount to a so-called "factual narrative," the reality is that all of these facts are undisputed and, more importantly, are directly tied to Mr. Baskies's opinions.  While certain of these facts, if considered in isolation, may appear simple, the jury will be assisted by an expert who can explain what these facts mean in the overall context of the transactions through which the policy was procured.  U.S. Bank's six examples (followed by Sun Life's explanation in bold) prove this point:

- "The target premium established by Coventry was essentially the minimum amount needed to keep the policy in force for a period of months after the expiration of the policy's two-year contestability period."  **This is a key undisputed fact that relates directly to Mr. Baskies's first opinion that the policy did not further any legitimate estate tax planning objective (even though, according to the application submitted to Sun Life, estate planning was the reason for the policy).  A layperson juror – not schooled in insurance issues – would not realize the significance of this fact as it relates to estate planning, the overall transaction, or whether the policy was a wager and otherwise lacked insurable interest.**

- "The Malkins also purportedly executed disclosure and/or acknowledgment documents providing that the trust and sub-trust that would ultimately be created to hold the policy were not intended to satisfy Mrs. Malkin's estate planning needs. . . ."  **This fact is also undisputed, and it is beyond comprehension how U.S. Bank can complain about Mr. Baskies's reliance on this fact or the documents from which this fact is drawn.  In these documents, the Malkins *admit and express in writing that it is _not_ their intention***

*to plan for their estate needs*. **Given the overall context of Mr. Baskies's opinions, the fact that they relate to the question of whether the policy or the related trusts served a valid estate planning need, it is obvious that Mr. Baskies would discuss and rely upon this key evidence.**

- "Mrs. Malkin's daughter and estate representative has testified that these figures are 'totally exaggerated' and that her mother could not even afford to pay the premiums." **Mr. Baskies does not contend this statement is accurate (although it is undisputed), and instead offers an opinion assuming it is. This is therefore an additional fact that obviously relates directly to the question of whether the policy and/or the trusts served a valid estate planning need, and thus are critical to Mr. Baskies's opinion that the policy could not have served an estate planning need. Moreover, an average juror is unlikely to understand the significance of an insured's financial resources as it relates to the use of life insurance in estate planning.**

- "On that day, Simba wrote a check to LaSalle for $5,000, which corresponds to the cash origination fee needed to fund the American General loan." **Far from an overly lengthy factual narrative, this is a simple, undisputed fact that without context means little or nothing, but with context means a lot. Indeed, the average juror would not know that it is unusual for a producing company like Simba to be paying funds to a lender like LaSalle, nor would the average juror have any idea whether this arrangement is indicative of a legitimate estate planning situation.**

- "This agreement noted that . . . Mrs. Malkin's 'plan will be to sell those policies in approximately twenty-six (26) months and retain the proceeds' . . . This document strongly suggests that the Malkins always intended to sell the Sun Life Policy and viewed the Sun Life Policy as an investment." **The Malkin's undisputed admission regarding their intent to sell the policy is a key fact in eliminating estate planning as a possible rationale for the existence of the policy, but the average juror will not understand this without assistance from an expert. For example, the average juror is unlikely to know that life insurance in an estate planning context is held until maturity (not sold) so that the proceeds can most often be used to pay estate taxes.**

- "I understand that Coventry and AIG have a longstanding contractual relationship that requires Coventry to offer to sell to AIG Life Settlements life insurance policies that meet certain eligibility requirements and that allows Coventry to offer to sell to AIG Life Settlements life insurance policies that do not meet those eligibility requirements." **This is another undisputed fact, and it directly supports Mr. Baskies's final opinion that the policy did not serve a legitimate estate planning need, but instead served to make Coventry (a secondary market participant – not Mrs. Malkin or her estate) the real benefactor of the policy.**

Accordingly, Mr. Baskies properly bases his opinions on the factual record of this case, and U.S. Bank's effort to stop Mr. Baskies from offering those well-founded, relevant opinions makes no sense.

