## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### Case No. 14-CIV-62610-BLOOM/Valle

SUN LIFE ASSURANCE COMPANY OF
CANADA,

       Plaintiff,

v.

U.S. BANK NATIONAL ASSOCIATION, and
LARRY BRYAN,

       Defendants.

_____

**PLAINTIFF SUN LIFE ASSURANCE COMPANY OF CANADA'S RESPONSE TO U.S. BANK'S COUNTER-STATEMENT OF MATERIAL FACTS IN OPPOSITION TO SUN LIFE'S STATEMENT OF MATERIAL FACTS AND U.S. BANK'S COUNTER-STATEMENT OF ADDITIONAL MATERIAL FACTS**

| No. | Sun Life Statement | U.S. Bank Counterstatement | Sun Life Response[1] |
|---|---|---|---|
| 1. | Coventry is a family of entities that claims to have "created the secondary market for life insurance in the US . . . , pioneered the life settlement industry[,] and opened a new class of longevity-based assets for institutional investors worldwide." Coventry Capital Website, available at www.coventry-capital.com/About-Coventry/About-coventry.asp.[2] | U.S. Bank disputes the assertions contained in paragraph 1. The referenced statements on the "Coventry Capital Website" are unauthenticated, inadmissible hearsay evidence of no probative value. | U.S. Bank does not contest the factual veracity of Sun Life's assertion at paragraph 1.  Moreover, AIG, the entity in whose shoes U.S. Bank claims it stands in these proceedings,[3] admitted in a recent lawsuit in the Southern District of New York that Coventry "has been recognized for "'creat[ing] a secondary market for life insurance [and] pioneer[ing] the resulting life settlement industry. . . ." *See Lavastone Capital LLC v. Coventry First LLC*, 14-7139 (S.D.N.Y. May 26, 2015), Lavastone's Local Rule 56.1 Statement of Undisputed Material Facts ¶¶ 11, 14, 16, 26, 43-45, 98-113, attached hereto as Exhibit 68. |
| 2. | American International Group, Inc. is as an international insurance organization with many subsidiary business units, one of which was AIG Life Settlements LLC, which is now known as Lavastone Capital LLC.[4] Dep. of R. Mosley at 52:4-19, attached hereto as | U.S. Bank does not dispute the assertion in paragraph 2. | U.S. Bank does not dispute Sun Life's assertions at paragraph 2. |

---

[1] Sun Life's Statement of Undisputed Facts cited directly to various pieces of evidence (e.g., deposition exhibits and deposition transcripts) and attached that evidence as exhibits to the Declaration of Kevin Golden. For ease of reference, the citations in Sun Life's Response (i.e., the citations in this final column) will use the exhibit numbering system of the Declarations of Kevin Golden.  (Thus, for example, the Statement of Larry Bryan, which was cited in Sun Life's Statement of Material Facts as Dep. Ex. 120 will be referred to in Sun Life's Response as Ex. 5.)  Sun Life will, however, continue to refer to deposition transcripts by the convention "Dep. of __" so that the speaker can be easily identified.

[2] The family of Coventry entities includes but is not limited to, Coventry First, LLC, Coventry Financial, LLC, and Coventry Capital, LLC. *See* Coventry Group Website, available at http://coventry.com/about-coventry-ourhistory.html (referring to itself interchangeably as "Coventry First" and "Coventry"); Coventry Capital Website, available at www.coventry-capital.com (Coventry Capital referring to itself as "Coventry" and providing cross-link to Coventry's main website). Unless otherwise indicated, these entities will be referred to herein as "Coventry."

[3] U.S. Bank testified that U.S. Bank in its own right has "nothing to do with this case" because the death benefit, if paid by Sun Life, will flow through U.S. Bank, as securities intermediary, to AIG.  Dep. of R. Mosley at 52:4-53:20, 509:3-512:10; *id.* ("U.S. Bank itself has nothing to do with this case.  It's U.S. Bank in its capacity as securities intermediary [for AIG].  I can't answer any questions on U.S. Bank because U.S. Bank has nothing to do with this case.").  U.S. Bank refers to AIG as the "beneficial owner" of the Policy that U.S. Bank is "representing" in this litigation. *Id.* at 52:20-53:5.  U.S. Bank also admits that U.S. Bank's legal fees in this matter are being paid by AIG. *Id.* at 178:2-180:14.

[4] Unless otherwise indicated, AIG Life Settlements and Lavastone will be referred to herein as "AIG."

|   | Exhibit 1. |  |  |
|---|---|---|---|
| 3. | U.S. Bank National Association ("U.S. Bank") is one of the nation's largest commercial banks providing a comprehensive line of banking, investment, mortgage, trust, and payment services to its clients. U.S. Bank Website, available at http://phx.cornorate-ir.net/phoenix.zhtml?c=117565&p=irol-homeProfile. | U.S. Bank does not dispute the assertion in paragraph 3, except refers to the U.S. Bank Website (https://www.usbank.com/index.html) for the description of U.S. Bank's businesses. | U.S. Bank does not dispute the substance of Sun Life's assertions at paragraph 3, which were drawn from the same website to which U.S. Bank refers. |
| 4. | In 2001, Coventry, AIG, and U.S. Bank entered into a contractual framework for the sale of life insurance policies originated by Coventry to investment accounts administered by U.S. Bank for the benefit of AIG. Dep. of R. Mosley at 222:14-223:18. | U.S. Bank disputes the assertions contained in paragraph 4. Mr. Mosley stated that there was a "contractual framework that defines the duties of what each one of the parties are to perform relative to all the policies purchased by AIG from Coventry that went through AIG Life Settlements Trust." (Deposition of Russell Mosley conducted on October 19, 2015 ("Mosley Dep.") at 222:14-223:18 (Walsh Decl. II, Ex. Y)).[5] | U.S. Bank's disputation of Sun Life's assertions at paragraph 4 is not substantiated by the evidence to which it cites.  U.S. Bank's corporate representative, Russell Mosley, plainly testified that it was U.S. Bank's understanding that the Origination Agreements between and among Coventry, AIG, and U.S. Bank "constitute[d] the contractual framework for the conveyance of life insurance policies from Coventry to AIG with the [administration] of U.S. Bank." Dep. of R. Mosley at 154:21-155:13.  He then explained that the aforementioned contractual framework "define[d] the duties of what each one of the parties are to perform relative to all the policies purchased by AIG from Coventry that went through AIG Life Settlements Trust."  Dep. of R. Mosley at 222:14-223:18. |
| 5. | AIG's role in this contractual framework was defined primarily as "Purchaser"; Coventry's | U.S. Bank disputes the characterizations contained in paragraph 5, and refers to the | U.S. Bank does not dispute Sun Life's assertions at paragraph 5, and Sun Life has |

---

[5] Filed concurrently with this opposition to Sun Life's Statement of Material Facts is the Declaration of Jonathan J. Wals dated December 3, 2015 ("Walsh Decl. II"), which attaches as exhibits Y-EEE the deposition excerpts and other documents referenced in this Counter-Statement in Opposition.

| | | |
|---|---|---|
| | role was defined primarily as "Originator and Seller"; and U.S. Bank's roles included: (i) securities intermediary to Coventry; (ii) securities intermediary to AIG; (iii) fiscal agent; (iv) titling trustee of a trust established for the benefit of AIG; and (v) securities intermediary to itself as trustee of that trust. *Id.* 52:4-7, 187:8-14, 194:15-195:2, 209:3-8, 171:8-19, 73:21-74:2; Dep. Ex. 81, Life Policies Origination Agreements,[6] at 485, 555, attached hereto as Exhibit 2; | Life Policies Origination Agreements as evidence of its contents. | not engaged in characterization.  The Origination Agreements executed by U.S. Bank plainly refer to AIG as "Purchaser," (Ex. 2 at 482, 485, 552, 555), and plainly refer to Coventry as "Originator and Seller," (*id.*).  Moreover, U.S. Bank testified that U.S. Bank served in a variety of capacities under its contracts with Coventry and AIG, including (i) securities intermediary to Coventry, (Dep. of R. Mosley at 194:15-195:2); (ii) securities intermediary to AIG, (*id.* at 52:4-14); (iii) fiscal agent (*id.* at 208:8-209:8); (iv) titling trustee of a trust established for the benefit of AIG (*id.* at 183:18-188-9); and (v) securities intermediary to itself as trustee of that trust (*id.* at 187:8-14); *see also* Ex. 68 ¶¶ 114-16, 135, 138, 240-42. |
| 6. | This contractual framework required Coventry to sell and AIG to buy any life insurance policy Coventry originated meeting the "eligibility criteria." Dep. Ex. 81 at §§ 2.01. | U.S. Bank disputes the characterizations contained in paragraph 6, and refers to the Life Policies Origination Agreements as evidence of its contents. | U.S. Bank does not dispute Sun Life's assertions at paragraph 6, and Sun Life has not mischaracterized those agreements.  Sun Life's reference to Coventry's obligation to sell and AIG's obligation to buy was taken from the Origination Agreements executed by U.S. Bank.  Ex. 2 at 486-88, 556-58  Moreover, AIG, the party in whose shoes U.S. Bank claims to stand in this litigation, has already conceded that AIG and Coventry had obligations to buy and sell these policies. *See* Ex. 68 ¶¶ 143, 145-52.  Finally, at his deposition, U.S. Bank's corporate representative disclaimed any knowledge on this topic, and therefore U.S. Bank should |

[6] The parties to the 2001 Origination Agreement were Montgomery Capital LLC, Coventry Life Settlements Trust, and U.S. Bank; however, Montgomery Capital LLC later changed its name to Coventry First LLC and AIG owned the beneficial interest in the Coventry Life Settlements Trust. *Id.* at 74:3-24, 149:20-150:2, 177:9-15.

| | | | |
|---|---|---|---|
| | | | not be allowed to take a contrary position now. *See* Dep. of R. Mosley at 101:5-105:4, 114:4-16 ("U.S. Bank does not know whether Coventry had to . . . sell AIG any or AIG had to buy any."). |
| 7. | The eligibility criteria — the satisfaction of which would be determined by AIG as part of a process known as a "Pre-Offer Review" — included the following:<br><br>• The insured needed to be sixty years or older with a life expectancy shortly before the sale to AIG of more than 25 months and less than 180 months whose probability of outliving that life expectancy was 10% or less.<br><br>• The policy in question needed to be a high face value policy (generally greater than $250,000) issued by a domestic life insurance company with a strong financial rating whose policies did not already account for roughly 10% of AIG's aggregate life insurance portfolio or $200,000,000 (whichever was greater).<br><br>• The policy also needed to be beyond the applicable contestability period and could not cause AIG's aggregate investment in a particular insured to exceed $10 million.<br><br>• The probabilistic monetary yield to AIG from the death benefit needed to be at least 10% after taking into consideration | U.S. Bank disputes the characterizations contained in paragraph 7, and refers to the Life Policies Origination Agreements as evidence of its contents. | U.S. Bank does not dispute Sun Life's assertions at paragraph 7, and Sun Life has not engaged in characterization. Sun Life's recitation of the "eligibility criteria" was taken directly from the "eligibility criteria" provided for in the Glossary to the Origination Agreement executed by U.S. Bank, (Ex. 2 at 529-30), and the fact that AIG would determine whether the "eligibility criteria" were satisfied pursuant to a process known as a "Pre-Offer Review" is plainly provided for at § 4.01 of the Origination Agreement itself, (Ex. 2 at 500-01, 569-70). |

| | | | |
|---|---|---|---|
| | AIG's acquisition costs and projected monthly premiums and expenses. *Id.* at 500-01, 569-70, 529-530. | | |
| 8. | The buy-sell relationship between AIG and Coventry was exclusive; absent a material breach (including Coventry's failure to meet its initial production commitment), Coventry could not sell eligible policies to buyers other than AIG and AIG could not buy eligible policies from sellers other than Coventry. *Id.* | U.S. Bank disputes the characterizations contained in paragraph 8, and refers to the Life Policies Origination Agreements as evidence of its contents. | U.S. Bank does not dispute Sun Life's assertions at paragraph 8, and Sun Life has not engaged in characterization. Sun Life's recitation of the exclusivity of the arrangement between AIG and Coventry was taken directly from § 2.01 of the Origination Agreement executed by U.S. Bank. (Ex. 2 at 486-88, 556-58.). Moreover, AIG, the party in whose shoes U.S. Bank claims to stand in this litigation, has already conceded as much. *See* Ex 68 ¶ 315 ("[AIG] Was Contractually Barred From Purchasing Life Policies From Other Sellers"); *id.* ¶¶ 150, 151, 220. |
| 9. | Coventry stood to earn significant fees in connection with the origination and servicing of these policies for AIG. *Id.* at 535 (Coventry earned an "originator's fee" equal to 5% of the face value of each conveyed policy); *id.* at 505, 545, 546 (Coventry earned a variable "success fee" based on Coventry's ability to acquire policies cheaply); Dep. Ex. 85, Servicing and Monitoring Agreement, at 992-93 (Coventry earned monthly servicing fees based on a percentage of AIG's aggregate portfolio), attached hereto as Exhibit 3. | U.S. Bank disputes the characterizations contained in paragraph 9, and refers to the Life Policies Origination Agreements and Servicing and Monitoring Agreements as evidence of their contents. | U.S. Bank does not dispute Sun Life's assertions at paragraph 9, and Sun Life has not engaged in characterization. Sun Life's recitation of the various fees owed to Coventry was taken directly from contractual agreements to which U.S. Bank was a party. Ex. 2 at 535 (Coventry earned an "origination fee" equal to 5% of the face value of each conveyed policy); *id.* at 505, 545, 546 (Coventry earned a variable "success fee" based on Coventry's ability to acquire policies cheaply); Ex. 3 at 992-93 (Coventry earned monthly servicing fee based on a percentage of AIG's aggregate portfolio). Moreover, AIG, the entity in whose shoes U.S. Bank purports to be standing in this litigation, has already admitted that AIG paid Coventry "over $1 |

| | | |
|---|---|---|
| | | billion in fees as part of their engagement – approximately $996 million in origination-related fees and approximately $55 million in servicing fees." Ex. 68 ¶¶ 266-68. |
| 10. | It has been reported that from 2001 through 2011 (when AIG stopped acquiring life settlements), AIG acquired nearly 7,000 life settlements from Coventry with a total face value of approximately $20 billion. Reuters, AIG Seeks $2 Billion at Close of "Life Settlements" Trial in N.Y.," available at http://www.reuters.com/article/2015/10/26/aig-trial¬coventryfirst-idUSL1N12Q2C120151026#RldwZdhLDsJxkVMZ.97. | U.S. Bank disputes the assertions contained in paragraph 10. The referenced statements in the article "Reuters, AIG Seeks $2 Billion at Close of 'Life Settlements' Trial in N.Y." are unauthenticated, inadmissible hearsay evidence of no probative value. | U.S. Bank does not contest the factual veracity of Sun Life's assertion at paragraph 10. Moreover, the fact that reputable news outlets are reporting that AIG acquired nearly 7,000 life insurance policies from Coventry with a total face value of roughly $20 billion is not unauthenticated, inadmissible hearsay of no probative value.[7] See Siegworth v. Sun City Stables, No. 8:09-973, 2011 WL 1675411, at *1 n.1 (M.D. Fla. May 4, 2011) (quoting Church of Scientology v. Clearwater, 2 F.3d 1514, 1530 (11th Cir. 1993)) (newspaper articles not improper on motion for summary judgment). In any event, U.S. Bank does not dispute that Coventry has conveyed thousands of policies with a face value of billions of dollars to AIG pursuant to a contractual framework dating back to 2001 and that the Malkin Policy was one of those policies. See U.S. Bank's Counter-Statements of Material Fact ("U.S. Bank's CMF") ¶¶ 11, 12. And AIG admits as much. Ex. 68 ¶¶ 118, 180 (AIG representing that "Coventry originated 6,979 Life Policies . . . for Lavastone by using the POR process"). |

[7] The substance of this report is completely consistent with the testimony of U.S. Bank's corporate designee that U.S. Bank was involved in the conveyance from Coventry to AIG of approximately 3,000 policies with a face value of several billion dollars because Coventry and AIG also used another securities intermediary, Wells Fargo Bank, N.A., on other policies originated by Coventry and conveyed to AIG. See Ex. 68 ¶¶ 116, 240-42.

| 11. | U.S. Bank has confirmed that since 2001, U.S. Bank has been involved in the conveyance from Coventry to AIG of approximately 3,000 policies with a face value of several billion dollars. Dep. of Russell Mosley at 513:13-515:10. | U.S. Bank disputes the assertions contained in paragraph 11. Mr. Mosley did not testify that "U.S. Bank has been involved in the conveyance from Coventry to AIG of approximately 3,000 policies with a face value of several billion dollars." Rather, at his deposition, Mr. Mosley was asked the following questions and gave the following answers:<br><br>Q: Earlier we discussed a contractual framework between U.S. Bank, Coventry, and AIG dating back to some time in 2001. Do you remember that?<br>A: Yes.<br>Q: And I asked you how many life insurance policies Coventry has conveyed to AIG pursuant to that contractual framework dating back to 2001. Do you remember that question?<br>A: Yes.<br>Q: And you told me that the answer was approximately 3,000 policies. Do you remember that?<br>A: Yes.<br>Q: And my question for you is whether U.S. Bank will say, as you sit here today, that that approximation is, in fact, accurate, understanding that it's an approximation.<br>A: That is pretty close to being what the number is. | U.S. Bank's disputation of Sun Life's assertions at paragraph 11 is not substantiated by the evidence to which it cites and is not understood.  The testimony cited by U.S. Bank is completely consistent with Sun Life's assertions. |

| | | | |
|---|---|---|---|
| | | Q: And that's actually accurate; right?<br>A: That's actually accurate, yes.<br>Q: Okay. I also asked you earlier the approximate face value of those roughly 3,000 policies. Do you remember that?<br>A: Yes.<br>Q: And you told me, I think, that it would be somewhere in the neighborhood of billions of dollars. Do you remember that?<br>A: Yes.<br>Q: And my question for you is whether U.S. Bank will say, as you sit here today, that the approximate value of those 3,000 policies is, in fact, in the neighborhood of billions of dollars.<br>A: Yes.<br>(Mosley Dep. at 513:13-515:10 (Walsh Decl. II, Ex. Y)). | |
| 12. | U.S. Bank has confirmed that the $5 million Sun Life policy issued on the life of Phyllis Malkin that is at issue in this case was one of those policies. *Id.* at 163:3-5. | U.S. Bank does not dispute the assertions in paragraph 12. | U.S. Bank does not dispute Sun Life's assertions at paragraph 12. |
| 13. | Larry Bryan (formerly known as Larry Schweiger) was a long-time life insurance producer who held insurance licenses with many different states and appointments with many different insurance companies until his insurance licenses were revoked in 2009. | U.S. Bank disputes the assertions in paragraph 13 in part. Mr. Bryan testified that he lost his Florida license in 2009. (Deposition of Larry Bryan conducted on October 12, 2015 ("Bryan Dep.") at 20:1-9 (Walsh Decl. I, Ex. D)[8]). He testified that he | U.S. Bank's partial disputation of Sun Life's assertions at paragraph 13 is not supported by the evidence to which it cites.  Mr. Bryan testified that he used to be licensed to sell insurance in roughly 15-25 states.  Dep. of L. Bryan at 19:10-16.  Mr. Bryan further |

---

[8] References to Walsh Decl. I, Exs. A-X are to the Declaration of Jonathan J. Walsh dated November 16, 2015 (ECF No. 062), filed concurrently with U.S. Bank's Motion for Summary Judgment, and the deposition excerpts and other documents attached as exhibits referenced in this Counter-Statement in Opposition.

| | | | |
|---|---|---|---|
| | Dep. of L. Bryan at 16:19-17:11, 19:10-20:12, 22:15-23:15, attached hereto as Exhibit 4. | did not remember the circumstances "off the top of [his] head" but he knew "it was the filling out of a form and then it was the communication to the state of Florida was what they had said." (Id.). In addition, Sun Life's assertion that Mr. Bryan was a "long-time life insurance producer" is not supported by any citation to evidence. | testified that he started selling life insurance right out of college in 1979, transitioned to selling insurance on his own in 1989, sold his insurance company in 1999, got back into the life insurance business in 2005 with his stepfather doing business as Simba, and had his Florida insurance license revoked in 2009. Dep. of L. Bryan at 19:22-20:11, 27:4-29:22. Mr. Bryan further testified that he is no longer licensed to sell insurance in any state. Dep. of L. Bryan at 17:24-18:1. Importantly, U.S. Bank does not dispute that Mr. Bryan held appointments to sell insurance from many different insurance companies of which Sun Life was but one. *See* CMF ¶ 13; Dep. of L. Bryan at 22:12-25. For this reason, Mr. Bryan was not Sun Life's agent. *See* Sun Life's Motion for Summary Judgment at 29 n.7. |
| 14. | In early 2005, Mr. Bryan went into business in South Florida using the name Simba.[9] Dep. Ex. 120, Statement of Larry Bryan at 1, attached hereto as Exhibit 5. | U.S. Bank does not dispute the assertions in paragraph 14. | U.S. Bank does not dispute Sun Life's assertions in paragraph 14. |
| 15. | Mr. Bryan served as Simba's Chairman from 2005 until Simba went out of business in 2009.[10] Dep. of L. Bryan at 50:4-19, 52:8-24, 53:15-17, 107:11-12. | U.S. Bank disputes the assertions in paragraph 15 in part. While Mr. Bryan testified that he served as Chairman of Simba, he did not provide the dates he held this position. (Bryan Dep. at 50:4-20, 52:8-24, 53:15-17, 107:11-12 (Walsh Decl. II, Ex. Z)). | U.S. Bank's partial disputation of Sun Life's assertions at paragraph 15 is not substantiated by the evidence to which it cites. Mr. Bryan testified that he founded Simba with his stepfather in 2005. (Ex. 5 at 1.) Mr. Bryan further testified that his title at Simba was either "managing member," "managing partner," or "chairman"; that all of Simba's employees reported either |

---

[9] Simba is a term referring to a group of entities including Simba Group and Simba Life Plans. *Id.* at 36:23-37:19.

[10] In 2007, Simba changed its name to Wealth Modes. Dep. of L. Bryan at 52:10-15.

| | | | |
|---|---|---|---|
| | | | directly or indirectly to him; and that Mr. Bryan reported to no one.  Dep. of L. Bryan at 48:14-51:3, 52:8-53:14, 107:11-12. The record does not support the inference that Mr. Bryan ever held any position at Simba other than those to which he testified, and U.S. Bank has not offered any affirmative evidence even suggesting this might be so. |
| 16. | From 2005 through 2007, Peter Shapiro reported directly to Mr. Bryan as Simba's Director of Operations; he managed the staff and "quarterback[ed]" the day-to-day operations. Dep. Ex. 120 at 3; Dep. of P. Shapiro at 16:4-18:9, 152:4-25, attached hereto as Exhibit 6. | U.S. Bank does not dispute the assertions in paragraph 16. | U.S. Bank does not dispute Sun Life's assertions at paragraph 16. |
| 17. | Simba was not in the "traditional" life insurance business; instead, Simba offered its clients "a risk-free opportunity to make money." Dep. Ex. 120 at 1, 3; Dep. of L. Bryan II at 15:14-16, attached hereto as Exhibit 7. | U.S. Bank disputes the assertions in paragraph 17. The transaction was not risk free; certain clients bore out-of-pocket expenses. (Bryan Dep. at 189:5-190:6 (testified that only "some" clients used premium financing; "[s]ome didn't do premium financing") (Walsh Decl. II, Ex. Z)). | U.S. Bank's disputation of Sun Life's assertions at paragraph 17 is not supported by the evidence to which U.S. Bank cites. Mr. Bryan testified – consistent with Simba's marketing literature – that the "life insurance capacity transaction" offered by Simba always involved premium financing and never involved risk to Simba's clients.  Ex. 5 at 1 ("We offered our clients a transaction that we sometimes referred to as a 'life insurance capacity transaction' that always involved premium financing. . . . The benefit to the insureds included the possibility of big cash payments by the funders at nor risk or expense to the insured."); Ex. 9 at 2 ("There are no obligations or out of pocket expenses to you when engaging in a 'life insurance capacity transaction.'").  Mr. Bryan and Mr. Shapiro further testified that Mrs. Malkin participated in the "life insurance capacity |

| | | |
|---|---|---|
| | | transaction" at Simba. Dep. of L. Bryan at 90:23-91:20, 98:15-99:22, 101:16-20, 106:7-12, 134:2-21, 156:20-25, 177:21-180:7, 181:11-182:2, 182:18-21, 184:24-185:3, 193:3-15, 212:18-23, 216:6-217:13, 244:23-246:25, 247:1-250:13, 252:18-254:13, 262:21-264:5, 267:15-269:7, 272:20-273:16, 277:2-19, 277:22-279:6, 279:8-280:9, 306:19-308:17, 309:6-311:5, 316:1-317:3, 322:3-323:22, 326:12-16, 335:22-336:1, 416:15-417:14, 420:5-25 (identifying each step of the transaction in which Mrs. Malkin engaged at Simba as being part and parcel of a "life insurance capacity transaction"); Dep. of P. Shapiro at 69:24-79:4 (reviewing Simba's "life insurance capacity transaction" marketing materials and confirming that the description of the "life insurance capacity transaction" contained within that document was the same transaction in which Mrs. Malkin engaged at Simba). The possibility that Simba may have done some work for clients (other than Mrs. Malkin) that did not involve a "life insurance capacity transaction" – the volume of which Mr. Shapiro testified was possibly 1.5% of Simba's work (Dep. of P. Shapiro at 168:12-23) – is irrelevant and provides no basis for U.S. Bank's disputation. |
| 18. | The transactions offered through Simba involved the acquisition of life insurance policies by way of non-recourse premium financing. Dep. of L. Bryan II at 21:23-22:1 ("All we did was premium financed, non-recourse premium finance. That was the nature of our business. And I think every | U.S. Bank does not dispute the assertion contained in paragraph 18, except that U.S. Bank disputes the statement made at the Deposition of Larry Bryan conducted October 22, 2015 ("Bryan II Dep.") at 21:23-22:1. (Walsh Decl. II, Ex. AA). Mr. Bryan testified that only "some" clients | U.S. Bank's partial disputation of Sun Life's assertions at paragraph 18 is not supported by the evidence to which U.S. Bank cites. The testimony from Mr. Bryan that U.S. Bank says it disputes – "All we did was premium financed, non-recourse premium finance" – was given by Mr. Bryan in |

| | | |
|---|---|---|
| | insured that came to us knew that is what we did."). | used premium financing; "[s]ome didn't do premium financing." (Bryan Dep. at 189:5-190:6 (Walsh Decl. II, Ex. Z)). | response to a question that asked Mr. Bryan to explain the testimony he gave in the Statement of Larry Bryan about the "life insurance capacity transactions" at Simba in which Mrs. Malkin participated.  Dep. of L. Bryan II at 21:20-22:3.  As explained above at paragraph 17, a "life insurance capacity transaction" at Simba always involved non-recourse premium financing.  The possibility that Simba may have done some work for clients (other than Mrs. Malkin) that did not involve a "life insurance capacity transaction" – the volume of which was maybe 1.5% of Simba's work – is irrelevant and provide no basis for U.S. Bank's disputation. |
| 19. | The non-recourse premium financing offered through Simba was provided by financial institutions referred to by Simba as "funders," including companies such as Park Venture, Coventry, Positive Financial, and Imperial Premium Finance,[11] among others. Dep. Of L. Bryan at 62:19-63:15-18, 14:6-11; Dep. of P. Shapiro 25:7-13; Dep. Ex. 120 at 1-5. | U.S. Bank disputes the assertions in paragraph 19 in part. Sun Life's assertion that Simba worked with Imperial Premium Finance is a mischaracterization of the testimony. (Bryan Dep. at 14:6-8 ("The gist of it was I believe Lincoln didn't want to pay the claim and I know — I think Imperial Premium Finance was involved.") (Walsh Decl. II, Ex. Z)). | U.S. Bank's partial disputation of Sun Life's assertions at paragraph 19 is not substantiated by the evidence to which it cites, and Sun Life did not engage in mischaracterization.  Simba's (and Mr. Bryan's) involvement in Imperial Premium Finance's scheme to "evade Florida's insurable-interest law" has been documented by the Eleventh Circuit in *Sciarretta v. Lincoln Nat'l Life Ins.*, 778 F.3d 1205 (11th Cir. 2015).[12]  Mr. Bryan's deposition testimony confirmed his involvement in that scheme and that litigation.  Dep. of L. Bryan at 10:20-11:9, 14:1-11. |

[11] In April 2012, Imperial Premium Finance entered into a non-prosecution agreement with the United States Attorney for the District of New Hampshire in connection with STOLI-related insurance fraud. *Sciarretta v. Lincoln Nat'l Life Ins. Co.,* 778 F.3d 1205 (11th Cir. 2015).