### 2.     Mr. Marcus's opinions are also based on the facts of record.

Although U.S. Bank contends that the facts set forth by Mr. Marcus are "loosely related to the remainder of his Report," the opposite is true.  Indeed, Mr. Marcus applies his expertise to the record evidence to reach a series of detailed, well-founded, relevant opinions on topics that are helpful to, and outside the general understanding of, a jury.  Each of these opinions is based upon the facts and documents cited in his report, and each is supported by the factual record of this case.  For example, his first opinion is that "the so-called 'loan' was not really a loan." Exhibit B, ¶ 31.  Mr. Marcus applies the record evidence to conclude that:

- Mrs. Malkin did not act like a real borrower because, among other things, the loan had an interest rate that was higher than what was available in the market to a borrower with the supposed financial profile of the Malkins;

- the lender did not act like a real lender because in the real-world lending market (i) lenders typically require borrowers to make a financial commitment upfront, (ii) lenders typically require at least two potential sources of repayment, (iii) lenders typically conduct thorough due diligence of those potential sources of repayment, but here, among other things, (iv) Mrs. Malkin made no cash contribution towards the transaction, (v) the "loan" was non-recourse to Mrs. Malkin, and the only source of repayment was the policy; and (vi) there was little or no financial due diligence; and

- the "loan" was not structured like a real loan because, among other things, in the real-world lending market, lenders generally prefer a simple straightforward structure that results in low fees and direct and simple access to the party responsible for repayment, but here the overall nature of the deal was complicated and inconsistent with a real loan of this size, and the lender retained an unusual level of control over Mrs. Malkin.  *Id.*, ¶¶ 32-41.

Mr. Marcus's next opinion is that "the 'loan' was a cover for a purchase."  *Id.*, ¶ 42.  In reaching this opinion, he relies on facts he discussed earlier – for instance, that Coventry acquired power of attorney over Mrs. Malkin and received authorization to take a number of

actions regarding the policy.  *Id.*, ¶ 43; *see also* ¶¶ 44-46 (discussing other record evidence supporting the conclusion that "from [Mr. Marcus's] assessment of the borrower, lender, and fundamental and economic components of the transaction . . . [it] was inconsistent with a real loan.").  Among other facts, Mr. Marcus focused on the reality that Coventry was in control, and that the design of the transaction made it "a near certainty that Coventry would end up with the policy . . . ."  *Id.*, ¶ 44.

And Mr. Marcus's final opinion – that the "real payor of the premiums was not Mrs. Malkin" – is likewise based on applying his expertise to the record evidence.  Specifically, he concludes that "Mrs. Malkin could not possibly have been the real payor because she did not bear any real risk," an opinion he reaches by analyzing the details of the "loan," the fact that Mrs. Malkin paid nothing out-of-pocket, and the fact that she could walk away from the "loan" without recourse.  *Id.*, ¶ 50.

As with Mr. Baskies, U.S. Bank cites specific examples of facts noted in the Marcus Report which U.S. Bank contends amount to a so-called "factual narrative."  But, once again, each specific fact is undisputed; each ties directly to Mr. Marcus's actual opinions; and each is a piece of evidence the jury will need help assessing so that it may understand and unravel the complex structure of the transactions through which the policy was manufactured by stranger investors for the purpose of wagering on Mrs. Malkin's life.  Just looking at some of U.S. Bank's examples, each of which is an incomplete excerpt from the Marcus Report, proves this point:

- "Mr. Schweiger appears to have had a relationship with Coventry whereby he would introduce Coventry to prospective insureds, who purportedly wanted to finance a life insurance policy and use that policy as collateral for the loan."  **This important undisputed fact is just one of the key pieces of evidence cited in paragraph 11 of the Marcus Report, and it supports Mr. Marcus's opinion that Coventry (the supposed lender) actually controlled the process through which the policy was manufactured. Without expert assistance, the jury is unlikely to understand that legitimate lenders don't engage in this sort of conduct, nor do they require insurance brokers like**

**Simba to secretly split their commissions on the placement of life insurance (another key fact in paragraph 11 of the Marcus Report).**

- "Mrs. Malkin purportedly acknowledged that she did not have any right to override Coventry's instructions to certain third parties concerning her medical records, and she renounced all right to revoke the power of attorney or to appoint any person other than Coventry to perform the act referred to in the document." **This undisputed fact is taken from a March 2, 2006 document in which Mrs. Malkin gave Coventry a broad, irrevocable, durable power of attorney to,** *inter alia*, **complete and execute applications and other documents concerning life insurance. Without expert assistance, the jury is unlikely to understand that legitimate lenders do not obtain and exert this type of extensive control over legitimate borrowers.**

- "It appears that the trustee and co-trustee were relieved of the obligation to monitor any collateral securing any borrowing of the Trust (or any sub-trust) or the attributes of any insurance policy (or insurance policy issuer) that the trust might later hold." **This undisputed fact is taken from the written trust agreement, and it further supports Mr. Marcus's opinion that Mrs. Malkin gave up control of the policy in favor of Coventry. Moreover, the average juror is not likely to understand what it means for a trustee to be relieved of the obligation of monitoring collateral, let alone how or why this might happen in the context of a legitimate lending transaction.**