[12] At the time, Simba was operating under the name Wealthmodes.  Dep. of L. Bryan at 52:10-15.

| 20. | The benefit of these transactions to the funders was "the potential acquisition of high face value life insurance policies." Dep. Ex 120 at 1, 4; *see* Dep. of P. Shapiro at 72:3-6 ("Simba was in the business of bringing insureds with excess life insurance capacity together with funders who wanted those policies."); Dep. of M. Roffeld[13] at 37:24-38:7, attached hereto as Exhibit 8. (The funder pays the premiums because "the funder wants the policy."). | U.S. Bank does not dispute the assertions in paragraph 20, except that U.S Bank disputes the statements made at the Deposition of Peter Shapiro conducted on October 15, 2015 ("Shapiro Dep.") at 72:3-6 *(see* Bryan Dep. at 102:5-103:7; 113:18-114:16 (Walsh Decl. II, Ex. Z)) and Deposition of Murray Roffeld conducted on October 13, 2015 ("Roffeld Dep.") at 37:24-38:7 (Walsh Decl. II, Ex. BB) *(see* Bryan Dep. at 189:5-190:6 (testifying that only "some" clients used premium financing; "[s]ome didn't do premium financing") (Walsh Decl. II, Ex. Z)). | U.S. Bank's partial disputation of Sun Life's assertions at paragraph 20 is not substantiated by the evidence to which it cites.  Indeed, none of the testimony cited by U.S. Bank gives rise to the reasonable inference that Simba was somehow *not* in the business of bringing insureds with excess life insurance capacity together with funders who wanted those policies or that the funders paid the premiums for some reason *other* than because the funders wanted the policies.  As explained above at paragraph 17, a "life insurance capacity transaction" at Simba always involved non-recourse premium financing.  The possibility that Simba may have done some work for clients (other than Mrs. Malkin) that did not involve a "life insurance capacity transaction" – the volume of which was maybe 1.5% of Simba's work – is irrelevant and provides no basis for U.S. Bank's disputation. |
| 21. | The benefit of these transactions to the insureds included "the possibility of big cash payments by the funders at no risk or expense to the insured." Dep. Ex. 120 at 1. | U.S. Bank disputes the assertions in paragraph 21. Benefits of applying for a life insurance policy to the insured include estate planning and financial planning purposes, and cash values. (Roffeld Dep. at 59:15-24; 60:5-7 (Walsh Decl. II, Ex. BB). | U.S. Bank's disputation of Sun Life's assertions at paragraph 21 is not substantiated by the evidence to which it cites, which consists of Mr. Roffeld's response to certain hypothetical questions about what "could" or "might" have been the case.  However, Mr. Roffeld was clear that Simba's clients were "in it for one reason. . . . [t]o make money. . . [o]n the sale of the policy."  Dep. of M. Roffeld at 35:6-25; *see also id.* at 37:24-38:2. |

---

[13] Mr. Roffeld was an insurance agent (and one-time friend of Mrs Malkin) who sometimes referred business to Simba. Dep. of M. Roffeld at 10:14-11:6, 20:12-24.

| 22. | The benefit of these transactions to Simba was "insurance commissions from the life insurance companies that issued the policies and cash payments from the funders based on volume of policies produced." Dep. Ex. 120 at 1. | U.S. Bank does not dispute the assertions in paragraph 22. | U.S. Bank does not dispute Sun Life's assertions at paragraph 22. |
|---|---|---|---|
| 23. | Mr. Shapiro described Simba's business bluntly: "It can also be said in a different way that it was what's called stranger-owned life insurance. They call it STOLI, S-T-O-L-I, stranger owned life insurance." Dep. of P. Shapiro at 21:7-10. | U.S. Bank disputes the assertions contained in paragraph 23. (Bryan Dep. at 189:5-190:6 (testifying that only "some" clients used premium fmancing; "[s]ome didn't do premium financing") (Walsh Decl. II, Ex. Z)). | U.S. Bank's disputation of Sun Life's assertions at paragraph 23 is not substantiated by the evidence to which it cites. Again, the possibility that Simba may have done some work for clients (other than Mrs. Malkin) that did not involve a "life insurance capacity transaction" – the volume of which was possibly 1.5% of Simba's work – is irrelevant and does not provide any basis for U.S. Bank's disputation of Sun Life's assertions. |
| 24. | Mr. Shapiro testified that this meant that Simba's clients acquired policies with money from entities unknown to them through "funny transactions" that masked the true source of the premium payments that were "not honest and straightforward and transparent." *Id.* at 165. | U.S. Bank disputes the assertions contained in paragraph 24. Sun Life's assertions in paragraph 24 misstate the testimony. (Shapiro Dep. at 165:11-20 ("In early -- in the early 2004, '5 and I'm not sure if '6, maybe '6, too, there was types of premium financing that the insurance company accepted and you didn't have to go through the back door, so to speak, and kind of cover up what you were doing with all these funny transactions where you had to put the case in force with these clients' quarterly personal checks and then get checks from Simba and then get checks from the funder, all that kind of stuff, which was not honest and straightforward and transparent.") (Walsh Decl. II, Ex. CC)). | U.S. Bank's disputation of Sun Life's assertions at paragraph 24 is not substantiated by the evidence to which it cites, and Sun Life has not misstated Mr. Shapiro's testimony. At his deposition, Mr. Shapiro testified that Simba was in the "STOLI" business. Dep. of P. Shapiro at 21:5-10. Counsel for U.S. Bank then tried to get Mr. Shapiro to testify that he was conflating "STOLI" with any situation where an insured purchased insurance with borrowed money, but Mr. Shapiro clarified that he was not making that blanket conflation and that what he meant by the term "STOLI" was the acquisition of policies with money from entities unknown to the insured through "funny transactions" that masked the true source of the premium |

| | | |
|---|---|---|
| | | payments that were "not honest and straightforward and transparent."  Dep. of P. Shapiro at 163:12-165:20. |
| 25. | Mr. Shapiro explained that STOLI "was the whole business platform for [Simba] so it was pretty much the mantra of the company." *Id.* at 21:16-22:9, 161:21-162:1. | U.S. Bank disputes the assertions contained in paragraph 25. (Bryan Dep. at 189:5-190:6 (testifying that only "some" clients used premium fmancing; "[s]ome didn't do premium financing") (Walsh Decl. II, Ex. Z)). | U.S. Bank's disputation of Sun Life's assertions at paragraph 25 is not substantiated by the evidence to which it cites.  Again, the possibility that Simba may have done some work for clients (other than Mrs. Malkin) that did not involve a "life insurance capacity transaction" – the volume of which was maybe 1.5% of Simba's work – is irrelevant and does not provide any basis for U.S. Bank's disputation. |
| 26. | Simba's target audience was healthy seniors with "excess (unwanted, not needed) life insurance capacity ($2 million or more)" who wanted to "realize its value." Dep. Ex. 8, "The Simba Group Presents: 'A Life Insurance Capacity Transaction' (The asset you never knew you had)," at 4, attached hereto as Exhibit 9; Dep. of P. Shapiro at 69:9-11; Dep. Ex. 120 at 3. | U.S. Bank does not dispute the assertions in paragraph 26. | U.S. Bank does not dispute Sun Life's assertions at paragraph 26. |
| 27. | Simba's clients were not interested in having (nor did they ever have) conversations about life insurance as a tool to cover risk. Dep. Ex. 120 at 3 ("[N]one of Simba's clients even wanted to have a traditional conversation about life insurance (in other words, the sort of conversations I used to have with insurance clients before I started Simba)."); Dep. of L. Bryan at 260:12-18 (Simba did not provide estate planning services); Dep. of Larry Bryan II at 22:17-23:5 ("When I used to do estate planning it | U.S. Bank disputes the assertions contained in paragraph 27. Sun Life's assertion in paragraph 27 constitutes inadmissible hearsay evidence. In addition, Sun Life's assertion mischaracterizes the testimony as neither Mr. Bryan nor Mr. Shapiro ever testified that they had spoken with all of Simba's clients. | U.S. Bank's disputation of Sun Life's assertions at paragraph 27 is not substantiated by citation to any evidence, and Sun Life has not mischaracterized the testimony.  U.S. Bank concedes that Mr. Bryan was the Chairman of Simba and that Mr. Shapiro "quarterback[ed] the day-to-day operations.  *See* U.S. Bank's CMF ¶¶ 15-16. By virtue of this experience, these gentlemen have the necessary personal knowledge of Simba's business and clientele base to give the testimony cited by Sun Life, and U.S. |

| | | |
|---|---|---|
| was — the purpose was for the actual covering of an estate tax. And we would normally sit down, myself, the client's lawyers, the personal estate planning lawyers, the client's CPA, and it would usually be a coordinated plan, amongst the three of us, to construct a life insurance portfolio for the purposes of covering the estate tax. [At Simba], I never met and we never met with any body's financial advisors to put together any kind of a financial or estate plan as it relates to taxes or what I would call traditional planning."); Dep. of P. Shapiro at 264:5-23 ("Most of the clientele, if not all of them, are past the point of planning their estate because most, if not all of them, are retired . . . and most, if not all of them, are past the point of going and restructuring their estate in any way. They already have done that 20, 30 years ago. Most of them . . . have met up with us because they heard . . . about this new, new, new transaction with life insurance . . . and they want to get in on this money-making quick scheme that doesn't cost them any money and so they're not involved with anything to do with estate or financial planning. They want to get in on this quick money rich lottery scheme."). | | Bank has not cited any affirmative evidence to refute it. Further, U.S. Bank has not cited to any statements that would meet the threshold hearsay requirement of an out-of-court statement offered for the truth. And even if U.S. Bank had, any such statement would qualify as an exception under Federal Rule of Evidence 803(1), (3) to show then-existing state of mind. *See* Fed. R. Evid. 803(3) ("The following are not excluded by the rule against hearsay . . . [a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health) . . . ."). |
| 28. | Simba's clients did not want or need the life insurance. Dep. Ex. 8 at 2 ("Life insurance capacity is defined as the amount of life insurance you could buy . . . but don't need, want, or plan to ever purchase."); *id.* at 4 ("Participation Requirements . . . Has Excess (unwanted, not needed) life insurance | U.S. Bank disputes the assertions contained in paragraph 28. Sun Life's assertion in paragraph 28 constitutes inadmissible hearsay evidence. In addition, Sun Life's assertion mischaracterizes the testimony. (Shapiro Dep. at 43:3-7 (Q: I'm asking you whether you have an understanding of | U.S. Bank's disputation of Sun Life's assertions at paragraph 28 is not supported by the evidence to which it cites, and Sun Life has not mischaracterized testimony. Rather, it is *U.S. Bank's* quotation that does not even encapsulate the whole question put to the witness. *See* Dep. of P. Shapiro at |

| | | |
|---|---|---|
| capacity"); Dep. of P. Shapiro at 43:3-11 ("[T]hey did not want the insurance for their own personal use with their own money."). | whether any of Simba's clients actually needed the insurance they were supposedly purchasing. Do you have — A: No.) (Walsh Decl. II, Ex. CC)). | 43:3-18 ("Q: I'm asking you whether you have an understanding of whether any of Simba's clients actually needed the insurance they were supposedly purchasing. Do you have – A: No. Q: Do you have an understanding? A: I have an understanding that they did not want the insurance for their own personal use with their own money. Q: And what is the basis of your understanding? A: They were all presented with an opportunity for outside financial gain, if they participated within this transaction, and they would not be getting their own personal life insurance. They would be getting personal financial compensation so that's why they participated in the transaction."). Further, U.S. Bank has not cited to any statements that would meet the threshold hearsay requirement of an out-of-court statement offered for the truth. And even if U.S. Bank had, any such statement would qualify as an exception under Rule of Evidence 803(1), (3).[14] |
| 29. | Simba's clients understood that they would be getting cash — not life insurance — and that is why they participated. Dep. of P. Shapiro at 43:13-18 ("They were all presented with an opportunity for outside financial gain if they participated within this transaction, and they would not be getting their own personal life insurance. They | U.S. Bank disputes the assertions contained in paragraph 29, which are based on inadmissible hearsay evidence. | U.S. Bank does not contest the factual veracity of Sun Life's assertion at paragraph 29, and U.S. Bank's contention that the assertions are "based on inadmissible hearsay" is wrong. U.S. Bank has not cited to any statements that would meet the threshold hearsay requirement of an out-of-court statement offered for the truth. And |

[14] Sun Life does not understand U.S. Bank to be asserting that the Simba marketing materials contained at Deposition Exhibit 8 (attached as Exhibit 9 hereto), entitled "The Simba Group Presents a Life Insurance Capacity Transaction" is inadmissible hearsay. *See* U.S. Bank CMF ¶¶ 32-37 (responding to Sun Life's assertions regarding this exhibit without asserting that it is hearsay). And of course, both Mr. Bryan and Mr. Shapiro have authenticated this document as having been a Simba business record. Dep. of L. Bryan at 98:15-99:22, 116:14-22; Dep. of P. Shapiro at 69:24-70:10.

| | | |
|---|---|---|
| | would be getting personal financial compensation so that's why they participated in the transaction."); *id.* 42:7 -11 (The "insurance was not for the client as the insured. . . . It was for the bank that put up the money. They were going to get the death benefit."); Dep. of M. Roffeld at 35:15-25 ("The insureds are in it for one reason . . . to make money [on the sale of the policy to the funders]"); Dep. Ex. 120 at 3 ("The only thing any of our clients wanted to talk to us about was getting a deal. . . . The typical questions we would hear from our clients included, hey, when is the cruise, when is the next event, and most importantly, how can I get my payout?"). | | even if U.S. Bank had, any such statement would qualify as an exception under Rule of Evidence 803(1), (3) to show then-existing state of mind. |
| 30. | There were no out-of-pocket costs to Simba's clients for participating in the transaction, and there was no risk to them. Dep. Ex. 120 at 5 ("Simba advertised our program as totally free to our clients, and it was."); *id.* at 5 (Simba clients took no risk); Dep. of L. Bryan at 323:6-8 (same); Dep. of P. Shapiro at 36:4-8 ("[The insured] had no . . . . skin in the game."); Dep. of M. Roffeld at 39:15-31 (The insured had no risk and nothing but upside in these transactions); Dep. Ex. 8 at 2 ("There are no obligations or out of pocket expenses to [clients] when engaging in a 'life insurance capacity transaction.'"); Dep. Ex. 10, Agenda Simba Agent Dinner Mtg., dated Jan. 10, 2007, at 1 ("THE DEAL IS FREE"), attached hereto as Exhibit 10. | U.S. Bank disputes the assertions in paragraph 30. Some clients bore out-of-pocket expenses. (Bryan Dep. at 189:5-190:6 (testifying that only "some" clients used premium financing; "[s]ome didn't do premium financing") (Walsh Decl. II, Ex. Z)). | U.S. Bank's disputation of Sun Life's assertion at paragraph 30 is not substantiated by the evidence to which it cites. As explained above at paragraph 17, a "life insurance capacity transaction" at Simba always involved non-recourse premium financing, and both Mr. Bryan and Mr. Shapiro testified that Mrs. Malkin participated in a "life insurance capacity transaction." The possibility that Simba may have done some work for clients (other than Mrs. Malkin) that did not involve a "life insurance capacity transaction" – the volume of which was maybe 1.5% of Simba's work – is irrelevant and provides no basis for U.S. Bank's disputation. |

| 31. | The only entities that paid any money for the policies procured through Simba — or assumed any risk — were the funders. Dep. of P. Shapiro at 241 ("[T]he business model of what Simba did was . . . none of the clients wanting to pay for hundreds of thousands of dollars for annual premiums for insurance at their ages. None of them. They were all on board for a number of third party financial institutions to pay for their insurance because there was a possibility that they were going to receive some sort of incentive or compensations for doing this particular transaction."); Dep. of M. Roffeld at 40:17-41:3 ("[T]he only entity that has any risk in this transaction is the funder[.]"); Dep. of L. Bryan at 324:13-16 ("Q: [W]ho shoulders the risk in this transaction? Who stands to potentially lose money? A: The funder."). | U.S. Bank disputes the assertions in paragraph 31. Some clients bore out-of-pocket expenses. (Bryan Dep. at 189:5-190:6 (testifying that only "some" clients used premium financing; "[s]ome didn't do premium financing") (Walsh Decl. II, Ex. Z)). | U.S. Bank's disputation of Sun Life's assertion at paragraph 31 is not substantiated by the evidence to which it cites. As explained above at paragraph 17, a "life insurance capacity transaction" at Simba always involved non-recourse premium financing, and both Mr. Bryan and Mr. Shapiro testified that Mrs. Malkin participated in a "life insurance capacity transaction." The possibility that Simba may have done some work for clients (other than Mrs. Malkin) that did not involve a "life insurance capacity transaction" – the volume of which was maybe 1.5% of Simba's work – is irrelevant and provides no basis for U.S. Bank's disputation. |
| --- | --- | --- | --- |
| 32. | Simba's marketing materials offered clients the opportunity to participate in a "life insurance capacity transaction" defined as "the amount of life insurance you could buy . . . but don't need, want or plan to ever purchase." Dep. Ex. 8 at 2. | U.S. Bank disputes the characterizations contained in paragraph 32, and refers to the "A Life Insurance Capacity Transaction" document as evidence of its contents. | U.S. Bank does not dispute Sun Life's assertions at paragraph 32, and the document entitled "A Life Insurance Capacity Transaction" plainly supports Sun Life's assertions. Ex. 9. |
| 33. | Simba's marketing materials stated that the "opportunity" being offered was to "create dollars today by using a paper asset (a life insurance policy not yet issued from a major insurance carrier insuring your life) in a joint venture type of arrangement with one or more of the major financial institutions that want to engage in these transactions." *Id.* at | U.S. Bank disputes the characterizations contained in paragraph 33, and refers to the "A Life Insurance Capacity Transaction" document as evidence of its contents. | U.S. Bank does not dispute Sun Life's allegations at paragraph 33, and the document entitled "A Life Insurance Capacity Transaction" plainly supports Sun Life's assertions. Ex. 9. |

| | 3. | | |
|---|---|---|---|
| 34. | Simba's marketing materials further defined the "transaction" as "allow[ing] one or more of these financial institutions to enjoy the benefits of a life insurance policy in exchange for (1) them paying all premiums and expenses associated with it, and (2) sharing a part of these benefits with you." *Id.* at 3; see Dep. of P. Shapiro at 75:1-22 (explaining that this means that the client gets a cash payment and the funder gets the death benefit). | U.S. Bank disputes the characterizations contained in paragraph 34, and refers to the "A Life Insurance Capacity Transaction" document as evidence of its contents. | U.S. Bank does not dispute the Sun Life's allegations at paragraph 34, and the document entitled "A Life Insurance Capacity Transaction" plainly supports Sun Life's assertions.  Ex. 9. |
| 35. | Simba's marketing materials clarified that the transaction was not about acquiring a life insurance policy for the death benefit or cash accumulation values. Dep. Ex. 8 at 6 ("Life insurance policies are paper assets with 3 distinct values: death benefit values, cash values, and capacity transaction values. This piece is all about 'capacity transaction values."). | U.S. Bank disputes the characterizations contained in paragraph 35, and refers to the "A Life Insurance Capacity Transaction" document as evidence of its contents. | U.S. Bank does not dispute the Sun Life's allegations at paragraph 34, and the document entitled "A Life Insurance Capacity Transaction" plainly supports Sun Life's assertions.  Ex. 9. |
| 36. | Rather, Simba's marketing materials offered clients a "free Powerball Lottery ticket" so that they could potentially hit "bingo" and win a "mini lottery." *Id.*; Dep. Ex. 10 at 1. | U.S. Bank disputes the characterizations contained in paragraph 36, and refers to the "A Life Insurance Capacity Transaction" and "Simba LBS Agenda Agent Dinner Meeting 1/10/07" documents as evidence of their contents. | U.S. Bank does not dispute Sun Life's allegations at paragraph 36, and the documents entitled "A Life Insurance Capacity Transaction," Ex. 9, and "Simba LBS Agenda Agent Dinner Meeting 1/10/07" plainly support Sun Life's assertions, Ex. 10. |
| 37. | The "life insurance capacity transaction" described in Simba's marketing materials was the same transaction that Mrs. Malkin participated in with Coventry through Simba. Dep. of L. Bryan at 90:23-91:20, 98:15- | U.S. Bank disputes the assertions in paragraph 37. Mr. Bryan testified that he did not have any personal knowledge of Mrs. Malkin's application for life insurance. (Bryan Dep. at 172:15-173:5, 226:6-229:16 | U.S. Bank's disputation of Sun Life's assertion at paragraph 37 is not substantiated by the evidence to which it cites.  The testimony cited by U.S. Bank merely stands for the proposition that Mr. Bryan did not |

| | | | |
|---|---|---|---|
| | 99:22, 101:16-20, 106:7-12, 134:2-21, 156:20- 25, 177:21-180:7, 181:11-182:2, 182:18-21, 184:24-185:3, 193:3-15, 212:18-23, 217:8-13, 244:23-246:25, 247:1-250:13, 252:18-254:13, 262:21-264:5, 267:15-269:7, 272:20-273:16, 277:2-19, 277:22-279:6, 279:8-280:9, 306:19-308:17, 309:6-311:5, 316:1-317:3, 322:3-323:22, 326:12-16, 335:22-336:1, 416:15-417:14, 420:5-25. | (Walsh Decl. II, Ex. Z)). | have the initial conversation with Mrs. Malkin and that Mr. Bryan was not involved in filling out Mrs. Malkin's insurance application. This does not in any way mean that Mr. Bryan lacks personal knowledge of the fact that Mrs. Malkin participated in a "life insurance capacity transaction" with Coventry through Simba. To the contrary, Mr. Bryan testified that he had personal knowledge of the Malkins and their experience at Simba by way of his interactions with the Malkins and his knowledge of the business Simba was running at that time. Ex. 5 at 3; Dep. of L. Bryan II at 23:6-24:4. Moreover, at the deposition testimony cited by Sun Life, counsel for Sun Life walked Mr. Bryan through all of the steps of a life insurance capacity transaction and then walked Mr. Bryan through the documents showing that Mrs. Malkin participated in those steps and got Mr. Bryan to confirm that Mrs. Malkin's participation in those steps was part of a "life insurance capacity transaction." Dep. of L. Bryan at 90:23-91:20, 98:15-99:22, 101:16-20, 106:7-12, 134:2-21, 156:20-25, 177:21-180:7, 181:11-182:2, 182:18-21, 184:24-185:3, 193:3-15, 212:18-23, 216:6-217:13, 244:23-246:25, 247:1-250:13, 252:18-254:13, 262:21-264:5, 267:15-269:7, 272:20-273:16, 277:2-19, 277:22-279:6, 279:8-280:9, 306:19-308:17, 309:6-311:5, 316:1-317:3, 322:3-323:22, 326:12-16, 335:22-336:1, 416:15-417:14, 420:5-25. Counsel for Sun Life then went through a similar exercise with Mr. Shapiro who testified that the "life insurance capacity transaction" |

| | | |
|---|---|---|
| | | described by Simba's marketing materials was consistent with Mrs. Malkin's experience at Simba.  Dep. of P. Shapiro at 69:24-79:4. |
| 38. | The first step in the process of applying to participate in a life insurance capacity transaction at Simba was for the client to fill out a short application including a Health Insurance Portability and Accountability Act (HIPAA) release allowing Simba (and others) to request the client's medical records. Dep. Ex. 8 at 4; Dep. Ex. 10 at 1; Dep. of P. Shapiro at 28:13-29:1. | U.S. Bank does not dispute the assertions in paragraph 38 to the extent they relate to Simba's general practices, and do not relate specifically to Mrs. Malkin. | U.S. Bank does not dispute Sun Life's assertion in paragraph 38.  However, U.S. Bank's suggestion that the business practices referenced in this paragraph do not "relate specifically to Mrs. Malkin" is demonstrably untrue.  *See* Ex. 17 at 2-3 (the HIPAA release signed by Mrs. Malkin); Dep. of P. Shapiro at 81:7-83:10 (explaining that this was Mrs. Malkin's HIPAA release that was sent to Coventry to facilitate the generation of life expectancy reports); U.S. Bank's CMF ¶ 86 (admitting that Simba acquired a HIPAA release from Mrs. Malkin in favor of itself, Coventry, and others); Dep. of L. Bryan at 180:8-185:3 (explaining that the short introductory packet, which included HIPAA release forms, filled out by Mrs. Malkin was part of the "life insurance capacity transaction" described in Simba's marketing materials). |
| 39. | Once Simba received the client's medical records, Simba would send those records to whatever insurance companies Mr. Bryan's funder contacts were telling him they wanted policies from at the time in order to round out their investment portfolios. Dep. Ex. 10 ("Stages of Process . . . Sending Case to Carriers for `Informal' Offers."); Dep. Ex. 8 at 4 (similar); Dep. Ex. 120 at 2 ("I worked with the funders to determine what sort of policies they wanted  My contacts at the | U.S. Bank does not dispute the assertions in paragraph 39 to the extent they relate to Simba's general practices, and do not relate specifically to Mrs. Malkin. | U.S. Bank does not dispute Sun Life's assertions at paragraph 39.  However, U.S. Bank's suggestion that the business practices referenced in this paragraph do not "relate specifically to Mrs. Malkin" is demonstrably untrue.  *See* Ex. 18 (Request for Mrs. Malkin's medical records); Ex. 19 (same); Ex. 20 (same); Dep. of P. Shapiro at 81:7-83:10 (explaining that Simba requested Mrs. Malkin's medical records so that Coventry (and other funders) could generate life |

| | | |
|---|---|---|
| funders would tell me what insurance companies they wanted in order to round out the funders' portfolios. I would then direct Simba to apply for the types of policies that the funders were interested in on behalf of Simba's clients."). | | expectancy reports on Mrs. Malkin); Ex. 21 (email from Mr. Shapiro to Marty Greenberg at the broker general agency asking to shop Mrs. Malkin's case to all of the insurers selected by Mr. Bryan and Mr. Greenberg); Dep. of L. Bryan at 180:8-185:3 (explaining that Simba's request for Mrs. Malkin's medical records was part of the life insurance capacity transaction described in Simba's marketing materials); Ex. 5 at 2, 4 ("My contacts at the funders would tell me what insurance companies they wanted in order to round out the funders' portfolios. I would then direct Simba to apply for the types of policies that the funders were interested in on behalf of Simba's clients. . . . . Mrs. Malkin got a Sun Life Policy and an American General policy because those were the sorts of policies that Coventry wanted.  After Simba got informal approval from Sun Life and American General that they would issue policies on Mrs. Malkin, Simba got confirmation from Coventry that it was still interested in these policies.  Then, Simba presented those policies (and the Coventry program) to Mrs. Malkin who agreed to participate."). |
| 40. | Once Simba received tentative offers from the insurers, Simba would send those offers, along with the medical records, to its network of funding entities. Dep. Ex. 10 at 1 ("Stages of the Process . . . Send Case to Multitude of Banks"); Dep. Ex. 8 at 4 (sending medical records to funding institutions is part of process); Dep. of P. Shapiro at 28:23-29:1 ("[I]f we get that offer | U.S. Bank does not dispute the assertions in paragraph 40 to the extent they relate to Simba's general practices, and do not relate specifically to Mrs. Malkin. | U.S. Bank does not dispute Sun Life's assertions at paragraph 40.  However, U.S. Bank's suggestion that the business practices referenced in this paragraph do not "relate specifically to Mrs. Malkin" is demonstrably untrue.  *See* Ex. 5 at 4 ("Mrs. Malkin got a Sun Life Policy and an American General policy because those were the sorts of policies that Coventry wanted.  After Simba |

| | | |
|---|---|---|
| | to be a decent offer, then we would ship the case to one of the funding companies and see if they like this case. It would just go from there."). | | got informal approval from Sun Life and American General that they would issue policies on Mrs. Malkin, Simba got confirmation from Coventry that it was still interested in these policies.  Then, Simba presented those policies (and the Coventry program) to Mrs. Malkin who agreed to participate."). |
| 41. | The funders would use the medical records provided by Simba to order life expectancy reports on the potential insureds. Dep. Ex. 10 at 1 ("Steps of Process . . . Ordering LE'S."); Dep. Ex. 8 at 4 (life expectancy reports are part of the process); Dep. of P. Shapiro at 30:25-31:3 ("[W]e would send [the records] to the funding companies as well because one of the main parts of this transaction was for the funding company to get . . . a life expectancy report."); Dep. of M. Roffeld at 32:9-10 (life expectancy reports were generated on every client). | U.S. Bank disputes the assertions contained in paragraph 41. Sun Life's assertions in paragraph 41 mischaracterize the testimony. (Dep. Ex. 10 at 1 (Golden Decl., Ex. 9)[15] (simply stating that "Ordering LE's"); Dep. Ex. 8 at 4 (Golden Decl., Ex. 10) ("You complete our short, introductory application which only allows us to retrieve your medical records, forward them to the insurance company, funding institutions and life expectancy companies for pricing and transaction offers."); Shapiro Dep. at 30:25-31:3 ("Occasionally, yes, we would send them [the medical records] to the funding company as well . . . .") (Walsh Decl. II, Ex. CC)). | U.S. Bank's disputation of Sun Life's assertion at paragraph 41 is not supported by the evidence to which it cites, and Sun Life has not mischaracterized the evidence.  U.S. Bank does not cite any evidence to refute the fact that medical records were used to generate life expectancy reports on Simba's clients for the benefit of the funding entities; the possibility that the medical records and life expectancy reports may have been ordered by Simba and passed along to the funders, in some cases, and ordered by the funders directly, in other cases, is immaterial.  *See* Ex. 68 ¶¶ 165-77 (AIG admitting that Coventry obtained medical records from insureds to get life expectancy reports).  And with respect to Mrs. Malkin, the evidence shows that Coventry sent AVS Underwriting Mrs. Malkin's medical records and received a life expectancy report in return months before the Application was even submitted to Sun Life.  *See* Ex. 22 (memorandum from Coventry to AVS Underwriting attaching Mrs. Malkin's medical records); Ex. 23 (email from AVS to |

---

[15] References to Golden Decl., Exs. 1-67 are to the Declaration of Declaration of Kevin L. Golden in Support of Motion for Summary Judgment by Plaintiff Sun Life Assurance Company of Canada, dated November 16, 2015. (ECF No. 063).

| | | Coventry stating a life expectancy of 180 months); Dep. of P. Loy at 65:2-15 (similar); Dep. of L. Bryan at 217:5-13 (confirming that Coventry's acquisition of the life expectancy report on Mrs. Malkin was part of the "life insurance capacity transaction" described in Coventry's marketing materials). |
|---|---|---|
| 42. | The funders used the life expectancy reports to determine how long the potential insureds were projected to live and thus how valuable a particular policy might be. Dep. of P. Loy[16] at 25:7-11 ("[I]t turns out that the economic value in the policy is determined by how long [the insured] is going to live, usually mostly based on — on premium, but — and then that, in subsequent term, affects how much [a company like Coventry] is willing to pay for that policy."), attached hereto as Exhibit 11; Dep. of P. Shapiro at 31:24-32:22. ("The reason why [the funders] care [about how long an insured is projected to live] is because the funding company is paying the premiums. . . . and since the bank is paying the premium, if the client's going to live a long, long time then the bank, who's also getting the death benefit, doesn't want to pay the premium because they're not going to make any money when the client dies. They've paid the premium for too many years     [I]f the bank pays the premium for too many years, they say, well this isn't a good case, we'll pass on this one and they'll | U.S. Bank disputes the assertions contained in paragraph 42. Sun Life's assertions in paragraph 42 mischaracterize the testimony. Messrs. Loy, Shapiro, and Roffeld did not testify that "funders used life expectancy reports to determine how long the potential insureds were projected to live and thus how valuable a particular policy might be." (Deposition of Philip Loy conducted October 15, 2015 ("Loy Dep.") at 25:7-11 ("[I]t turns out that the economic value in the policy is determined by how long [the insured] is going to live, usually mostly based on — on premium, but — and then that, in subsequent term, affects how much [a company like Coventry] is willing to pay for that policy.") (Walsh Decl. II, Ex. DD)); Shapiro Dep. at 31:24- 32:22 ("The reason why [the funders] care [about how long an insured is projected to live] is because the funding company is paying the premiums. . . . and since the bank is paying the premium, if the client's going to live a long, long time then the bank, who's also getting the death benefit, doesn't want to | U.S. Bank's disputation of Sun Life's assertions at paragraph 42 is not supported by the evidence to which it cites, and Sun Life has not mischaracterized the testimony. Mr. Shapiro explained that funders acquired life expectancy reports on potential clients (i.e., reports projecting how long a particular potential client could be expected to live). Dep. of P. Shapiro at 30:9-31:15. Mr. Shapiro was *then* asked, "[w]hy does the funding company care how long a person's going to live?" to which he responded, "[t]he reason they care is because the funding company is paying the premiums. The client is not paying the premium. The family of the . . . insured is not paying the premium. A bank is paying the premium and since the bank is paying the premium, if the client's going to live a long, long time, then the bank, who's also getting the death benefit, doesn't want to pay the premium because they're not going to make any money when the client dies. They've paid the premium for too many years. . . . The bank's paying the premium so the bank's getting the death |

<hr>

[16] Phil Loy is the president and co-founder of AVS Underwriting. Dep. of P. Loy at 13-16. AVS's business is to provide life expectancy evaluations and other services to the life settlement industry. *Id.* at 17-18. AVS was the "Approved Underwriter" under Coventry and AIG's Origination Agreement. Dep. Ex. 81, at 528.

| | | |
|---|---|---|
| look for another case."); Dep. of M. Roffeld at 32:20-34:21 (The funders wanted to know how long a potential insured might live so they could decide whether was a good investment to ultimately acquire). | pay the premium because they're not going to make any money when the client dies. They've paid the premium for too many years    [I]f the bank pays the premium for too many years, they say, well this isn't a good case, we'll pass on this one and they'll look for another case.") (Walsh Decl. II, Ex. CC)); Roffeld Dep. at 32:20-34:21 (discussing sending medical records and tentative offers) (Walsh Decl. II, Ex. BB)). | benefit so, if the bank pays the premium for too many years, they say, well, this isn't a good case, we'll pass on this one and they'll look for another case." Dep. of P. Shapiro at 31:21-32:22. For his part, Mr. Loy – the President of AVS Underwriting (a company that prepares life expectancy reports for members of the life settlement industry and that prepared a life expectancy report on Mrs. Malkin in December 2005 for Coventry) – was asked, "what purpose does a LE report serve for those in the life settlement industry?" to which he responded "[i]t basically gives an indication of how long the individual might live, and how long the company might be expected to pay premiums on that individual." Dep. of P. Loy at 24:2-8. Mr. Loy was further asked, "Could the LE be used in order to determine whether or not a life insurance policy on the insured was more or less valuable, based on how long they might live?" to which he responded "[t]hat's certainly true. . . . Certainly the amount of premium that you're paying over a period of time is one of those considerations. Some companies have an appetite for shorter life expectancies, because they don't want to be involved in a – in a really long-term transaction. Some companies don't mind a long-term transaction, but if the premiums are relatively high, they don't – they – they can't stand the – the long-term. . . . [I]t turns out that the economic value in the policy is determined by how long they're going to live, usually mostly based on – on premium, but – and then that, in subsequent term, |

| | | affects how much they're willing to pay for that policy." Dep. of P. Loy at 24:9-25:11. This is such a well-known principle that even Murray Roffeld – a semi-retired insurance agent who put cases through Simba to make some extra money – gave effectively the same testimony as the President of AVS. *See* Dep. of M. Roffeld at 32:20-34:21 (The funders wanted to know how long a potential insured might live so they could decide whether it was a good investment to ultimately acquire).  *See* Ex. 68 ¶¶ 165-77. |
|---|---|---|
| 43. | Afterwards, the funders would revert to Simba with an offer(s) or with a denial. Dep. Ex. 10 at 1 ("Stages of Process . . . Await Bingo."); Dep. of P. Shapiro at 34:16-34:18. ("They may not present anything but they may present a deal, an arrangement to go forward."). | U.S. Bank disputes the assertions contained in paragraph 43. Sun Life's assertions in paragraph 43 mischaracterize the testimony. (Dep. Ex. 10 at 1 (Golden Decl., Ex. 10) ("Stages of Process . . . Await Bingo."); Shapiro Dep. at 34:16-18 ("They may not present anything but they may present a deal, an arrangement to go forward.") (Walsh Decl. II, Ex. CC)). | U.S. Bank's disputation of Sun Life's assertions at paragraph 43 is not supported by the evidence to which it cites, and Sun Life has not mischaracterized the testimony. Mr. Shapiro testified that the funders would decide whether a particular Simba client got a deal or whether they did not.  Dep. of P. Shapiro at 33:25-34:18 ("Q: And what, if anything, would Simba do with the tentative offers once it got them from the insurance companies?  A: We would put those together in a nice, neat little package and send them, those offers over to the various funding organization and share with them that on this particular client, at this particular age, at this particular net worth just got these particular insurance offers, can you look at the case and decide if you want to fund these particular – these offers and then they'll go take the medical records and go get the life expectancy reports and they'll have a nice package now and then, in a about two, two-and-a-half weeks, three weeks, they'll get back to us with the total case all wrapped up |

| | | |
|---|---|---|
| | | as far as the offer, the financing, the life expectancy reports, and then we'll see if we want to go forward with whatever they present. *They may not present anything* but they may present a deal, an arrangement to go forward.  Q: So the funders made the decision on which life insurance applications to make? . . . A: Yes.") (emphasis added).  U.S. Bank has not cited to any evidence to rebut Mr. Shapiro's testimony on this point. |
| 44. | Then, Mr. Bryan would direct Mr. Shapiro and his staff which deals to accept on behalf of Simba's clients, and Simba would go ahead and make formal insurance applications. Dep. of P. Shapiro at 35:2-6 ("[The funders] would send the [offer] emails to me and then Larry and I would sit down and go over them and Larry would decide which ones he wanted to go forward with and say, you know, Peter, do this one, do that one."). | U.S. Bank does not dispute the assertions in paragraph 44 to the extent they relate to Simba's general practices, and do not relate specifically to Mrs. Malkin | U.S. Bank does not dispute Sun Life's assertions at paragraph 44, and U.S. Bank's suggestion that this assertion did not apply to Mrs. Malkin is unsubstantiated and untrue.  *See* Ex. 5. |
| 45. | The insureds were not involved in the decisional process of which life insurance policies to apply for. Dep. Ex. 120 at 3 ("No Simba client . . . ever asked [Simba] to get them a specific type of policy or a policy from a particular company."); Dep. of P. Shapiro at 34:19-21 ("Q: So the funders made the decision on which life insurance application to make? A: Yes."). | U.S. Bank disputes the assertions contained in paragraph 45. Sun Life's assertions in paragraph 45 mischaracterize the testimony. Mr. Bryan and Mr. Shapiro did not testify that Simba clients were not involved in the decisional process. (Dep. Ex. 120 at 3 (Walsh Decl. II, Ex. EE); Shapiro Dep. at 34:19-21 (Walsh Decl. II, Ex. CC)). | U.S. Bank's disputation of Sun Life's assertions at paragraph 45 is not substantiated by the evidence to which it cites, and Sun Life has not mischaracterized the testimony.  Mr. Shapiro testified that Mr. Bryan decided what insurance companies to make applications to.  Dep. of P. Shapiro at 34:19-35:13.  Mr. Shapiro was then asked, "[w]ere the insureds involved in this decision?" to which Mr. Shapiro responded, "[t]he insureds were involved to the point that *once* Larry gave me the direction of which way we were going on the financing arrangement . . . whether it was a back end |