- "On April 21, 2006, Simba wired Mrs. Malkin $5,000 and wrote her a check for $20,000. The same day, Simba overnight mailed Coventry a check written by Mrs. Malkin for $5,000 to cover the up-front cash origination fee necessary to fund the loan." **These facts are also undisputed. They provide support to Mr. Marcus's opinion that Mrs. Malkin could not possibly have been the real payor of premium because she did not bear any risk and did not even put any money down in connection with the so-called loan. Among other things, the average juror is unlikely to understanding whether what occurred here is typical in a legitimate lending relationship, including whether it is typical to find an entity like Simba (which was not listed as a party to the "loan") actual fund the origination fee.**

Accordingly, as with Mr. Baskies, Mr. Marcus properly bases his opinions on the factual record of this case, and U.S. Bank's effort to stop Mr. Marcus from offering those well-founded, relevant opinions makes no sense.

    **C.**    **<u>Sun Life is not proffering Messrs. Baskies and Marcus to offer factual narratives, and the cases U.S. Bank cites do not support its position.</u>**

In addition to its misconstruction of the Reports, U.S. Bank seems to misunderstand the manner in which Sun Life intends to introduce evidence at trial. Simply put, Sun Life is not

planning to use expert witnesses to offer factual narratives.  Instead, all of the various facts and documents Sun Life intends to introduce to support its case (including the facts and documents discussed by Messrs. Baskies and Marcus in the Reports) will first be introduced into the record at trial through a series of fact witnesses.  Only then will Sun Life call Messrs. Baskies and Marcus, proffer them as experts, and ask that they provide the jury with their opinions and conclusions based on their expertise and the relevant factual record.

Therefore, the cases cited by U.S. Bank do not support its argument because those cases stand for the unremarkable proposition that where an expert's *sole purpose* is to provide a factual narrative, such testimony is inadmissible.  *See Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1330 (M.D. Fla. 2015) ("'[A]n expert cannot be presented to the jury *solely for the purpose of* constructing a factual narrative based upon record evidence.'")[4]  Moreover, the experts in the cases cited by U.S. Bank were found to have been referencing only *select* facts.  *See id.* at 1330 (expert "presents a narrative of select regulatory events through the summary of selective quotations"); *In re Seroquel Prods. Liab. Litig.*, 2009 U.S. Dist. LEXIS 126995, at *205-09 (M.D. Fla. July 17, 2009) (noting that counsel selected an incomplete set of documents, and one of the experts looked at "only a fraction" of those documents and "did not look at materials related to documents she cited in her report.").  Further, these cases were not based on complex

---

[4] Two of the cases cited by U.S. Bank, *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 191-92 (S.D.N.Y. 2009) and *In re Trasylol Prods. Liab. Litig.*, 709 F. Supp. 2d 1323 (S.D. Fla. 2010), have no bearing on the instant case because they dealt with the same expert witness, Dr. Suzanne Parisian, who apparently had a well-documented history of offering factual narratives in place of actual opinions.  *Trasylol* is U.S. Bank's most often cited case, but beyond restating general expert principals, it is clearly limited to the particular issues that pertained to Dr. Parisian. *See* 709 F. Supp. 2d at 1339 ("Dr. Parisian's testimony at the six-hour Daubert hearing was problematic in various regards and intensified, rather than alleviated, my concerns.  More specifically, when efforts were made to establish the foundation of her opinions, Dr. Parisian retreated into obfuscation and referenced irrelevant FDA regulations while refusing to answer questions.  It was also apparent that her opinions were often inconsistent. Moreover, she considered evidence and formed new opinions the night before the Daubert hearing.  Much of her testimony was based on her review of internal Bayer documents and lacked any valuable FDA expertise.").

facts involving a complicated financial scheme.  Indeed, even U.S. Bank admits that the expert in *Tillman* was presenting "simple inferences drawn from uncomplicated facts."  U.S. Bank Brief at 8 (quoting *Tillman*).  And in *Seroquel*, the court did *not* preclude the experts, but simply cautioned against improper narratives.  *Seroquel*, 2009 U.S. Dist. LEXIS at *208-09.

Here, however, it is undisputed that Messrs. Baskies and Marcus do much more than solely state facts – they go on at length to use those facts along with their expertise to render clear opinions that are relevant to the issues in this case, dealing with the complicated scheme through which the policy was manufactured.  Moreover, U.S. Bank does not challenge the opinion section of the Reports, nor does it contend that the opinions offered by Messrs. Baskies and Marcus consist solely of a factual recitation.  Instead, concerning the Baskies Report, U.S. Bank challenges only the facts set forth in the "Background" section of that report, on pages 1 through 7; and with regard to the Marcus Report, U.S. Bank challenges only the facts set forth in the "Background Information" section of that report, at paragraphs 10 through 29.  And while U.S. Bank claims that both experts "restate the facts . . . in a light most favorable to Sun Life," this bald assertion is then never explained.