deal . . . or if it was an upfront deal, the insured knew which one they were getting *at that point* in the process." Dep. of P. Shapiro at 35:14-21 (emphasis added).  Mr. Shapiro was then asked, "why would the funders be making the decision and not the insured?" to which he responded, "The insureds couldn't make the decision.  The funders had to decide which one of the deals or what the deal was, *what they wanted to pay for*.  The insured was simply part of the transaction only because the – *we and the funders were using their body as the transaction*.  They had no . . . skin in the game. . . . [t]hey weren't involved in the transaction.  *They were just involved in the use of their body to be part of the transaction*." Dep. of P. Shapiro at 35:22-36:9 (emphasis added).  Mr. Bryan's testimony is completely consistent with the testimony provided by Mr. Shapiro on this point.  *See* Ex. 5 at 2, 3, 4 ("My contacts at the funders would tell me what insurance companies they wanted insurance policies from (and what types of policies they needed from those insurance companies) in order to round out the funders' portfolios.  I would then direct Simba to apply for the types of policies that the funders were interested in on behalf of Simba's clients.  No Simba client, to my recollection, ever asked us to get them a specific type of policy or a policy from a particular company. . . . To my knowledge, the Malkins never told anyone at Simba to get them a Sun Life policy or American General policies and the Malkins never told anyone at Simba to take out loans through

| | | |
|---|---|---|
| | | Coventry or Positive Financial.  That's not how deals at Simba worked. . . . Mrs. Malkin got a Sun Life policy and an American General policy because those were the sorts of policies that Coventry wanted.  After Simba got informal approval from Sun Life and American General that they would issue policies on Mrs. Malkin, Simba got confirmation from Coventry that it was still interested in these policies.  Then, Simba presented these policies (and the Coventry program) to Mrs. Malkin who agreed to participate."). |
| 46. | Neither were the insureds involved in the decisional process of which funding arrangements Simba applied for on their behalf. Dep. Ex. 120 at 4; Dep. of P. Shapiro at 35:15- 21 ("The insureds were involved to the point that once Larry gave me the direction of which way we were going on the financing arrangement . . . the insured knew which one they were getting at that point in the process."); *id.* at 36:15-21 ("[I]f we got more than one offer, then Larry would say we want to do the upfront or the back-end two-year deal and give me the instruction to get moving and then we would let the client know which way we were going and then we would give the case manager, you know, instructions to move forward."). | U.S. Bank disputes the assertions contained in paragraph 46. Sun Life's assertions in paragraph 46 mischaracterize the testimony. Dep. Ex. 120 does not show and Mr. Shapiro did not testify that "the insureds [were not] involved in the decisional process of which funding arrangements Simba applied for on their behalf." | U.S. Bank's disputation of Sun Life's assertions at paragraph 46 is not substantiated by the evidence to which it cites, and Sun Life has not mischaracterized the testimony.  Mr. Shapiro testified that the insureds were "informed" what life insurance policies and funding deals they would be getting *after* Mr. Bryan decided which ones Simba would be pursuing.  Dep. of P. Shapiro at 33:25-36:25. |
| 47. | Simba instructed its agents not to "[p]re sell/coach/qualify your clients on the deals. . . . If your client gets a deal, it's like a free Powerball Lottery ticket! They should grab it | U.S. Bank disputes the characterizations in paragraph 47, and refers the "A Life Insurance Capacity Transaction" and "Simba LBS Agenda Agent Dinner | U.S. Bank does not dispute Sun Life's allegations at paragraph 47, and the documents entitled "A Life Insurance Capacity Transaction" and "Simba LBS |

| | | |
|---|---|---|
| & run, and thank you & us. They should not ask you/us to get them another type of deal." Dep. Ex. 10 at 1; Dep. Ex. 8 at 6 ("You the client do not pick ahead of time which capacity transaction you like best. This is determined by which financial institution/institutions offer you a capacity transaction for consideration."). | Meeting 1/10/07" documents as evidence of their contents. | Agenda Agent Dinner Meeting 1/10/07" plainly support Sun Life's assertions. |
| 48. Mr. Shapiro testified that the insureds were not making the decision of which insurance policies to apply for or what financing deals to participate in because the insureds were allowing the funders to use their bodies to acquire life insurance in exchange for money. Dep. of P. Shapiro at 36:2-10 ("The insureds couldn't make the decision. The funders had to decide which one of the deals or what the deal was, what they wanted to pay for. The insured was simply part of the transaction only because the — we and the funder were using their body as the transaction. They had no      skin in the game. They had no — they weren't involved in the transaction. They were just involved in the use of their body to be part of the transaction."). | U.S. Bank does not dispute the assertions in paragraph 48 to the extent they relate to Simba's general practices, and do not relate specifically to Mrs. Malkin | U.S. Bank does not dispute Sun Life's assertions at paragraph 48.  However, U.S. Bank's suggestion that the business practices referenced in this paragraph do not "relate specifically to Mrs. Malkin" is unsubstantiated and untrue.  Mr. Shapiro was talking about Simba's clients, and Mrs. Malkin was one of Simba's clients.  U.S. Bank had the opportunity to cross examine Mr. Shapiro on this topic, but it chose not to do so.  U.S. Bank cites to no evidence to refute Sun Life's assertion and has thus failed to show a genuine issue. |
| 49. The funders basically offered three types of deals through Simba, namely (a) front-end deals; (b) back-end deals; and (c) hybrid deals. Dep. Ex. 120 at 1. | U.S. Bank does not dispute the assertions in paragraph 49 to the extent they relate to Simba's general practices, and do not relate specifically to Mrs. Malkin | U.S. Bank does not dispute Sun Life's assertions at paragraph 49. |
| 50. A front-end deal was where "the insured sold the policy to a specific funder at the very beginning of a transaction." *Id.* | U.S. Bank does not dispute the assertions in paragraph 50 to the extent they relate to Simba's general practices, and do not relate | U.S. Bank does not dispute Sun Life's assertions at paragraph 50. |

| | | specifically to Mrs. Malkin | |
|---|---|---|---|
| 51. | Mr. Bryan explained a typical front-end deal as follows.

Basically, a front-end deal was where the insured sold the policy to a specific funder at the very beginning of the transaction. Simba . . . would give premium money to the insured to put the policy in force. The insured would give that money to the insurance company. The funder would pay the client the front-end payment (usually 3% of the face amount of the policy) plus a reimbursement to the client for any premiums that were paid. The client would then return the reimbursed premium payment to Simba. The agreement was structured so that ownership of the policy would automatically transfer to the funder who would make all future payments directly to the insurance company.

Dep. Ex. 120 at 1-2; Dep. Ex. 75 (diagram showing the labyrinthine flow of cash in a typical front-end deal), attached hereto as Exhibit 12; Dep. of P. Shapiro at 148:25 — 150:2 (explaining the diagram consistent with Mr. Bryan); Dep. Ex. 12 (letters from Simba to insureds passing along a check | U.S. Bank does not dispute the assertions in paragraph 51 to the extent they relate to Simba's general practices, and do not relate specifically to Mrs. Malkin | U.S. Bank does not dispute Sun Life's assertions at paragraph 51. |

| | | |
|---|---|---|
| | from the funder for 3% of the face amount of the policy plus the premium payment and requesting that the insured return the premium payment to Simba and keep the rest for themselves), attached hereto as Exhibit 13. | | |
| 52. | Mr. Bryan explained the typical back-end deal as follows.<br><br>Basically, a back-end deal was where the insured would take out a loan from one or more of the funders (and/or the banks that they worked with) for a period of a little over two years to fund the premium payments necessary to keep the policy in force past the 2-year contestability period. The loans were always nonrecourse to the insured and any fees associated with the loan (or anything else for that matter) were paid for by someone else.  Dep. Ex. 120 at 2. | U.S. Bank does not dispute the assertions in paragraph 52 to the extent they relate to Simba's general practices, and do not relate specifically to Mrs. Malkin | U.S. Bank does not dispute Sun Life's assertions at paragraph 52.  However, U.S. Bank's suggestion that Simba's general practices referenced in this paragraph "do not relate specifically to Mrs. Malkin" is unsubstantiated and untrue.  This general description of a back-end deal at Simba was taken verbatim from the Statement of Larry Bryan.  *See* Ex. 5 at 2.  In that Statement, Mr. Bryan testified that the back-end deal that Mrs. Malkin did with Coventry was "very similar" to the general back-end deals he described therein, and all of the other evidence in this case proves that to be true.  *Id.* at 5. |
| 53. | Theoretically, there were four different possible outcomes of a back-end deal.<br><br>• (1) If the insured died before the loan matured (in other words, in the first two years or so), the death benefit would theoretically go to the insured's family minus the principal | U.S. Bank does not dispute the assertions in paragraph 53, to the extent they relate to Simba's general practices, and do not relate specifically to Mrs. Malkin | U.S. Bank does not dispute Sun Life's assertions at paragraph 53.  However, U.S. Bank's suggestion that Simba's general practices referenced in this paragraph "do not relate specifically to Mrs. Malkin" is unsubstantiated and untrue.  This general description of a back-end deal at Simba was taken almost verbatim from the Statement of Larry Bryan.  *See* Ex. 5 at 2.  In that |

| | | |
|---|---|---|
| and accrued interest, which would go to the funders. Dep. Ex. 120 at 2. From an actuarial perspective, the possibility of this happening was extraordinarily small and it never happened to any of Simba's roughly 300-400 clients. *Id.;* Dep. of P. Shapiro at 242:21-23 ("I don't think we ever had a client die during the first two years."). Simba would "not have been a viable business if [that] was the only thing [Simba] offered." Dep. Ex. 120 at 2; Dep. of P. Shapiro at 276:19-22 ("That wasn't any client's impetus to come down to Fort Lauderdale, sign all the paperwork and do it just to get two years' worth of free insurance because — that just wasn't."). <br>• (2) If the insured lived to loan maturity (which, again, is what happened in 100% of Simba's 300-400 clients), the insured could theoretically pay off the loan with interest and keep the policy. Dep. Ex. 120 at 2. However, "none of Simba's roughly 300-400 clients ever exercised this option" either. *Id.;* Dep. of P. Shapiro at 171:21-24 ("No one ever did that because the first thing they would have to do is pay back, let's say, Coventry the first two years' worth of premiums."). This was not why any of Simba's clients came to Simba, and Simba "would not have been a | | Statement, Mr. Bryan testified that the back-end deal that Mrs. Malkin did with Coventry was "very similar" to the general back-end deals he described therein. *Id.* at 5. |

| | | | |
|---|---|---|---|
| | viable business" if this was all it offered. Dep. Ex. 120 at 2; Dep. of P. Shapiro at 172:10-11 ("[The insureds] weren't getting into the transaction, as I said before, to buy insurance.").<br>• (3) At the expiration of the two-year period, the insured could attempt to sell the policy either directly to the funder or to some other investor (many of whom were also funders themselves of different policies). Dep. Ex. 120 at 2. This is the transaction that Simba advertised to its clients, and this is what Simba and all of its clients who participated in back-end deals were hoping would happen. *Id.* As it turned out, only a very small percentage of Simba's clients who participated in back-end deals were able to sell them | | |
| 54. | In 100% of the back-end deals done through Simba, the funder or some other investor — not the insured or their beneficiaries — ended up with the policy. *Id.* | U.S. Bank disputes the assertions contained in paragraph 54. Sun Life's assertions in paragraph 54 are not supported by Dep. Ex. 120. (Dep. Ex. 120 at 2 ("The third possibility was to relinquish the policy to the funder . . . . This is what happened in about 90% or more of back-end deals we did at Simba.") (Walsh Decl. II, Ex. EE)). | U.S. Bank's disputation of Sun Life's assertions at paragraph 54 is not substantiated by the evidence to which it cites. Mr. Bryan testified that (a) in 90% or more of the back-end deals at Simba, the policy was relinquished to the original funder; (b) in a small percentage of the back-end deals at Simba, the policy was sold to a third-party investor (who was often the original funder); (c) in none of the back-end deals at Simba did the death benefit go to the insured's family; and (d) in none of the back-end deals at Simba did the insured pay off the loan and keep the policy for themselves. |

| | | |
|---|---|---|
| | | Ex. 5 at 2. U.S. Bank does not dispute these figures. U.S. Bank CMF ¶ 53. Therefore, U.S. Bank has no basis to dispute the assertion that "[i]n 100% of the back-end deals done through Simba, the funder or some other investor – not the insured or their beneficiaries – ended up with the policy." |
| 55. | Once it was determined what deals Simba was moving forward with on behalf of its clients, Simba would help its clients fill out whatever boilerplate forms the funders required for their particular deal structure (i.e., trusts agreements, loan agreements, etc.) and then get those documents back to the funder. Dep. Ex. 120 at 3. | U.S. Bank disputes the assertions contained in paragraph 55. Dep. Ex. 120 speaks to Simba's practices with Coventry, not with all funders. (Dep. Ex. 120 at 4 ("Once Simba received these forms from Coventry, someone at Simba helped the Malkins fill them out, and then sent them back to Coventry.") (Walsh Decl. II, Ex. EE)). | U.S. Bank does not appear to dispute the fact that, once it was determined what *Coventry* deals Simba was moving forward with on behalf of its clients, Simba would help its clients fill out whatever boilerplate forms the funders required for their particular deal structure (i.e., trust agreements, loan agreements, etc.) and then get those documents back to *Coventry. See* U.S. Bank's CMF ¶ 55. For purposes of Sun Life's Motion, that is a sufficient admission. |
| 56. | Once the necessary deal structure was in place, Simba would make the formal applications to the insurance carriers selected by the funders. Dep. of P. Shapiro at 36:15-21. | U.S. Bank does not dispute the assertions contained in paragraph 56 to the extent they relate to Simba's general practices, and do not relate specifically to Mrs. Malkin | U.S. Bank does not dispute Sun Life's assertions at paragraph 56. However, U.S. Bank's suggestion that the business practices referenced in this paragraph do not "relate specifically to Mrs. Malkin" is unsubstantiated and untrue. Mr. Shapiro was talking about Simba's clients, and Mrs. Malkin was one of Simba's clients. U.S. Bank had the opportunity to cross examine Mr. Shapiro on this topic, but it chose not to do so. U.S. Bank cites to no evidence to refute Sun Life's assertion and has thus failed to show a genuine issue. |
| 57. | Although Mr. Bryan was listed as the writing agent on the applications submitted to insurance companies by Simba, he admits | U.S. Bank disputes the assertions contained in paragraph 57. Sun Life's assertions mischaracterize the testimony. Mr. Bryan | U.S. Bank's disputation of Sun Life's assertions at paragraph 57 is not substantiated by the evidence to which it |

| | | |
|---|---|---|
| that he never personally filled out applications and that others at Simba signed his name to them. Dep. of L. Bryan at 228:18 ("I didn't [personally] fill out any applications."); *id.* 159:5 ("[M]ost of the things were signed on my behalf."). | did not testify that he "never" personally filled out applications. (Bryan Dep. at 159:5-6, 228:18 (Walsh Decl. II, Ex. Z)). | cites, and Sun Life has not mischaracterized the testimony.  Mr. Bryan testified at his deposition as follows: "I didn't fill out *any* applications."  Dep. of L. Bryan 228:18 (emphasis added).  Earlier in his deposition, he mentioned that he personally "handled" only one "case" – the mother of a very good friend named Albert Minniochi. *Id.* at 57:2-58:6.  U.S. Bank does not dispute that Simba had roughly 300-400 clients. *See* U.S. Bank CMF ¶ 53.  The possibility that Mr. Bryan *may* have personally filled out the application for Mrs. Minniochi (and there is no evidence that filling out her application was necessarily part of "handling" her "case") is completely irrelevant to the Malkin matter and provides no genuine support for U.S. Bank's disputation. |
| 58. | Mr. Bryan instructed his staff to leave blank the question(s) on the insurance applications asking whether there was any in-force or pending life insurance on the life the potential insured even if Simba was making applications for multiple policies on behalf of the same insured. Dep. of P. Shapiro at 38:6-20 | U.S. Bank does not dispute the assertions contained in paragraph 58 to the extent they relate to Simba's general practices, and do not relate specifically to Mrs. Malkin | U.S. Bank does not dispute Sun Life's assertions in paragraph 58.  However, U.S. Bank's suggestion that the business practices referenced in this paragraph do not "relate specifically to Mrs. Malkin" is unsubstantiated and untrue.  Two American General life insurance policies on the life of Mrs. Malkin were applied for and put in force at Simba.  The applications for these American General policies were dated March 13, 2006 and March 15, 2006, respectively. Ex. 33 at 185; Ex. 34 at 741.  The Sun Life Application upon which the Policy was issued was dated March 15, 2006.  Ex. Q to the Declaration of J. Walsh at 67. However, the Sun Life Application failed to disclose the existence of these other pending policies in the designated section. *See* Ex. Q to the |

| | | Declaration of J. Walsh at 64. |
|---|---|---|
| 59. | Simba engaged in this practice to enable it to acquire more policies on a single insured than the insurance companies would otherwise have issued. *Id.* at 38:24-39:8. | U.S. Bank does not dispute the assertions contained in paragraph 59 to the extent they relate to Simba's general practices, and do not relate specifically to Mrs. Malkin | U.S. Bank does not dispute Sun Life's assertions at paragraph 59.  However, U.S. Bank's suggestion that the business practices referenced in this paragraph do not "relate specifically to Mrs. Malkin" is unsubstantiated and untrue.  Mr. Shapiro testified that Mr. Bryan "repeatedly" instructed him to leave blank the "other insurance" question on insurance applications submitted on behalf of Simba's clients and threatened him with termination if he refused to do so.  Dep. of P. Shapiro at 37:25-39:8.  Mrs. Malkin was one of Simba's clients, and the application to Sun Life failed to disclose $9 million in pending life insurance coverage as required by the Sun Life application. *See supra* at ¶ 58.  U.S. Bank had the opportunity to cross-examine Mr. Shapiro on this point, but it chose not do so.  U.S. Bank cites to no evidence to refute Sun Life's assertion and has thus failed to show a genuine issue. |
| 60. | Mr. Bryan was also known to "tweak" the numbers on the financial disclosure forms (i.e., a potential insured's net worth and the components thereof) "to make it easier to get the case through the gatekeeper at the . . . insurance company." Dep. of P. Shapiro at 40:4-41:3 | U.S. Bank does not dispute the assertions contained in paragraph 60 to the extent they relate to Simba's general practices, and do not relate specifically to Mrs. Malkin | U.S. Bank does not dispute Sun Life's assertions at paragraph 60.  Moreover, the Sun Life Application lists Mrs. Malkin's net worth as $13,000,000.  Ex. Q to Declaration of J. Walsh at 65.  However, Mrs. Malkin's daughter testified that she spoke to her mother nearly every day of her life and, although she did not know the details of her mother's finances in 2006, she could say with certainty that her mother did not have a $13 million net worth in 2006.  Dep. of T. Guarnero at 126:22-25 ("My mother, if she |

| | | |
|---|---|---|
| | | had in excess of $13 million, my life would have been a whole lot easier with sending my kids to college, so she didn't."); *id.* at 28:4-6, 43:2-9, 65:6-11, 128:7-19 (noting that Mrs. Malkin's condo – the only real estate she owned in 2006 – was sold in 2014 for $528,000); *id.* at 177:13-19; Dep. of J. Klein at 66:12-15 ("Q: At the time of your mother's passing what was the total value, if you know, of her estate?  A: I would say 1.5 [million], I guess, because that's basically what we ended up with."). |
| 61. | Simba's practice was to state on the application that the purpose of the insurance being sought was "estate planning" even though this was not really true. *See supra* ¶ 27. | U.S. Bank does not dispute the assertions contained in paragraph 61 to the extent they relate to Simba's general practices, and do not relate specifically to Mrs. Malkin | U.S. Bank does not dispute Sun Life's assertions at paragraph 61.  However, U.S. Bank's suggestion that the business practices referenced in this paragraph do not "relate specifically to Mrs. Malkin" is unsubstantiated and untrue.  The Sun Life application asked what the coverage would primarily be used for and provided a number of check-boxes, namely (i) income replacement; (ii) split dollar; (iii) business continuity; (iv) supplemental retirement income; (v) deferred compensation plan; (vi) estate plan; (vii) key person; (viii) charitable gift; (ix) bonus plan; (x) premium financing; and (xi) other.  Ex. Q to Declaration of J. Walsh at 65.  The only box that was checked was "estate plan."  *Id.*  But Mrs. Malkin did not need $5 million in insurance (let alone $13 million) to cover her estate taxes.  Ex. 15 at 1 ("In so far as obtaining the policy for estate purposes there was no need to do so as my mother did not have that much money to have needed a $5,000,000 policy to cover any estate taxes."); Dep. of T. Guarnero at |

| | | |
|---|---|---|
| | | 123:6-21 (Mrs. Malkin's estate paid $0 in estate taxes upon her death),  Dep. of L. Bryan II at 22:17-23:5 ("When I used to do estate planning . . . the purpose was for the actual covering of an estate tax.  And we would normally sit down, myself, the client's lawyers, the personal estate planning lawyers, the client's CPA, and it would usually be a coordinated plan, amongst the three of us, to construct a life insurance portfolio for the purpose of covering the estate taxes.  [At Simba,] I never met and we never met with anybody's financial advisors to put together any kind of a financial or estate plan as it related to taxes or what I would call traditional planning."); Dep. of L. Bryan at 259:24-260:18 (Simba did not do estate planning); Ex. 16 at Ex. A (Mrs. Malkin's trust and estate attorney was not in any way involved in the application for the Policy); Dep. of P. Shapiro at 41:7-42:11 (Simba always checked the "estate plan" box, but it was never true). |
| 62. | Simba also attached a policy illustration to the application showing projected policy performance over time based on "normal" funding assumptions; Simba then produced policy illustrations for the funders showing "minimal" funding assumptions but did not share those policy illustrations with the insurance companies. Dep. Ex. 120 at 3. | U.S. Bank does not dispute the assertions contained in paragraph 62 to the extent they relate to Simba's general practices, and do not relate specifically to Mrs. Malkin | U.S. Bank does not dispute Sun Life's assertions at paragraph 62.  However, U.S. Bank's suggestion that the business practices referenced in this paragraph do not "relate specifically to Mrs. Malkin" is unsubstantiated and untrue.  The application to Sun Life listed planned *annual* payments of $173,000.  Ex. Q to Declaration of J. Walsh at 64.  However, Coventry had already determined that the "target" premium for at least the first *26 months* would only be $238,050.  Ex. 25 ("We priced the $5m Sun Life Protector Plus standard with a level DB. |

| | | This qualifies for the PFP2 for a 26 month loan term.  Target is $238,050."). |
|---|---|---|
| 63. | Mr. Bryan's first introduction to Coventry was in 2005 when he spoke with a Coventry executive named Ted Kilkuskie who told Mr. Bryan how Coventry's program worked and what Simba needed to do to get started. Dep. Ex. 120 at 4. | U.S. Bank does not dispute the assertions in paragraph 63. | U.S. Bank does not dispute Sun Life's assertions at paragraph 63. |
| 64. | Mr. Kilkuskie visited Simba's offices many times and spoke at Simba events.  *Id.* | U.S. Bank does not dispute the assertions in paragraph 64. | U.S. Bank does not dispute Sun Life's assertions at paragraph 64. |
| 65. | Other than Mr. Kilkuskie, Simba's primary contacts at Coventry were Dan Geraghty and Brian Tafaro with whom someone from Simba spoke roughly 4-5 times a week. Dep. Ex. 120 at 4; Dep. of P. Shapiro at 114:18-24. | U.S. Bank does not dispute the assertions in paragraph 65. | U.S. Bank does not dispute Sun Life's assertions at paragraph 65. |
| 66. | Mr. Bryan worked with his contacts at Coventry to "make sure Simba knew what policies Coventry was hot for at any given moment." Dep. Ex. 120 at 4. | U.S. Bank disputes the assertions in paragraph 66. The referenced statements by Dan Geraghty constitute inadmissible hearsay evidence of no probative value. | U.S. Bank does not contest the factual veracity of Sun Life's assertion at paragraph 66, and Sun Life's assertions are not based on inadmissible hearsay of no probative value.  The evidence supporting Sun Life's assertion is the sworn testimony of Mr. Bryan that Simba applied for the policies that Mr. Bryan understood that Coventry wanted to acquire – not necessarily the truth of Mr. Geraghty's statements.  And in any event, Mr. Geraghty's statements come in for the truth pursuant to Fed. R. Evid. 803(1), (3) to show then-existing state of mind.  *See* Fed. R. Evid. 803(3) ("The following are not excluded by the rule against hearsay . . . [a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) |

41

| | | |
|---|---|---|
| | | or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health) . . . ."). This evidence is highly probative to the question of whether Coventry was using Mrs. Malkin as an instrument to acquire a policy Coventry could not otherwise acquire to wager on her life and profit from her death. |
| 67. | Mr. Bryan understood that "Coventry was building a portfolio of policies and that Coventry didn't want to be top heavy in any one type of policy from any one insurance company." *Id.;* Dep. of L. Bryan II at 19:3-11 ("As it was explained to us . . . when the funders funded these different policies, they may be funding a number of American General, or they may be funding a number of Mass Mutual, or a number of Trans America, and sometimes from month-to-month . . . sometimes if they had too many deals with one insurance company, they would want to start building a portfolio of a different insurance company."). | U.S. Bank disputes the assertions in paragraph 67. The referenced statements by unidentified individuals at Coventry constitute inadmissible hearsay evidence of no probative value. | U.S. Bank does not contest the factual veracity of Sun Life's assertion at paragraph 67, and Sun Life's assertions are not based on inadmissible hearsay of no probative value. The evidence supporting Sun Life's assertion is the sworn testimony of Mr. Bryan that Mr. Bryan understood that Coventry was building a portfolio of policies and did not want to be top-heavy in any one type of policy from any one insurance company – not necessarily the truth of any statements made to Mr. Bryan by his Coventry contacts.[17] And in any event, any statement comes in for the truth pursuant to Fed. R. Evid. 803(1), (3) to show then-existing state of mind. *See* Fed. R. Evid. 803(3) ("The following are not excluded by the rule against hearsay . . . [a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health) . . . ."). This evidence is highly |

---

[17] Mr. Bryan disclosed his primary Coventry contacts as Executives Ted Kilkuskie, Dan Geraghty, and Brian Tafaro. Ex. 5 at 4. There are no reliability concerns with Mr. Bryan's testimony because, among other things, it is consistent with the Origination Agreement between and among Coventry, AIG, and U.S. Bank that rendered ineligible for purchase by AIG any policy procured by Coventry that would cause AIG's aggregate life insurance holdings from a particular insurance company to exceed the greater of 10% of AIG's aggregate life insurance policy holdings or $200,000,000. *See* Ex. 2 at 529-30.

| | | probative to the question of whether Coventry was using Mrs. Malkin as an instrument to acquire a policy Coventry could not otherwise acquire to wager on her life and profit from her death. |
|---|---|---|
| 68. | Mr. Bryan would then "make sure that Simba applied for the types of policies that Coventry (and the other funders) wanted." Dep. Ex. 120 at 4; Dep. of L. Bryan II at 32:3-10 ("[I]t seemed to be the same thing from the funders end it's, hey, you know, we want American General, we want Sun Life, we want Security Life of Denver. They would kind of let us know what is going on and we would ask them, you know, what insurance company do you want, because it didn't pay for us to go spend our time getting an insurance policy issued from a company that they didn't want to fund right this minute."). | U.S. Bank disputes the assertions in paragraph 68. The referenced statements by unidentified individuals at Coventry constitute inadmissible hearsay evidence of no probative value. | U.S. Bank does not contest the factual veracity of Sun Life's assertion at paragraph 68, and Sun Life's assertions are not based on inadmissible hearsay of no probative value.   The evidence supporting Sun Life's assertion is the sworn testimony of Mr. Bryan that Mr. Bryan "would make sure that Simba applied for the types of policies that Coventry (and the other funders) wanted" – not necessarily the truth of any statements made to Mr. Bryan by his Coventry contacts. And in any event, any statement comes in for the truth pursuant to Fed. R. Evid. 803(1), (3) to show then-existing state of mind. *See* Fed. R. Evid. 803(3) ("The following are not excluded by the rule against hearsay . . . [a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health) . . . ."). This evidence is highly probative to the question of whether Coventry was using Mrs. Malkin as an instrument to acquire a policy Coventry could not otherwise acquire to wager on her life and profit from her death. |
| 69. | Simba had a non-exclusive producer agreement with Coventry that required Mr. Bryan to "identify and submit to Coventry all [c]lients identified by [Mr. Bryan], in respect | U.S. Bank disputes the characterizations in paragraph 69, and refers to the Producer Agreement as evidence of its contents. | U.S. Bank does not dispute Sun Life's assertions at paragraph 69, and the Producer Agreement plainly supports them. Ex. 14 at |

| | | |
|---|---|---|
| | of which a [potential insured was] seeking financing which is directly or indirectly collateralized in whole or in part by the market or future value of the life insurance policy." Dep. Ex. 22, Producer Agreement, dated November 17, 2005 at § 2.3(a), attached hereto as Exhibit 14. | | § 2.3(a). |
| 70. | Simba was also required to provide Coventry with whatever information Coventry required in connection with these insureds and to pass along documents from Coventry to the insureds. *Id.* at § 2.3(b), (c); Dep. of L. Bryan at 191:1-192:12. | U.S. Bank disputes the characterizations in paragraph 70, and refers to the Producer Agreement as evidence of its contents. | U.S. Bank does not dispute Sun Life's assertions at paragraph 70, and the Producer Agreement plainly supports them.  Ex. 14 at § 2.3(b), (c); *see* Dep. of L. Bryan at 191:1-192:12 (confirming as much). |
| 71. | Simba also needed to get approval from Coventry before disseminating promotional materials relating to these transactions. *Id.* at § 2.4; Dep. of L. Bryan at 200:8-16 ("So any marketing material we had, [Mr. Kilkuskie] would have been familiar with. . . . He probably would have [been familiar with Dep. Ex. 8]. I don't know what he would tell you. It wouldn't be in his best interest to say he was but I think he was."). | U.S. Bank disputes the characterizations in paragraph 71, and refers to the Producer Agreement as evidence of its contents. In addition, the testimony of Mr. Bryan that Sun Life cites does not support this assertion. (Bryan Dep. at 200:8-16 ("So any marketing material we had, [Mr. Kilkuskie] would have been familiar with. . . . He probably would have [been familiar with Dep. Ex. 8]. I don't know what he would tell you. It wouldn't be in his best interest to say he was but I think he was.") (Walsh Decl. Z, Ex. D)). | U.S. Bank does not dispute Sun Life's assertions at paragraph 71, and the Producer Agreement plainly supports them.  Ex. 14 at § 2.4.  U.S. Bank's assertion that *Mr. Bryan's* testimony does not support Sun Life's assertions is also wrong.  The testimony of Mr. Bryan provides additional evidence that what the Producer Agreement required actually happened.  Dep. of L. Bryan at 200:8-16. |
| 72. | Coventry also required Mr. Bryan to split his commissions with them. Dep. Ex. 22 at § 3.1; Dep. of L. Bryan at 205:15-23 ("Q: Am I to understand . . . that Coventry wouldn't provide premium financing if you didn't split your commission with them? A: That's correct."). | U.S. Bank disputes the characterizations in paragraph 72, and refers to the Producer Agreement as evidence of its contents. | U.S. Bank does not dispute Sun Life's assertions at paragraph 72, and the Producer Agreement plainly supports them.  Ex. 14 at § 3.1; *see* Dep. of L. Bryan at 205:15-23 (confirming as much). |

| 73. | Simba did "many deals" with Coventry and at one point even got a "six figure" bonus based on volume. Dep. Ex. 120 at 4; Dep. of L. Bryan II at 33:17-24. | U.S. Bank does not dispute the assertions in paragraph 73. | U.S. Bank does not dispute Sun Life's assertions at paragraph 73. |
|---|---|---|---|
| 74. | "Coventry did all (or nearly all) back-end deals," which Mr. Bryan described as:<br><br>The Coventry deal was very similar to the back-end deals I described above. There would be a 26-month loan to pay premiums. After 26 months, the insured technically had the option to (i) keep the policy and pay off the loan with interest, (ii) to sell the policy, repay the loan and keep the profits, or (iii) to relinquish the policy to Coventry and walk away. As I mentioned earlier, though, none of the Simba clients who did Coventry deals, to my knowledge, kept the policy, and in fact, the vast majority of Coventry deals ended up being relinquishments. To the extent a Simba client was able to sell a policy that went through the Coventry program, Coventry might have also been the buyer (they did that too).<br>Dep. Ex. 120 at 4-5. | U.S. Bank does not dispute the assertions in paragraph 74 to the extent they relate to Simba's general practices, and do not relate specifically to Mrs. Malkin. | U.S. Bank does not dispute Sun Life's assertions at paragraph 74. However, U.S. Bank's suggestion that the business practices referenced in this paragraph do not "relate specifically to Mrs. Malkin" is unsubstantiated and untrue. Mr. Bryan described a back-end deal and testified that Mrs. Malkin did two of those with Coventry (producing a Sun Life policy and an American General policy). Ex. 5 at 4. U.S. Bank cites absolutely no evidence to even suggest that Mrs. Malkin's Sun Life policy was the product of anything other than a Coventry back-end deal. |
| 75. | In 2005, Phyllis Malkin was a retired woman in her mid-seventies living in a three- | U.S. Bank disputes the assertions contained in paragraph 75 as Sun Life fails to cite | U.S. Bank's disputation of Sun Life's assertions at paragraph 75 is not |