Accordingly, any objection U.S. Bank might have should be raised and addressed during trial.  *See Drake v. Allergan, Inc.*, 2014 U.S. Dist. LEXIS 151830, at *14-15 (D. Vt. Oct. 23, 2014) ("At trial, counsel for either party may object if an expert's testimony crosses the line. The Court will consider, for example, whether a recitation of facts is properly the basis of the expert's opinion or has transitioned into mere regurgitation. . . .").  And to the extent U.S. Bank believes Messrs. Baskies and Marcus should consider other facts, or that their understanding of the facts is somehow slanted, U.S. Bank can cross-examine them.  *See*, *e.g.*, *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003) ("trial court properly did not rule

inadmissible [expert's] damages testimony simply because it was based on [plaintiff's] version

of the contested facts.").  Notably, however, the facts Messrs. Baskies and Marcus rely upon are

not actually in dispute and entitle Sun Life to summary judgment.  *See* Sun Life's Rule 56.1

Statement.

**V.     MESSRS. BASKIES AND MARCUS ARE NOT OFFERING OPINIONS ABOUT
        KNOWLEDGE, INTENT, OR STATE OF MIND.**

Mr. Baskies's overall objective was to review the underlying transactions and related

documents to determine whether the "policy . . . and/or the trusts created in connection with the

acquisition of the [policy] . . . serve legitimate estate planning purposes."  Exhibit A, p. 1.

For his part, Mr. Marcus's overall objective was "to analyze the financial transactions

surrounding the application, procurement, and issuance of life insurance on the life of Mrs.

Malkin in 2006 and render an opinion as to the nature of those transactions in light of [his]

expertise and experience."  Exhibit B, ¶ 6.

U.S. Bank now tries to confuse Messrs. Baskies's and Marcus's opinions and the

evidence on which they rely by arguing that they are somehow opining on knowledge, intent, or

state of mind of certain *unidentified* individuals or entities.  U.S. Bank has this wrong.  Indeed,

this is not what Messrs. Baskies and Marcus have done in the Reports; neither gave deposition

testimony to suggest that this is what will occur at trial; and Sun Life does not intend to elicit

such testimony.

To be clear, Messrs. Baskies and Marcus are offering opinions about the actual effect of

the underlying transactions – that is, how the design of the underlying transaction actually played

out.  This is not akin to testimony about anyone's intentions or knowledge.  *See Capitol Records,*

*LLC v. Escape Media Group, Inc.*, 2014 U.S. Dist. LEXIS 183098, at *28-29 (S.D.N.Y. May 28,

2014) ("Dr. Horowitz has not opined on the parties' state of mind, but rather has provided

information on the design and functionality of the [MP3 streaming] program . . . . Such expert

opinion is proper and aids the finder-of-fact in understanding [the website's] features.") (quoting

*Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 398, 414 (S.D.N.Y. 2011) (permitting

same expert to testify that "[a]lthough Lime Wire LLC professes to be agnostic about what files

are transferred using LimeWire, LimeWire's feature set is optimized for downloading popular

audio files," and the design of defendant's user interface supports the download of music files.");

*see also Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, 2011 U.S. Dist. LEXIS 62969,

at *4-5 (S.D. Fla. June 7, 2011) (precluding defendant's expert from testifying that the

defendant's "intent to open stores with the Pandora LLC name has nothing to do with deriving

any benefit from the so-called reputation of the plaintiff in the South Florida market," but

permitting the expert to testify as to "Pandora LLC's brand strategy, the value, strength and

distinctiveness of the marks, as well as general marketing reasons why Pandora LLC would open

stand-alone stores" because although "probative of . . . intent," it was helpful for the jury to

understand the facts of the case.)

Moreover, situations where an expert is actually opining on intent or knowledge are case-

specific, and involve clear statements that simply don't exist in the Reports of Messrs. Baskies

and Marcus.  *See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 545 n.38 (S.D.N.Y.

2004) (precluding expert from stating that "it [was]  highly improbable that the company was

unaware of [an] issue prior to marketing.")

Here, Mr. Baskies will tell the jury whether the various trusts and the policy were

designed in such a way as to actually meet the stated objective of "estate planning," as was

indicated on the application submitted to Sun Life.  This doesn't involve Mr. Baskies offering

14

opinions as to what any particular person intended, thought, or knew – it has simply to do with the ultimate effect of the transaction.