| | | |
|---|---|---|
| | bedroom condominium in Aventura, Florida with her retired second husband Paul Malkin | "pleadings, depositions, answers to interrogatories, admissions, and affidavits on file with the Court" in violation of Local Rule 56.1. | substantiated by any evidence.  And, in fact, in 2005, Mrs. Malkin *was* a retired woman in her mid-seventies living in a three-bedroom condominium in Aventura, Florida with her retired second husband Paul Malkin.  Dep. of J. Klein at 51:21-23, 52:2-6, 52:13-53:4; Dep. of T. Guarnero at 30:8-17, 43:15-20.  These are *basic facts* in this case, and U.S. Bank's failure to admit them is illustrative of the approach it has taken in responding to Sun Life's Rule 56.1 Statement. |
| 76. | That summer, the Malkins were referred to Simba by a senior citizen in Mrs. Malkin's building by the name of Mike Sparber. Dep. of M. Roffeld at 26:11-27:1; Dep. of L. Bryan at 167:5-14, 365:4-19, 368:2-9; Dep. of P. Shapiro at 64-65; Dep. Ex. 120 at 3. | U.S. Bank does not dispute that the Malkins were referred to Simba by a senior citizen in their building, but U.S. Bank disputes that it was Mr. Sparber. Other witnesses testified that Mr. Roffeld or Mr. Dictor could have referred the Malkins to Simba. (Bryan Dep. at 365:15-19 (Walsh Decl. II, Ex. Z); Shapiro Dep. at 65:11-16 (Walsh Decl. II, Ex. CC)). | U.S. Bank's disputation of Sun Life's assertions at paragraph 76 is not substantiated by the evidence to which it cites.  Messrs. Bryan and Shapiro testified that they did not know exactly who referred Mr. Malkin to Simba, but that it could have been one of three individuals, namely Murray Roffeld, Ted Dictor, or Mike Sparber.  Dep. of P. Shapiro at 65:11-16; Dep. of L. Bryan at 167:7-14.  Mr. Roffeld testified without equivocation that Mrs. Malkin was referred to Simba by Mike Sparber.  Dep. of M. Roffeld at 26:11-17, 27:15-28:7.  There is no inconsistency between the testimony cited by Sun Life, and U.S. Bank cites no affirmative evidence to the contrary. |
| 77. | Mr. Sparber (who is now deceased) had previously participated in a deal at Simba and had used some of his payout to purchase a Bentley that he then used "to entice seniors in | U.S. Bank does not dispute that "Mr. Sparber (who is now deceased) had previously participated in a deal at Simba." U.S. Bank disputes the remaining assertions in | U.S. Bank's partial disputation of Sun Life's assertion at paragraph 77 is not substantiated by citation to any evidence.  Mr. Bryan – the Chairman of Simba – testified that one of the |

| | | |
|---|---|---|
| | his neighborhood to come to Simba to get their own deal."[18] Dep. Ex. 120 at 3. | paragraph 77 because Mr. Bryan's statement is unsupported by admissible evidence. | individuals who referred cases to Simba (Mr. Sparber) bought a Bentley and used that Bentley "to entice seniors in his neighborhood to come to Simba to get their own deal." Ex. 5 at 3. There is nothing inadmissible about this testimony, and U.S. Bank provides no reason why it should not be admitted beside a bald conclusion. |
| 78. | Mr. Shapiro (who was social with the Malkins outside of work as well) had discussions with the Malkins early-on in the process about the Malkins' lack of need or desire for life insurance. Dep. of P. Shapiro at 272:7-15; *see id.* at 69:15-23. | U.S. Bank disputes the assertions in paragraph 78, which are based on inadmissible hearsay evidence. | U.S. Bank does not contest the factual veracity of Sun Life's assertion at paragraph 78, and U.S. Bank's bald conclusion that these assertions "are based on inadmissible hearsay evidence" is wrong. U.S. Bank has not identified any particular statement that will necessarily be offered for the truth and even if it had done so, any statements made by the Malkins to Mr. Shapiro about their lack of need or desire for life insurance would be admissible under Fed. R. Evid. 803(1), (3) to show then-existing state of mind. *See* Fed. R. Evid. 803(3) ("The following are not excluded by the rule against hearsay . . . [a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health) . . . ."). |
| 79. | The Malkins told Mr. Shapiro that they did not want or need life insurance. *Id.* at 240:16-19; *see id.* 66:5-16 ("Q: Do you know whether the Malkins came to Simba because they needed life insurance? A: No, they did | U.S. Bank disputes the assertions in paragraph 79, which are based on inadmissible hearsay evidence. | U.S. Bank does not contest the factual veracity of Sun Life's assertion at paragraph 79, and U.S. Bank's bald conclusion that these assertions "are based on inadmissible hearsay evidence" is wrong. U.S. Bank has |

---

[18] As the referral source for Mrs. Malkin, Mr. Sparber would have received 25% of the commission even though he was not a licensed insurance agent. Dep. of L. Bryan at 168:10-18, 365:20-366:4; Dep of M. Roffeld 28:1-7.

not need life insurance. Q: . . . [D]o you know whether the Malkins came to Simba because they wanted life insurance? A: No, they did not want life insurance. Q: Do you know who, if anyone, did want life insurance policies on Mrs Malkin's life? A: No, I don't know anyone that wanted life insurance on their life except for the banks that financed this."); *id.* at 71:7-72:6 (Mrs Malkin could qualify for insurance coverage that Mrs. Malkin didn't want but that some funder did want); *id.* at 76:9-16 (similar).

|  | not identified any particular statement that will necessarily be offered for the truth; indeed, Mr. Shapiro testified that his basis for this testimony was discussions with the Malkins *and* his knowledge of Simba's business. Dep. of P. Shapiro at 240:16-241:12.  In any event, any statements made by the Malkins to Mr. Shapiro about their lack of need or desire for insurance would be admissible under Fed. R. Evid. 803(1), (3) to show then-existing state of mind.  *See* Fed. R. Evid. 803(3) ("The following are not excluded by the rule against hearsay . . . [a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health) . . . ."). |

| 80. | Mr. Bryan also had conversations and other professional interactions with the Malkins starting in 2005 which satisfied him that the Malkins were not interested in "traditional" life insurance. Dep. Ex. 120 at 3 ("Like all of Simba's clients, the Malkins were not interested in life insurance in the traditional sense. . . . I know that based on conversations myself and others at Simba had with the Malkins and based on my knowledge of the business that Simba was running."); Dep. of L. Bryan II at 23:12-24:24 ("[Mrs Malkin] and Paul came to the office and everyone was crystal clear on, you know, what everyone was doing."). | U.S. Bank disputes the assertions in paragraph 80, which are based on inadmissible hearsay evidence. Moreover, Mr. Bryan's earlier testimony rebuts Sun Life's contention that this fact is undisputed. At his deposition, Mr. Bryan was asked the following questions and gave the following answers regarding Mrs Malkin's application for life insurance:

Q: Do you see where it says purpose of insurance?
A: Yes.
Q: What box is checked?
A: Estate protection.
Q: Is that consistent with what you understood the use of the insurance would | U.S. Bank's disputation of Sun Life's assertions at paragraph 80 is not supported by the evidence to which it cites.  The fact that Mr. Bryan offered an enormously broad definition of "estate planning" (so broad that it essentially renders that term meaningless) is not inconsistent with Mr. Bryan's testimony that the Malkins were not interested in "traditional" insurance; rather, the two are completely consistent.  Neither is Sun Life's assertion at paragraph 80 based on inadmissible hearsay.  U.S. Bank has not identified any particular statement that will necessarily be offered for the truth; indeed, Mr. Bryan's testimony is based partly on discussions with the Malkins *and* partly on his knowledge of Simba's business. Ex. 5 at 3; Dep. of L. Bryan II at 23:12-24:24.  And |

| | | be at the time?<br>A: You know, it is pretty open ended, whether it is estate protection, estate planning. Just anything to do with the estate I think is quite fine.<br>Q: So is that consistent with your understanding of what the insurance would be used for at the time which it was applied?<br>A: I think it was part of all estate planning is what I would say, sure.<br>(Bryan Dep. at 225:14-226:5 (Walsh Decl. II, Ex. Z)). | in any event, any statements made by the Malkins to Mr. Bryan about their lack of need or desire for life insurance would be admissible under Fed. R. Evid. 803(1), (3) to show then-existing state of mind. *See* Fed. R. Evid. 803(3) ("The following are not excluded by the rule against hearsay . . . [a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health) . . . ."). |
|---|---|---|---|
| 81. | Instead, the Malkins were "looking for a risk free opportunity to make money." Dep. Ex. 120 at 3; Dep. of P. Shapiro at 65:21-66:4 ("[The Malkins] came to Simba, like all the other clients, to participate in the transaction for financial gain. . . . They came to Simba to participate in the insurance process, the insurance transaction to — to receive income, personal financial income from doing the Simba transaction."); Dep. of M. Roffeld at 51:2-7 (confirming that Mrs Malkin told him, "right after she got her deal" that she only did it "to make money"). | U.S. Bank disputes the assertions in paragraph 81, which are based on inadmissible hearsay evidence. | U.S. Bank does not contest the factual veracity of Sun Life's assertion at paragraph 81, U.S. Bank's bald conclusion that these assertions "are based on inadmissible hearsay evidence" is wrong.  U.S. Bank has not identified any particular statement that will necessarily be offered for the truth; indeed, both Messrs. Bryan and Shapiro testified that their basis for this line of testimony was party discussions *and* partly knowledge of Simba's business. Ex. 5 at 3; Dep. of P. Shapiro at 65:21-66:4 ("[The Malkins] came to Simba, *like all other* clients, to participate in the transaction for financial gain. . . . They came to Simba to participate in the insurance process, the insurance transaction to – to receive income, personal financial income from doing the Simba transaction.") (emphasis added); *id.* at 240:16-241:12.  In any event, any statements made by the Malkins to Messrs. Bryan, Shapiro, and/or Roffeld about their intention and desire to participate in a risk-free opportunity to make money would be |

| | | |
|---|---|---|
| | | admissible under Fed. R. Evid. 803(1), (3) to show then-existing state of mind. *See* Fed. R. Evid. 803(3) ("The following are not excluded by the rule against hearsay . . . [a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health) . . . ."). |
| 82. | More specifically, the Malkins came to Simba to enter into a "joint venture type of arrangement" with a funder "to provide the funder with a policy in exchange for money." Dep. of P. Shapiro at 73:7-74:6; *see id.* at 79:2-4 ("Q: To your knowledge, was Mrs Malkin used by funders to acquire policies? A: Yes."); Dep. Ex. 120 at 1 ("Without the funders, Simba's business (and the life insurance policies that we placed) would not have existed."). | U.S. Bank disputes the assertions contained in paragraph 82, which are based on inadmissible hearsay evidence. | U.S. Bank does not contest the factual veracity of Sun Life's assertion at paragraph 82, and U.S. Bank's bald conclusion that these assertions "are based on inadmissible hearsay evidence" is wrong. U.S. Bank does not identify any statements upon which this testimony is allegedly based. In any event, any statements made by the Malkins to Messrs. Bryan and/or Shapiro about the Malkin's intent to come to Simba to engage in a "joint venture type of arrangement" with a funder "to provide the funder with a policy in exchange for money" would be admissible under Fed. R. Evid. 803(1), (3) to show then-existing state of mind. *See* Fed. R. Evid. 803(3) ("The following are not excluded by the rule against hearsay . . . [a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health) . . . ."). |
| 83. | Mrs. Malkin never intended to pay — nor did she ever pay — any premiums for the life insurance policies issued through Simba. Dep. of L. Bryan II at 23:21-24:1 ("Everyone | US. Bank disputes the assertions contained in paragraph 83, which are based on inadmissible hearsay evidence. | U.S. Bank does not contest the factual veracity of Sun Life's assertion at paragraph 83, and U.S. Bank's bald conclusion that these assertions "are based on inadmissible |

| | | |
|---|---|---|
| | in our office, if you asked them about non . . . recourse premium financing . . . they would all tell you that no client ever paid anything or intended to pay, and [the Malkins] understood that."); Dep. of P. Shapiro at 243:18-19 ("The Malkins didn't want to, as no one wanted to, pay for this insurance on their own."); Dep. Ex. 71, Statement of Toni Guarnero,[19] at 1-2, attached hereto as Exhibit 15 ("Regarding my mother's intention to pay the premium, that's easy, my mother never intended to pay the policy nor did she have the wherewithal to pay this policy. . . . My mother never made a premium payment to Sun Life. . . ."); Dep. Ex. 120 at 5 ("The Malkins, like the other Simba clients who did Coventry deals before them, paid no premium payments (or anything else for that matter) and took no risk."). | | hearsay evidence" is wrong.  U.S. Bank does not identify any statements upon which this testimony is allegedly based.  In any event, any statements made by Mrs. Malkin regarding her intent to never pay any premiums for the Policy would be admissible under Fed. R. Evid. 803(1), (3) to show then-existing state of mind.  *See* Fed. R. Evid. 803(3) ("The following are not excluded by the rule against hearsay . . . [a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health) . . . ."). |
| 84. | Mrs. Malkin always intended to sell her policies as soon as she was able. Dep. Ex. 71 at 2 ("Once again, there was never an intention on her part to keep this policy, and my mother never paid for the policy nor could she afford to pay for the policy."); Ex. A to Aff. of A. Cohn, Agreement Regarding Life Insurance Policies, dated June 1, 2006 ("Phyllis' plan will be to sell those policies in approximately twenty-six (26) months and retain the proceeds, after payment of all expenses and loans relating to [the Sun Life and American General] policies."), attached hereto as Exhibit 16; Dep. of M. Roffeld at 54:19-25 (Mrs. Malkin told him "right after" | U.S. Bank disputes the assertions contained in paragraph 84, which are based on inadmissible hearsay evidence. | U.S. Bank does not contest the factual veracity of Sun Life's assertion at paragraph 84, and U.S. Bank's bald conclusion that these assertions "are based on inadmissible hearsay evidence" is wrong.  U.S. Bank does not identify any statements upon which this testimony is allegedly based.  And, in any event, any statements made by Mrs. Malkin regarding her intent to sell her policies as soon as she was able would be admissible under Fed. R. Evid. 803(1), (3) to show then-existing state of mind.  *See* Fed. R. Evid. 803(3) ("The following are not excluded by the rule against hearsay . . . [a] statement of the declarant's then-existing state of mind |

---

[19] Toni Guarnero is Mrs Malkin's only daughter and the personal representative of Mrs. Malkin's estate.

| | | | |
|---|---|---|---|
| | she got the policy that "the reason she got that policy was to sell it."). | | (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health) . . . ."). The Agreement Regarding Life Insurance Policies itself satisfies the business record exception. *See* Ex. 16 ("On May 10, 2006, Mrs. Malkin hired me to draft an agreement between herself and her husband, which I entitled 'Agreement Regarding Life Insurance Policies.' . . . The Malkins executed the agreement and sent it back to me on or about June 1, 2006.  I have kept it in my files ever since in the ordinary course of my practice.  A true and accurate copy of this agreement is attached hereto as Exhibit A."); Fed. R. Evid. 803(6). |
| 85. | Both Malkins attempted to participate in the transactions offered by Simba; Mr. Malkin was not healthy enough to qualify, but Mrs. Malkin was. Dep. of M. Roffeld at 26:9-10. | U.S. Bank disputes that the assertions contained in paragraph 85 accurately characterize Mr. Roffeld's deposition testimony. At his deposition, Mr. Roffeld was asked the following questions and gave the following answers:<br>    Q: Did you ever discuss the possibility of getting a life insurance policy<br>    with the Malkins? A: No.<br>    Q: Do you know why you didn't?<br>    A: Sure I know why. Q: Can you tell me?<br>    A: Sure.<br>    Q: Will you tell me?<br>    A: She was -- Of course. Q: Please tell me.<br>    A: Of course. She was already written and he was already turned down.<br>    He was not insurable and she was already written.<br>(Roffeld Dep. at 25:23-26:10 (Walsh Decl. II, Ex. BB)). | U.S. Bank's disputation of Sun Life's assertions at paragraph 85 is not substantiated by the evidence to which it cites.  Indeed, the deposition testimony cited by U.S. Bank supports Sun Life's assertion. *See* U.S. Bank CMF ¶ 85 (citing Dep. of M. Roffeld at 25:23-26:10)).  Nor are Sun Life's assertions "unsupported by the evidence, inadmissible hearsay, and lacking foundation." Mr. Roffeld was a friend of the Malkins and a referral agent for Simba and as such has personal knowledge of whether the Malkins tried to participate in Simba's program and whether or not they were accepted.  Dep. of M. Roffeld at 10:14-11:6, 20:12-24.  There is not even a question of hearsay because U.S. Bank does not identify any statements upon which this testimony is supposedly allegedly based. |

| | | Moreover, U.S. Bank disputes the assertions contained in paragraph 85 as unsupported by the evidence, inadmissible hearsay, and lacking foundation. | |
|---|---|---|---|
| 86. | On August 19, 2005, Simba acquired a HIPAA release from Mrs. Malkin in favor of itself and numerous third-parties including insurance companies and funding entities such as Coventry. Dep. Ex. 18 at 2-3, attached hereto as Exhibit 17; Dep. of P. Shapiro at 82-83. | U.S. Bank does not dispute the assertions contained in paragraph 86. | U.S. Bank does not dispute the assertions contained at paragraph 86. |
| 87. | Simba used the HIPAA release to acquire Mrs. Malkins' medical records from her various physicians. Dep. Ex. 19, Request for Medical Records, attached hereto as Exhibit 18; Dep. Ex. 20, Request for Medical Records, attached hereto as Exhibit 19; Dep. Ex. 21, Request for Medical Records, attached hereto as Exhibit 20; Dep. of P. Shapiro at 85:10-87:14. | U.S. Bank does not dispute the assertions contained in paragraph 87. | U.S. Bank does not dispute the assertions contained at paragraph 87. |
| 88. | Simba then used Mrs. Malkin's medical records to make informal applications to insurers as selected by Mr. Bryan based on his knowledge of the policies that the funders wanted at that time. Dep. Ex. 120 at 2; Total Financial_00263, Email from P. Shapiro to M. Greenberg ("Confirm that this case is being shopped to all of the companies Total [Financial] represents that Marty G[reengerg] & Larry [Bryan] have agreed to."), attached hereto as Exhibit 21. | U.S. Bank disputes the assertions contained in paragraph 88, which are based on inadmissible hearsay evidence. The document bates stamped Total Financial_00263 is outside the scope of the current record, constitutes unauthenticated, inadmissible hearsay evidence that is outside the scope of the current record in violation of Local Rule 56.1, and is of no probative value. | U.S. Bank does not contest the factual veracity of Sun Life's assertion at paragraph 88, and U.S. Bank's statement that Sun Life's assertion is based on inadmissible hearsay is wrong.  The document was produced by Total Financial pursuant to subpoena and is obviously an email from Mr. Shapiro to Total Financial.  Sun Life is not required to produce every piece of evidence on a motion for summary judgment in admissible form, the evidence submitted by Sun Life simply has to be susceptible to being reduced to admissible form.  *See McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996).  This document is not |

| | | |
|---|---|---|
| | | "outside the scope of the current record," and there is no rule against using self-authenticating documents produced pursuant to subpoena in connection with a motion for summary judgment.  Finally, the document is highly probative in connection with Mr. Bryan's testimony that the funders (including Coventry) told him what policies from what insurance companies they wanted him to pursue.  *See* Ex. 5 at 2 ("My contacts at the funders would tell me what insurance companies they wanted insurance policies from (and what types of policies they needed from those insurance companies) in order to round out the funders' portfolios.  I would then direct Simba to apply for the types of policies that the funders were interested in on behalf of Simba's clients.").  This email shows Mr. Shapiro following that direction in connection with the Policy.  *See* Ex. 21 ("Confirm that this case is being shopped to all of the companies that Total [Financial] represents that Marty G[reenberg] & Larry [Bryan] have agreed to."). |
| 89. | On November 15, 2005, Coventry sent Mrs Malkin's medical records to AVS Underwriting ("AVS") so that AVS could prepare a life expectancy report on Mrs. Malkin Dep. Ex. Q, Memo from Emily Patton to Phil Loy attaching P Malkin's medical records, dated November 15, 2005, attached as Exhibit 22; Dep. of L. Bryan at 217:5-13. | U.S. Bank does not dispute the assertion contained in paragraph 89. | U.S. Bank does not dispute Sun Life's assertions at paragraph 89. |
| 90. | On or about December 1, 2005, AVS emailed Coventry a life expectancy report showing a | U.S. Bank does not dispute the assertion | U.S. Bank does not dispute Sun Life's |

| | | |
|---|---|---|
| | projected life expectancy for Mrs Malkin of 180 months.[20] Dep. Ex. R, Email from Candy Nielsen to Emily Patton (Coventry) and Kenn Zinn (AIG), dated December 1, 2005, attached hereto as Exhibit 23; Dep. of P. Loy at 65:12-15. | contained in paragraph 90. | assertions at paragraph 90. |
| 91. | Coventry used this life expectancy report to see how long it would have to pay premiums on any potential Malkin policies and thus to determine how valuable such a policy might be. Dep. of P. Loy at 25:7-11 ("[I]t turns out that the economic value in the policy is determined by how long [the insured] is going to live, usually mostly based on — on premium, but — and then that, in subsequent term, affects how much [a company like Coventry] is willing to pay for that policy."); Dep. of P. Shapiro at 93:7-95:7 (life expectancy correlates to value of policy); Dep. of L. Bryan at 208:2-21 (same); Dep. of M. Roffeld at 32:1-34:21 (same). | U.S. Bank disputes the assertions contained in paragraph 91, which are based on inadmissible hearsay evidence. Mr. Loy, Mr. Shapiro, Mr. Bryan, and Mr. Roffeld have no knowledge of how "Coventry used [the] life expectancy report . . . on any potential Malkin policies." Moreover, Mr. Bryan's testimony rebuts Sun Life's contention that this fact is undisputed. At his deposition, Mr. Bryan was asked the following questions and gave the following answers: <br><br> Q: Did Simba ever order life expectancies on behalf of their clients? <br> A: I'm trying to think if we did or the institutions did or maybe we both did. It is possible. <br> Q: When you say the institutions, what do you mean? <br> A: The financial institutions that would provide the funds. <br> Q: Does that include Coventry? <br> A: I don't know whether they did or didn't. They would be - again, they - Q: When you say financial institutions, that includes Coventry, right? <br> A: It does. I'm just suggesting that I don't know whether they order LE's or not. <br> (Bryan Dep. at 135:22-136:13 (Walsh Decl. | U.S. Bank's disputation of Sun Life's assertion at paragraph 91 is not substantiated by the evidence to which it cites. U.S. Bank does not dispute that Coventry sought and received a life expectancy report on Mrs. Malkin's life in late 2005. *See* U.S. Bank CMF ¶¶ 89-90. U.S. Bank does not genuinely dispute that life expectancy reports are used by participants in the life settlement market (such as Coventry, who claims to have invented that market) to determine the value of life insurance policies. *See supra* at ¶¶ 1, 91. Thus, without any affirmative evidence, U.S. Bank appears to be arguing that Coventry (a leader in the life settlements) *may* not have used the life expectancy reports it commissioned on Mrs. Malkin the way life settlement companies *undeniably* use reports such as these. And again, AIG admits that Coventry used life expectancy reports to gauge the value of life insurance policies. Ex. 68 ¶¶ 165-77. Moreover, Messrs. Bryan and Shapiro both had significant interaction with Coventry in connection with these transactions and thus are competent to testify as to how Coventry used these reports. U.S. Bank had an opportunity to cross examine both of these |

---

[20] Other funding entities, such as Park Venture, also acquired life expectancy reports on Mrs. Malkin at this time.  Ex. 24.

| | | |
|---|---|---|
| | II, Ex. Z)). | gentlemen and to raise this supposed issue, but U.S. Bank chose not to do so. Finally, the testimony from Mr. Bryan's deposition cited by U.S. Bank does not show a genuine issue. The fact that Mr. Bryan could not remember whether *Coventry* ordered the life expectancy reports or whether Simba did that *for Coventry* or whether they *both* ordered the life expectancy reports is immaterial. |
| 92. | The email from AVS to Coventry containing the life expectancy report on Mrs. Malkin was also sent to the manager of an AIG underwriting team, Ken Zinn, whose team of underwriters were physically co-located in Coventry's building (and used Coventry's email servers) at the time. Dep. Ex. R; Dep. of P. Loy at 35-38, 65-68. | U.S. Bank does not dispute the assertions contained in paragraph 92, but notes that the purported email contains no reference to the Malkin Sun Life Policy. | U.S. Bank does not dispute Sun Life's assertions at paragraph 92. U.S. Bank admits that AVS sent a life expectancy report on Mrs. Malkin to Coventry (copy to Kenn Zinn) on or about December 1, 2005. *See* U.S. Bank's CMF ¶ 92. The fact that the email "contains no reference to the Malkin Sun Life Policy" is of no consequence. |
| 93. | AVS sent Mrs Malkin's life expectancy to AIG because AIG was also underwriting Mrs. Malkin at the same time as Coventry. Dep. of P. Loy at 70:14-16 (AIG was underwriting "every potential insurance policy that Coventry might present to them."). | U.S. Bank disputes the assertions contained in paragraph 93, which are based on inadmissible hearsay evidence and are not supported by the cited testimony. | U.S. Bank does not contest the factual veracity of Sun Life's assertion at paragraph 93. Mr. Zinn was copied on the life expectancy report prepared by AVS for Coventry. Ex. 23 (copy to "Ken Zinn AIG Group aigunderwriting@coventryfirst.com"). Mr. Loy testified that "he knew all of [AIG's] underwriters" and had "daily communications with Ken [Zinn] about the underwriting of specific underwriting reports. *See* Dep. of P. Loy at 34:25-35:7, 35:22-36:3, 36:16-37:13. Mr. Loy further testified that Mr. Zinn was "given the task of also underwriting the same medical records that we were" because AIG was "belt and suspenders." *See* Dep. of P. Loy at 38:1-38:11. Mr. Loy also testified that he did not |

| | | |
|---|---|---|
| | | recall dealing with AIG on any deal that did not involve Coventry. *See* Dep. of P. Loy at 38:23-39:2, 39:8-39:11.  Finally, Mr. Loy testified that at the time the email in question was sent, AIG used Coventry's "server to transmit e-mails" and AIG's underwriting team shared office space in Coventry's building. *See* Dep. of P. Loy 66:12-66:19.<br><br>Moreover, U.S. Bank's suggestion that Lavastone's involvement was somehow related to American General's separate underwriting in connection with the issuance of the two other American General policies is disingenuous. *Compare* U.S. Bank's Mot. at 27 & n.12, *with* Ex. 68 ¶¶ 129 n.14, 165-77 (explaining that Mr. Zinn was head of a team at AIG Risk Finance (not American General) and that he was involved in generating life expectancy reports in connection with the origination of policies AIG would *buy* not issue. |
| 94. | "After Simba received informal approval from Sun Life and American General that they would issue policies on Mrs. Malkin, Simba got confirmation from Coventry that it was still interested in these policies." Dep. Ex. 120 at 4. | U.S. Bank does not dispute that the assertion contained in paragraph 94 accurately reflects Mr. Bryan's written statement cited at Dep. Ex. 120 at 4. U.S. Bank disputes that there is no issue of fact as to the assertion that "Simba got confirmation from Coventry that it was still interested in the policies." Mr. Bryan's earlier testimony rebuts Sun Life's contention that this fact is undisputed. At his deposition, Mr. Bryan was asked the following questions and gave the following answers:<br><br>Q: And so, for example, Coventry | U.S. Bank is wrong that the cited portions of Mr. Bryan's deposition testimony rebut his written statement that "Simba got confirmation from Coventry that it was still interested in the policies." At the deposition testimony cited by U.S. Bank, Mr. Bryan was asked questions about Coventry's state of mind regarding entering into joint ventures with insureds; Mr. Bryan was not asked whether Simba got confirmation from Coventry that it was still interested in policies from Sun Life and American General after Simba received informal approval from Sun Life and American |

<table>
<tr>
<td></td>
<td></td>
<td>entered into joint ventures with insureds as part of a life insurance capacity transaction?<br>A: I would say they probably did, yeah.<br>Q: Is that because — could that have been because Coventry wanted the policy?<br>A: I think the best thing would be to ask Coventry.<br>Q: I'm asking you.<br>A: I can't answer what their motive.<br>Q: I totally understand that. I'm asking you about your understanding. Do you have an understanding of whether Coventry entered into joint venture type of arrangements, such as this life insurance capacity, that they were interested in acquiring the policy?<br>A: I never looked at what their interest was.<br>Q: So you do not have an understanding?<br>A: I've never spoken to anybody about it. I didn't form any opinions about it. I didn't care what their motives were.<br>(Bryan Dep. at 106:7-107:10 (Walsh Decl. II, Ex. Z)).</td>
<td>General that they would issue policies on Mrs. Malkin. There is no inconsistency between Mr. Bryan's Statement and his deposition testimony. And the testimony cited by Sun Life from Mr. Bryan's Statement is fully consistent with the testimony from Mr. Shapiro and Mr. Roffeld that U.S. Bank does not even purport to dispute. *See* Dep. of P. Shapiro at 33:25-36:25 (explaining that "*the funders made the decision on which life insurance applications to make*" because the funders were paying for the policies and simply using the insured's "body"); Dep. of M. Roffeld at 37:24-38:7 (The funder pays the premiums because "the funder wants the policy.").</td>
</tr>
<tr>
<td>95.</td>
<td>It was eventually decided to acquire three policies on Mrs. Malkin's life — a $5 million Sun Life policy through Coventry (the "Policy"), a $4 million American General policy through Coventry, and a $4 million American General policy through Positive Financial — for a total of $13 million in coverage. *Id.*</td>
<td>U.S. Bank does not dispute the assertion contained in paragraph 95 that three policies were taken out on the life of Mrs. Malkin, including a $5 million Sun Life policy, and two $4 million American General policies. U.S. Bank disputes the assertion that "Mt was eventually decided to acquire three policies on Mrs. Malkin's life," which</td>
<td>U.S. Bank does not dispute the majority of Sun Life's assertion at paragraph 95. U.S. Bank's disputation of the phrase "It was eventually decided" on hearsay grounds is not understood or supported. U.S. Bank has not identified an alleged statement or provided any substantiation of its hearsay bald hearsay allegation. Mr. Bryan's testimony is based on his experience as</td>
</tr>
</table>

| | | is based on inadmissible hearsay evidence. | Chairman of Simba and his professional interaction with Coventry.  Ex. 5. |
|---|---|---|---|
| 96. | "The Malkins never told anyone at Simba to get them a Sun Life policy or American General policies, and the Malkins never told anyone at Simba to take out loans through Coventry or Positive Financial." Dep. Ex. 120 at 4. | U.S. Bank disputes the assertions contained in paragraph 96. Mr. Bryan testified that he did not have any personal knowledge of Mrs. Malkin's application for life insurance. (Bryan Dep. at 172:15-173:5, 226:6-229:16 (Walsh Decl. II, Ex. Z)). | U.S. Bank's disputation of Sun Life's assertions at paragraph 96 is not substantiated by the evidence to which it cites.  The testimony of Mr. Bryan to which U.S. Bank cites stands for the narrow proposition that Mr. Bryan does not remember who referred Mrs. Malkin to Simba or who had the first conversation with her and that Mr. Bryan did not fill out Mrs. Malkin's applications and did not personally verify her net worth.  This testimony does not rebut Mr. Bryan's statement that "The Malkins never told anyone at Simba to get them a Sun Life policy or American General policies, and the Malkins never told anyone at Simba to get them to take out loans through Coventry or Positive Financial."  Ex. 5 at 4.  Mr. Bryan was the Chairman of Simba and familiar with its business, and he had conversations and other professional interactions with Mrs. Malkin starting in 2005.  Ex. 5 at 3 ("I know that based on conversations myself and others at Simba had with the Malkins and based on my knowledge of the business that Simba was running."); Dep. of L. Bryan II at 23:6-24:24.  There is no basis for the suggestion that Mr. Bryan lacks personal knowledge that the Malkins never told anyone at Simba to get them a Sun Life policy and a loan from Coventry. |
| 97. | A Sun Life and two American General policies were applied for (and, as discussed, | U.S. Bank disputes the assertions in paragraph 97 as Mr. Bryan's statement | U.S. Bank does not contest the factual veracity of Sun Life's assertion at paragraph |

| | | |
|---|---|---|
| below procured) because those were the policies Coventry and Positive Financial wanted. *Id.* | regarding what "Coventry and Positive Financial wanted" is unsupported by the evidence and constitutes inadmissible hearsay. | 97.  Moreover, the excerpt from the Statement of Larry Bryan that U.S. Bank baldly claims "constitutes inadmissible hearsay" does not contain the threshold hearsay requirement of a statement and to the extent it was based in part on a statement from Mr. Bryan's contacts at Coventry to Mr. Bryan about what policies Coventry wanted, the statement would be admissible to show then-existing state of mind.  *See* Fed. R. Evid. 803(3) ("The following are not excluded by the rule against hearsay . . . [a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health) . . . .").  U.S. Bank's claim that Mr. Bryan's statement is "unsupported by the evidence" is not substantiated by any record citation and not understood.  U.S. Bank had seven full hours to cross-examine Mr. Bryan about the contents of the Statement of Larry Bryan, but U.S. Bank used less than two hours and ended the deposition without developing any evidence to cast doubt on the veracity of the Statement of Larry Bryan including the specific testimony quoted by Sun Life at paragraph 97. |
| 98. | On or about February 16, 2006, Coventry approved Mrs. Malkin for a nonrecourse premium finance loan for the Policy. CC-00069, Coventry Internal Logs at 2/16/2006, attached hereto as Exhibit 25. | U.S. Bank disputes the assertions contained in paragraph 98. The document bates stamped CC-00069 is outside the scope of the current record, constitutes unauthenticated, inadmissible hearsay evidence that is outside the scope of the current record in violation of Local Rule | U.S. Bank does not contest the factual veracity of Sun Life's assertion at paragraph 98.  Moreover, Coventry has authenticated the internal log in question (which was produced pursuant to subpoena in this litigation) and testified that it was made and kept in the ordinary course of Coventry's business.  Affidavit of Coventry Capital I, |

| | | 56.1, and is of no probative value. | LLC Officer and/or Custodian of Records, attached hereto as Exhibit 69; *see* Fed. R. Evid. 803(6).  This document is not "outside the scope of the current record." Under the rules, "the proper materials for supporting or opposing summary judgment include 'depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials.'" *U.S. v. Arana*, No.  11-cv-20172, 2011 WL 1348412, at *2 (S.D. Fla. 2011) (citing Fed. R. Civ. P. 56(c)(1)(A)).  The court has "great flexibility with regard to the evidence that may be used on a Rule 56 proceeding" and "the particular forms of evidence mentioned in the rule are not the exclusive means . . . [insofar as] the court may consider *any* material that would be admissible or usable at trial."  Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 2721 (emphasis added) (citing *Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir. 1993); *Aguilera v. Cook Cnty. Police & Corrections Merit Bd.* 760 F.2d 844, 849 (7th Cir. 1985); *Brown v. Trans World Airlines, Inc.*, 746 F.2d 1354, 1358 (8th Cir. 1984); *Spear v. Dayton's*, 733 F.2d 554, 555 (8th Cir. 1984)).  There is no rule prohibiting a court from considering a document produced pursuant to subpoena and authenticated by the certification of the custodian of record.  *See, e.g.*, *It's A 10, Inc. v. Beauty Elite Grp., Inc.*, No. 13-cv-60154, 2013 WL 6834804, at *12 (S.D. Fla. Dec. 23, 2013) (denying defendant's motion to strike portions of the evidence offered by plaintiff in connection with summary |