Likewise, Mr. Marcus will explain to the jury whether the loan was a real loan, whether the loan had the effect of operating as a cover for the purchase of the policy, and whether Mrs. Malkin was the real payor of premium.  This also doesn't involve opinions as to anybody's intentions, thoughts, or knowledge.  Instead, Mr. Marcus's opinions simply address the actual effect of the transaction.

U.S. Bank overlooks this critical issue, and mischaracterizes the Reports.

### A.    <u>U.S. Bank mischaracterizes Mr. Baskies's opinions.</u>

In making its case that Mr. Baskies is opining on intent, U.S. Bank points to specific purported examples from the Baskies Report.  U.S. Bank Mem., pp. 7-9.  However, Mr. Baskies is simply using his expertise to discuss the possible benefits that could be achieved by using a trust in connection with a life insurance policy, but concludes based on the record evidence and his specialized knowledge that ". . . the Malkin transaction was designed in such a way that none of these hypothetical benefits of a typical life insurance policy could ever have been realized." Exhibit A, pp. 12-13.  U.S. Bank contends that this is somehow an opinion about someone else's knowledge or intentions.  U.S. Bank Mem., p. 7, bullet 4.  However, Mr. Baskies is not suggesting here that any specific person had any particular intent or knowledge; instead, he is simply concluding that the program that was used to procure the policy, and which involved a revocable trust, did not in his opinion serve a legitimate estate planning need.

U.S. Bank also cites a portion of Mr. Baskies's report in which he quotes a 2006 document that itself discusses intentions.  *See* U.S. Bank Mem., p. 7, bullet 5 (citing Mr. Baskies's reliance on a document from 2006 titled "Settlor and Co-Trustee Disclosure Statement and Acknowledgement" which undisputedly includes the following acknowledgement:  "[Mrs.

15

Makin] hereby acknowledges and understands that the Trust Agreement and the Supplement to Trust Agreement are not intended to satisfy [Mrs. Malkin's] estate planning needs and have not been designed as an estate planning tool."). Clearly Mr. Baskies is not offering an opinion on intent; he's simply quoting a document that uses the word *intended* and that is part of the record.

U.S. Bank also confuses portions of Mr. Baskies's opinions with his citation to other evidence on which those opinions are based. For instance, Mr. Baskies cites an agreement Mrs. Malkin signed in which she undisputedly indicated her intention to sell the policy. Exhibit A, p. 13 (citing Guarnero 195, Agreement Regarding Life Insurance Policies).[5] U.S. Bank focuses only on a snippet of what Mr. Baskies writes about that document, arguing that he is opining on intent because the Baskies Report says this: "Mrs. Malkin clarified that her intention was to sell the policy on the secondary marked upon the expiration of the loan . . ." However, U.S. Bank cut its quotation short. The full sentence actually reads: "Mrs. Malkin clarified that her intention was to sell the policy on the secondary marked upon the expiration of the loan ***thereby obviating any hypothetical tax-free growth and/or supplemental income benefits the policy might theoretically have afforded down the line***." *Id.* (emphasis added). Thus, Mr. Baskies is clearly using the document he cites as evidentiary support for his conclusion that the transactions was not one that would provide a legitimate estate planning benefit, and this supports his later conclusion that the transactions actually accomplished a different result – a policy that was acquired from the start by stranger investors.

---

[5] It is undisputed that within this agreement, which was signed by Mrs. Malkin, the following clear and undisputed statement of her intent to sell the policy is included: "Phyllis' plan will be to sell those policies in approximately twenty-six (26) months and retain the proceeds, after payment of all expenses and loans relating to those two (2) policies." Mrs. Malkin's intention to sell the policy is not Mr. Baskies' opinion, it is a matter of undisputed fact which is further supported by a statement provided by Mrs. Malkin's daughter (also considered by Mr. Baskies), wherein she stated that "[t]he deal also was like, after 2 years of someone else paying the policy she would then transfer the insurance over, or she may have even singed those papers upfront to the individuals involved in selling the policy" and "there was never an intention on [my mother's part] to keep this policy[.]" *See* Exhibit 15 to Sun Life's Statement of Undisputed Material Facts. [Dkt. # 63, 66-6].