61

| | | |
|---|---|---|
| | | judgment motion where the evidence in question consisted of documents that were produced during discovery and attached to an authenticity certification by reasoning that "it is common practice for attorneys to submit documents produced in discovery . . . in the form of a declaration with exhibits at the summary judgment stage.") Finally, the logs in question are highly probative on the issue of whether Coventry used Mrs. Malkin as a conduit to procure a policy as a wager on her life. |
| 99. | Simba began helping Mrs. Malkin fill out the boilerplate forms Coventry required and send them back to Coventry. Dep. of P. Shapiro at 272:16-274:7; Dep. Ex. 120 at 4. | U.S. Bank disputes the assertions contained in paragraph 99. Neither Mr. Shapiro nor Mr. Bryan had any recollection about Simba's assistance to Mrs. Malkin in filling out any Coventry forms. (Shapiro Dep. at 190:12-198:11 (Walsh Decl. II, Ex. CC); Bryan Dep. at 254:17-258:9 (Walsh Decl. II, Ex. Z)). | U.S. Bank's disputation of Sun Life's assertion at paragraph 99 is not substantiated by the evidence to which it cites. Mr. Shapiro testified that all of the forms came from Coventry in a "big packet" that was sent to him and that he would distribute these forms to his subordinates who would get the Malkins to sign them and then someone at Simba would send the documents back to Coventry. Dep. of P. Shapiro at 195:11-23, 272:16-274:7. The testimony cited by U.S. Bank stands for the unremarkable and irrelevant proposition that Mr. Shapiro was not physically present when the forms were signed. *See* U.S. Bank CMF ¶ 99 (citing Dep. of P. Shapiro at 190:12-198:11)). For his part, Mr. Bryan testified in the Statement of Larry Bryan that Mr. Shapiro "along with the case managers and other people who worked at Simba, handled filling out whatever forms the funders required, got those forms signed by the insureds, and sent those forms back to the funders." Ex. 5 at 3. This is completely consistent with Mr. |

| | | |
|---|---|---|
| | | Bryan's prior deposition testimony that Simba acted like a "go between" for the deal paperwork between Mrs. Malkin and the funders. *See, e.g.*, Dep. of L. Bryan at 248:14-249:19, 252:18-254:13, 262:21-266:1, 271:19-273:16, 278:19-279:7, 306:19-308:17, 327:21-328:19, 420:6-25.   The testimony cited by U.S. Bank stands for the unremarkable proposition that Mr. Bryan could not recall "go[ing] back ten years" whether the particular trust form he was shown by counsel was "a Coventry trust," but he was emphatic that whatever trust was used in a Coventry deal was required to be used by Coventry.  Dep. of L. Bryan at 262:21-24 ("Q: Did the funder dictate what types of trusts were used in life insurance capacity transactions?  A: Of course they did."). |
| 100. | The documents Coventry required to participate in its program were "not negotiable."  Dep. Ex. 120 at 5; Dep. of P. Shapiro at 47:2-22; Dep. of L. Bryan at 264:265:21. | U.S. Bank disputes the assertions contained in paragraph 100, which are based on inadmissible hearsay evidence. U.S. Bank further disputes Sun Life's characterization of Mr. Shapiro's and Mr. Bryan's testimony. | U.S. Bank does not contest the factual veracity of Sun Life's assertion at paragraph 100.  Moreover, U.S. Bank is wrong that Sun Life mischaracterized the forms as "non-negotiable."  Dep. of P. Shapiro at 47:2-21 ("Q: . . . Did the insureds have any opportunity to negotiate the terms of the trust agreements in your experience?  A: No."); Dep. of L. Bryan at 265:10-21 ("Q: What influence did the insured have, to your knowledge, over the contents of these documents you have been looking at?  A: I would say virtually none . . . [F]or the most part, they were non-negotiable. Q: They were take it or leave it deals? A: Pretty much, yeah. Q: That came from the funders? A: Yeah."); Ex. 5 at 5 ("Once Simba |

| | | |
|---|---|---|
| | | received these forms from Coventry, someone at Simba helped the Malkins fill them out, and then sent them back to Coventry.  The documents were not negotiable, and no client ever asked me to negotiate them.  This would have been true for the Malkins as well.").  Nor has U.S. Bank identified a threshold statement in support of its bald hearsay allegation. |
| 101. | Mrs. Malkin did not ask to negotiate any of these forms, nor did she care what they looked like. *Id.* ("Like all of Simba's other Coventry clients before them, the Malkins didn't care what the documents looked like. They had no real control over the terms of the loan (other than the fact that they could reject it outright, although none of our clients ever did that) and they had no real control over the policy."); *Id.* at 5 ("[N]o one (including the Malkins) cared about the details of the policies or the loans or whatever paperwork needed to be done."). | U.S. Bank disputes the assertions contained in paragraph 101, which are based on inadmissible hearsay evidence. | U.S. Bank does not contest the factual veracity of Sun Life's assertion at paragraph 101.  Moreover, U.S. Bank does not identify any threshold statement in support of its bald hearsay allegation.  Mr. Bryan's testimony is based in part on his knowledge of Simba's business. Ex. 5 at 3.  And any statement by Mrs. Malkin that she did not care about the details of any of the paperwork is admissible as a statement of then-existing mental or emotional state. Fed. R. Evid. 803(1), (3). |
| 102. | On March 2, 2006, Mrs. Malkin executed a power of attorney through which she irrevocably appointed Coventry as her attorney-in-fact with full powers of substitution to act for her for purposes of "originating and/or servicing any life insurance policies on [her] life, which powers specifically include[d], but [were] not limited to, the power to complete and execute any applications or other documents in connection with the maintenance or the liquidation of the [p]olicies." Dep. Ex. 28, Insureds Authorization to Release Medical | U.S. Bank disputes the characterizations contained in paragraph 102, and refers to the Insureds Authorization to Release Medical Records and the Special Irrevocable Durable Power of Attorney as evidence of their contents. | U.S. Bank does not dispute Sun Life's assertions at paragraph 102, and the "Insureds Authorization to Release Medical Records and the Special Irrevocable Durable Power of Attorney" plainly supports them. |

| | | | |
|---|---|---|---|
| | Records and Special Irrevocable Durable Power of Attorney, at 1, attached hereto as Exhibit 26. | | |
| 103. | Mr. Malkin also executed a power of attorney allowing Coventry to act in his stead to originate, maintain, service, and/or liquidate the policies. Dep. Ex. 29, Borrower's Special Irrevocable Durable Power of Attorney, at 1, attached hereto as Exhibit 27. | U.S. Bank disputes the characterizations contained in paragraph 103, and refers to the Borrower's Special Irrevocable Durable Power of Attorney as evidence of its contents. | U.S. Bank does not dispute Sun Life's assertions at paragraph 103, and the "Borrower's Special Irrevocable Durable Power of Attorney" plainly supports them. |
| 104. | These boilerplate power of attorney forms were created by Coventry, and Coventry required insureds to sign them to participate in the program. Dep. Ex. 120 at 4; Dep. of L. Bryan at 243:14-15, 245:6-8, 248:14-21; Dep. of P. Shapiro at 272:16-273:23. | U.S. Bank disputes the assertions in paragraph 104, which are based on inadmissible hearsay evidence. U.S. Bank further disputes the characterization of the deposition testimony cited by Sun Life. In his deposition, Mr. Bryan stated that he "assumed" that the Insured's Authorization to Release Medical Records and Special Irrevocable Durable Power of Attorney came from Coventry, (Bryan Dep. at 242:20-243:15 (Walsh Decl. II, Ex. Z)) and that he did not recall whether the Borrower's Special Irrevocable Durable Power of Attorney came from Coventry, (*id.* at 245:1-15). Moreover, Mr. Shapiro did testify that Coventry "required" insureds to sign any Coventry forms. (Shapiro Dep. at 272:16-273:23 (Walsh Decl. II, Ex. CC)). Finally, U.S. Bank disputes the characterization of the application process as a "program." | U.S. Bank's disputation of Sun Life's assertions at paragraph 104 is not substantiated by the evidence to which it cites.  Mr. Shapiro testified unequivocally that the power of attorney forms came from Coventry.  Dep. of P. Shapiro at 272:16-274:7.  Mr. Bryan's testimony that – "I'm assuming [the power of attorney form] came from – it looks like it came from Coventry" – is completely consistent with Mr. Shapiro's unequivocal testimony.  Dep. of L. Bryan at 241:1-245:8.  The notion that these forms are not Coventry's forms is also belied by the fact that Judge Cohen described them as part of Coventry's non-recourse premium financing loan [NRPF] program in *Pruco Life Insurance Company v. Brasner*, No. 10-80804, 2011 U.S. Dist. LEXIS 156297, at *8-9 (Nov. 14, 2011).  Moreover, contrary to U.S. Bank's suggestion, Mr. Bryan unequivocally testified that Coventry "required" potential insureds like Mrs. Malkin to sign these boilerplate forms. Dep. of L. Bryan at 248:11-249:21 ("Q: Coventry required these forms to be signed?  A: |

| | | |
|---|---|---|
| | | Yes."); Ex. 5 at 4 ("Coventry provided Simba with all of the boilerplate documents (trust docs, loan docs, power of attorney, etc.) that were needed to do a Coventry deal. . . . The documents were not negotiable . . . . This would have been true for the Malkins as well."). |
| 105. | The Malkins did not review these powers of attorney forms, ask to negotiate them, or question why Coventry wanted them. Dep. Ex. 120 at 4; Dep. of L. Bryan at 239:16-240:3 ("[W]e didn't question what a funder wanted and the insured didn't question that either."). | U.S. Bank disputes the assertions in paragraph 105, which are based on inadmissible hearsay evidence. Mr. Bryan also testified that he was not personally involved with Mrs. Malkin's power of attorney forms. (Bryan Dep. at 246:5-23 (Walsh Decl. II, Ex. Z)). | U.S. Bank's disputation of Sun Life's assertions at paragraph 105 is not supported by the evidence to which it cites. The testimony of Mr. Bryan cited by U.S. Bank stands for the limited proposition that Mr. Bryan was not physically present when the power of attorney forms were signed. *See* U.S. Bank CMF ¶ 105 (citing Dep. of L. Bryan at 246:5-23)). Moreover, U.S. Bank has not identified a threshold statement upon which to base its bald hearsay allegations; indeed, the fact that someone did *not* say something is *not* hearsay. |
| 106. | That same day, the Malkins also executed a form providing that the trust that was going to be established to hold the Malkin policies was "not intended to satisfy [Mrs Malkin's] estate planning needs and [was] not designed as an estate planning tool."[21] Dep. Ex. 30, Disclosure Statement and Acknowledgment, at 2, attached hereto as Exhibit 28. | U.S. Bank disputes the assertions in paragraph 106, which are based on inadmissible hearsay evidence. | U.S. Bank does not contest the factual veracity of Sun Life's assertion at paragraph 106. Moreover, U.S. Bank's bald hearsay allegation is wrong. Coventry certified that the document in question is an authentic business record. Ex. 69. |
| 107. | On March 15, 2006, Mrs. Malkin (as settlor) Wilmington Trust Company (as trustee) and Mr. Malkin (as beneficial owner and co-trustee) entered into an agreement purporting | U.S. Bank disputes the assertions in paragraph 107 that the Phyllis Malkin Insurance Trust Agreement was created "for the express purpose of applying for and | U.S. Bank's disputation of Sun Life's assertions at paragraph 107 is not supported by the evidence to which it cites. *See* Ex. 29 ¶ 1 (authorizing the Trust to execute "one or |

[21] The document also required the Malkins to cooperate with Coventry and do what it asked provided there were never any costs to the Malkins. *Id.* at 2.

| | | |
|---|---|---|
| | to create a Delaware statutory trust with an initial trust estate of $1.00 entitled the "Phyllis Malkin Insurance Trust" for the express purpose of applying for and holding life insurance policies on the life of Mrs. Malkin (the "Trust").[22] Dep. Ex. 33, Phyllis Malkin Insurance Trust Agreement, dated March 15, 2006, attached hereto as Exhibit 29. | holding life insurance policies on the life of Mrs. Malkin," and refers to the Phyllis Malkin Insurance Trust Agreement as evidence of its contents. | more applications and contracts for life insurance, which policies are to become part of the trust estate . . . ."). |
| 108. | The Trust was created with forms non-negotiable forms provided by Coventry. Dep. Ex. 120 at 4; Dep. of P. Shapiro at 47:2-22; Dep. of L. Bryan at 264:6-265:21. | U.S. Bank disputes that the assertions in paragraph 108, which are based on inadmissible hearsay evidence. Moreover, Mr. Bryan's earlier testimony rebuts Sun Life's contention that the trust forms were "provided by Coventry." At his deposition, Mr. Bryan was asked the following questions and gave the following answers regarding the Phyllis Malkin Insurance Trust Agreement: "Q: Who [drafted the trust agreement]? A: I don't know. If this is a Coventry trust, and I'm not suggesting it is or isn't, I wouldn't know. It doesn't say in the back or anywhere that this is a Coventry trust. If it did, then it speaks for itself." (Bryan Dep. at 256:18-23 (Walsh Decl. II, Ex. Z)). | U.S. Bank's disputation of Sun Life's assertion at paragraph 108 is not supported by the evidence to which it cites.  Mr. Shapiro testified unequivocally that that in Simba's deals the funding company provided the "form agreements to create the trusts" and that the Malkin Trust Agreement was sent to Simba by Coventry.  Dep. of P. Shapiro at 47:2-20, 130:6-131:25 ("Q: Do you know who did draft [the Malkin Trust Agreement]?  A: It came in the Coventry packet of documents which was a very large amount of paperwork.").  The testimony cited by U.S. Bank stands for the unremarkable proposition that Mr. Bryan could not recall "go[ing] back ten years" whether the particular trust form he was shown by counsel was "a Coventry trust," but he was emphatic that whatever trust was used in a Coventry deal was required to be used by Coventry.  Dep. of L. Bryan at 262:21-24 ("Q: Did the funder dictate what types of trusts were used in life insurance capacity transactions?"  A: Of course they |

---

[22] The agreement contains a handwritten "made as of' date of March 15, 2006; however, it appears as though the date may have been altered. *Id.* For purposes of this motion, Sun Life assumes the date was correct.

| | | |
|---|---|---|
| | | did.").  In any event, Mr. Bryan's testimony that he did not recall with certainty is *not* inconsistent with Mr. Shapiro's unequivocal testimony that the Trust forms came from Coventry.  U.S. Bank's bald hearsay allegation is not substantiated by any evidence and is not understood.  U.S. Bank has not identified a threshold statement, and any statement would be admissible pursuant to Fed. R. Evid. 803(1), (3). |
| 109. | Coventry made the decision to use Wilmington Trust as the trustee and to create a Delaware statutory trust. Dep. of L. Bryan at 258:20-24, 262:21-263:2. | U.S. Bank disputes the assertions in paragraph 109, which are based on inadmissible hearsay evidence. Moreover, Mr. Bryan's earlier testimony rebuts that Coventry made the decision to use Wilmington Trust. At his deposition, Mr. Bryan was asked the following questions and gave the following answers regarding the Phyllis Malkin Insurance Trust Agreement: "Q: Do you know why Wilmington Trust Company was chosen as the trustee? A: Without a doubt, Wilmington Trust — this may not have been a Coventry. I don't remember Coventry being involved with Wilmington Trust. I remember Park Venture being involved with Wilmington Trust." (Bryan Dep. at 258:13-19 (Walsh Decl. II, Ex. Z)). | U.S. Bank's disputation of Sun Life's assertion at paragraph 109 is not substantiated by the evidence to which it cites.  There is no dispute that the Wilmington Trust Company was chosen to be the Trustee.  *See* Ex. 29 (Trust Agreement signed by Wilmington Trust as Trustee); U.S. Bank's CMF ¶ 107 (failing to deny that Wilmington Trust was Trustee).  Mr. Bryan testified that the funders chose the trustees and decided what types of trusts were used in life insurance capacity transactions such as the one engaged in by Mrs. Malkin.  *See* Dep. of L. Bryan at 258:20-24, 262:21-263:2.  The fact that Mr. Bryan could not recall with certainty the name of the trust company used by Coventry after so many years is not inconsistent with his testimony that funders like Coventry made the decisions on what trusts and trustees to use. U.S. Bank did not depose Wilmington Trust or Coventry in an attempt to controvert this testimony and should not now be allowed to infuse some scintilla of metaphysical doubt into the equation by pointing to small, inconsequential details that were not |

| | | |
|---|---|---|
| | | perfectly remembered.  Sun Life made a prima facie case, and U.S. Bank has failed to come forward with evidence to rebut it. |
| 110. | Mrs. Malkin had no input into these decisions, no influence over the Trust's content, and no ability to negotiate any of its terms. *Id.* at 262:21-266:5; Dep. Ex. 120 at 4. | U.S. Bank disputes the assertions in paragraph 110, which are based on inadmissible hearsay evidence. Mr. Bryan testified that he did not have any personal knowledge of Mrs. Malkin's application for life insurance, (Bryan Dep. at 172:15-173:5, 226:6-229:16 (Walsh Decl. II, Ex. Z)), or Mrs. Malkin's Trust, *(id.* at 254:17-258:9). | U.S. Bank's disputation of Sun Life's assertion at paragraph 110 is not substantiated by the evidence to which it cites.  The testimony of Mr. Bryan to which U.S. Bank cites stands for the narrow proposition that Mr. Bryan does not remember who referred Mrs. Malkin to Simba or who had the first conversation with her and that Mr. Bryan did not fill out Mrs. Malkin's applications and did not personally verify her net worth.  This testimony does not rebut the proposition that "Mrs. Malkin had no input into these decision, no influence over the Trust's content, and no ability to negotiate any of its terms."  Sun Life SUF ¶ 110.  Mr. Bryan was the Chairman of Simba and familiar with its business, and he had conversations and other professional interactions with Mrs. Malkin starting in 2005. Ex. 5 at 3; Dep. of L. Bryan II at 23:6-24:24.  There is no basis for the suggestion that Mr. Bryan lacks personal knowledge, and U.S. Bank has not developed any affirmative evidence to rebut Mr. Bryan's testimony.  U.S. Bank's bald hearsay allegation is unsupported insofar as U.S. Bank has not even identified a threshold statement and any such statement would be admissible under Rule 803(1), (3). |
| 111. | Mrs. Malkin's ability to name the beneficiaries she wanted was also restricted. Ex. A to Aff. of A. Cohn at 1 | U.S. Bank disputes the assertions in paragraph 111, which are based on | U.S. Bank does not contest the factual veracity of Sun Life's assertion at paragraph 111.  Moreover, U.S. Bank's bald hearsay |

| | | |
|---|---|---|
| ("Whereas Phyllis was informed that she could only name one (1) beneficiary of the aforementioned insurance policies, and has, therefore, named her husband Paul Malkin, with the intent that he shall act to carry out this plan and receive those funds partially for himself and partially in a custodial relationship for the benefit of Phyllis' children."). | inadmissible hearsay evidence. | objection is flatly refuted by the Affidavit of Alan Cohn. *See* Ex. 16 ("On May 10, 2006, Mrs. Malkin hired me to draft an agreement between herself and her husband, which I entitled 'Agreement Regarding Life Insurance Policies.' . . . The Malkins executed the agreement and sent it back to me on or about June 1, 2006. I have kept it in my files ever since in the ordinary course of my practice. A true and accurate copy of this agreement is attached hereto as Exhibit A."); Fed. R. Evid. 803(6). |
| 112. | On the same day, Mrs. Malkin signed an application for a $5 million universal life insurance policy from Sun Life listing the Trust as the proposed owner, beneficiary, and premium payor (the "Application"). Dep. Ex. 57, Sun Life Ins. App., dated March 15, 2006, at 84, 88, attached hereto as Exhibit 30. | U.S. Bank disputes the assertions in paragraph 112. The undisputed facts demonstrate that Mrs. Malkin signed an application for a $5 million universal life insurance policy from Sun Life on February 16, 2006 listing "trust pending" as the proposed owner and premium payor. Mrs. Malkin listed her husband, Paul Malkin, as the proposed beneficiary. (Deposition of Donald Lawrence conducted on October 28, 2015 ("Lawrence Dep.") at 22:23-26:6 (Walsh Decl. I, Ex. E) & Dep. Ex. 159 (Walsh Decl. I, Ex. F)). | U.S. Bank's disputation of Sun Life's assertions at paragraph 112 is not substantiated by the evidence to which it cites. There is no genuine dispute that the Application Sun Life received on March 15, 2006 was the Application upon which the Policy was issued and that the other prior applications discussed by U.S. Bank are irrelevant under the express terms of the Policy and applicable substantive law. *See* Sun Life's Counter-Statement of Material Facts in Opposition to U.S. Bank's Motion for Summary Judgment ¶¶ 1-17; Sun Life's Mem. of Law in Opposition to U.S. Bank's Motion for Summary Judgment at 9–10. |
| 113. | Mrs. Malkin did not make the decision to apply for coverage from Sun Life. Dep. Ex. 120 at 4 ("The Malkins never told anyone at Simba to get them a Sun Life policy . . . ."); *Id.* at 3 ("No Simba client . . . ever asked [Simba] to get them a specific type of policy or a policy from a particular company."); Dep. of P. Shapiro at 34:19-21 ("Q: So the | U.S. Bank disputes the assertions in paragraph 113. Mr. Bryan testified that he did not have any personal knowledge of Mrs. Malkin's application for life insurance. (Bryan Dep. at 172:15-173:5, 226:6-229:16 (Walsh Decl. II, Ex. Z)). | U.S. Bank's disputation of Sun Life's assertion at paragraph 113 is not substantiated by the evidence to which it cites. The testimony of Mr. Bryan to which U.S. Bank cites stands for the narrow proposition that Mr. Bryan does not remember who referred Mrs. Malkin to Simba or who had the first conversation with |

| | | | |
|---|---|---|---|
| | funders made the decision on which life insurance application to make? A: Yes."). | | her and that Mr. Bryan did not personally fill out Mrs. Malkin's applications and did not personally verify her net worth.  This testimony does not rebut the proposition that "Mrs. Malkin did not make the decision to apply for coverage from Sun Life."  Mr. Bryan was the Chairman of Simba and familiar with its business, and he had conversations and other professional interactions with Mrs. Malkin starting in 2005. Ex. 5 at 3; Dep. of L. Bryan II at 23:6-24:24.  There is no basis for the suggestion that Mr. Bryan lacks personal knowledge, and U.S. Bank has not developed any affirmative evidence to rebut Mr. Bryan's testimony. |
| 114. | The Application was signed by Wilmington Trust (as owner) in Delaware; Mrs. Malkin (as insured) and Mr. Bryan (as producer) also purportedly signed it in Delaware; however, Mrs. Malkin was not actually in Delaware, and Mr. Bryan now admits that neither was he. Dep. Ex. 57 at 94; Dep. Ex. 70, Malkin Planner at 203, attached hereto as Exhibit 31; Dep. of L. Bryan at 389:12-390:11; Dep. of T. Guarnero at 177:2-12, attached hereto as Exhibit 32. | U.S. Bank disputes the assertions in paragraph 114. There is no admissible evidence that Wilmington Trust signed the application in Delaware. The undisputed facts are that Mrs. Malkin and Mr. Bryan or his representative signed the application in Florida. (Bryan Dep. at 289:12-290:11 (Walsh Decl. II, Ex. Z); Lawrence Dep. at 22:23-26:6 (Walsh Decl. I, Ex. E) & Dep. Ex. 159 (Walsh Decl. I, Ex. F)). | U.S. Bank's partial disputation of Sun Life's assertions at paragraph 114 is not substantiated by the evidence to which it cites.  The Sun Life Assurance Company of Canada Life Insurance Policy Dating Acknowledgment and Delivery Receipt Form (the "Delivery Form") was addressed to the Trust as owner of the Policy.  Ex. 47 at 18; Ex. 48 at 18.  The Trust's address was Drop Code 1625, 1100 N. Market Street, Wilmington, Delaware 19890.  Ex. 48 at 17; Exhibit Q to Declaration of J. Walsh at 62. The Delivery Form stated: "By signing below, you confirm that you have received, reviewed, and accepted the policy.  [Sun Life] will retain this document as evidence that the policy has been delivered to you on the date shown."  *Id.*  The Delivery Form was signed by Scott A. Huff, Senior Financial Services Officer at Wilmington |

| | | |
|---|---|---|
| | | Trust Company, on April 20, 2006 in Wilmington, Delaware.  Ex. 47 at 18; Mem. from S. Huff, dated January 16, 2008, AmericanGeneral 187-188 (confirming Mr. Huff was representative of Wilmington Trust), attached hereto as Exhibit 70; Mem. from S. Huff, dated April 26, 2007, AmericanGeneral 152-153 (same), attached hereto as Exhibit 71; Aff. of E. Jordan (certifying these documents as authentic business records), attached hereto as Exhibit 72.  The Delivery Form itself explicitly says it was signed at "Wilmington, Delaware." *Id.*  The following day, the broker general agent returned the executed Delivery Form to Sun Life.  Ex. 48.  These Delivery Form and letter Sun Life received enclosing the Delivery Form have been authenticated by Sun Life as being true and accurate copies kept in the ordinary course.  *See* Aff. of G. Lawrence, attached hereto as Exhibit 73. Sun Life has made a prima facie case.  If U.S. Bank wanted to try to show that Wilmington Trust did not sign the Delivery Form when and where the Delivery Form shows that it was signed, it was incumbent upon U.S. Bank to develop that evidence. But U.S. Bank did not even try. |
| 115. | The Application asked whether there was any "in-force" or "pending" insurance with any life insurance company; despite the fact that there were by then two executed American General applications — each for $4 million in coverage — this question was answered in the negative. Dep. Ex. 57 at 88; Dep. Ex. 39, AG Ins. App., dated March 13, 2006, attached | U.S. Bank disputes the assertions in paragraph 115. It is undisputed that Mrs. Malkin signed the application on February 16, 2006. (Id.). At that point, the two American General applications had not been executed and there was no "in-force" or "pending" insurance with American General. (Dep. Exs. 39-41 | U.S. Bank's disputation of Sun Life's assertions at paragraph 115 is not substantiated by the evidence to which it cites.  There is no genuine dispute that the Application Sun Life received on March 15, 2006 was the Application upon which the Policy was issued and that the other prior applications discussed by U.S. Bank are |

| | | | |
|---|---|---|---|
| | hereto as Exhibit 33.; Dep. Ex. 41, AG Ins. App., dated March 15, 2006, attached hereto as Exhibit 34. | (Walsh Decl. II, Exs. FF-HH)). Additionally, any alleged fraud in the application is not — and cannot be — at issue in this case as the two-year contestability period has long expired. *See Allstate Life Ins. Co. v. Miller,* 424 F.3d 1113, 1115 (11th Cir. 2005). | irrelevant under the express terms of the Policy and applicable substantive law. *See* Sun Life's Counter-Statement of Material Facts in Opposition to U.S. Bank's Motion for Summary Judgment ¶¶ 1-17; Sun Life's Memorandum of Law in Opposition to U.S. Bank's Motion for Summary Judgment at 9–10.  Sun Life is not seeking to have the Policy declared void *ab initio* based on fraud in the application; however, the fact that Sun Life was deceived is relevant to Sun Life's claim that the Policy was a cover for an illegal wager and to U.S. Bank's equitable (purported) defenses. |
| 116. | The Application asked "[i]f the Application was taken out on a non-medical basis, were the answers from the Proposed Insured(s) obtained personally and in your presence"; this question was answered "yes," despite the fact that Mr. Bryan now admits the answers were not obtained by him or in his presence. Dep. Ex. 57 at 96; Dep. of L. Bryan at 391:25-392:5. | U.S. Bank refers to the Application as evidence of its contents.  Additionally, any alleged fraud in the Application is not — and cannot be — at issue in this case as the two-year contestability period has long expired. *See Miller,* 424 F.3d at 1115. | U.S. Bank does not appear to dispute Sun Life's assertions at paragraph 116, and the Application fully supports them.  *See* Exhibit Q to Declaration of J. Walsh.  Moreover, Sun Life is not seeking to have the Policy declared void *ab initio* based on fraud in the application; however, the fact that Sun Life was deceived is relevant to Sun Life's claim that the Policy was a cover for an illegal wager and to U.S. Bank's equitable (purported) defenses. |
| 117. | Application asked what the coverage would primarily be used for and provided a number of check-boxes, namely (i) income replacement; (ii) split dollar; (iii) business continuity; | U.S. Bank refers to the Application as evidence of its contents. | U.S. Bank does not dispute Sun Life's assertions at paragraph 117, and the Application fully supports them.  *See* Exhibit Q to Declaration of J. Walsh. |
| 118. | Mrs. Malkin did not need $5 million in insurance (let alone $13 million) to cover her estate taxes. Dep. Ex. 71 at 1 ("In so far as obtaining the policy for estate purposes there | U.S. Bank disputes the assertions in paragraph 118, which are based on inadmissible hearsay evidence. Additionally, any alleged fraud in the Application is not — | U.S. Bank does not contest the factual veracity of Sun Life's assertion at paragraph 118.  Moreover, U.S. Bank does not even cite to a particular threshold statement in |

| | | |
|---|---|---|
| was no need to do so as my mother did not have that much money to have needed a $5,000,000 policy to cover any estate taxes."); Dep. of T. Guarnero at 123:6-21 (Mrs. Malkin's estate paid $0 in estate taxes upon her death), Dep. of L. Bryan II at 22:17-23:5 ("When I used to do estate planning . . . the purpose was for the actual covering of an estate tax. And we would normally sit down, myself, the client's lawyers, the personal estate planning lawyers, the client's CPA, and it would usually be a coordinated plan, amongst the three of us, to construct a life insurance portfolio for the purpose of covering the estate taxes. [At Simba,] I never met and we never met with anybody's financial advisors to put together any kind of a financial or estate plan as it related to taxes or what I would call traditional planning."); Dep. of L. Bryan at 259:24-260:18 (Simba did not do estate planning); Aff. of A. Cohn (Mrs. Malkin's trust and estate attorney was not in any way involved in the application for the Policy); Dep. of P. Shapiro at 41:7-42:11 (Simba always checked the "estate plan" box, but it was never true). | and cannot be — at issue in this case as the two year contestability period has long expired. *See Miller*, 424 F.3d at 1115. Finally, In Ms. Guarnero's and Mr. Klein's testimony rebuts Sun Life's contention that this fact is undisputed. (Guarnero Dep. Tr. at 95:5-96:9 (Walsh Decl. II, Ex. II); Klein Dep. Tr. at 28:23-29:12 (Walsh Decl. II, Ex. MM)). | support of its bald hearsay allegation. Finally, Sun Life is not seeking to have the Policy declared void *ab initio* based on fraud in the application; however, the *fact* that Sun Life was deceived is relevant to Sun Life's claim that the Policy was a cover for an illegal wager and to U.S. Bank's equitable (purported) defenses. |
| 119. | The Application listed Mrs. Malkin's "total household income" as $460,000 and her "total household net worth" as $13,000,000. Dep. Ex. 57 at 00090. | U.S. Bank refers to the Application as evidence of its contents. | U.S. Bank does not dispute Sun Life's assertions at paragraph 119, and the Application fully supports them. *See* Exhibit Q to Declaration of J. Walsh. |
| 120. | In connection with the Application, a Sun Life personal financial questionnaire was filled out listing a $13,000,000 net worth, being $10,000,000 (real estate) + $3,000,000 | U.S. Bank refers to the Sun Life Personal Financial Questionnaire as evidence of its contents. | U.S. Bank does not dispute Sun Life's assertions at paragraph 120, and the Sun Life Personal Financial Questionnaire fully |

| | | | |
|---|---|---|---|
| | (personal property) + $2,000,000 (stocks/bonds) + $300,000 (cash/savings). Dep. Ex. 160 at 4, Sun Life Personal Financial Questionnaire, attached hereto as Exhibit 35. | | supports them. |
| 121. | The financial information on this form is not written in Mrs. Malkin's handwriting, and Simba did not do anything to verify that it was correct. Dep. Ex. 71 at 1 ("Though it was signed by my mother, the numbers that are written in the estimated net worth are not those of my mother's handwriting."); Dep. of L. Bryan at 217:14-221:6 ("You don't do anything besides have [the insured] fill out a financial statement and sign it."). | U.S. Bank refers to the Sun Life Personal Financial Questionnaire as evidence of its contents. Additionally, any alleged fraud in the Application is not — and cannot be — at issue in this case as the two year contestability period has long expired. *See Miller,* 424 F.3d at 1115. | U.S. Bank does not dispute Sun Life's assertions at paragraph 121, and the Sun Life Personal Financial Questionnaire fully supports them. Moreover, Sun Life is not seeking to have the Policy declared void *ab initio* based on fraud in the application; however, the *fact* that Sun Life was deceived is relevant to Sun Life's claim that the Policy was a cover for an illegal wager and to U.S. Bank's equitable (purported) defenses. |
| 122. | According to Mrs. Malkin's daughter and the personal representative of Mrs. Malkin's estate (who spoke with her mother nearly every day of her life) the $13 million net worth (and the alleged $10 million in real estate) was "totally exaggerated." Dep. Ex. 71 at 1; Dep. of T. Guarnero at 177:13-19; *id.* at 126:22-25 ("My mother, if she had in excess of $13 million, my life would have been a whole lot easier with sending my kids to college, so she didn't."); *id.* at 28:4-6, 43:2-9, 65:6-11, 128:7-19 (noting that Mrs. Malkin's condo — the only real estate she owned in 2006 — was sold in 2014 for $528,000); Dep. of J. Klein[23] at 66:12-15 ("Q: At the time of your mother's passing what was the total value, if you know, of her estate? A: I would say 1.5 [million], I guess, | U.S. Bank disputes the assertions in paragraph 122. Mrs. Guarnero's testimony regarding the net worth of her mother's estate at the time of her death is irrelevant on Sun Life's motion for summary judgment. Moreover, Ms. Guarnero testified that she had no knowledge of her mother's net worth in approximately 2005 and 2006 when her mother applied for the Sun Life policy. (Deposition of Toni Guarnero conducted on October 21, 2015 ("Guarnero Dep.") at 61:9-63:18 (Walsh Decl. II, Ex. II)). Additionally, any alleged fraud in the Application is not — and cannot be — at issue in this case as the two year contestability period has long expired. *See Miller,* 424 F.3d at 1115. | U.S. Bank's disputation of Sun Life's assertion at paragraph 122 is not substantiated by the evidence to which U.S. Bank cites. Although Mrs. Guarnero did not know the *details* of her mother's financial situation in 2006 (when Mrs. Malkin was a healthy, grown woman), Mrs. Guarnero (who spoke with her mother nearly every single day of her life) unequivocally rejected the notion that her mother was worth a whopping $13 million at that time based on facts available to Mrs. Guarnero. Dep. of T. Guarnero at 177:13-19, 126:22-25 ("My mother, if she had in excess of $13 million, my life would have been a whole lot easier with sending my kids to college, so she didn't."). Contrary to U.S. Bank's assertions, the fact that Mrs. Malkin's estate |