The other examples cited by U.S. Bank are similarly unavailing.  And to be clear, Sun Life will not proffer Mr. Baskies to opine on issues of intent, knowledge, or state of mind. Instead, Mr. Baskies is being proffered to help the jury unravel the complex nature of the transactions through which the policy was acquired, and to assist the jury in reaching a conclusion about whether the transactions were actually structured in a way that would satisfy a legitimate estate planning need (as was stated on the policy application) or whether the transactions were structured such that stranger investors acquired a policy to wager on Mrs. Malkin's life.

> **B.**     **U.S. Bank mischaracterizes Mr. Marcus's opinions.**

In attempting to establish that Mr. Marcus is opining on intent/knowledge/state of mind, U.S. Bank points to only four purported examples of this in the Marcus Report.  However, none of these supposed examples makes its case.

To be sure, U.S. Bank's lead example is an excerpt of the last sentence of paragraph 40 of Mr. Marcus's report.  A reading of that full paragraph, however, reveals no effort by Mr. Marcus to opine on anyone's intent/knowledge/state of mind.  Instead, Mr. Marcus is offering his own opinion, based on the record evidence, that in his view the complexity of the loan structure does not seem to him to be one designed to effectuate a real lending purpose.  He's not offering his view on what anyone else may have thought or intended.

The same is true of the other purported examples U.S. Bank puts forth – in each, U.S. Bank cites an incomplete excerpt from Mr. Marcus's report, and none of these supposed examples is an instance of Mr. Marcus attempting to state what someone else intended or thought.  Instead, he's merely offering his own opinions as to the effect of the design of the underlying transaction. *See* Exhibit B, ¶¶ 41-44.

And, as with Mr. Baskies, Sun Life will not proffer Mr. Marcus to opine on issues of intent, knowledge, or state of mind.  Instead, Mr. Marcus is being proffered to help the jury understand the complicated financial transactions surrounding the policy, including, for example, who actually paid premiums for the policy (which is not self-evident from the documents), whether the "loan" was a real loan (which requires a detailed analysis of the so-called loan), and ultimately whether the policy was procured as a wager on the life of Mrs. Malkin.  As discussed below, these are complex issues an average juror will not likely understand without assistance.

## VI.   MR. BASKIES IS NOT OFFERING LEGAL CONCLUSIONS.

U.S. Bank's final objection concerning Mr. Baskies is that he is supposedly offering legal conclusions when, in his final opinion he concludes that "the policy appears to have been acquired from the start by investors other than Mrs. Malkin and her family."  U.S. Bank's main point of contention seems to be that because Mr. Baskies mentions "state insurable interest and anti-gambling laws," this means his entire opinion is a legal conclusion.

However, nowhere in his report does Mr. Baskies describe the elements of insurable interest or wagering; there is no suggestion in his report that he would attempt to instruct the jury on legal issues (and he will not); and he does not offer an opinion as to whether the policy was a wager or whether it was procured by those lacking an insurable interest in Mrs. Malkin. Moreover, although U.S. Bank deposed Mr. Baskies, it did nothing to establish that he is somehow intending to give legal opinions or conclusions.[6]

---

[6] Moreover, the cases cited by U.S. Bank do not support its argument.  For example, in *United States SEC v. Big Apple Consulting U.S.A., Inc*., 2011 U.S. Dist. LEXIS 95292, at *12 (M.D. Fla. Aug. 25, 2011), the court precluded only one of an expert's three opinions, concluding that where the expert opined that "a broker dealer is required to investigate 'red flags' and has a duty of providing fair and balanced information to the public," the expert crossed the line of properly explaining standard practices to opining on legal duties.  Likewise, in *Morgan v. N. Miss. Med. Ctr., Inc*., 458 F. Supp. 2d 1341 (S.D. Ala. 2006), an expert was precluded from testifying that the defendant hospital actually violated a statute.  Nowhere in the Baskies Report is there anything that comes close to an opinion about legal duties, nor does Mr. Baskies opine that anyone actually violated a particular statute.

Instead, his report clearly explains the testimony he will provide at trial.  As already discussed, in his first opinion, he opines on whether the policy and the underlying transactions could have served a legitimate estate planning need; he concludes there was no legitimate need.  Baskies Report, pp. 9-11.  Next, he concludes that even if there were a legitimate need for the policy, the transactions were not structured in a way to satisfy that need.  *Id.*, pp. 11-13.  Thus, having ruled out the possibility that either the policy or the underlying transactions could actually have served a legitimate need, his final opinion discusses what effect the transactions did have.  Specifically, he concludes that the transactions' structure resulted in investors acquiring the policy from the start, and he explains the record evidence that supports this opinion.  *See* Exhibit A, p. 14-15 (describing, among other things, how the trust and other documentation actually gave Coventry control over the policy from its inception).