---

[23] Jeffrey Klein is Mrs. Malkin's youngest son. Dep. of J. Klein at 16:22-24, attached hereto as Exhibit 36.

| | | |
|---|---|---|
| because that's basically what we ended up with."). | | was worth only about $1.5 million (and that her condo was worth only about $528,000) at the time of her passing nine years later is highly probative of whether Mrs. Malkin was worth $13 million ($10 million of which was alleged to have been real estate) in 2006. Sun Life has established a prima facie case that the $13 million net worth alleged on the application was untrue, and U.S. Bank has failed to provide any affirmative evidence of Mrs. Malkin's net worth that would refute it. Moreover, Sun Life is not seeking to have the Policy declared void *ab initio* based on fraud in the application; however, the *fact* that Sun Life was deceived and that Mrs. Malkin had no estate planning need for the insurance is relevant to Sun Life's claim that the Policy was a cover for an illegal wager and to U.S. Bank's equitable (purported) defenses. |
| 123. | The Application lists Mr. Bryan as the agent entitled to 100% of the commissions; however, unbeknownst to Sun Life, Coventry required Mr. Bryan to pay Coventry 50% of the commissions on the Malkin policy as part of a side-agreement used to avoid putting Coventry's name on the Sun Life application. Dep. Ex. 57 at 00097; Dep. Ex. 43, Production Split Schedule, attached hereto as Exhibit 37; CC001419, Email from Dan Geraghty to Nolan Smith, dated May 15, 2006 ("We are doing SCAs as we originally decided, not adding a Coventry entity to the app."), attached hereto as Exhibit 38; Dep. of L. Bryan at 305:20-22; *id.* at 205:17-19 ("[I]f it is not going to be a | U.S. Bank refers to the application as evidence of its contents. U.S. Bank disputes the assertion that it was "unbeknownst to Sun Life, [that] Coventry required Mr. Bryan to pay Coventry 50% of the commissions on the Malkin policy as part of a side-agreement used to avoid putting Sun Life's name on the Sun Life application." Moreover, the document bates stamped CC001419 is outside the scope of the current record, constitutes unauthenticated, inadmissible hearsay evidence that is outside the scope of the current record in violation of Local Rule 56.1, and is of no probative value. | U.S. Bank's disputation of Sun Life's assertions at paragraph 123 is not substantiated by citation to any evidence. U.S. Bank's bald assertion that the email from Dan Geraghty to Nolan Smith, dated May 15, 2006 is outside the scope of the record and constitutes unauthenticated inadmissible hearsay is incorrect. Coventry certified that the document in question is a true and accurate copy of a document created and kept by Coventry in the ordinary course of its business.  Aff. of Coventry Capital I, LLC Officer and/or Custodian of Records. And there is no rule prohibiting a court from considering a document produced pursuant to subpoena and authenticated by the |

| | | |
|---|---|---|
| | commission sharing, there is no deal."). | | certification of the custodian of record. *See, supra* ¶ 98 (citing, *inter alia, It's A 10, Inc. v. Beauty Elite Grp., Inc.*, No. 13-cv-60154, 2013 WL 6834804, at *12 (S.D. Fla. Dec. 23, 2013)). |
| 124. | On March 16, 2006, Mrs. Malkin (as settlor), Wilmington Trust (as trustee), Mr. Malkin (as beneficial owner and co-trustee), and Coventry Executive Krista Lake (as attorney-in-fact for LaSalle Bank) purportedly entered into an agreement instructing Wilmington Trust to establish a separate series of the Trust known as the "Phyllis Malkin Insurance Trust, Premium Finance Sub-Trust II" ("Sub Trust II") to take out a loan to fund the Policy and hold the Policy for the benefit of Coventry during the course of the loan.[24] Dep. Ex. 37, Second Supp. to Trust Agr., attached hereto as Exhibit 40; Dep. Ex. 38, Sub-Trust II Cert., attached hereto as Exhibit 41; CC224-225, Certificate of Registration with Del. Sec. of State, attached hereto as Exhibit 42. | U.S. Bank disputes the assertion in paragraph 124 that Mrs. Malkin, Wilmington Trust, Mr. Malkin and "Coventry . . . purportedly entered into an agreement instructing Wilmington Trust" to take any action and refers to the Second Supplement to Trust Agreement and Sub-Trust II Certificate as evidence of their contents. Moreover, the document bates stamped CC000224-225 is outside the scope of the current record, constitutes unauthenticated, inadmissible hearsay evidence that is outside the scope of the current record in violation of Local Rule 56.1, and is of no probative value. | U.S. Bank's disputation of Sun Life's assertions at paragraph 124 is not substantiated by the evidence to which it cites. *See* Ex. 40 at 88 ("The Settlor desires to instruct the Trustee . . . to establish a new series of the Trust entitled "Phyllis Malkin Insurance Trust, Premium Finance Sub-Trust II . . . ."). Moreover, U.S. Bank's bald assertion that the Certificate of Registration – a public record bearing the Seal of the Delaware Secretary of State – is outside the record and unauthenticated, inadmissible hearsay is incorrect. Coventry certified that the document in question is a true and accurate copy of a document created and kept by Coventry in the ordinary course of its business. Aff. of Coventry Capital I, LLC Officer and/or Custodian of Records; Fed. R. Evid. 803; *see supra* ¶ 98 (explaining why such documents are eligible for consideration on a motion for summary judgment). |
| 125. | Mrs. Malkin had no influence over the Sub-Trust II's content and no ability to negotiate any of its terms. Dep. of L. Bryan at 262:21-263:23 ("Q: Did the funder dictate what | U.S. Bank disputes the assertions in paragraph 125, which are based on inadmissible hearsay evidence. | U.S. Bank does not contest the factual veracity of Sun Life's assertion at paragraph 125, and U.S. Bank's bald hearsay objection is misplaced. U.S. Bank does not even |

---

[24] Although this agreement purports to have been made on March 16, 2006, it appears to have been signed no earlier than April 7, 2006 when Coventry decided that the American General policy and the Sun Life policy would not fund under the same loan. *See* CC 1015, Email from D. Geraghty to D. Curran, dated April 7, 2006 ("The sun piece will be issued next week but is no longer under the same loan as the AG. We need to send new trust docs, same info, for the second policy . . . . Can you add "II" to the trust name?"), attached hereto as Exhibit 39.

| | | |
|---|---|---|
| types of trusts were used in life insurance capacity transactions? A: Of course they did. .. Q: So was it true with the Malkins? A: Of course."); Dep. Ex. 120 at 4 ("Coventry provided Simba with all the boilerplate documents (trust docs, loan docs, power of attorney, etc.) that were needed to do a Coventry deal. . . . The documents were not negotiable, and no client ever asked me to negotiate them. This would have been true for the Malkins as well."). | | identify the threshold requirement of a statement offered for the truth. |
| 126. | Mrs. Malkin subsequently entered into a twenty-six month, non-recourse premium financing loan through Coventry, as Program Administrator for LaSalle, to fund the Policy in the principal loan amount of $238,050 (the "Loan"). Dep. Ex. 48, Note and Security Agreement, at Schedule A, attached hereto as Exhibit 43. | U.S. Bank refers to the Note and Security Agreement as evidence of its contents. | U.S. Bank does not contest the factual veracity of Sun Life's assertion at paragraph 126, and the Note and Security Agreement fully supports them. |
| 127. | A universal life insurance policy is a flexible premium policy that allows the premium payor to determine how much to pay in premiums (provided it is above the minimum necessary to put/keep the policy in force) and that has the potential to build cash value over time to the extent more than minimal payments are made. Dep. of L. Bryan at 331:21-332:6. | U.S. Bank does not dispute the assertions in paragraph 127. | U.S. Bank does not dispute Sun Life's allegations at paragraph 127. |
| 128. | In a traditional life insurance transaction, the insured determines how much he or she wants to pay in initial premiums (again provided it is above the minimum necessary to put the policy in force); however, in a "life insurance capacity transaction," the funders | U.S. Bank does not dispute the assertions in paragraph 128 except U.S. Bank disputes the characterization of "life insurance capacity transaction," which is based on inadmissible hearsay evidence. | U.S. Bank's disputation of Sun Life's so-called "characterization" is not supported by citation to any evidence, and U.S. Bank's bald hearsay allegation is unexplained and unfounded. Simba marketed a "life insurance capacity transaction," and Mr. |

| | | | |
|---|---|---|---|
| | decided how much to fund the policy. Dep. of L. Bryan at 333:8-334:5. | | Bryan (Simba's Chairman) testified about Simba's "life insurance capacity transaction." *See, e.g.*, Ex. 9; Ex. 5; Dep. of L. Bryan; Dep. of Larry Bryan II. There is no hearsay and no characterization. |
| 129. | Mrs. Malkin did not have any input into deciding that the principal loan amount would be $238,050; rather, that was a "take it or leave it number" determined by Coventry months before the Loan was executed. Dep. of L. Bryan at 331:1-18; CC-00069, Coventry Internal Log, dated February 16, 2006 ("We priced the $5m Sun Life Protector Plus standard with a level DB. This qualifies for the PFP2 for a 26 month loan term. Target is $238,050."). | U.S. Bank disputes the assertions in paragraph 129, which are based on inadmissible hearsay evidence. The document bates stamped CC00069 is outside the scope of the current record, constitutes unauthenticated, inadmissible hearsay evidence that is outside the scope of the current record in violation of Local Rule 56.1, and is of no probative value. | U.S. Bank does not contest the factual veracity of Sun Life's assertion at paragraph 129. Coventry certified that the Coventry Internal Log in question is a true and accurate copy of the document created and kept by Coventry in the ordinary course of its business. Ex. 69; *see supra* at 98 (explaining why such documents are eligible for consideration on a motion for summary judgment). |
| 130. | The interest rate on the Loan was 17.11%[25] meaning that on a principal of $238,050 plus $5,214.86 (financed origination fee) and $5,142.70 (trust administration fee) the total amount due after twenty-six months would be $340,496.41. Dep. Ex. 48 at Schedule A. | U.S. Bank does not dispute the assertions contained in paragraph 130. | U.S. Bank does not dispute Sun Life's assertions at paragraph 130. |
| 131. | Mrs. Malkin did not have any input into what the interest rate was on the Loan nor did she care what it was. Dep. of P. Shapiro at 142:11-:143:12 ("[T]he Malkins . . . were not participating in the dollars on this Schedule A so the interest rate, as well as all the other dollars listed here, were not subject to the Malkin's responsibility so these numbers didn't really apply to the Malkins so I don't know if there was any point that we ever | U.S. Bank disputes the assertions contained in paragraph 131, which is based on inadmissible hearsay evidence. | U.S. Bank does not contest the factual veracity of Sun Life's assertion at paragraph 131. Moreover, U.S. Bank's bald hearsay objection does not identify a threshold statement and any statement by Mrs. Malkin regarding her lack of care about the details of the policies or the loans or whatever paperwork was required is admissible as a statement of then-present state of mind or |

[25] The all-in rate (i.e., the rate that includes all fees and expenses) was 19.01%. Dep. Ex. 48, at 69.

| | | |
|---|---|---|
| discussed this with them because they did not have any financial investment."); Dep. Ex. 120 at 4 ("[The Malkins] had no real control over the terms of the loan (other than the fact that they could reject it outright, although none of our clients ever did that)".); *id.* at 5 ("[N]o one (including the Malkins) cared about the details of the policies or the loans or whatever paperwork was needed to be done."). | | emotion. Fed. R. Evid. 803(1), (3). |
| 132. The Loan was non-recourse to Mrs. Malkin meaning that at the end of twenty-six months Mrs. Malkin could relinquish the Policy to Coventry and walk away from the Loan without any negative financial repercussions. Dep. Ex. 48, at 00063 ("You may satisfy all of your payment and other obligations under this Agreement by relinquishing to us all of your right, title, and interest in, to, and under all Policies in writing, on or before the Scheduled Maturity Date."); Dep. Ex. 45, Settlor Non-Recourse Security Agreement, attached hereto as Exhibit 44. | U.S. Bank does not dispute that the Loan was non-recourse. U.S. Bank disputes the remaining assertions contained in paragraph 132, which are based on inadmissible hearsay evidence. | U.S. Bank's partial disputation of Sun Life's assertions at paragraph 132 is not substantiated by citation to any evidence and the documents are not hearsay. The Note and Security Agreement was produced by Wilmington Trust Company in this litigation pursuant to subpoena, and the records custodian from Wilmington Trust has certified that the documents are authentic business records of Wilmington Trust. *See* Aff. of D. Young, attached hereto as Exhibit 74. The Settlor Non-Recourse Security Agreement was produced by U.S. Bank from its files in connection with a Document Request issued in this litigation, and Mr. Shapiro laid foundation. *See* Ex. 44 (bearing U.S. Bank bates labeling); Dep. of P. Shapiro at 139:25-140:25. |
| 133. The Loan also required payment of a $5,000 unfinanced (i.e., cash) origination fee. Dep. Ex. 47 at Schedule A, attached hereto as Exhibit 45. | U.S. Bank does not dispute the assertions contained in paragraph 133. | U.S. Bank does not dispute Sun Life's assertion at paragraph 133. |
| 134. Sun Life delivered the Policy to the owner, Wilmington Trust, as trustee for the Trust in | U.S. Bank disputes the assertions in paragraph 134, which are based on | U.S. Bank does not contest the factual veracity of Sun Life's assertion at paragraph |

| | | |
|---|---|---|
| Wilmington, Delaware, and Wilmington Trust acknowledged receipt of the Policy in Wilmington, Delaware on April 20, 2006.[26] Sun Life (Malkin) 18, Life Ins. Policy Dating Acknowledgment and Delivery Receipt Form, attached hereto as Exhibit 47. | unauthenticated, inadmissible hearsay evidence. The document bates stamped Sun Life (Malkin) — 00018 is outside the scope of the current record, constitutes unauthenticated, inadmissible hearsay evidence that is outside the scope of the current record in violation of Local Rule 56.1, and is of no probative value. | 134.  Moreover, The Delivery Form was addressed to the Trust as owner of the Policy.  Ex. 47 at 18; Ex. 48 at 18.  The Trust's address was Drop Code 1625, 1100 N. Market Street, Wilmington, Delaware 19890.  Ex. 48 at 17; Exhibit Q to Declaration of J. Walsh at 62.  The Delivery Form stated: "By signing below, you confirm that you have received, reviewed, and accepted the policy.  [Sun Life] will retain this document as evidence that the policy has been delivered to you on the date shown."  *Id.*  The Delivery Form was signed by Scott A. Huff, Senior Financial Services Officer at Wilmington Trust Company, on April 20, 2006 in Wilmington, Delaware.  Ex. 47 at 18; Ex. 70 at 187-188; Ex. 71 at 152-153; Ex. 72 (certifying these documents as authentic business records).  The Delivery Form itself explicitly says it was signed at "Wilmington, Delaware."  *Id.*  The following day, the broker general agent returned the executed Delivery Form to Sun Life.  Ex. 48. These Delivery Form and letter Sun Life received enclosing the Delivery Form have been authenticated by Sun Life as being true and accurate copies kept in the ordinary course.  Ex. 73.  Sun Life has made a prima facie case.  If U.S. Bank wanted to try to show that Wilmington Trust did not sign the Delivery Form when and where the Delivery |

---

[26] Prior to receipt of the Application upon which the Policy was issued, Sun Life received an incomplete, partially signed application (not the application upon which the Policy was ultimately issued) listing Phyllis Malkin as the potential owner. Declaration of M. Wilkosky, attached hereto as Exhibit 46. A Sun Life administrator therefore entered "Florida" into the computer system as the "application state." *Id.* Later, when Sun Life received the Application (upon which the Policy was ultimately issued) listing the Trust as the prospective owner, Sun Life's administrator inadvertently failed to change the "state of application" to Delaware in the computers. *Id.* As a result, the Policy as ultimately issued contained some Florida forms. *Id.* Shortly after the Policy was issued, in or around August 2006, Sun Life's computers were updated to reflect that the "application state" was in fact Delaware. *Id.*

| | | |
|---|---|---|
| | | Form shows that it was signed, it was incumbent upon U.S. Bank to develop that evidence.  But U.S. Bank did not bother. |
| 135. | On April 21, 2006, the broker general agent returned the executed Acknowledgment and Deliver Receipt Form to Sun Life. Sun Life (Malkin) 16-18, Letter from Total Financial to Sun Life, dated April 21, 2006, attached hereto as Exhibit 48. | U.S. Bank disputes the assertions in paragraph 135, which are based on inadmissible hearsay evidence. The document bates stamped Sun Life (Malkin) — 00016-18 is outside the scope of the current record, constitutes unauthenticated, inadmissible hearsay evidence that is outside the scope of the current record in violation of Local Rule 56.1, and is of no probative value. | U.S. Bank's disputation of Sun Life's assertions at paragraph 135 is not substantiated by citation to any evidence. The Letter from Total Financial to Sun Life, dated April 21, 2006 was sent to Sun Life, along with a copy of the aforementioned Delivery Form, by the broker general agent, Total Financial.  Ex. 48.  Sun Life's custodian of records has provided an affidavit certifying that this letter enclosing the Delivery Form is an authentic business record.  *See* Ex. 73; Fed. R. Evid. 803(6). |
| 136. | On the same day, Simba sent a wire to Mrs. Malkin for $5,000 to cover the $5,000 origination fee due on the Loan. Dep. Ex. 53, Simba Life Plans Bank Records, at 4/21 "Wire to Phyllis Muriel Mal[k]in", attached hereto as Exhibit 49; Dep. Ex. 120 at 5 ("Simba had Mrs. Malkin write the $5,000 check but Simba simultaneously wired $5,000 to Mrs. Malkin's account. Coventry preferred that it look like the origination fees were actually coming from the insureds."); Dep. of L. Bryan at 320:6-8 (Simba paid the $5,000, not Mrs. Malkin) | U.S. Bank disputes the assertions in paragraph 136 and Sun Life's characterization of Mr. Bryan's testimony that the wire was intended "to cover" the origination fee. | U.S. Bank does not appear to dispute the factual veracity of Sun Life's assertion at paragraph 136, and the evidence cited by Sun Life plainly shows that Simba paid Mrs. Malkin $5,000 to cover the $5,000 origination fee due on the loan.  Ex. 49; Ex. 5 at 5; Dep. of L. Bryan at 320:6-8. |
| 137. | On the same day, Simba sent a check to Mrs. Malkin for an additional $20,000. Dep. Ex. 50; Dep. Ex. 120 ("At my deposition, I was shown a $20,000 check from Simba to Mrs. Malkin I still don't remember what that was for."); Dep. of P. Shapiro at 147:5-7 ("I think | U.S. Bank does not dispute the assertions in paragraph 137. | U.S. Bank does not dispute Sun Life's assertions at paragraph 137. |

| | | | |
|---|---|---|---|
| | that this was payment for something that didn't go right with this transaction or something."). | | |
| 138. | On May 10, 2006, Mrs. Malkin asked her long-time trust and estate attorney — who had nothing to do with applying for these policies or preparing any related trust agreements — to draft an agreement between her and her husband entitled "Agreement Regarding Life Insurance Policies"; that agreement was then sent to the Malkins for review and signature two days later. Aff. of A. Cohn; Dep. Ex. 71 at 1 (Mrs. Malkin's financial advisor had nothing to do with this transaction and did not know it was occurring). | U.S. Bank refers to the Agreement Regarding Life Insurance Policies as evidence of its contents. U.S. Bank disputes Sun Life's reliance on Exhibit 71 for its assertion regarding Mrs. Malkin's financial advisor as inadmissible hearsay evidence unsupported by the record. At her deposition, Mrs. Guarnero testified that she had no personal knowledge of whether Mrs. Malkin's financial advisor had involvement with Mrs. Malkin's application for life insurance and the preparation of any related trust agreements and that she did not discuss it with him (Guarnero Dep. at 131:20-132:17 (Walsh Decl. II, Ex. II)). | U.S. Bank's disputation of the assertions at paragraph 137 is not substantiated by the evidence to which it cites.  Mrs. Guarnero did *not* testify that she had no personal knowledge of whether her mother's financial advisor was involved in the transaction; rather, Mrs. Guarnero *confirmed* that the financial advisor did not have any participation in the transaction.  In response to a question by counsel, Mrs. Guarnero testified that she never spoke *to the financial advisor* about this topic, but then counsel simply moved on to a different topic without inquiring as to any other source of Mrs. Guarnero's knowledge such as her mother with whom Mrs. Guarnero spoke nearly every day of her life.  Dep. of T. Guarnero at 132:2-18. |
| 139. | The agreement memorialized Mrs. Malkin's intent to sell the Policy after the expiration of the twenty-six month loan. *Id.* at Ex. A. ("Phyllis' plan will be to sell [the Sun Life and American General policies] in approximately twenty-six (26) months and retain the proceeds, after payment of all expenses and loans relating to those (2) policies."). | U.S. Bank disputes the characterizations contained in paragraph 139 and refers to the Agreement Regarding Life Insurance Policies as evidence of its contents. | U.S. Bank does not dispute Sun Life's assertions at paragraph 139, and the Agreement Regarding Life Insurance Policies plainly supports them. |
| 140. | On May 25, 2006, Coventry paid the initial premiums to Sun Life. Total Financial 75, Mem. from Coventry to L. Schweiger, attached hereto as Exhibit 50. | U.S. Bank disputes the assertions in paragraph 140, which are based on inadmissible hearsay evidence. The document bates stamped TotalFinancial-00075 is outside the scope of the current | U.S. Bank does not contest the factual veracity of Sun Life's assertion at paragraph 140.  Moreover, the memorandum from Coventry to Mr. Bryan showing that Coventry paid the initial premiums to Sun |

| | | | |
|---|---|---|---|
| | | record, constitutes unauthenticated, inadmissible hearsay evidence that is outside the scope of the current record in violation of Local Rule 56.1, and is of no probative value. | Life was produced by the broker general agent pursuant to subpoena in this litigation. Although Total Financial has not yet produced a record custodian to authenticate the document, Sun Life can and will call such a witness to testify at trial, if necessary.[27]  A document is properly presented in connection with a summary judgment motion where it could be reduced to an admissible form at trial.  *See McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996).  In any event, Sun Life has a copy of the same document in its files, and Sun Life's custodian of record has certified that it is an authentic business record.  Ex. 73.  The document is highly probative because it shows that Coventry paid the premiums. |
| 141. | There is no evidence that the Malkins ever paid any premium or incurred any costs in relation to the Policy. | U.S. Bank disputes the assertions in paragraph 141. Neither Mr Malkin nor Mrs. Malkin is available to respond to these assertions and Sun Life has not proffered any evidence in support of these assertions, in violation of Local Rule 56.1. | U.S. Bank's disputation of Sun Life's assertions at paragraph 141 is not substantiated by citation to any evidence. Sun Life's assertion is that there is *no* evidence.  If U.S. Bank wanted to dispute that negative assertion, it was incumbent upon U.S. Bank to come forward with *some* evidence.  U.S. Bank has not done so.  If Mrs. Malkin ever paid any premiums or incurred any costs, the evidence of those payments and costs would have survived her passing in the form of financial records.  But U.S. Bank offers no such evidence because Mrs. Malkin never made any payments or incurred any costs.  Sun Life's assertions should be deemed admitted on this basis |

[27] Total Financial's Chief Financial Officer recently refused to provide the requested certification based on a conversation he claimed to have recently had with counsel for U.S. Bank.

| | | | alone. |
|---|---|---|---|
| 142. | In October 2006, the Malkins attended a free seven-day Caribbean cruise sponsored by Simba (at a total cost to Simba of roughly $250,000) as a "thank you" for participating in these three transactions. Dep. of L. Bryan at 139:12-17, 140:16-22, 364:8-14. | U.S. Bank does not dispute that the Malkins attended a cruise sponsored by Simba in October 2006, after the Policy was issued. U.S. Bank disputes the remaining characterizations contained in paragraph 142. | U.S. Bank's partial disputation of Sun Life's assertions at paragraph 142 is not supported by citation to any evidence, and Sun Life has not characterized the testimony. *See* Dep. of L. Bryan at 139:12-17 (the cruise was a "thank you for your business"); *id.* at 140:16-22 (the cruise cost roughly $250,000); *id.* at 372:6-24 (the cruise was free to the roughly "couple hundred" people who Simba invited to attend including Mrs. Malkin). |
| 143. | On or about July 17, 2008, Coventry decided not to make an offer to buy the Malkin policy. CF-33, Coventry Internal Logs, dated July 17, 2008 ("This is just real weak . . . and [we] just don't see any value in purchasing the Sun."), attached hereto as Exhibit 51. | U.S. Bank disputes the assertions in paragraph 143, which are based on inadmissible hearsay evidence. The document bates stamped CC000033 is outside the scope of the current record, constitutes unauthenticated, inadmissible hearsay evidence that is outside the scope of the current record in violation of Local Rule 56.1, and is of no probative value. | U.S. Bank does not contest the factual veracity of Sun Life's assertion at paragraph 143. Moreover, Coventry's document custodian certified that the Coventry Internal Logs are authentic business records and there is no rule against the use of such exhibits in connection with a motion for summary judgment. *See supra* ¶ 98; Fed. R. Evid. 803(6); Ex. 69. |
| 144. | On July 25, 2008, the Loan went into default and default interest began to accrue. Dep. Ex. 62, Letter from Coventry to P Malkin, attached hereto as Exhibit 52. | U.S. Bank disputes the assertions in paragraph 144, which are based on inadmissible hearsay evidence. The Letter from Coventry to P Malkin is outside the scope of the current record, constitutes unauthenticated, inadmissible hearsay evidence that is outside the scope of the current record in violation of Local Rule 56.1, and is of no probative value. | U.S. Bank does not contest the factual veracity of Sun Life's assertion at paragraph 144. Moreover, Coventry's document custodian certified that the Letter from Coventry to Mrs. Malkin was an authentic business record and there is no rule against the use of such exhibits in connection with a motion for summary judgment. *See supra* ¶ 98; Fed. R. Evid. 803(6); Ex. 69. |
| 145. | Somewhere between August 4 and August 6, 2008, Simba (by then doing business as Wealth Modes) paid the accrued default | U.S. Bank disputes the characterizations contained in 145 and refers to the Email chain between N. Brathwaite and S. Lehman | U.S. Bank does not dispute Sun Life's assertions at paragraph 145, and U.S. Bank's disputation of Sun Life's so-called |

| | | |
|---|---|---|
| | interest for Mrs. Malkin Dep. Ex. 64, Email chain between and among Natalie Brathwaite (Wealth Modes) and Shauna Lehman (Coventry), dated August 4-6, 2008, attached hereto as Exhibit 53 (showing that Coventry received a wire from Wealth Modes for the outstanding default interest); Dep. of L. Bryan at 416:15-18 ("Q: Does that refresh your recollection as to whether someone at Simba or Wealth Modes made that wire to cover the default interest? A: Looks like we did."); Dep. Ex. 120 at 5 ("The Malkins . . . paid no premium payments (or anything else for that matter). . ."). | dated August 4-6, 2008 as evidence of its contents. | "characterizations" is not substantiated by the evidence to which U.S. Bank cites.  The referenced email chain shows that Simba paid Mrs. the accrued default interest for Mrs. Malkin and Mr. Bryan confirmed as much at his deposition and subsequently in the Statement of Larry Bryan.  Ex. 53; Dep. of L. Bryan at 416:15-18; Ex. 5 at 5. |
| 146. | On or around August 6, 2008, Mrs. Malkin irrevocably relinquished all of her rights in the Trust and Sub-Trust II (including the Policy) to Coventry, as servicing agent for LaSalle. Dep. Ex. 65, Irr. Settlor Instr. Letter, attached hereto as Exhibit 54.[28] | U.S. Bank disputes the characterizations in paragraph 146, and refers to the Irr. Settlor. Inst. Letter as evidence of its contents. | U.S. Bank does not dispute Sun Life's assertions at paragraph 146, and U.S. Bank's disputation of Sun Life's so-called "characterizations" is not substantiated by the evidence to which it cites.  *See* Ex. 54 at 81, 84 ("Now, therefore, in consideration of the foregoing, the undersigned Settlor [Mrs. Malkin] hereby irrevocably instructs the Trustee [Wilmington Trust] . . . as follows: The Trustee shall fully relinquish to the Servicing Agent [Coventry on behalf of LaSalle] all rights, interests, powers, privileges and benefits created under or reserved to the Settlor in the Trust and Sub-Trust . . . ."). |
| 147. | On or before August 18, 2008, Coventry sent the Policy to AIG for a Pre-Offer Review, and on August 18, 2008, AIG certified that the Policy was "[a]pproved for purchase in | U.S. Bank does not dispute the assertions in paragraph 147. | U.S. Bank does not dispute Sun Life's assertions at paragraph 147. |

---

[28] Mrs Malkin's purported signature looks decidedly different from the other record signatures of Mrs. Malkin.