While this conclusion may well inform the ultimate issue in this case, and thus assist the jury in deciding whether the policy was a wager by investors lacking an insurable interest in Mrs. Malkin and whether the trust was a sham, such testimony is expressly permitted.  Fed. R. Evid. 704(a) ("An opinion is not objectionable just because it embraces an ultimate issue); *see also*, *Hanson v. Waller*, 888 F.2d 806 (11th Cir. 1989) (applying Rule 704 to permit expert to opine on whether a driver or pedestrian contributed to an accident or did anything wrong because it would be helpful to the jury in deciding whether either party was negligent).  Indeed, to the extent Sun Life is not entitled to summary judgment, Mr. Baskies's testimony will assist the jury in understanding the actual transactions and determining that they were used to create the false appearance of a legitimate insurance policy.  *See United States v. Moran*, 493 F.3d 1002 (9th Cir. 2007) (permitting expert to testify that defendant's tax plan was a "sham" where the jury still had to decide whether taxes were owed).

19

## VII.   MR. MARCUS'S TESTIMONY CLEARLY RELATES TO RELEVANT ISSUES THAT ARE BEYOND THE UNDERSTANDING OF THE AVERAGE LAY PERSON.

U.S. Bank's final objection concerning Mr. Marcus is that the "facts in this case are straightforward" and therefore no expert is needed to explain the underlying transaction to a jury. This argument is at best a throw-away because it is easily belied by the complexity of the underlying financial transaction about which Mr. Marcus opines.  In fact, given the actual complexity of the underlying transaction documents, not to mention the sheer volume of interrelated agreements that were in play here, it is surprising that U.S. Bank has even made this argument.  *See*, *e.g.*, Sun Life's Rule 56.1 Statement, ¶¶ 102, 103, 106, 107, 124, 126 (describing the many transactional documents used to procure this policy and to conceal its true nature as a wager on Mrs. Malkin's life).

Of course, U.S. Bank offers nothing but a bald assertion that jurors will somehow be familiar with the concepts on which Mr. Marcus opines – including, for example, how to determine if a loan is truly a loan.  And U.S. Bank offers no rationale for its apparent contention that average jurors would be familiar with and able to understand the sort of complex, multi-layered transactions at issue here.  One could imagine that most jurors will have (at best) a rudimentary understanding of how a loan actually works, how and why borrowers legitimately enter into loans, or how lenders customarily behave in legitimate lending transactions.  And one can imagine that none of the jurors who might ultimately be seated in this case will have any understanding whatsoever of the actual transactions or agreements used to procure and fund the policy.  Indeed, without expert testimony, jurors will likely be lost in the complexity of the numerous interrelated transactional documents.

Notably, and as with the other objections U.S. Bank lodges, the single case it cites for the proposition that the instant case is somehow "straightforward" is not at all analogous.  In *United*

*States v. Masferrer*, 367 F. Supp. 2d 1365, 1375-1376 (S.D. Fla. 2005), the court precluded three expert witnesses, one of whom, Ross Buckley, was proffered to "testify to 'what really happened in the transactions' at issue."  However, the *Masferrer* court first found that Mr. Buckley was not qualified to render opinions because he had apparently failed to look at the underlying transaction.  *Id.* at 1375-76 (noting, *inter alia*, that "Mr. Buckley; (1) did not look at the fundamentals of the loans or the borrowers; [and] (2) did not look at whether the loans were repaid . . . .").  Only then did the court further conclude that Mr. Buckley's opinions also related to "relatively straightforward" facts, such as "the times, dates and amounts of the purchase and sale of [certain] loans [and] reports Defendants filed with government agencies."

In the instant case, it is of course undisputed that Mr. Marcus actually did review the critical underlying documents – after all, U.S. Bank's lead objection is that Mr. Marcus included a robust factual background section in his report.  Moreover, Mr. Marcus's opinions go well beyond simply discussing "times, dates, and amounts."  He has deconstructed a series of complicated, multi-layered financial transactions to assist the jury in understanding the true effect of those transactions so that they may understand what occurred, and thus render a verdict.

As Mr. Marcus explains, "[a]t a superficial level, the loan documentation in this matter purports to show that the Malkin Trust entered into a loan to pay approximately two years of life insurance premiums to Sun Life."  Exhibit B, ¶ 30.  It is only "when you look closely at the financial reality of what actually happened here, [that] it becomes apparent that what was labeled as a 'loan' was in actuality a purchase and that Mrs. Malkin (or the Malkin Turst on her behalf) did not really pay the premiums."  *Id.*

U.S. Bank clearly wants the jury to remain at only a superficial (and thus misleading) level.  But U.S. Bank's desire to mislead the jury into thinking the transactions at issue were

21

simple and legitimate is not a basis to preclude testimony from an undeniably qualified expert who will assist the jury in understanding the transactions and thus rendering a verdict.