| | | | |
|---|---|---|---|
| | accordance with the Origination Agreement." Dep. Ex. 102, Purchaser's Certification of Completion of Pre-Offer Review Pursuant to Section 4.01 of Origination Agreement, dated August 18, 2008, attached hereto as Exhibit 55. | | |
| 148. | On August 18, 2008, Coventry entered into an agreement with the Trust (then owned by Coventry as servicing agent for LaSalle) to sell the Policy to Coventry for $255,000. Dep. Ex. 100, Life Ins. Policy Purchase Agreement, attached hereto as Exhibit 56. | U.S. Bank does not dispute the assertions in paragraph 148. | U.S. Bank does not dispute Sun Life's assertions at paragraph 148. |
| 149. | That same day, U.S. Bank executed ownership and beneficiary change request forms asking Sun Life to change the Policy's record owner and beneficiary from the Trust to U.S. Bank, as securities intermediary for an undisclosed principal that we now know was AIG. Dep. Ex. 104, Ownership Change Request, attached hereto as Exhibit 57; Dep. Ex. 105, Beneficiary Change Request, attached hereto as Exhibit 58. | U.S. Bank does not dispute the assertions in paragraph 149. | U.S. Bank does not dispute Sun Life's assertions at paragraph 149. |
| 150. | Around this time, Coventry sent U.S. Bank a number of the underlying Malkin deal documents, including but not limited to, the Trust agreements, Loan agreements, power of attorney forms, and the Application. Dep. of R. Mosley at 268:16-270:24, 272:7-281:18, 289:4- 291:17, 294:4-295:16, 298:5-300:17, 303:8-305:25. | U.S. Bank disputes the assertions in paragraph 150 to the extent that the terms as to what U.S. Bank received are undefined and open-ended. U.S. Bank does not dispute that it received the following documents referenced in the portion of the deposition testimony of Mr. Mosley cited by Sun Life: Exs. 88, 91, 92, 94, and 95. U.S. Bank disputes that it received Exs. 37, 88, and 90 before Mrs. Malkin's death. | U.S. Bank's partial disputation of Sun Life's assertions at paragraph 150 is not substantiated by citation to any evidence. U.S. Bank's counsel's bald assertion that U.S. Bank did not receive the Trust Agreement, the Sub-Trust Agreement, and the Sub-Trust II Agreement (Dep. Exs. 37, 88, and 90) until after Mrs. Malkin's death is not supported by an affidavit or any other evidence.  And in fact, the Trust and Sub-Trust Agreement were produced by U.S. Bank in this litigation and U.S. Bank's |

| | | |
|---|---|---|
| | | corporate representative testified that Coventry sent this paperwork to U.S. Bank in connection with the Sales Documentation in 2008, but that U.S. Bank did not review it because it was not part of U.S. Bank's checklist.  Dep. of R. Mosley at 246:24-253:6, 272:7-273:18.  Mr. Mosley further testified that no one at U.S. Bank has had communications with Coventry (or AIG) in connection with this lawsuit since it was filed.  Dep. of R. Mosley at 469:22-470:21. |
| 151. | U.S. Bank did not review any of these documents to determine whether they suggested that Policy might have lacked an insurable interest, or was an illegal wagering contract, or whether the Trust that applied for the Policy might have been invalid; moreover, U.S. Bank has "no idea" whether Coventry, AIG, or anyone else did either. Dep. of R. Mosley at 268:16-270:24, 272:7-281:18, 289:4-291:17, 294:4-295:16, 298:5-300:17, 303:8-305:25. | U.S. Bank does not dispute the assertions in paragraph 151. | U.S. Bank does not dispute Sun Life's assertions at paragraph 151. |
| 152. | In fact, U.S. Bank does not have any internal policies, guidelines, procedures, and/or requirements relating to: (a) any investigation or diligence it must conduct before it agrees to acquire an ownership interest in a life insurance policy; (b) stranger originated life insurance; (c) premium financing; (d) life settlements; or (e) insurable interest, nor does U.S. Bank have any fraud prevention methods whatsoever that it uses prior to acquiring an ownership or beneficial interest in a life insurance policy. Dep. of R. Mosley | U.S. Bank does not dispute the assertions in paragraph 152. | U.S. Bank does not dispute Sun Life's assertions at paragraph 152. |

| | | | |
|---|---|---|---|
| | at 426:10-434:5, 436:4-438:7. | | |
| 153. | On or around August 19, 2008, U.S. Bank conveyed (a) the Policy from Coventry to AIG; (b) $255,000 from AIG to the (Coventry-controlled) Trust; and (c) $172,352 from AIG to Coventry as a so-called "originator's fee." Dep. of R. Mosley at 374:10-375:15; Dep. Ex. 106, Tripartite Entitlement Order, attached hereto as Exhibit 59; Dep. Ex. 89, Coventry/AIG Checklist, at 363, 370 (disbursement schedules), attached hereto as Exhibit 60. | U.S. Bank does not dispute the assertions in paragraph 153. | U.S. Bank does not dispute Sun Life's assertions at paragraph 153. |
| 154. | On September 13, 2014, Mrs. Malkin passed away, and on October 17, 2014, U.S. Bank submitted a death claim to Sun Life. | U.S. Bank does not dispute the assertions in paragraph 154. | U.S. Bank does not dispute Sun Life's assertions at paragraph 154. |
| 155. | Following receipt of the death claim, Sun Life reviewed its file materials and, as part of that review, authorized an investigation by Stuart Drobny. Dep. of G. Lawrence at 91:16- 24-92:1-3, attached hereto as Exhibit 61. | U.S. Bank does not dispute the assertions in paragraph 155. | U.S. Bank does not dispute Sun Life's assertions at paragraph 155. |
| 156. | Sun Life authorized Mr. Drobny to speak to Mrs. Malkin's daughter, Toni Guarnero, whereby Sun Life learned, among other things, that (i) Mrs. Malkin did not have the means to pay the premiums; (ii) Mrs. Malkin was approached by an insurance representative who talked to her about putting a policy in place on her life in exchange for a financial payment; and (iii) Mrs. Malkin was told that the policy would eventually be sold on the secondary market and that she might participate in the proceeds | U.S. Bank does not dispute the assertions in paragraph 156. | U.S. Bank does not dispute Sun Life's assertions at paragraph 156. |

| | | | |
|---|---|---|---|
| | of that sale. *Id.* at 101:5-8. | | |
| 157. | On November 14, 2014, Sun Life commenced this action. *Id.* at 102:23-103:1-2. | U.S. Bank does not dispute the assertions in paragraph 157. | U.S. Bank does not dispute Sun Life's assertions at paragraph 157. |
| 158. | U.S. Bank subsequently filed an answer, affirmative defenses, and counterclaims. | U.S. Bank does not dispute the assertions in paragraph 158. | U.S. Bank does not dispute Sun Life's assertions at paragraph 158. |
| 159. | U.S. Bank has since admitted that it has no factual basis for many of its denials, affirmative defenses, and counterclaims and that U.S. Bank itself will not suffer damages if the death benefit is not paid because AIG (not U.S. Bank) stands to receive the proceeds, if paid, and AIG is paying U.S. Bank's legal bill. Dep. of R. Mosely at 444:14-512:23. | U.S. Bank disputes the allegations in paragraph 159, which mischaracterize the testimony of U.S. Bank. Mr. Mosley testified at length regarding the factual bases for its denials, affirmative defenses, and counterclaims and that it relied on counsel in preparing its pleadings. (Mosley Dep. at 446:19-512:23 (Walsh Decl. II, Ex. Y)). U.S. Bank specifically testified that it will suffer damages in its capacity as securities intermediary if Sun Life does not pay the claim to the death benefit under the Malkin Policy. (*Id.* at 509:6-512:23). | U.S. Bank's disputation of Sun Life's assertions at paragraph 159 is not substantiated by the evidence to which it cites. U.S. Bank has admitted that it has no factual basis for many of its denials, affirmative defenses, and counterclaims. *See* Dep. of R. Mosley at 444:14-512:23; Sun Life's Motion for Summary Judgment at 27–30 (explaining in more detail). Moreover, when U.S. Bank says that "it will suffer damages in its capacity as securities intermediary," what U.S. Bank means is that *AIG* will not get the $5 million death benefit. Dep. of R. Mosley at 509:3-512:4 (admitting that U.S. Bank proper "has nothing to do with this case"). |
| 160. | On April 14, 2005 Sun Life issued a memorandum to insurance producers contracted with Sun Life wherein Sun Life, *inter alia,* (i) acknowledged its awareness of "recent increased volume and variety of sales techniques and transactions" that were characterized as STOLI; (ii) acknowledged that many of these transaction might have been legitimate but that Sun Life nevertheless believed that "a growing number . . . have come to depart from | U.S. Bank does not dispute the assertions in paragraph 160, and refers to the Memo from C. Accum as evidence of its contents. U.S. Bank disputes the assertions contained in paragraph 160, however, to the extent Sun Life attempts to offer them in support of its heading. | U.S. Bank does not dispute Sun Life's assertions at paragraph 160. |

| | | | |
|---|---|---|---|
| | traditional and appropriate uses of life insurance"; (iii) explained that it viewed as improper (a) "lending of life" sales (where a person lends his insurability to an unrelated person), (b) offering seniors "'free' insurance" or a cash incentive to enter into a transaction, and (c) the use of non-recourse premium financing; and (iv) advised that these types of transactions were "detrimental to our policyholders and producers, as well as Sun Life Financial and the entire life insurance industry." Dep. Ex. 135, Mem. from Claude Accum, attached hereto as Exhibit 62; Dep of T. Foley[29] at 48:3-49:19, attached hereto as Exhibit 63 ("[W]e wanted to make crystal clear to our agents and brokers that there were species of business with which Sun Life did not want to be involved.") | | |
| 161. | In March 2006, Sun Life decided not to issue policies funded through nonrecourse premium financing loans because it believed that such loans were a feature of STOLI. Dep. Ex. 138, "Position of Non-Recourse Premium Financing," attached hereto as Exhibit 64. | U.S. Bank disputes the characterizations contained in paragraph 161 and refers to the "Position on Non-Recourse Premium Financing" as evidence of its contents. | U.S. Bank does not dispute U.S. Bank's assertions at paragraph 161, and U.S. Bank's disputation of Sun Life's so-called "characterizations" at paragraph 161 is not substantiated by citation to any evidence. |

| No. | U.S. Bank Counterstatement | Sun Life Response |
|---|---|---|
| 162. | On February 16, 2006, Mrs. Malkin executed an application for a $5 million life insurance policy with Sun Life (the "Original Application") in Florida. (Lawrence Dep. at 20:3-23:17 (Walsh Decl. I, Ex. E) & Dep. Ex. 159 (Walsh Decl. I, Ex. F)). The | Sun Life does not dispute that it received a February 16, 2006 application form, nor does it dispute that the February 16, 2006 application form identified a Florida address for Mrs. Malkin.  Although U.S. Bank now calls this document the "Original Application," this is a |

---

[29] Thomas Foley was Chief Underwriter at Sun Life from 2006 to 2011. Dep. of T. Foley at 10:3-8.

| | | |
|---|---|---|
| | application lists Mrs. Malkin's Florida address at 19101 Mystic Point # 501, Aventura, Florida 33180. (Dep. Ex. 159 at 269 (Walsh Decl. I, Ex. F)). | term made up by U.S. Bank seemingly to create some confusion, and U.S. Bank's citation to testimony from Donald Lawrence fails to support U.S. Bank's assertions.  Moreover, the February 16, 2006 document (which is Exhibit F to the Walsh Decl. I.), is an incomplete and partially signed insurance application, and it is undisputed that this document was not ultimately attached to the Policy and thus did not form part of the insurance contract. *See* Exhibit Q to Walsh Decl. I. Accordingly, the so-called "Original Application" is irrelevant, inadmissible, and immaterial. *See* Sun Life's Counterstatement of Facts in Opposition to U.S. Bank's Motion for Summary Judgment. |
| 163. | Mrs. Malkin and Mr. Bryan or his representative signed the Original Application listing "Ft. Lauderdale, FL" as the "signed at" location. (Lawrence Dep. at 23:3-17 (Walsh Decl. I, Ex. E) & Dep. Ex. 159 (Walsh Decl. I, Ex. F). Mrs. Malkin did not sign the application in Delaware, nor did Mr. Bryan or his representative. (Bryan Dep. at 389:12-390:11 (Walsh Decl. I, Ex. E) & Dep. Ex. 57 (Walsh Decl. I, Ex. L)). | Undisputed; however, this fact is immaterial to the issues before the Court on summary judgment. |
| 164. | Mrs. Malkin listed the proposed owner and payor on the Original Application as "Trust Pending," (Dep. Ex. 159 at 269, 272 (Walsh Decl. I, Ex. F)), and Paul Malkin, Mrs. Malkin's husband, as the 100% beneficiary of the death benefit. (Lawrence Dep. at 22:23-23:2 (Walsh Decl. I, Ex. E)) & Dep. Ex. 159 at 272 (Walsh Decl. I, Ex. F)). | Undisputed; however, this fact is immaterial to the issues before the Court on summary judgment. |
| 165. | Mrs. Malkin listed Florida as her driver's license state of issue and her Florida driver's license number. (Dep. Ex. 159 at 269 (Walsh Decl. I, Ex. F)). | Undisputed; however, this fact is immaterial to the issues before the Court on summary judgment. |
| 166. | As of that date and through the date of her death, Mrs. Malkin remained a resident of Florida, having initially moved there in approximately 1987-90. (Deposition of Jeffrey Klein conducted on October 14, 2015 ("Klein Dep.") at 18:6-24 (Walsh Decl. I, Ex. H); Guarnero Dep. at 27:24-28:6, 32:21-23 (Walsh Decl. I, Ex. I)). Mrs. Malkin resided at 19101 Mystic Point Drive, number 501, Aventura, Florida. (Guarnero Dep. at 27:24-28:6, 32:21-23, 84:21- | Undisputed; however, this fact is immaterial to the issues before the Court on summary judgment. |

| | | |
|---|---|---|
| | 85:22 (Walsh Decl. I, Ex. I)). | |
| 167. | The Original Application included various forms signed by Mrs. Malkin in Florida, including: (i) a Financial Information form; and (ii) an Authorization for Release and Disclosure of Non-Health Related Information. (Sun Life (Malkin) — 00281-314 at 281, 314 (Walsh Decl. I, Ex. G)). | Sun Life does not dispute that Mrs. Malkin signed the two stated forms in Florida. However, U.S. Bank continues to refer to something called the "Original Application." But there is no such document, and the Court need not go any further than to look at U.S. Bank's own Exhibits to see this is so. In Paragraph 162 of its Rule 56.1 Statement, U.S. Bank refers to Walsh Decl. I., Ex. F as the so-called "Original Application." In Paragraph 167, it refers to Walsh Decl. I., Ex. G, which includes Ex. F along with numerous other documents. None of this makes any sense and appears merely to be an attempt to create confusion. In any event, there is only one application upon which the Policy was issued, and it is attached to, and forms part of, the Policy. *See* Sun Life's Counterstatement of Facts in Opposition to U.S. Bank's Motion for Summary Judgment. |
| 168. | Mrs. Malkin also signed Part II of the Original Application without designating a "signed at" location. (Sun Life (Malkin) — 00281-314 at 303 (Walsh Decl. I, Ex. G)). Mrs. Malkin and the broker signed the Certificate of Insurability included in the Original Application on February 20, 2006 again without designating a "signed at" location. (Sun Life (Malkin) — 00281-314 at 283 (Walsh Decl. I, Ex. G)). The Original Application included a fax header on several pages. (Dep. Ex. 159 at 278 (Walsh Decl. I, Ex. F) & Sun Life (Malkin) — 00281-314 at 278, 281, 294, 303, 310, 312, 314) (Walsh Decl. I, Ex. G)) | Sun Life does not dispute that Mrs. Malkin signed the stated forms, or that Mr. Bryan signed one of the stated forms, without designating a "signed at" location. However, Sun Life disputes the characterization of the "Original Application," and these facts are immaterial. *See* Sun Life's Counterstatement of Facts in Opposition to U.S. Bank's Motion for Summary Judgment. |
| 169. | Sun Life received the Original Application. (Lawrence Dep. at 20:9-26:6 (Walsh Decl. I, Ex. E) & Dep. Ex. 159 (Walsh Decl. I, Ex. F) & (Sun Life (Malkin) — 00281- 314 at 283 (Walsh Decl. I, Ex. G)) | Sun Life does not dispute that it received the February 16, 2006 application form (i.e., Walsh Decl. I., Ex. F) or the other forms contained in Walsh Decl. I., Ex. G. However, there is no such document entitled the "Original Application," and U.S. Bank's use of the exhibits submitted with its Rule 56.1 Statement makes no sense. In this Paragraph 169, U.S. Bank refers to both Ex. F and Ex. G as the so-called "Original Application," but, as previously noted, these exhibits are comprised of different documents. In any event, these facts are immaterial. *See* Sun Life's Counterstatement of Facts in Opposition to U.S. Bank's Motion for Summary Judgment. |

| 170. | Sometime thereafter, the Original Application was altered and the "signed at" location was changed from "Ft. Lauderdale, FL" to "Wilmington, DE" (the "First Alteration"). (Lawrence Dep. at 24:4-25:17 (Walsh Decl. I, Ex. E) & Dep. Ex. 160 at 207 | Sun Life does not dispute that it received an application form in place of the February 16, 2006 application form, and this subsequent application form contained the differences noted by U.S. Bank in this paragraph. However, there is no such document entitled the "First Alteration to the Original Application." This is a phrase made up by U.S. Bank seemingly to create some confusion where none exists. It appears to refer to an updated, signed *but undated* application form Sun Life subsequently received. *See* Ex. 46 ¶ 4 n.1. Moreover, in support of its assertion that the February 16, 2006 application form had been "altered," U.S. Bank cites the deposition of Donald Lawrence, but he did not so testify. *See* Dep. of D. Lawrence at 25:6-10. Further, the exhibit to which U.S. Bank refers (i.e., Walsh Decl. I., Ex. J) is a composite exhibit which contains many more pages than the updated application form received by Sun Life. Regardless, it is undisputed that neither of these application forms was attached to, or formed part of, the Policy; thus, neither is admissible, relevant, or material. *See* Sun Life's Counterstatement of Facts in Opposition to U.S. Bank's Motion for Summary Judgment. |
| 171. | The First Alteration also includes alterations to the "Owner," "Beneficiary," and "Payor" sections of the application:<br><br>The First Alteration to the Original Application lists the "Phyllis Malkin Insurance Trust dtd. 3/15/06" (the "Malkin Trust") as the proposed owner of the Malkin Policy and Wilmington Trust Company ("Wilmington Trust") as the trustee (Dep. Ex. 160 at 199 (Walsh Decl. I, Ex. J));<br><br>The First Alteration to the Original Application lists the Malkin Trust as the proposed beneficiary (Dep. Ex. 160 at 202 (Walsh Decl. I, Ex. J)); and<br><br>The First Alteration to the Original Application does not indicate the name of the proposed payor. (Dep. Ex. 160 at 202 (Walsh Decl. I, Ex. J)) | Sun Life does not dispute that the differences noted by U.S. Bank between the February 16, 2006 application form and the subsequently received undated application form existed. However, there is no such document entitled the "First Alteration to the Original Application," and, in any event, these facts are immaterial because these documents were not part of the application upon which the Policy was issued. *See* Sun Life's Counterstatement of Facts in Opposition to U.S. Bank's Motion for Summary Judgment. |

| 172. | In Part II of the First Alteration, "Wilmington, DE" is listed with Mrs. Malkin's signature with no "signed at" date. (Dep. Ex. 160 at 220 (Walsh Decl. I, Ex. J)) | Sun Life does not dispute that it subsequently received these documents or that the referenced form indicated that it was signed by Mrs. Malkin in Wilmington, Delaware and is undated.  Sun Life disputes the characterization of the "First Alteration to the Original Application," and these facts are immaterial.  *See* Sun Life's Counterstatement of Facts in Opposition to U.S. Bank's Motion for Summary Judgment. |
|---|---|---|
| 173. | The First Alteration included the same fax header as the Original Application, signifying that the Original Application was altered (not that this form was separately completed). (Dep. Ex. 160 at 196, 207, 220, 226, 228, 230 (Walsh Decl. I, Ex. J)) | This paragraph constitutes argument, not fact.  In any event, Sun Life does not dispute that certain facsimile transmission information appears at the top of one page of these aforementioned application forms.  However, Sun Life disputes the characterization of the "Original Application" and the "First Alteration to the Original Application," and further disputes that any "alteration" occurred or that there is actual evidence to support this argument.  In any event, these facts are immaterial.  *See* Sun Life's Counterstatement of Facts in Opposition to U.S. Bank's Motion for Summary Judgment. |
| 174. | Sometime thereafter, the First Alteration was altered and a date of "3/15/06" was provided in the signature section (the "Second Alteration"). (ECF No. 1-1 at 12 (Walsh Decl. I, Ex. K)). This date was also added to the "signed at" section in Part II of the Second Alteration. (ECF No. 1-1, at 16 (Walsh Decl. I, Ex. K)). The Second Alteration included the same fax header at the top of the page as the Original Application, signifying that the Original Application was altered (not that this form was separately completed). (ECF 1-1 at 12, 16 (Walsh Decl. I, Ex. K)) | Sun Life does not dispute that it ultimately received a completed, signed and *dated* application form.  However, there is no such document entitled the "Second Alteration to the Original Application."  This is yet another term made up by U.S. Bank, seemingly to create confusion where none exists.  Moreover, as stated above, it is undisputed that, subsequent to its receipt of the incomplete and partially signed February 16, 2006 application form, Sun Life received a cover letter from the broker's office, dated March 21, 2006, enclosing additional underwriting requirements, including a "new application" in place of the February 16, 2006 forms.  *See* Ex. 46 at ¶ 4.  It is undisputed that this "new application" stated that it was signed in Wilmington, Delaware on March 15, 2006, and it identified the proposed policy owner as the Phyllis Malkin Insurance Trust, dated 3/15/06 – a trust established in the state of Delaware.  *See id.*; Dep. of D. Lawrence at 98:14-100:19; *see* Lawrence Deposition Exhibit 158; Ex. Q to Walsh Decl. I.  *See* Sun Life's Counterstatement of Facts in Opposition to U.S. Bank's Motion for Summary Judgment. |

| 175. | The Certificate of Insurability included in the Second Alteration lists "Wilmington, DE" as the "signed at" location and is dated "3/15/06." (ECF No. 1-1 at 18 (Walsh Decl. I, Ex. K)) | Sun Life does not dispute that it received the Certificate of Insurability. However, Sun Life disputes the characterization of the "Second Alteration to the Original Application" and U.S. Bank's attempt to lump-together documents to create this composite exhibit. *See* Sun Life's Counterstatement of Facts in Opposition to U.S. Bank's Motion for Summary Judgment. |
|------|------|------|
| 176. | The Second Alteration includes an Authorization for Release and Disclosure of Psychotherapy Notes signed by Mrs. Malkin with "Ft. Lauderdale, FL" as the "signed at" location and "3/15/06" as the date, (Bryan Dep. at 373:23-374:14 (Walsh Decl. I, Ex. D) & Dep. Ex. 57 at 116 (Walsh Decl. I, Ex. L)), as well as a Florida Informed Consent form for Notice and Consent for Blood Testing signed by Mrs. Malkin and dated "3/15/06," (Dep. Ex. 57 at 118 (Walsh Decl. I, Ex. L)). | Sun Life does not dispute that it received the updated authorization, disclosure, and consent forms. However, Sun Life disputes the characterization of the "Second Alteration to the Original Application" and U.S. Bank's attempt to lump together documents to create this composite exhibit. |
| 177. | Sun Life received and was in possession of all three versions of Mrs. Malkin's life insurance application. (Dep. Ex. 57 (Walsh Decl. I, Ex. L); Ex. 159 (Walsh Decl. I, Ex. F); Dep. Ex. 160 (Walsh Decl. I, Ex. J)). | Sun Life does not dispute that it received the three documents referenced in paragraph 177. Sun Life disputes the fallacious characterization of these documents as "versions of Mrs. Malkin's life insurance application." *See* Sun Life's Counterstatement of Facts in Opposition to U.S. Bank's Motion for Summary Judgment. There were three applications sent to Sun Life. The first two were incomplete. Sun Life did not issue the Policy until it received and accepted a *completed* Application. That is the Application upon which the Policy was issued that was attached to the Policy and incorporated by reference therein. *See* Sun Life's Counter-Statement of Undisputed Facts in Opposition to U.S. Bank's Motion for Summary Judgment. |
| 178. | In exchange for premiums and other consideration, Sun Life subsequently issued and delivered a $5 million life insurance policy, no. 020119706, dated April 11, 2006, to the Malkin Trust. (ECF No. 19-1 (Walsh Decl. I, Ex. M)). The Policy designates the Trust as the beneficiary. (*Id.*). When the Policy was issued, Mrs. Malkin's trust was the beneficiary, Mrs. Malkin was the grantor of the trust, and Mrs. Malkin's husband and children were the ultimate beneficiaries of the trust and the Policy. (ECF No. 19-1 (Walsh Decl. I, Ex. M), Ex. 57 (Walsh Decl. I, Ex. L) Ex. 309 (Walsh Decl. II, Ex. | Sun Life does not dispute that it received an initial premium in connection with the Policy, nor does Sun Life dispute that it issued the Policy to the Trust in Delaware, through its Delaware Trustee, Wilmington Trust Company. However, Exhibit M referred to in this paragraph 178 is not a complete copy of the Policy that was delivered. Indeed, U.S. Bank has represented that Exhibit Q to the Walsh Decl. I is the Policy. *See* SUF ¶ 25; Dep. of G. Lawrence at 29:4-5. Sun Life does not dispute that the Policy, which was issued and delivered in Delaware to the Delaware policy owner, was |

| | | |
|---|---|---|
| | 00) Ex. 55 (Walsh Decl. II, Ex. NN)). The Policy contained Florida-specific forms, as required by Florida statute. (Lawrence Dep. at 29:4-30:13 (Walsh Decl. I, Ex. E)). | mistakenly printed with certain forms with a "FL" designation. *See* Ex. 46 ¶ 7. Although U.S. Bank cites the deposition testimony of Donald Lawrence in support of its assertion that the Policy contained Florida forms, Mr. Lawrence provided no such testimony. Instead, he testified that he understands that, in advance of approving a life insurance application form, state approval is required, and that he believes all of the states have policy contract filing requirements. *See* Dep. of D. Lawrence at 29:7-30:13. In any event, it is undisputed that Sun Life's printing of the Policy with certain forms containing the "FL" designation was human error, and that this mistake does not change the undisputed fact that the Application was signed by the owner in Delaware, the Policy was delivered to the Delaware owner in Delaware, and the Policy was signed for and accepted by the policy owner in Delaware. *See* Sun Life's Counterstatement of Facts in Opposition to U.S. Bank's Motion for Summary Judgment. Sun Life disputes U.S. Bank's assertion that "When the Policy was issued, Mrs. Malkin's trust was the beneficiary, Mrs. Malkin was the grantor of the trust, and Mrs. Malkin's husband and children were the ultimate beneficiaries of the trust and the Policy." When the Policy was issued, the Trust was the record owner and beneficiary; Mrs. Malkin's husband and children were never the record beneficiaries of the Policy. *See* Ex. Q to Walsh Decl. I. The Trust Agreement lists Mrs. Malkin as settlor, but for the reasons explained in Sun Life's Motion, in reality, the Trust was settled by Coventry. *See* Ex. 29. Sun Life learned in connection with this litigation that Mr. Malkin was originally listed as the Trust's beneficiary, though Sun Life denies that this is of any consequence. *See id.* Mrs. Malkin's children were never listed as Trust beneficiaries. *See id.* |
| 179. | As required by Florida law, Fla. Stat. Ann. § 627.455 (2015), Section 4 of the Malkin Policy contains an "Incontestability" provision which states that: "[a]fter this Policy has been in force during the lifetime of the Insured for a period of two years from its Issue Date, we [Sun Life] cannot contest it except for non-payment of Premiums." (ECF No. 19-1 at 10FL (Walsh Decl. I, Ex. M); *see also* Lawrence Dep. at 30:8-13 (Walsh Decl. I, Ex. E)). | Sun Life does not dispute that the Policy contains an incontestability provision, but Sun Life denies that this provision was included "as required by Florida law." Instead, the inclusion of certain forms containing the "FL" designation was human error which is immaterial to the issues before the Court. *See* Sun Life's Counterstatement of Facts in Opposition to U.S. Bank's Motion for Summary Judgment. |

| 180. | In addition, the express terms of the Malkin Policy allowed Mrs. Malkin to assign all or some of her rights in the Policy. (Exs. 156-58 at 10FL (Walsh Decl. I, Exs. O-Q)). Sun Life acknowledged the assignment of this Policy. (Dep. Ex. 170 (Walsh Decl. I, Ex. U)). | Sun Life does not dispute that the Policy contained an assignments provision, but Sun Life disputes that this is relevant to this action. *See* Ex. Q to Declaration of J. Walsh. The Policy is void *ab initio* if it was a cover for an illegal wager and/or lacked insurable interest. |
|---|---|---|
| 181. | The Policy issued on Mrs. Malkin's life states: "Sales representatives do not have the authority to alter or modify this Policy or to waive any of its provisions. The only persons with this authority are our [Sun Life's] president, actuary, secretary or one of our vice presidents." (Dep. Exs. 156-58 at 10FL (Walsh Decl. I, Exs. O-Q)). | Sun Life does not dispute that the Policy contains the referenced language, but Sun Life disputes that this is relevant to this action. *See* Ex. Q to Walsh Decl. I. |
| 182. | U.S. Bank, Wilmington Trust Company, Coventry First LLC, and Total Financial & Insurance Services, Inc. ("Total Financial") received copies of the Policy, either in conjunction with the Policy's initial issuance or its subsequent sale to U.S. Bank, and those versions all contain Florida-specific forms and "FL" designations. (Lawrence Dep. at 18:19-20:1 (Walsh Decl. I, Ex. E) & Dep. Exs. 155-58 (Walsh Decl. I, Exs. N-Q)). | Sun Life does not dispute that third parties obtained partial copies of the Policy. Notably, however, Walsh Decl. I., Exhibits N, O, and P are not complete copies of the Policy. U.S. Bank has contended that Exhibit Q (also previously marked as Lawrence Deposition Exhibit 158) is the actual Policy. *See* Sun Life's Counterstatement of Facts in Opposition to U.S. Bank's Motion for Summary Judgment. |
| 183. | In conjunction with its issuance of the Policy, on April 11, 2006, Sun Life printed a Production Audit Report listing the forms contained in the Policy that Sun Life "printed in accordance with state filing rules." (Lawrence Dep. at 30:17-33:12 (Walsh Decl. I, Ex. E) & Dep. Ex. 162 (Walsh Decl. I, Ex. R); Deposition of Michelle Wilkosky conducted on October 29, 2015 ("Wilkosky Dep.") at 25:14-27:3 (Walsh Decl. I, Ex. S) & Dep. Ex. 162 (Walsh Decl. I, Ex. R)). Among the forms listed in the Production Audit Report are the Florida forms that were in fact contained in the Malkin Policy when it was issued by Sun Life. (Lawrence Dep. at 30:17-33:12 | Sun Life does not dispute that it printed a Production Audit Report on or about April 11, 2006 listing certain "FL" forms.[30] Nor does Sun Life dispute that the Policy which was issued and delivered in Delaware to the Delaware policy owner contained certain forms with a "FL" designation due to human error. *See* Ex. 46 ¶ 7. However, these facts are immaterial. |

---

[30] In support of its assertion that the Audit Production Report listed policy forms "printed in accordance with state filing rules," U.S. Bank cites the testimony of Mr. Lawrence and Ms. Wilkosky. For the record, Mr. Lawrence, upon being shown the Audit Production Report, merely confirmed that the document says what it says. *See* Dep. of G. Lawrence at 31:1-6. And Ms. Wilkosky did the same, and then went on to explain that, due to human error, the Policy was issued with certain forms having the "FL" designation, but because the Application pursuant to which the Policy was issued (i.e., the application attached to the Policy) identified a Delaware policy owner, because the Application was signed in Delaware, and because the Application was accompanied by a Delaware policy illustration, Sun Life's records were updated in August 2006 to reflect that the Policy is a Delaware contract. *See* Dep. of M. Wilkosky at 26:4-29:1. In any event, nothing about the Audit Production Report or the issuance of a policy with certain forms containing the "FL" designation changes any of the undisputed facts set forth by Ms. Wilkosky.

| | | |
|---|---|---|
| | (Walsh Decl. I, Ex. E) & Dep. Ex. 162 (Walsh Decl. I, Ex. R); Wilkosky Dep. at 25:14-27:3 (Walsh Decl. I, Ex. S) & Ex. 162 (Walsh Decl. I, Ex. R)). | |
| 184. | The Policy issued to the Malkin Trust in April 2006 was a Florida Policy. (Lawrence Dep. at 18:19-20:1, 29:4-33:12 (Walsh Decl. I, Ex. E) & Exs. 155-58 (Walsh Decl. I, Exs. N-Q); Wilkosky Dep. at 24:10-27:20 (Walsh Decl. I, Ex. S) & Ex. 156 (Walsh Decl. I, Ex. 0)). | Sun Life disputes U.S. Bank's assertions at paragraph 184.  This is a legal conclusion to which no response is required.  Moreover, Sun Life properly objected to U.S. Bank's attempts to get Sun Life's witnesses to agree with this legal conclusion.  Therefore, the testimony U.S. Bank seeks to rely upon is not admissible and cannot be considered on summary judgment. *See*, *e.g.*, Dep. of D. Lawrence at 32:22-33:1. |
| 185. | Mrs. Malkin funded the Trust with $1.00. She also selected the beneficiary of the trust. (Ex. 309 (Walsh Decl. II, Ex. 00)). Mrs. Malkin was the settlor of the Trust, and Paul Malkin was the beneficial owner and co-trustee. (*Id.*) | Sun Life disputes the assertions and characterizations at paragraph 185.  U.S. Bank has offered no evidence that Mrs. Malkin actually paid the nominal $1.00 initial trust estate.  Moreover, the evidence shows that Mrs. Malkin was prohibited from naming her children as beneficiaries of the policies.  Ex. 16 at Ex. A.  Finally, although Mrs. Malkin is listed as settlor, the real settlor was Coventry. *See* Sun Life's Motion for Summary Judgment at 19–21. |
| 186. | Mrs. Malkin voluntarily applied for and procured the Policy herself using funds she obtained in a loan from LaSalle Bank. (Ex. 309 (Walsh Decl. I, Ex. JJ)). Mrs. Malkin took this loan out in her own name and certified that she was not relying on the representations of any party in entering the loan agreement. (*Id.*; USBANK_MALKIN0000037) (Walsh Decl. II, Ex. KK)). | Sun Life disputes the assertions and characterizations at paragraph 186.  Mrs. Malkin never paid any premiums for the Policy.  Ex. 50 (Coventry paid initial premiums to Sun Life); Dep. of L. Bryan II at 23:21-24:1 ("Everyone in our office, if you asked them about non . . . recourse premium financing . . . they would all tell you that no client ever paid anything or intended to pay, and [the Malkins] understood that."); Dep. of P. Shapiro at 243:18-19 ("The Malkins didn't want to, as no one wanted to, pay for this insurance on their own."); Ex. 15 ("Regarding my mother's intention to pay the premium, that's easy, my mother never intended to pay the policy nor did she have the wherewithal to pay this policy. . . . My mother never made a premium payment to Sun Life. . . ."); Ex. 5 at 5 ("The Malkins, like the other Simba clients who did Coventry deals before them, paid no premium payments (or anything else for that matter) and took no risk."); Exhibit 49 (Simba wires Mrs. Malkin $5,000 to cover $5,000 origination fee); Ex. 5 at 5 ("Simba had Mrs. Malkin write the $5,000 check but Simba simultaneously wired $5,000 to |