In addition, U.S. Bank seems to purposefully confuse factual citations in the Marcus Report with what it calls "his arguments," and cites four specific purported examples of so-called "straightforward arguments" it claims Sun Life's lawyers can make.  *See* U.S. Bank Mem., p. 16 (citing incomplete excerpts from paragraphs 32 through 37 of the Marcus Report).  However, each of these incomplete examples is simply a discussion of some of the many facts Mr. Marcus properly uses as the basis of his first opinion that "the so-called 'loan' was not really a loan" – an opinion that spans paragraphs 31 through 41 of his report.

And U.S. Bank ends its attack on Mr. Marcus with a couple high-level comments, suggesting that Mr. Marcus "provides nearly no explanation for [certain] opinions," and that he supposedly makes "various conclusory statements," although only one example is given.  *See* U.S. Bank Mem., pp. 16-17 (complaining specifically about paragraphs 40, 41, and 45 of the Marcus Report).[7]  Once again, U.S. Bank relies on incomplete extracts from the Marcus Report. For example, U.S. Bank complains that paragraphs 40 and 41 of the Marcus Report lack an explanation for his reasoning, but this is belied by simply reading the entirety of those passages (not to mention the preceding 39 paragraphs of his report).  Finally, U.S. Bank suggests that Mr. Marcus's opinion, at paragraph 45 of his report, is "conclusory."  However, while this is where Mr. Marcus offers a particular opinion and conclusion (i.e., that the loan was not a real loan, but instead "the purchase by Coventry/LaSalle of ownership interests in the Policy"), this opinion is very clearly supported by the facts and analysis that precede it.

---

[7] U.S. Bank refers here to "Section 3" of the Marcus Report.  However, it seems to actually be focusing on paragraphs 40 and 41, which are part of Section V(A)(3) of that report.

## VIII.  <u>CONCLUSION</u>

U.S. Bank's effort to preclude Messrs. Baskies and Marcus only serves to highlight the actual need for the sort of competent, well-founded testimony these experts will provide.  U.S. Bank specific objections are unfounded and should, if necessary, be dealt with during trial. Accordingly, the Court should enter an order denying U.S. Bank's motion and allowing Sun Life to proffer Messrs. Baskies and Marcus as expert witnesses at trial.

Dated:  December 3, 2015

PETT FURMAN, PL
2101 N.W. Corporate Blvd.
Suite 316
Boca Raton, FL 33431
(561) 994-4311
(561) 982-8985 (fax)

By: <u>s/ Wendy Furman</u>
Wendy L. Furman, Esq.
Fla. Bar No. 0085146
wfurman@pettfurman.com

Michael J. Miller (*Admitted pro hac vice*)
Thomas S. Downie (*Admitted pro hac vice*)
Gregory J. Star (*Admitted pro hac vice*)
Joseph M. Kelleher (*Admitted pro hac vice*)
Kevin L. Golden (*Admitted pro hac vice*)
Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
(215) 988-2700
(215) 988-2757 fax
Michael.Miller@dbr.com
Thomas.Downie@dbr.com
Gregory.Star@dbr.com
Joseph.Kelleher@dbr.com
Kevin.Golden@dbr.com
*Attorneys for Sun Life*
*Assurance Company of Canada*

## <u>CERTIFICATE OF SERVICE</u>

      I certify that on December 3, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

> John K. Shubin, Esq.
> Ian E. DeMello, Esq.
> Shubin & Bass, P.A.
> 46 S.W. 1st Street
> Third Floor
> Miami, FL 33130
> jshubin@shubinbass.com
> idemello@shubinbass.com
> eservice@shubinbass.com
> *Counsel for U.S. Bank*
>
> Steven J. Reisman, Esq. *(Admitted pro hac vice)*
> Jonathan J. Walsh, Esq. *(Admitted pro hac vice)*
> Nicole M. Mazanitis, Esq. *(Admitted pro hac vice)*
> Alyssa Astiz, Esq. *(Admitted pro hac vice)*
> Curtis, Mallet-Prevost, Colt & Mosle LLP
> 101 Park Ave.
> New York, NY 10178-0061
> sreisman@curtis.com
> jwalsh@curtis.com
> nmazanitis@curtis.com
> aastiz@curtis.com
> *Co-Counsel for U.S. Bank*

<u>s/Wendy L. Furman</u>
Wendy L. Furman

24