Mrs. Malkin's account. Coventry preferred that it look like the origination fees were actually coming from the insureds."); Dep. of L. Bryan at 320:6-8 (Simba paid the $5,000 origination fee, not Mrs. Malkin); Ex. 53 (showing that Coventry received a wire from Wealth Modes for the outstanding default interest); Dep. of L. Bryan at 416:15-18 ("Q: Does that refresh your recollection as to whether someone at Simba or Wealth Modes made that wire to cover the default interest? A: Looks like we did."); Ex. 5 at 5 ("The Malkins . . . paid no premium payments (or anything else for that matter). . ."); Dep. of P. Shapiro at 241:3-12 ("[T]he business model of what Simba did was . . . none of the clients wanting to pay for hundreds of thousands of dollars for annual premiums for insurance at their ages. None of them.  They were all on board for a number of third party financial institutions to pay for their insurance because there was a possibility that they were going to receive some sort of incentive or compensations for doing this particular transaction."); Dep. of M. Roffeld at 40:17-41:3 ("[T]he only entity that has any risk in this transaction is the funder[.]"); Dep. of L. Bryan at 324:13-16 ("Q: [W]ho shoulders the risk in this transaction?  Who stands to potentially lose money? A: The funder.").  Mrs. Malkin did not voluntarily apply for or procure the policy herself.  Ex. 5 at 4 ("Like all of Simba's other Coventry clients before them, the Malkins didn't care what the documents looked like.  They had no real control over the terms of the loan (other than the fact that they could reject it outright, although none of our clients ever did that) and they had no real control over the policy."); *Id.* at 5 ("[N]o one (including the Malkins) cared about the details of the policies or the loans or whatever paperwork needed to be done."); Dep. of P. Shapiro at 142:11-:143:12 ("[T]he Malkins . . . were not participating in the dollars on this Schedule A so the interest rate, as well as all the other dollars listed here, were not subject to the Malkin's responsibility so these numbers didn't really apply to the Malkins so I don't know if there was any point that we ever discussed this with them. . . . because they did not have any financial investment."); Ex. 5 at 4 ("The Malkins never told anyone at Simba to get them a Sun Life policy . . . ."); *Id.* at 3 ("No Simba client . . . ever asked [Simba] to get them a specific type of policy or a policy from a particular

| | | company."); Dep. of P. Shapiro at 34:19-21 ("Q: So the funders made the decision on which? life insurance application to make?  A: Yes."); Dep. of P. Shapiro at 36:2-10 ("The insureds couldn't make the decision [of what policies and deals to apply for].  The funders had to decide which one of the deals or what the deal was, what they wanted to pay for.  The insured was simply part of the transaction only because the – we and the funder were using their body as the transaction.  They had no . . . skin in the game.  They had no – they weren't involved in the transaction.  They were just involved in the use of their body to be part of the transaction."); Ex. 5 at 4 (Mrs. Malkin got a Sun Life policy because that was the Policy Coventry wanted).  Sun Life disputes U.S. Bank's characterization of USBANK_MALKIN0000037) and refers to it for its content. |
|---|---|---|
| 187. | Mrs. Malkin paid the origination fees for the Policy. (Dep. Ex. 092 (Walsh Decl. II, Ex. LL)). | Sun Life disputes U.S. Bank's assertion at paragraph 187.  Mrs. Malkin received a wire from Simba to cover this $5,000 origination fee.  Exhibit 49 (wire from Simba for $5,000 origination fee); Ex. 5 at 5 ("Simba had Mrs. Malkin write the $5,000 check but Simba simultaneously wired $5,000 to Mrs. Malkin's account.  Coventry preferred that it look like the origination fees were actually coming from the insureds."); Dep. of L. Bryan at 320:6-8 (Simba paid the $5,000, not Mrs. Malkin). |
| 188. | Mrs. Malkin never had a conversation with Larry Bryan about whether she intended to sell the Policy. (Bryan Dep. at 355:18-356:2 (Walsh Decl. II, Ex. Z)). | Sun Life does not dispute that Mr. Bryan never had this specific conversation with Mrs. Malkin.  But Mr. Bryan had similar conversations with Mrs. Malkin about related concepts.  Ex. 5 at 3 ("Like all of Simba's clients, the Malkins were not interested in life insurance in the traditional sense. . . . I know that based on conversations myself and others at Simba had with the Malkins and based on my knowledge of the business that Simba was running."); Dep. of L. Bryan II at 23:12-24:24 ("[Mrs. Malkin] and Paul came to the office and everyone was crystal clear on, you know, what everyone was doing.").  And others *did* have conversations with Mrs. Malkin about her intent to sell the Policy as soon as she was able.  Ex. 15 at 2 ("Once again, there was never an intention on her part to keep this policy, and my mother never paid for the policy nor could she afford to pay for the policy."); Ex. 16 at Ex. A ("Phyllis' plan |

| | | will be to sell those policies in approximately twenty-six (26) months and retain the proceeds, after payment of all expenses and loans relating to [the Sun Life and American General] policies."); Dep. of M. Roffeld at 54:19-25 (Mrs. Malkin told him "right after" she got the policy that "the reason she got that policy was to sell it."). |
|---|---|---|
| 189. | Mrs. Malkin's daughter, Toni Guarnero, was not even aware in 2006 that her mother had applied for and taken out the Policy. (Guarnero Dep. at 81:11-82:14; 117:13-16, Walsh Decl. II, Ex. II)). Prior to this lawsuit, Ms. Guarnero had no knowledge of her mother's intentions in 2006 when Mrs. Malkin applied for the Policy. (*Id.* at 95:5-96:9, 147:24-148:21). | Sun Life disputes U.S. Bank's assertions at paragraph 189. The citations provided by U.S. Bank do not support U.S. Bank's assertions. Moreover, Mrs. Guarnero testified that her mother told her "that she was *applying* for a life insurance policy, but [Mrs. Guarnero] didn't know any *details* in 2006." Dep. of T. Guarnero at 80:25-81:6 (emphasis added). Sun Life also disputes that Mrs. Guarnero had no knowledge of her mother's intentions in 2006 when she applied for the Policy. Dep. of T. Guarnero at 188:3-189:2. |
| 190. | Mrs. Malkin's son, Jeffrey Klein, was also unaware that his mother had applied for a Policy in early 2006 and had no knowledge regarding her intentions or finances in early 2006. (Klein Dep. at 28:23-29:12, 48:25-49:7; 51:13-19 (Walsh Decl. II, Ex. MM)). | Sun Life does not dispute that Mr. Klein was unaware that his mother had applied for a Policy in early 2006. Sun Life disputes the rest of U.S. Bank's assertions as they are not substantiated by the testimony to which U.S. Bank cites. |
| 191. | The "Agreement Regarding Life Insurance Policies" between Mrs. Malkin and her husband was not executed until June 1, 2006, well after the Policy was applied for in February. (Dep. Ex. 055 (Walsh Decl. II, Ex. NN)). Mrs. Malkin received insurance coverage for two years and if Mrs. Malkin had died during the two-year contestability period, the death benefit would have been paid to her husband. (Dep. Ex. 120 at 2 (Walsh Decl. II, Ex. EE)). | Sun Life disputes U.S. Bank's assertions and characterizations at paragraph 191. The Application upon which the Policy was issued was executed on March 15, 2006. *See* Sun Life's Counterstatement of Facts in Opposition to U.S. Bank's Motion for Summary Judgment. On April 20, 2006, the insurance contract was entered into when the Delaware trustee for the original owner accepted delivery of the Policy in Wilmington, Delaware. Ex. 47; Ex. 48. At this point, Sun Life was bound to provide coverage regardless of any change in Mrs. Malkin's health status so long as premiums were current and the other terms and conditions were satisfied.[31] Ex. 47. On May 10, 2006, Mrs. Malkin hired Attorney Alan Cohn to draft the Agreement Regarding Life Insurance Policies. Ex. 16. This agreement memorialized Mrs. Malkin's intent to sell the Policy as soon as she was able. *Id.* On May 12, 2006, Mr. Cohn sent a copy of that agreement to Mrs. Malkin. Ex. 16. On May 25, 2006, |

---

[31] This assumes the contract was valid to begin with, which, as Sun Life later learned, it was not.

|  |  | Coventry paid the initial premiums to put coverage in force. Ex. 50. Mrs. Malkin returned an executed copy of that agreement to Mr. Cohn on June 1, 2006. Ex. 16. If Mrs. Malkin died before the loan matured (in other words, in the first twenty-six months), the death benefit would theoretically go to the Trust minus the loan's principal and interest, which would go to Coventry. Ex. 5 at 2. From an actuarial perspective, the possibility of this happening with Mrs. Malkin (who had a 180 month life expectancy) was extraordinarily small and it never happened to any of Simba's roughly 300-400 clients. Ex. 5; Dep. of P. Shapiro at 242:21-23 ("I don't think we ever had a client die during the first two years."); *Id.* at 276:19-22 ("That wasn't any client's impetus to come down to Fort Lauderdale, sign all the paperwork and do it just to get two years' worth of free insurance because – that just wasn't."); Ex. 23 (Mrs. Malkin had an 180-month life expectancy at the end of 2005); *see also* U.S. Bank's Counter-Statement of Material Facts in Opposition to Sun Life's Statement of Material Facts ¶ 53. |
| 192. | The terms of the loan Mrs. Malkin received from LaSalle to finance the Policy premiums included a maturity date of 26 months. (Dep. Ex. 048 (Walsh Decl. II, Ex. QQ)). At that time, Mrs. Malkin could either (i) pay off the LaSalle loan and retain the Policy or (ii) sell the Policy to a third party and use the proceeds of the sale to pay off the loan. (*Id.*) | Sun Life disputes U.S. Bank's assertions and characterizations at paragraph 192. Sun Life does not dispute that the term of the purported loan Mrs. Malkin entered into with Coventry was 26 months. If Mrs. Malkin lived to loan maturity (which, again, is what happened in 100% of Simba's 300-400 clients), Mrs. Malkin could have theoretically paid off the loan with interest and kept the Policy. Ex. 5 at 2. However, "none of Simba's roughly 300-400 clients ever exercised this option." *Id.*; Dep. of P. Shapiro at 171:21-24 ("No one ever did that because the first thing they would have to do is pay back, let's say, Coventry the first two years' worth of premiums."). Mrs. Malkin certainly could not have done that because she did not even have the money to pay the premiums – let alone the principal plus roughly $90,000 in interest. *See* Ex. 15 at 2. This was not why any of Simba's clients came to Simba, and Simba "would not have been a viable business" if this was all it offered. Ex. 5 at 2; Dep. of P. Shapiro at 172:10-11 ("[The insureds] weren't getting into the transaction, as I said before, to buy insurance."). Moreover, at the expiration of the two-year period, Mrs. Malkin could have attempted to sell the policy either directly to the funder or to some other |

|  |  |  |
|---|---|---|
|  |  | investor (many of whom were also funders themselves of different policies).  As it turned out, only a very small percentage of Simba's clients who participated in back-end deals were able to sell them after the loan matured.  *Id.*  And when this did happen, the policy was often purchased by the original funder anyway.  Dep. of L. Bryan II at 17:16-17 ("Occasionally we would be able to make a sale [to an entity that was not the original funder] but that wasn't a lot.").  U.S. Bank fails to mention Mrs. Malkin's third option – which was to relinquish the Policy back to Coventry and walk away with nothing.  Ex. 5 at 2.  This is what happened in 90% or more of back-end deals at Simba, and it is exactly what happened to Mrs. Malkin.  *Id.*; Ex. 54.  In 100% of the back-end deals done through Simba, the funder or some other investor – not the insured or their beneficiaries – ended up with the policy.  Ex. 5 at 2. |
| 193. | Mrs. Malkin was not obligated to sell the Policy. (*Id.*; Dep. Ex. 120 at 2 (Walsh Decl. II, Ex. EE); Bryan Dep. at 356:7-15 (Walsh Decl. II, Ex. Z)). | Sun Life does not dispute that Mrs. Malkin was not legally obligated to sell the Policy, but Sun Life disputes that this formality is relevant to the Court's inquiry, which is to look beyond mere formalities to the true nature of the transaction, and Coventry could have liquidated it at any time pursuant to its sweeping power of attorney.  *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust*, 28 A.3d 1059, 1071, 1074, 1076 (Del. 2011); Ex. 26; *Brasner*, 2011 U.S. Dist. LEXIS, at *8-9  ("Essentially, the Power of Attorney and Borrower's Power of Attorney placed Coventry in position to hold control over the . . . [p]olicy . . . ."). |
| 194. | Sun Life identified stranger-originated life insurance ("STOLI") as a risk to its business as early as 2005 and monitored and analyzed STOLI intensely through various systems. These efforts included, among other things, the creation of Handle With Care ("HWC") lists tracking brokers who concerned Sun Life based on their involvement with STOLI, (Deposition of Thomas Foley conducted on October 27, 2015 ("Foley Dep.") at 109:12-112:14 (Walsh Decl., Ex. UU) & Dep. Ex. 142 (Walsh Decl. II, Ex. PP); Lawrence Dep.at 43:20-44:10 (Walsh Decl. II, Ex. RR), and change in ownership and beneficiary lists that permitted Sun Life to identify suspicious changes, including those that | Sun Life disputes these assertions.  These assertions mischaracterize facts and are unsupported by the evidence to which U.S. Bank cites.  There are no facts of record to support the assertion that Sun Life "monitored" or "analyzed" STOLI in 2005.  The facts demonstrate that, on April 14, 2005, Sun Life issued a memorandum to insurance producers contracted with Sun Life wherein Sun Life, *inter alia*, (i) acknowledged its awareness of "recent increased volume and variety of sales techniques and transactions" that were characterized as STOLI; (ii) acknowledged that many of these transaction might have been legitimate but that Sun Life nevertheless believed that "a growing number . . . have come to |

occurred shortly after the policies' contestability periods had passed. (Lawrence Dep. at 44:11-75:18 (Walsh Decl. II, Ex. RR) & Dep. Ex. 163A (Walsh Decl. II, Ex. SS)).

depart from traditional and appropriate uses of life insurance"; (iii) explained that it viewed as improper (a) "lending of life" sales (where a person lends his insurability to an unrelated person), (b) offering seniors "free' insurance" or a cash incentive to enter into a transaction, and (c) the use of non-recourse premium financing; and (iv) advised that these types of transactions were "detrimental to our policyholders and producers, as well as Sun Life Financial and the entire life insurance industry." Ex. 62.

The facts demonstrate that Sun Life distributed this memorandum in 2005 to insurance producers contracted with Sun Life because it "wanted to make crystal clear to [its] agents and brokers that there were species of business with which Sun Life did not want to be involved." Dep. of T. Foley at 48:3-49:19.

The facts further demonstrate that, nearly five years later, in 2010, Sun Life's underwriting department created a "Handle with Care' list, which was a list of brokers that exhibited patterns of market conduct or behavior that Sun Life just felt it had concerns about, and Sun Life wanted to screen their business more closely. Dep of D. Lawrence at 43:24-44:3 (Walsh Decl. II, Ex. RR).  Stated another way, this was a list of brokers whose quality of business the underwriting department had some concerns about and the underwriters wanted to make sure that they were aware of these concerns.  Dep. of T. Foley at 109:12-24.  (Walsh Decl., Ex. UU) & Dep. Ex. 142 (Walsh Decl. II, Ex. PP).  STOLI was only *one of many* concerns about the quality of business.  Dep. of D. Lawrence at 44:4-10 (Walsh Decl. II, Ex. RR); Dep. of T. Foley at 110:2-5. (Walsh Decl., Ex. UU) & Dep. Ex. 142 (Walsh Decl. II, Ex. PP).

U.S. Bank's use of the terms "monitoring" and "analyzing" are its own characterizations of Sun Life's activities.  As was made clear by Mr. Foley, Sun Life's chief underwriter, STOLI is very difficult to detect, and Sun Life was trying to responsibly manage its block of business. Dep. of T. Foley at 123:1-9 ("It's very, very difficult to prove until you have a break-through where you can actually say, wow, this is really, really STOLI."); Dep. of D. Lawrence at 103:3-

| | | |
|---|---|---|
| | | 22 ("So first of all, virtually nobody is telling us this is a STOLI policy. Like the producer is not telling us it's a STOLI policy. The owner's not telling us. The insured's not telling us because it's concealed.") |
| 195. | In 2008, Sun Life identified the Malkin Policy as presenting indicia of STOLI (Lawrence Dep. at 71:16-75:5 (Walsh Decl. II, Ex. RR) & Dep. Ex. 163A (Walsh Decl. II, Ex. SS); Sun Life (Malkin) — 00859-60 (Walsh Decl. II, Ex. TT)). | Sun Life does not dispute that, in 2008, it received and processed a request to change the record owner of the Policy and that the change was recorded on a chart maintained by Sun Life, which identified ownership changes.<br><br>However, the remaining assertions by U.S. Bank are unsupported by the evidence to which U.S. Bank cites.  Mr. Lawrence made no mention of "STOLI" or "indicia of STOLI" in this deposition excerpt. |
| 196. | When Arpita Sen at Sun Life received the change in beneficiary and change in ownership forms, she asked Noreen Murtagh in Sun Life's "ServiceCentre" department to review the "Viatical Settlement" to determine if the Policy was included therein. (Sun Life (Malkin) 00859-60 (Walsh Decl. II, Ex. TT)). | Sun Life disputes these assertions.  These assertions mischaracterize facts; they are misleading; and they are unsupported by the evidence to which U.S. Bank cites.  Ms. Sens' e-mail states, "[t]his is another Ownership Request we need to check the Viatical Settlement for two policies."  Ms. Sen makes no mention of "reviewing" anything or of making a "determination" about anything.  And there's been no discovery relating to this e-mail; U.S. Bank's attempts to read words into the e-mail are unfounded. |
| 197. | Sun Life also identified Total Financial, the agency that procured the Policy, as a company that was involved in STOLI. (Foley Dep. at 94:16-102:16 (Walsh Decl. II, Ex. UU) & Dep. Ex. 141 at 2433 (Walsh Decl. II, Ex. VV)). | Sun Life disputes these assertions.  These assertions mischaracterize facts; are misleading; and are unsupported by the evidence to which U.S. Bank cites.  U.S. Bank refers to an internal presentation at Sun Life as part of an effort by Sun Life in 2010 to capture information that the underwriters were gathering about broker general agency firms so they could determine how to more efficiently underwrite business. Dep. of T. Foley at 96:4-11.<br><br>The facts further demonstrate that, in connection with this tiering process, and determining which of the firms to do business with, Sun Life considered a multitude of factors: placement rate, the amount of business submitted, the amount of resources used versus the amount of business being placed, and the quality of the firm's business. Dep. |

| | | of T. Foley at 100:6-17. ("[I]s it an arduous haul with underwriting their cases? Is it a drip, drip of [underwriting] evidence? Do we have problems with the evidence received either, [], is it completed properly and those kinds of things? Do they have brokers that have concerns for us, repeatedly concerns for us.") Sun Life had a multitude of concerns. Dep. of T. Foley at 100:22-101:4 ("Do they have case where we're finding irregularities? Are clients potentially misrepresenting the [application] answers? Are we finding that out when we get medical records? Are they submitting poorly completed applications where we've got to go back repeatedly to get questions answered because they [were not] completed on the application?") Sun Life does not dispute that Total Financial was a broker general agent contracted with Sun Life or that Total Financial was on the tiering list, along with all the other broker general agents, but there is nothing in the evidence to which U.S. Bank cites that supports U.S. Bank's assertions. |
|---|---|---|
| 198. | In 2009, Sun Life terminated Larry Bryan and reserved "the right to take any action as [Sun Life] deem[s] appropriate" with respect to the in-force contracts sold by or through Larry Bryan. (Dep. Ex. 122 (Walsh Decl. II, Ex. WW)). | Sun Life does not dispute that it terminated its sales representative agreement with Mr. Bryan in 2009. Nor does Sun Life dispute that, in the letter it sent Mr. Bryan terminating the agreement, Sun Life reserved its rights. |
| 199. | Sun Life anticipated litigation regarding the Policy as early as November 2011 when it began having privileged conversations with counsel (Wilkosky Dep. at 45:15-49:8 (Walsh Decl. II, Ex. XX) & Dep. Ex. 131 (Walsh Decl. II, Ex. YY)). | Sun Life disputes these assertions. They are unsupported by the evidence to which U.S. Bank cites. Additionally, to the extent the 2011 privileged communication to which U.S. Bank refers was also work product, it was work product for unrelated litigation, as noted in the privilege log. |
| 200. | But Sun Life made no effort to confirm or deny its STOLI suspicions. Sun Life determined that this course of action would be too much work. (Lawrence Dep. at 86:16-92:21 (Walsh Decl. II, Ex. RR)). | Sun Life disputes these assertions. They are unsupported by the evidence to which U.S. Bank cites. As Mr. Lawrence testified, in the case of this Policy, during the claim review process, when Sun Life had the "totality of the information" relating to the policy, Sun Life had sufficient concerns based on the information in the aggregate such that it decided to consult with counsel and have an investigator speak with a family member of the insured. The insured's daughter, |

| | | |
|---|---|---|
| | | Toni Guarnero, provided information at that time indicating that the policy taken out on her mother (Ms. Malkin) was a wagering policy and one that lacked an insurable interest at inception.  Dep. of D. Lawrence 91:16-92:3; 101:1-102:22. |
| 201. | Sun Life has identified over 460 policies with a face value in excess of $1.7 billion as having "features of STOLI," yet it only challenges these policies when its obligation to pay the death benefit comes due. (Foley Dep. at 103:22-108:5 (Walsh Decl. II, Ex. UU) & Dep. Ex. 141 (Walsh Decl. II, Ex. VV)). | Sun Life disputes these assertions.  They are unsupported by the evidence to which U.S. Banks cites.<br><br>U.S. Bank refers to a power point presentation slide reflecting that, in 2010, Sun Life had identified policies having potential features of STOLI.  Among them were policies identified by Sun Life's actuaries.  As Mr. Lawrence and Mr. Welsh, both Sun Life actuaries who were involved in the generation of the actuarial policy list, made clear at their depositions, the policies identified by the actuaries were based on behavioral assumptions and did not identify policies that were procured pursuant to a STOLI scheme.  Dep. of D. Lawrence at 103:3-22 ("So first of all, virtually nobody is telling us this is a STOLI policy. Like the producer is not telling us it's a STOLI policy. The owner's not telling us. The insured's not telling us because it's concealed. The approach we took to form we'll call it the actuarial list was -- I used the phrase "predictive modeling" earlier in the deposition; so basically we were looking at data -- basically data and patterns for those policies that ended up on the list."); Dep. of D. Lawrence at 104:13-23  ("[W]e're using our best efforts to identify, based on these patterns, what we think looks suspicious, but there's no guarantee we're right; and so, you know – and the worst thing that would happen for me as, you know, a manager of a business that's serving customers is to accuse somebody who really did not procure the policy in any, you know, way that's illegal or, you know, not meeting our criteria and so forth and accuse them of doing that."); Dep. L. Welsh at 56:16-24, attached hereto as Exhibit 75 ("It would be a list of – based on the criteria and the data that we made up or studied, these are policies that are behaving like STOLI, and as I mentioned earlier, on one quarter or on one year, they could be on the list, and then we have more data and the next year they're off, and then on another year they could be back on or they could not be on there for three years, |

| | | and they show up, just based on time and additional data."). |
|---|---|---|
| 202. | Despite being aware of STOLI since 2005, flagging the Policy as having indicia of STOLI in 2008, Sun Life continued to accept premium payments for years. (Lawrence Dep. at 45:2-47:18 (Walsh Decl. II, Ex. RR) & Dep. Ex. 163A (Walsh Decl. II, Ex. SS)). | While Sun Life does not dispute that premium payments were made and accepted with respect to this Policy, Sun Life disputes the remaining assertions, as these are misleading and unsupported by the evidence to which U.S. Banks cites.  In the cited deposition excerpt, Mr. Lawrence testified about an e-mail update he provided to senior management regarding "some work that [he] commissioned to try to better understand Sun Life's experience relating to the level and pattern of premiums that [Sun Life] [was][receiving] on a subset of [its] block."  Dep. of D. Lawrence at 45:2-47:18.  Mr. Lawrence never mentioned premium payments on this Policy.  In fact, he never even mentioned this Policy.   Moreover, he never mentioned the word "STOLI."  *Id.* |
| 203. | Sun Life repeatedly represented to U.S. Bank that the Policy was in-force and verified the existence of coverage under the Policy, and U.S. Bank relied to its detriment on those representations by continuing to make premium payments. (Mosley Dep. at 490:15- 491:15, 505:3-16 (Walsh Decl. II, Ex. Y); Dep. Exs. 173-75 (Walsh Decl. II, Exs. ZZ-BBB)). | Sun Life disputes these assertions, as they are mischaracterizations of the evidence and misleading.

Sun Life has obligations under in-force policies to send certain policyholder correspondence and notices (e.g., annual statements).  Dep. of M. Wilkosky at 58:23-59:5, attached hereto as Exhibit 76.  Sun Life does not dispute the assertion that it sent policy holder correspondence and notices to the owner(s) of the Policy.

Sun Life disputes assertions that it made any representations to the owner of the Policy with knowledge of the true facts and circumstances surrounding the procurement of the Policy, which at all times, were intentionally concealed from Sun Life. |
| 204. | On October 17, 2014, U.S. Bank submitted a claim for the $5 million death benefit under the Malkin Policy. (Wilkosky Dep. at 32:11-33:5 (Walsh Decl. I, Ex. S) & Dep. Ex. 169 (Walsh Decl. I, Ex. X)). | Sun Life does not dispute that U.S. Bank made the asserted claim. |
| 205. | Following Sun Life's receipt of U.S. Bank's death claim, Sun Life printed a different copy of the Policy on November 11, 2014, stating that the original policy was "deemed to have been lost or | Sun Life disputes these assertions.  They are mischaracterizations of the evidence, misleading and unsupported by the evidence to which |

| | |
|---|---|
| destroyed." (Dep. Ex. 154 (Walsh Decl. II, Ex. CCC)). Sun Life's computer systems were not updated to reflect the Delaware forms until October 30, 2015. (Sun Life (Malkin) — 05131 (Walsh Decl. II, Ex. DDD)). | U.S. Bank cites.<br><br>As has been explained to U.S. Bank several times now, when the Policy was administratively settled by Sun Life on or about August 4, 2006, the entry was made to Sun Life's administrative system updating the applicable state to Delaware based on the application having been signed in Delaware, the address for the policy owner shown as Delaware, and the Delaware policy illustration that was submitted to Sun Life in connection with the application for the policy.  Dep. of M. Wilkosky at 28:4-16; Ex. 46.<br><br>In connection with this lawsuit, Sun Life was asked to generate a duplicate copy of the Policy.  Usually, such requests are made by the policy owner when the policy owner loses or inadvertently destroys their copy of the policy – hence the stamp to which U.S. Bank refers.  Ex. 46; Dep. of M. Wilkosky at 19:1-4.  Sun Life never lost or destroyed the original copy of the Malkin Policy; it was delivered in this case to the policy owner, i.e., Trust.  Dep. of M. Wilkosky at 21:3-13(Q: "Did Sun Life lose the policy contract on Mrs. Malkin's life?"  A:  "No. Sun Life did not lose the contract."  Q:  "Where is it?"  A:  "The original contract is sent to the policy owner.")<br><br>In this case, as U.S. Bank knows, a request for a duplicate policy was made in November 2014 in connection with this litigation, and a duplicate policy contract was generated.  Ex. 46.  Because Sun Life's administrative system reflects (and has reflected since the time the policy was administratively settled), that the applicable state was Delaware, the duplicate copy did not contain the forms containing the "FL" designation, which were delivered in 2006.  *Id.*  As U.S. Bank has been told numerous times now, the policy was, as a result of a human error, mistakenly issued with the "FL" pages.<br><br>There is no evidence to support U.S. Bank's assertion that Sun Life updated its computer system on October 30, 2015.  U.S. Bank is apparently referring to a document it asked Sun Life to generate and produce in this lawsuit.  Specifically, U.S. Bank asked Sun Life to go into its system and hit the "print" button in order to generate a |

| | | production audit report for the Malkin Policy.  Dep. of M. Wilkosky 87:12-24.  Ms. Wilkosky did that and Sun Life produced the document on October 30, 2015, but there are simply no facts of record to support U.S. Bank's assertions.<br><br>Should U.S. Bank continue to have any doubt as to whether Sun Life's system was updated in 2006 to reflect that the Malkin Policy was entered into the system at that time as a Delaware contract, U.S. Bank need only look to the files of the entity from which the Policy was purchased – the Trust.  After the Policy was issued, but before ownership was transferred, on or about July 29, 2008, the Trust, through its trustee, Wilmington Trust Company, requested a policy illustration from Sun Life, which request Sun Life satisfied by generating a policy illustration and sending it to the Trust – the policy illustration indicated "State: Delaware" on it.  *See* SUNLIFE (MALKIN) 00796-00806, attached hereto as Exhibit 77.  U.S. Bank, however, made no attempt to gather any information or documents regarding the Policy from the prior owner prior to the sale and even now, after obtaining these documents in discovery, apparently chooses to ignore them. |
|---|---|---|
| 206. | Only after Mrs. Malkin died and based on its previous suspicions that the Policy was STOLI did Sun Life and its counsel engage an investigator to interview Mrs. Malkin's family. (Lawrence Dep. at 40:8-24, 101:6-102:24 (Walsh Decl. II, Ex. RR)). | Sun Life disputes these assertions.  They are unsupported by the evidence to which U.S. Bank cites.  As Mr. Lawrence testified, in the case of this Policy, during the claim review process, when Sun Life had the "totality of the information" relating to the policy, Sun Life had sufficient concerns based on the information in the aggregate such that it decided to consult with counsel and have an investigator speak with a family member of the insured.  The insured's daughter, Toni Guarnero, provided information at that time indicating that the policy taken out on her mother (Ms. Malkin) was a wagering policy and one that lacked an insurable interest at inception.  Dep. of D. Lawrence 91:16-92:3; 101:1-102:22. |
| 207. | The investigator spoke with Toni Guarnero and obtained a Declaration regarding the Policy. (Guarnero Dep. at 10:18-14:3; 93:25-94:14 (Walsh Decl. II, Ex. II)). The Declaration is based on documents and information that the investigator provided and that | Sun Life does not dispute that Mr. Drobney spoke with Mrs. Guarnero and obtained a declaration.  Sun Life disputes the remaining allegations because they are misleading and unsupported |

| | | |
|---|---|---|
| | Mrs. Guarnero had not seen before. (*Id.* at 126:11-127:10). | by the evidence to which U.S. Bank cites. |
| 208. | Based on this Declaration, Sun Life filed this lawsuit seeking to avoid its obligations to pay the death benefit on the Policy. | Sun Life disputes these assertions.  They are unsupported by the evidence to which U.S. Bank cites.  As Mr. Lawrence testified, in the case of this Policy, during the claim review process, when Sun Life had the "totality of the information" relating to the policy, Sun Life had sufficient concerns based on the information in the aggregate such that it decided to consult with counsel and have an investigator speak with a family member of the insured.  The insured's daughter, Toni Guarnero, provided information at that time indicating that the policy taken out on her mother (Ms. Malkin) was a wagering policy and one that lacked an insurable interest at inception.  Dep. of D. Lawrence 91:16-92:3; 101:1-102:22. |

Dated:  December 14, 2015

PETT FURMAN, PL
Attorneys for Sun Life
Assurance Company of Canada
2101 N.W. Corporate Blvd., Suite 316
Boca Raton, FL 33431
(561) 994-4311
(561) 982-8985 (fax)


By:___s/Wendy L. Furman
        Wendy L. Furman
        Fla. Bar No. 0085146
        wfurman@pettfurman.com

Michael J. Miller (*Admitted pro hac vice*)
Thomas S. Downie (*Admitted pro hac vice*)
Gregory J. Star (*Admitted pro hac vice*)
Joseph M. Kelleher (*Admitted pro hac vice*)
Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996

(215) 988-2700
(215) 988-2757 fax
Michael.Miller@dbr.com
Thomas.Downie@dbr.com
Gregory.Star@dbr.com
Joseph.Kelleher@dbr.com
*Attorneys for Sun Life*
*Assurance Company of Canada*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 14, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

John K. Shubin, Esq.
Ian E. DeMello, Esq.
Shubin & Bass, P.A.
46 S.W. 1st Street
Third Floor
Miami, FL 33130
jshubin@shubinbass.com
idemello@shubinbass.com
eservice@shubinbass.com
*Counsel for U.S. Bank*

Steven J. Reisman, Esq. *(Admitted pro hac vice)*
Jonathan J. Walsh, Esq. *(Admitted pro hac vice)*
Nicole M. Mazanitis, Esq. *(Admitted pro hac vice)*
Alyssa Astiz, Esq. *(Admitted pro hac vice)*
Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Ave.
New York, NY 10178-0061
sreisman@curtis.com
jwalsh@curtis.com
nmazanitis@curtis.com
aastiz@curtis.com
*Co-Counsel for U.S. Bank*

<u>s/Wendy L. Furman</u>
Wendy L. Furman