UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 14-CIV-62610-BLOOM/VALLE

SUN LIFE ASSURANCE COMPANY OF
CANADA,

      Plaintiff,

v.

U.S. BANK NATIONAL ASSOCIATION,
and LARRY BRYAN,

      Defendants.

_____/

## ORDER

This cause is before the Court upon Plaintiff Sun Life Assurance Company of Canada's Motion for Summary Judgment, ECF No. [65] ("Sun Life Motion"), Defendant U.S. Bank National Association's Motion for Summary Judgment, ECF No. [60] ("U.S. Bank Motion") (collectively, the "Motions"), and U.S. Bank National Association's Motion to Stay Case Pending the Florida Supreme Court's Ruling in *Wells Fargo Bank, N.A., et al. v. Pruco Life Ins. Co.*, No. SC15-382 (Fla. 2015), ECF No. [113] ("Motion to Stay"). The Court has reviewed all Motions, the voluminous record submitted in support thereof, all supporting and opposing briefing, and is otherwise fully advised in the premises. For the reasons that follow, U.S. Bank's Motion for Summary Judgment and Motion to Stay are denied and Sun Life's Motion for Summary Judgment is granted in part and denied in part.

## I. BACKGROUND AND FACTS

As recognized by the Southern District in *Pruco Life Ins. Co. v. Brasner*, No. 10-80804-CIV-COHN, 2011 WL 134056 (S.D. Fla. Jan. 7, 2011), a large secondary market for life

insurance has emerged.  In this market, existing life insurance policies are sold to third parties who lack an insurable interest in the insured's life.  If acquired for a legitimate purpose at the inception of the policy, this type of sale generally raises no issues.  On the other hand, where the policy lacks an insurable interest at inception and is procured for the purpose of re-sale to investors on the secondary market, questions concerning the validity of the policy are raised.  Over a century ago, Justice Holmes cautioned that "[a] contract of insurance upon a life in which the insured has no interest is a pure wager that gives the insured a sinister counter interest in having the life come to an end."  *Grigsby v. Russell*, 222 U.S. 149, 154 (1911).  This practice is known as stranger-originated life insurance or stranger-owned life insurance, "STOLI" for short, and is precisely the claim underlying this litigation.

U.S. Bank National Association ("U.S. Bank") is the owner and beneficiary of a $5 million insurance policy issued by Sun Life Assurance Company of Canada ("Sun Life") on the life of Phyllis Malkin (the "Malkin Policy" or "Policy").  U.S. Bank National Association's Statement of Facts ("U.S. Bank SOF"), ECF No. [61] at ¶ 4.[1]  Presently, Sun Life believes the Policy to be a STOLI policy, wherein investors utilized Malkin's life as a conduit to procure the policy, wager on her life, and profit from her death.  *See generally* Complaint, ECF No. [1].  Accordingly, Sun Life seeks to have the Malkin Policy rendered *void ab initio*.  *Id.*

**A.**   **Larry Bryan and Simba**

Defendant Larry Bryan ("Bryan") is a former insurance producer who was named as the broker on the Malkin Policy.  U.S. Bank SOF at ¶¶ 5, 6.  In early 2005, Bryan started an insurance business in South Florida known as "Simba."  *See* Sun Life's Statement of Facts ("Sun

---

[1] Where a fact is uncontested, the Court refers solely to the originating document.

Life SOF"), ECF No. [63] at ¶ 14.[2]  Simba offered its clients what they referred to as "life insurance capacity transactions," where life insurance policies were acquired by way of non-recourse premium financing.[3]  *Id.* at ¶ 18; October 2015 Statement of Larry Bryan ("Bryan Statement"), ECF No. [71-1] at 1; October 22, 2015 Deposition of Larry Bryan ("Bryan October 22nd Depo."), ECF No. [71-6] at 21:20-24.  Various entities served as "funders" for the non-recourse financing offered through Simba.  *See* Bryan Statement at 1; October 12, 2015 Deposition of Larry Bryan ("Bryan Depo."), ECF No. [70-1] at 63:13-15.[4]  Funders were responsible for "put[ting] up the money to pay the premium" on the particular policy.  *See*

---

[2]  Many of U.S. Bank's challenges to Sun Life's SOF are simply boilerplate objections, challenging the particular fact on a plethora of bases including probative value, materiality, and most commonly, hearsay.  *See generally* U.S. Bank's Response to Sun Life SOF, ECF No. [100].  Such boilerplate objections do not assist the Court's resolution of these matters.  *See Oneal v. Alfa Laval, Inc.*, No. 13-61510-CIV, 2014 WL 5341878, at *1 (S.D. Fla. Oct. 19, 2014) (admonishing litigants for submitting "boilerplate objections that are essentially meaningless" in response to a statement of facts).  Further, while certain objections are valid, U.S. Bank appears to forget that eventual inadmissibility will not foreclose the Court from consideration of certain documents or testimony.  "The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment."  *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999)).  However, a district court may consider a hearsay statement "if the statement could be reduced to admissible evidence at trial or reduced to an admissible form," such as, "hav[ing] the hearsay declarant testify directly to the matter at trial."  *Id.* (citing *Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996)) (emphasis added).  The same is true for documents: "[o]n motions for summary judgment, a court may consider only that evidence which can be reduced to an admissible form."  *Snover v. City of Starke, Fla.*, 398 F.App'x 445, 449 (11th Cir. 2010) (internal quotations and citations omitted).  While authentication is a prerequisite to admissibility, "[o]therwise admissible evidence can be submitted in inadmissible form at the summary judgment stage, though at trial it must be submitted in admissible form."  *Bowe v. Pub. Storage*, No. 1:14-CV-21559-UU, 2015 WL 3440418, at *3 (S.D. Fla. May 19, 2015) (citing *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996)).  In sum, where the contested evidence may be reduced to an admissible form at trial, the Court may consider it.

[3]  Not all of Simba's clients used "premium financing."  October 12, 2015 Deposition of Larry Bryan, ECF No. [70-2] at 189:5-190:6.

[4]  Bryan's consecutively paginated October 12, 2015 deposition is located at ECF Nos. [70-1] through [70-4].  For ease of reference, the Court refers to these exhibits simply as "Bryan Depo."

Deposition of Peter Shapiro ("Shapiro Depo."), ECF No. [71-2] at 72:1-6.  In essence, Simba facilitated the life insurance transaction, locating the potential insured, handling the life insurance application and underwriting, introducing the insured to any of the premium financing options, and bringing together the insured and an available funder.  *See* Bryan Depo. at 61:25:63:15; Shapiro Depo. at 72:1-6.  If the transaction was successful, the benefit to the funder was, of course, the acquisition of a high face value life insurance policy.  Sun Life SOF at ¶ 20. According to Bryan, in exchange the insureds would receive "big cash payments by the funders at no risk or expense."  Bryan Statement at 1.  Simba's benefit came in the form of insurance commissions from the insurer and cash payments from the funders based on the volume of policies produced.  Sun Life SOF at ¶ 22.  Peter Shapiro, Simba's director of operations from 2005 to 2007, described Simba's operations candidly: "Simba was in the premium financing of life insurance.  It can also be said in a different way that it was what's called stranger-owned life insurance."  Shapiro Depo. at 21:5-22:9.

Simba targeted a particular clientele:  healthy seniors with "excess (unwanted, not needed) life insurance capacity $2 million or more)" who wanted to "realize its value."  Sun Life SOF at ¶ 26; *see also* "A Life Insurance Capacity Transaction (The asset you never knew you had)," (hereinafter, "Simba Brochure") ECF No. [71-8] at 3, 5.  Through its marketing materials, Simba represented to potential clients that there was "no obligations or out of pocket expenses to you, when engaging in 'a life insurance capacity transaction."  Simba Brochure at 3.  As explained by Simba, the potential insureds would use such a transaction "[t]o create dollars today by using a paper asset, (a life insurance policy <u>not</u> yet issued from a major insurance carrier insuring your life) in a joint venture type of arrangement with one or more of the financial institutions that want to engage in these transactions."  *Id.* at 4 (emphasis in original).  Clients

were to "allow one or more of these financial institutions to enjoy the benefits of a life insurance policy in exchange for (1) them paying all premiums and expenses associated with it, and (2) sharing a part of these benefits with you." *Id.*

Thus, Simba sought clients who did not wish to purchase life insurance for their own personal use. *See id.*; *see also* Shapiro Depo. at 43:3-18; Deposition of Murray Roffeld ("Roffeld Depo."), ECF No. [71-7] at 34:12-35:25; Shapiro Depo. at 35:22-36:10. The transaction was arranged so that the funder, not the insured, would bear all the risk. *See* Bryan Depo. at 323:6-324:16.

The process of obtaining a life insurance capacity transaction through Simba was relatively simple. First, the client filled out a short application which included a Health Insurance Portability and Accountability Act ("HIPAA") release allowing Simba to access the client's medical records. Sun Life SOF at ¶ 38. After reviewing the medical records, Simba forwarded those records to the insurance companies sought by the funders. *Id.* at ¶ 39. Once Simba received tentative offers from the insurers, Simba sent those offers, along with the client's medical records, to its network of funding entities. *Id.* at ¶ 40. Should the funder find that the policy and client met its particular criteria, the funder presented an offer to proceed. *See* Shapiro Depo. at 34:16-18. If an offer was made, Simba would prepare formal insurance applications for the client. Sun Life SOF at ¶¶ 44, 56.

According to Simba, the insureds did not decide which insurance to go with; this decision was left to the funders. *See* Bryan Statement at 3-4 ("No Simba client . . . ever asked us to get them a specific type of policy or a policy from a particular company."); Shapiro Depo. at 34:19-21 ("Q: So the funders made the decision on which life insurance applications to make? A: Yes."), 36:2-21 ("The insureds couldn't make the decision. The funders had to decide which one

of the deals or what the deal was, what they wanted to pay for . . . .  [W]e and the funder were using [the insured's] body as the transaction.  [The insured] had no . . . skin in the game.").  Indeed, Simba's marketing materials informed the client of this fact.  *See* Simba Brochure at 7 ("You the client do not pick ahead of time which capacity transaction you like best.  This is determined by which financial institution/institutions offer you a capacity transaction for consideration.").

Funders offered three types of deals to prospective insureds: a "front-end deal" where the insured sold the policy to the funder at the very beginning of the transaction; a "back-end deal" where the insured would take out a loan from a funder for a period of a little over two years to fund the premium payments necessary to keep the policy in force past the two year contestability period; or a hybrid style deal.  *See* Sun Life SOF at ¶¶ 49-52.  Although the means and results varied, in almost 90% of the back-end deals organized by Simba, the insured would relinquish the policy to the funder and walk away.  *See id.* at ¶¶ 53-54; Bryan Statement at 3 (stating that in 90% of the back-end deals, "the policy ended up being owned by the funder who made the loan in the first place").

Simba staff were instructed to leave blank the question(s) on the client's application relating to the existence of any in-force or pending life insurance on the life of the potential insured.  Sun Life SOF at ¶¶ 58-59.  This would allow Simba to acquire more policies in behalf of the potential insured than the insurance companies would otherwise have issued.  *Id.*

**B.**    **Coventry, U.S. Bank, and Simba**

In 2005, Bryan commenced a relationship with Coventry Capital LLC ("Coventry") and entered into a non-exclusive producer agreement.  *See* Sun Life SOF at ¶ 63; Producer Agreement dated November 7, 2005 ("Producer Agreement"), ECF No. [66-5].  Coventry was to

provide financing for certain life insurance policies through loans to potential insureds and Simba was to introduce prospective clients to Coventry and solicit applications from such clients. *See* Sun Life SOF at ¶ 63; Producer Agreement.  Through this agreement, Simba made "many deals" with Coventry, at one point receiving a bonus from Coventry based on the sheer volume of transactions.  Sun Life SOF at ¶ 73.  Nearly all the deals consummated by virtue of this agreement were back-end deals where the insured later relinquished the policy to Coventry.  *See* Bryan Statement at 6.

Prior to Coventry's relationship with Simba, Coventry, American International Group, Inc. ("AIG"), and U.S. Bank entered into a contractual framework for the sale of life insurance policies originated by Coventry. *See* Life Settlement Policies Origination Agreement (hereinafter, the "Origination Agreement"), ECF No. [64-1] at 2.  Coventry[5] served as "Originator and Seller," AIG served as "Purchaser,"[6] and U.S. Bank as "Trustee."  *See id.*  Under the Origination Agreement, Coventry agreed to sell to AIG, subject to the terms and conditions contained therein, various life insurance policies, granting them the rights to, *inter alia*, collect death benefits.  *See id.* at 6.  Throughout the course of this agreement Coventry conveyed approximately 3,000 policies to AIG, the approximate value of which is estimated to be in the billions of dollars.  *See* Deposition of Russell Dwayne Mosley at 513:13-515:10 (filed under seal).  The Malkin Policy was one such policy.  *Id.* at 163:3-5.

---

[5] At the time of the agreement, Coventry was operating as Montgomery Capital LLC.  *See* Deposition of Russell Dwayne Mosley at 74:18-20 (filed under seal).  For simplicity's sake, the Court refers exclusively to Coventry.

[6] The entity named in the agreement is "Coventry Life Settlements Trust."  *See* Life Settlement Policies Origination Agreement, ECF No. [64-1] at 2.  For all intents and purposes, AIG and Coventry Life Settlements Trust are one in the same.  *See* Deposition of Russell Dwayne Mosley at 73:14-74:24.

## C.   The Malkin Policy

At all relevant times, Phyllis Malkin ("Malkin") resided at 19101 Mystic Point Drive, Aventura, Florida, with her husband, Paul Malkin ("Mr. Malkin") (collectively, the "Malkins"). *See* U.S. Bank SOF at ¶¶ 8, 12.  In 2005, a neighbor referred the Malkins to Simba.  *See* Sun Life SOF at ¶ 76.  In accord with its policies and practices, Simba obtained a HIPAA release from Malkin in favor of itself and other third-parties including insurance companies and funding entities such as Coventry.  *Id.* at ¶¶ 86-87.  Simba used the release to obtain Malkin's medical records from her physicians and began shopping Malkin to funders.  *See id.*; Sun Life Exhibit 21, ECF No. [66-12] (September 19, 2005 Email from Shapiro).  Shortly thereafter, Coventry forwarded Malkin's medical records to an underwriting company so that a life expectancy report could be prepared.  *See* Sun Life SOF at ¶¶ 89-90.  As insurance companies do, Coventry presumably utilized the prepared life expectancy report to determine how valuable Malkin's potential policy would be.  *See id.* at ¶ 91.  Simba then procured informal approval from Sun Life and another insurer, American General, that they would be willing to issue policies on Malkin's life.  Bryan Statement at 4.  After Simba obtained confirmation from Coventry that it was still interested in the potential policies, it was decided that three policies would be obtained on Malkin's life: one from Sun Life for $5 million (to reiterate, the "Malkin Policy" or "Policy"), and two from American General, each for $4 million.  *Id.*;Sun Life SOF at ¶ 95.  According to Bryan, these policies were the policies that Coventry wanted.  Bryan Statement at 4.  The Malkins never instructed anyone at Simba to obtain a policy from Sun Life or American General on their behalf, nor did they instruct anyone at Simba to take out loans through Coventry.  *Id.*[7]

---

[7] The cited portions of Bryan's deposition testimony relied upon by U.S. Bank to refute this statement do not support U.S. Bank's assertion that Bryan had no knowledge of Malkin's application.  *See* U.S. Bank's Response to Sun Life SOF, ECF No. [100] at ¶ 96.  The testimony

14-CIV-62610-BLOOM/VALLE

On February 16, 2006, Coventry approved Malkin for a non-recourse premium finance loan for the Policy. *Id.* at ¶ 98; *see also* Sun Life Exhibit 25, ECF No. [66-16] at 6.  Simba assisted Malkin in completing the appropriate forms affiliated with the loan. *See* Shapiro Depo. at 195:7-23, 272:7-274:7; *see also, e.g.,* Bryan Depo. at 248:4-249:19, 253:20-254:13 (stating that Simba acted as a "facilitator" or "go between" between Coventry and the prospective insureds). As with all transactions, the funder, in this case Coventry, dictated what documents were necessary to become part of the program and were otherwise "non-negotiable." *See* Bryan Depo. at 264:11-266:5 (describing the forms as "non-negotiable" and the deal as "take it or leave it"). On March 2, 2006, Malkin executed a power of attorney through which she irrevocably granted Coventry the power to act for her for purposes of "originating and/or servicing any life insurance policies insuring [her] life." *See* Insured's Authorization to Release Medical Records and Special Irrevocable Durable Power of Attorney, ECF No. [66-17] at 2.  Coventry's authority included "the power to complete and execute any applications or other documents in connection with the maintenance, or the liquidation" of such policies."[8] *See id.*  As noted by Bryan, these forms were required by Coventry for participation in the program. *See* Bryan Depo. at 246:5-250:7, 264:11-266:5[9]; Shapiro Depo. at 272:16-274:7.

---

merely reveals that Bryan did not *directly* handle the application process but, instead, delegated such responsibilities to his staff.

[8] At the same time, Mr. Malkin executed a separate power of attorney allowing Coventry to act in his stead "for the purpose of it originating, maintaining, servicing, and/or liquidating . . . any life insurance policies which are owned by the [Phyllis Malkin Insurance] Trust," identified herein, *infra*.  Borrower's Special Irrevocable Durable Power of Attorney, ECF No. [66-18] at 2.

[9] While Bryan cannot unequivocally identify where the Malkin-specific forms came from, he does believe they came from Coventry. *See* Bryan Depo. at 242:20-244:1 ("I'm assuming it came from – it looks like it came from Coventry then.").

The Malkins then executed a form providing for the creation of a trust, with Malkin as settlor and Mr. Malkin as co-trustee.  *See* Settlor and Co-Trustee Disclosure Statement and Acknowledgment (hereinafter, "Trust Disclosure Statement" or "Statement"), ECF No. [66-19]. The Trust Disclosure Statement noted that Malkin had agreed to take out a non-recourse loan "for the sole purpose of allowing it to procure the [life insurance policies]."  *Id.* at ¶ 1.  The Statement further provided that upon maturity of the loan, Malkin was to satisfy her obligations under the loan by either paying Coventry the balance of the loan, or "relinquishing to [Coventry] all of [Malkin's] right, title and interest in, to and under [the insurance policies]."  *Id.* at ¶ 3. Upon relinquishment, the Malkins "w[ould] not be entitled to recover any death benefits or other monetary benefits under or relating to the [life insurance policies]."  *Id.* at ¶ 4.  The Statement acknowledged that the establishment of the trust was "not intended to satisfy [Malkin's] estate planning needs and ha[s] not been designed as an estate planning tool."[10]  *Id.* at ¶ 6.  On March 15, 2006, Malkin established a Delaware trust, the Phyllis Malkin Insurance Trust (the "Malkin Delaware Trust"), which named Mr. Malkin as the beneficial owner and co-trustee, along with Wilmington Trust Company ("Wilmington Trust") as an additional co-trustee.  *See* Malkin Delaware Trust, ECF No. [94-3].  The initial trust corpus was nominal, a mere $1.00.  *Id.* According to Shapiro, Coventry provided all the trust forms necessary for the creation of the Malkin Delaware Trust:

> Q:   [D]o you know where the form agreements to create the trusts came from?
>
> A:   The funding company provided those – all the trust paperwork.
>
> *          *          *
>
> Q:   Did the insureds have any opportunity to negotiate the terms of the trust agreements in your experience?

---

[10] Upon her death, Malkin's estate paid $0 in estate taxes.  *See* Deposition of Toni Guarnero, ECF No. [67-2] at 123:8-21 ("We . . . didn't have to pay any estate tax.").

> A:      No.
>
> Q:      Were they just boilerplate forms from funders?
>
> A:      Yes.

*See* Shapiro Depo. at 47:2-22 (objections and formatting omitted).  Malkin's estate attorney was not involved in the application for the Policy, the preparation of related trust agreements, or any related documentation.  *See* Affidavit of Alan Cohn, ECF No. [66-7] at ¶ 2; *see also* Sun Life SOF at ¶ 138.[11]

Sun Life received an application form from Malkin, indicating a signature date of March 15, 2006, which named the Malkin Delaware Trust as the owner and beneficiary of the potential policy.  *See* Sun Life Exhibit 30 (hereinafter, the "March Application Document"), ECF No. [66-21] at 7-11; U.S. Bank SOF at ¶ 16; *see also* Declaration of Michelle Wilkosky ("Wilkosky Decl."), ECF No. [125-3] at ¶ 3.[12]  The stated trustee for the Malkin Insurance Trust was to be Wilmington Trust, a Delaware entity.  Wilkosky Decl. at ¶ 3; U.S. Bank SOF at ¶ 17; March Application Document at 7.  As for the signing location, the March Application Document indicated that it had been signed by Malkin and the representative of Wilmington Trust in Wilmington, Delaware.  March Application Document at 17, 23, 29.  However, the attached authorization and release forms were signed by Malkin in Fort Lauderdale, Florida, and Bryan admits that neither he nor Malkin signed the application in Delaware.  *Id.* at 38-39; Bryan Depo. at 389:12-390:11.

This was not the first application Sun Life received in connection with Malkin.  On February 16, 2006, Sun Life received an application for a $5 million life insurance policy,

---

[11] Bryan confirms that Simba never engaged in estate-planning related transactions.  *See* Bryan Depo. at 259:24-260:18.

[12] U.S. Bank contends that the Wilkosky Declaration is unsworn and, therefore, inadmissible. This problem has since been remedied.  *Compare* ECF No. [68-10] *with* [125-3].  The Court refers exclusively to the sworn declaration.

seeking to insure the life of Malkin (hereinafter, the "February Application Document").  *See* U.S. Bank SOF at ¶ 8; Wilkosky Decl. at ¶ 2.  This application contained the signatures of Malkin and Bryan and indicated that the form had been "signed at" Fort Lauderdale, Florida. U.S. Bank SOF at ¶ 9.  The February Application Document was incomplete: the identity of the proposed policy owner was missing, and instead, the application listed the owner and payor as "Trust Pending."  *Id.* at ¶ 10; Wilkosky Decl. at ¶ 2.  Mr. Malkin was listed as the beneficiary of the death benefit.  U.S. Bank SOF at ¶ 10.  As identification, Malkin utilized her Florida driver's license and the associated driver's license number.  *Id.* at ¶ 11.  As with the March Application Document, the February Application Document also included various forms signed by Malkin in Florida, including a Financial Information form, and an Authorization for Release and Disclosure of Non-Health Related Information form.  *Id.* at ¶ 13. Other sections of this application contained signatures of both Malkin and Bryan without the inclusion of a "signed at" designation.  *Id.* at ¶ 14.

In sum, several critical distinctions exist between the February and March Application Documents: the owner, previously unidentified, was replaced with the Malkin Delaware Trust, a Delaware entity; Mr. Malkin was removed as the designated beneficiary and was replaced with the Malkin Delaware Trust; and the "signed at" location was changed from Fort Lauderdale, Florida, to Wilmington, Delaware.  *Compare generally* February Application Document *with* March Application Document.  U.S. Bank believes the February Application Document to be the application upon which the Malkin Policy was issued.

Regardless, on April 11, 2006, Sun Life issued and delivered a $5 million life insurance policy, No. 020119706, to the Malkin Delaware Trust (to reiterate, the "Malkin Policy" or "Policy").  U.S. Bank SOF at ¶ 23.  The Policy was delivered to the policy owner, the Malkin

14-CIV-62610-BLOOM/VALLE

Delaware Trust, on April 20, 2006, in Wilmington, Delaware. *See* Wilkosky Decl. at ¶ 7. The "Life Insurance Policy Dating Acknowledgement and Delivery Receipt Form" (hereinafter, "Delivery Form") confirms this fact. *See* Sun Life Exhibit 47, ECF No. [68-11] (signed by Scott A. Huff, Senior Financial Services Officer on April 20, 2006 at "Wilmington, DE"). The Delivery Form further acts as a confirmation form, stating that "[b]y signing below, [the owner] confirm[s] that [it] ha[s] received, reviewed and accepted the policy." *Id.* The Form also notes that if the owner fails to accept the Policy within forty-five (45) days, the owner must "return the [P]olicy to Sun Life with a completed Certificate of Insurability (statement of continued good health) for further consideration and re-dating." *Id.*

As initially delivered and issued, the Malkin Policy contained forms with a "FL" designation. Wilkosky Decl. at ¶ 7; *see also* U.S. Bank SOF at ¶ 26. Sun Life does not dispute that the initial Policy contained such designations and Florida-specific forms, but contends that this occurred simply by way of human error. *See* Wilkosky Decl. at ¶¶ 6-7. According to Sun Life's Associate Director of Operations, because the proposed insured's signature occurred in Florida, as reflected by the February Application Document, a Sun Life representative entered the application state as Florida. *Id.* at ¶ 3. Sun Life's computer system was not updated and the Policy was issued containing the Florida-specific forms. *Id.* at ¶¶ 6-7. When the Policy was "settled" and was no longer considered to be in the "new business phase," Sun Life's administrative system updated the application state to Delaware based on the March Application Document having been signed in Delaware, the address for the policy owner being shown as Delaware, and a Delaware policy illustration that was submitted to Sun Life. *Id.* at ¶¶ 9-10. Later, in connection with this litigation, a duplicate copy of the Policy was generated. *Id.* at ¶ 11.

Because Sun Life's system had registered Delaware as the application state of the Policy since the Policy was "settled," the duplicate copy did not contain any "FL" designations. *Id.*

Among other provisions, the Malkin Policy contains an incontestability clause. The clause provides that "[a]fter this Policy has been in force during the lifetime of the Insured for a period of two years from its Issue Date, we [Sun Life] cannot contest it except for non-payment of premiums." U.S. Bank SOF at ¶ 24. Florida law requires such a provision to be present in the Policy. *See* Fla. Stat. § 627.455 ("Every insurance contract shall provide that the policy shall be incontestable after it has been in force during the lifetime of the insured for a period of 2 years from its date of issue except for nonpayment of premiums . . . ."). The Delaware version of the Policy contains similar language: "In the absence of fraud, after this Policy has been in force during the lifetime of the Insured for a period of two years from its Issue Date, we [Sun Life] cannot contest it except for non-payment of Premiums." *See* Redline Comparison between Malkin Policy on Florida Forms and Malkin Policy on Delaware Forms, ECF No. [97-1]. Indeed, Delaware law also requires life insurance policies to contain incontestability provisions. *See* Del. Code tit. 18, § 2908.

With the benefit of hindsight and substantial discovery, Sun Life claims that the application, whether it be the March or February Application Document, and associated forms were rife with misrepresentations. For instance, the March Application Document indicated that Malkin had a household income of $460,000 and a total household net worth of $13,000,000. *See* March Application Document at 13. Similarly, a "Personal Financial Questionnaire" submitted in conjunction with the application indicated that Malkin had $10,000,000 in real estate, $2,000,000 in stocks/bonds, $3,000,000 in personal property, and $300,000 in cash. *See* Personal Financial Questionnaire, ECF No. [67-5] at 5. Malkin's sole daughter and the personal

14

representative of her estate, Toni Guarnero ("Guarnero"), an individual with intimate knowledge of Malkin's financial affairs, notes that this estimation of Malkin's net worth is "totally exaggerated." *See* Declaration of Toni Ellen Guarnero ("Guarnero Decl."), ECF No. [66-6] at 1; *see also* Deposition of Toni Guarnero ("Guarnero Depo."), ECF No. [67-2] at 127:25-128:4. In fact, the only real estate Malkin owned in 2006 was a three-bedroom condominium in Aventura, Florida, which was sold in 2014 for $528,000. *See* Guarnero Depo. at 43:2-47:3, 65:6-11, 70:13-21. Upon Malkin's death, Guarnero and her two siblings split Malkin's estate three ways, each receiving their respective share of a $1.1 million trust and the proceeds from the sale of the condominium. *Id.* at 63:19-65:14. Other misrepresentations include the fact that Malkin never travelled to Delaware, despite the application indicating that it was signed by her there, Guarnero Depo. at 177:2-12, and Bryan's attestation that certain elements were filled out "in [his] presence," when they were not, see Sun Life SOF at ¶ 116. Nevertheless, the Policy was issued.

### D.     Post-Policy Dealings

Shortly after the Policy was issued, Malkin, through the Malkin Sub-Trust,[13] entered into a twenty-six (26) month premium financing loan through Coventry, as program administrator for LaSalle Bank, to fund the Policy in the principal loan amount of $238,050 (the "Loan"). *See* Note and Security Agreement dated May 25, 2006 (the "Loan Agreement"), ECF No. [68-7]; *see also* Sun Life SOF at ¶ 126. The Loan was non-recourse, meaning that at the end of the loan period, Malkin could relinquish the Policy to Coventry and walk away from the Loan without

---

[13] On March 16, 2006, Malkin (as settlor), Wilmington Trust (as trustee), and Mr. Malkin (as beneficial owner and co-trustee), established the "Phyllis Malkin Insurance Trust, Premium Finance Sub-Trust II" (hereinafter, the "Malkin Sub-Trust" or "Sub-Trust"). *See* Second Supplement to Trust Agreement, ECF No. [68-4]. The Sub-Trust was created with the express intention to enter into a "Note and Security Agreement" between the Sub-Trust and LaSalle Bank in order to pay premiums on the Malkin Policy. *See id.*

personal financial detriment, although the collateral listed in the loan, that is, the Policy, would be forfeited.[14]  Sun Life SOF at ¶ 132.   The Loan also required that Malkin pay a $5,000 origination fee.  *Id.* at ¶ 133.   Curiously, Simba wired $5,000 to Malkin on April 21, 2006, the day after the Policy was received by the Malkin Delaware Trust.  *See* Simba Records, ECF No. [68-13].  Additionally, on the same day the Loan Agreement was executed, Coventry informed Bryan that a wire had been sent to Sun Life for a premium payment in the amount of $238,050.  *See* Coventry Memo dated May 25, 2006, ECF No. [68-14].   The record is devoid of evidence that Malkin ever directly paid premiums related to the Policy but, nevertheless, U.S. Bank disputes that Coventry was responsible for paying the premiums on the Malkin Policy.  *See* U.S. Bank Response to Sun Life SOF, ECF No. [100] at ¶¶ 140-41.

On or about July 17, 2008, Coventry's records indicate that it was backing out of the transaction, determining that it didn't "see any value in purchasing the [Malkin Policy]."  *See* Coventry Record, ECF No. [69-1].  On July 25, 2008, Malkin defaulted on the Loan and default interest began to accrue.  *See* Default Notice, ECF No. [69-2]. Thereafter, Simba paid the accrued default interest for Malkin.  *See* Email Chain, ECF No. [69-3].

On or around August 5, 2008, Malkin relinquished all rights and interests in the Malkin Delaware Trust, previously reserved to the settlor, to Coventry.   Sun Life SOF at ¶ 146. Thereafter, Wilmington Trust, as trustee, entered into an agreement with Coventry assigning the Malkin Policy to it.  *See* U.S. Bank Counterclaims, ECF No. [19] at ¶¶ 22-23; *see also* Sun Life SOF at ¶ 146.  On August 18, 2008, the Malkin Delaware Trust agreed to sell the Policy to Coventry for $255,000.  Sun Life SOF at ¶ 148; *see also* Life Insurance Policy Purchase Agreement, ECF No. [69-6].  The very same day, U.S. Bank executed a beneficiary change

---

[14] Given the terms of the loan, which provided for a 17.11% interest rate, the total amount due after twenty-six months would be $340.496.41.  Sun Life SOF at ¶ 130.

request form, asking Sun Life to change the Policy's owner of record from the Malkin Delaware Trust to U.S. Bank, acting as a securities intermediary for what would later be discovered to be AIG.  Sun Life SOF at ¶ 149; Beneficiary Change Request, ECF No. [69-8].  Additionally, U.S. Bank submitted an Ownership Change Request to Sun Life, naming U.S. Bank as the owner and primary beneficiary of the Policy.  U.S. Bank Counterclaims at ¶ 27; U.S. Bank SOF at ¶ 31. The next day, U.S. Bank conveyed the Policy from Coventry to AIG.  *See* Sun Life SOF at ¶ 153.  On September 3, 2008, Sun Life acknowledged the beneficiary and ownership change.  *See* U.S. Bank Counterclaims at ¶ 28; U.S. Bank SOF at ¶ 31.[15]  From the Policy's inception, Sun Life sent various correspondences regarding the Policy which seemingly confirmed its validity. *See* Statement of Facts Chart, ECF No. [123] at ¶ 203.

**E.**      **Malkin's Passing and Sun Life's Investigation**

U.S. Bank remained the owner and beneficiary under the Malkin Policy until Malkin's death on September 13, 2014.  U.S. Bank SOF at ¶ 34; Sun Life SOF at ¶ 154.  On October 17, 2014, U.S. Bank submitted a death claim to Sun Life, requesting that Sun Life remit to it the $5 million death benefit available under the Malkin Policy.  U.S. Bank SOF at ¶ 35; Sun Life SOF at ¶ 154.  Upon receipt of U.S. Bank's death claim, Sun Life reviewed its file materials and commenced an investigation, authorizing the investigator, Stuart Drobny ("Drobny") to speak with Malkin's survivors, including Guarnero.  Sun Life SOF at ¶ 155.  Through the investigation, Sun Life learned that Malkin did not have the means to pay the premiums, and that Malkin had been approached by an insurance representative who spoke to her about putting a life insurance

---

[15] Although the Counterclaim allegations were denied by Sun Life, see ECF No. [24], Sun Life, nonetheless, admits the majority of these facts in the context of the instant Motions, see Sun Life's Response to U.S. Bank SOF, ECF No. [92] at ¶¶ 31-32.

policy in place in exchange for financial compensation.  *Id.* at ¶ 156.  Malkin was told this policy

would then be sold on the secondary market so that she could retain the proceeds of the sale.  *Id.*

According to Guarnero, Malkin never intended to obtain the insurance for the purpose of

insurance as she was unable to afford such high premiums.  *See* Guarnero Decl. at 1.  Rather,

Malkin purchased the insurance with the understanding that she would receive monies up front.

*Id.*  In fact, as noted, Malkin's traditional financial advisor played no role in the procurement of

the Policy.  *See id.*; Affidavit of Alan Cohn, ECF No. [66-7] at ¶ 2.  An agreement, executed in

the event Malkin was to die prior to selling the Policy, confirmed that it was Malkin's plan to sell

the policy after the incontestability period had lapsed in order to retain the proceeds.  *See*

Agreement Regarding Life Insurance Policies, ECF No. [66-7] at 4 (dated June 1, 2006) (stating

that Malkin's "plan will be to sell [the Policy] in approximately twenty-six (26) months and

retain the proceeds").[16]

As early as April 2005, Sun Life was aware of a recent increase in STOLI transactions

and set out implementing changes in order to unearth such policies at an early stage.  *See* Sun

Life Memo, ECF No. [69-12] at 2-3.  Prior to 2008, and as early as 2005, Sun Life began

monitoring activities that were indicative of questionable practices, for instance, ownership

changes, and would terminate brokers involved in demonstrated STOLI patterns.  *See* Deposition

of Gregory Lawrence ("Lawrence Depo."), ECF No. [111] at 43:20-45:13; Deposition of

---

[16] This agreement also indicated that because of "the arrangement [Malkin] had undertaken," other restrictions had been placed on her.  *See* Agreement Regarding Life Insurance Policies, ECF No. [66-7] at 4-5.  For instance "she [could] only name one (1) beneficiary" under the Policy and was, therefore, making the agreement to distribute the Policy's death benefits to other individuals should she pass before the Policy was sold.  *See id.*

Thomas Foley, III ("Foley Depo."), ECF No. [103-9] at 101:24-102:16.[17]  In 2010, Sun Life was taking action as to various firms it engaged with, attempting to flag those responsible for repeated irregularities, misrepresentations on applications, and other items.  *See* Foley Depo. at 94:16-102:16; *see also* Email containing PowerPoint ("Sun Life PowerPoint"), ECF No. [103-10].  Sun Life utilized a tiering system to monitor firms, placing firms in either a "green," "yellow," or "red" classification.  *See* Sun Life PowerPoint at 10.  The "red" classification of firms included those with poor placement rates and those requiring a high resource strain due to large numbers of applications, unrealistic service expectations, and/or an extensive amount of rating appeals.  *Id.*  Policies which exhibited indicia of STOLI were also placed in the "red" category.  *Id.*  Based on an undisclosed factor, Sun Life flagged Total Financial, an entity involved in the Malkin Policy transaction, as having indicia of irregularity, recommending the firm be moved from "Yellow" to "Red" in the tiering system employed.  *See* Sun Life PowerPoint, ECF No. [103-10] at 7; Foley Depo. at 94:16-102:16.

Notwithstanding the fact that Sun Life was aware of the ever-increasing issues with STOLI policies, it maintained a procedure of declining to investigate individual policies until the insured had passed.  *See* Lawrence Depo. at 86:10-88:21.  According to Sun Life's corporate representative, the sheer volume of in-force policies prevented Sun Life from constantly monitoring the policies it issued.  *Id.*

Thus, it was not until an investigation was commenced, revealing the above information, that Sun Life refused to pay the death benefits due under the Malkin Policy, notwithstanding the

---

[17] On December 21, 2009, Sun Life terminated its association with Bryan reserved "the right to take any action as [Sun life] deem[ed] appropriate" with respect to the in-force contracts sold by or through Byran.  *See* Letter, ECF No. [103-11].  Additionally, at some point prior to 2010, Sun Life terminated a broker affiliated with an entity involved in the Malkin Policy, Total Financial. *See* Foley Depo. at 112:8-14.

fact that U.S. Bank had paid approximately $853,523.13 in premiums on the Policy.  *See* U.S. Bank's Counterclaims, ECF No. [19] at ¶ 3.  Approximately one month after U.S. Bank submitted its claim for death benefits, Sun Life commenced this action seeking a declaration that the Policy is void.  *See generally* Complaint, ECF No. [1].

### III. DISCUSSION

The parties' respective Motions essentially present one critical issue: whether the Malkin Policy can be rendered *void ab initio* under the applicable law, particularly in light of the fact that the two-year incontestability period contained in the Policy has lapsed.  Resolution of this question requires a determination of whether Florida or Delaware law applies.

### A.    Choice of Law

"In determining which law applies, a federal district court sitting in diversity must apply the choice of law rules of the forum state."  *Trumpet Vine Investments, N.V. v. Union Capital Partners I, Inc.*, 92 F.3d 1110, 1115 (11th Cir. 1996) (*citing Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)); *Rando v. Gov't Employees Ins. Co.*, 556 F.3d 1173, 1176 (11th Cir. 2009); *Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007)).  This action was commenced in the Southern District of Florida and, accordingly, Florida's choice-of-law rules apply.

As a preliminary matter, a district court engaged in a choice of law analysis must determine which sovereigns have an interest in the application of their laws.  *Pycsa Panama, S.A. v. Tensar Earth Technologies, Inc.*, 625 F. Supp. 2d 1198, 1218 (S.D. Fla. 2008) *aff'd*, 329 F. App'x 257 (11th Cir. 2009) (citing *Judge v. Am. Motors Corp.*, 908 F.2d 1565, 1568 (11th Cir. 1990)).  This inquiry is critical as a comprehensive choice of law analysis is only required if the matter involves a true conflict.  *Id.* (citing *Tune v. Philip Morris, Inc.*, 766 So. 2d 350, 352 (Fla.

2d DCA 2000)).  A true conflict exists where "two or more states have a legitimate interest in a particular set of facts in litigation and the laws of those states differ or would produce a different result."  *Id.* (citing *Walker v. Paradise Hotel, Ltd.*, No. 01–3564, 2003 WL 21361662, *2-3 (S.D. Fla. April 25, 2003)); *see also Fioretti v. Massachusetts Gen. Life Ins. Co.*, 53 F.3d 1228, 1234 (11th Cir. 1995) (noting the principle that "when the laws of the competing states are substantially similar, the court should avoid the conflicts question and simply decide the issue under the law of each of the interested states").  Alternatively, a false conflict is presented "where the laws of the interested jurisdictions are: (1) the same; (2) different but would produce the same outcome under the facts of the case; or (3) when the policies of one jurisdiction would be furthered by the application of its laws while the policies of the other jurisdiction would not be advanced by the application of its laws."  *Pycsa*, 625 F. Supp. 2d at 1218-19 (citing *Tune*, 766 So. 2d at 352).  The interested sovereigns are Florida and Delaware and, while not a hard and fast conflict, there is a sufficient clash between the laws of the two States concerning the incontestability clauses so as to necessitate the analysis contained *infra*: Delaware law permits a party to challenge the Policy after the contestability period has lapsed, whereas that question remains unresolved in the Florida courts.  *See Pruco Life Ins. Co. v. Wells Fargo Bank, N.A.*, 780 F.3d 1327, 1336-37 (11th Cir. 2015) (certifying question to Florida Supreme Court).

Next, the Court must characterize the legal issue before it, determining whether the issue sounds in tort, contracts, property law, etc.  *Telemundo*, 485 F.3d at 1240.  The instant dispute unequivocally involves a question of contract.

In the absence of a contractual provision dictating the applicable law, Florida applies the doctrine of *lex loci contractus* to issues involving matters of contract.  *Shaps v. Provident Life & Acc. Ins. Co.*, 244 F.3d 876, 881 (11th Cir. 2001) (citing *Fioretti v. Mass. Gen. Life Ins. Co.*, 53

F.3d 1228, 1235 (11th Cir. 1995)); *Prime Ins. Syndicate, Inc. v. B.J. Handley Trucking, Inc.*, 363 F.3d 1089, 1091 (11th Cir. 2004) ("Under Florida's choice-of-law rules, *lex loci contractus* applies in contract matters.") (citation omitted).   The doctrine instructs courts that, "in the absence of a contractual provision specifying governing law, a contract, other than one for performance of services, is governed by law of the state in which the contract is made." *Shaps*, 244 F.3d at 881 (citation omitted); *Rando*, 556 F.3d at 1176 ("With regard to insurance contracts, Florida follows the '*lex loci contractus'* choice-of-law rule, which 'provides that the law of the jurisdiction where the contract was executed governs the rights and liabilities of the parties in determining an issue of insurance coverage.'" (quoting *State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So. 2d 1160, 1163 (Fla. 2006))).   "*Lex loci contractus* is, in general, an 'inflexible,' bright-line rule that exists 'to ensure stability in contract arrangements.'" *Rando*, 556 F.3d at 1176 (quoting *Roach*, 945 So. 2d at 1164).

Thus, the critical inquiry concerns the location where the contract is "made" or "executed."   "The last act necessary to complete a contract is the offeree's communication of acceptance to the offeror.'" *Sun Capital Partners, Inc. v. Twin City Fire Ins. Co., Inc.*, No. 12-CV-81397-KAM, 2015 WL 4648617, at *1 (S.D. Fla. Aug. 5, 2015) (quoting *Prime Ins. Syndicate*, 363 F.3d at 1093).   In the context of insurance policies, "the *locus contractus* is generally the state where the insured executed the insurance application." *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1059-60 (11th Cir. 2007) (citing *Fioretti*, 53 F.3d at 1236; *Shaps*, 244 F.3d at 881).   While this may be the general rule, the Eleventh Circuit has noted that other courts have found "that a contract dispute is governed by the laws of the state in which the contract was *delivered*." *Prime Ins. Syndicate*, 363 F.3d at 1093 (noting holding from *Pastor v. Union Cent. Life Ins. Co.*, 184 F. Supp. 2d 1301, 1305 (S.D. Fla. 2002)) (emphasis added).

Regardless, what is clear is that "[t]he determination of where a contract was executed is fact-intensive, and requires a determination of where the last act necessary to complete the contract was done." *Prime*, 363 F.3d at 1092-93.

There is one general exception to the *lex loci contractus* doctrine: a Florida court will depart from the doctrine "for the purpose of necessary protection of [Florida] citizens [and to enforce] some paramount rule of public policy." *U.S. Fid. & Guar. Co. v. Liberty Surplus Ins. Corp.*, 550 F.3d 1031, 1033 (11th Cir. 2008) (quoting *Roach*, 945 So. 2d at 1164) (alteration in original).

### i.    *Lex Loci Contractus Dictates that Delaware Law Applies*

U.S. Bank asserts that Florida law applies because: (1) Malkin signed the February Application Document in Fort Lauderdale, Florida; and (2) the Policy as initially issued was a Florida-designated policy as evidenced by the inclusion of various Florida forms. *See* U.S. Bank Motion at 14-15. Conversely, Sun Life implores the Court to find Delaware law applies, given that: (1) the Policy was delivered to the trust owner in Delaware; and (2) the Policy was not "accepted" by the owner until the Delivery Form was signed and returned to Sun Life. *See* Sun Life Motion at 12-22.

The salient inquiry is where the last act necessary to complete the contract was carried out. Stated differently, the question to be answered is "the completion of *what act* created a binding contract?" As one Court in this District has recognized, there is no bright-line rule in Florida requiring the *locus contractus* to be the location of either the signing of the application or the delivery of the policy. *See Sun Capital*, 2015 WL 4648617, at *2-6. U.S. Bank argues that the place of contracting or the "last act" necessary to create a binding contract must always be where the insured executed the application. *See* U.S. Bank Reply, ECF No. [119] at 6.

However, this overly-simplistic construction of *lex loci contractus* is hostile to the Eleventh Circuit's instruction that the determination of the location of contract be "fact-intensive."   *See Sun Capital*, 2015 WL 4648617, at *6 (noting that the "last act" inquiry would not be "fact-intensive" if there was only one factual consideration).   U.S. Bank's cited authority on the point, particularly its heavy reliance upon *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043 (11th Cir. 2007), fails to support its position that Florida law applies.

The Florida Supreme Court in *State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So. 2d 1160 (Fla. 2006) confirmed that the "law of the jurisdiction where the *contract* was executed governs the rights and liabilities of the parties."   *Id.* at 1163 (emphasis added).   By no means did the *Roach* Court intend to abrogate the general rule that the location of the *contract*'s execution dictates the appropriate law to be applied.   Modifying the language of *Roach*'s instruction in a small but substantial way, U.S. Bank has generated a new proposition, to wit, that the execution of the *application* dictates the applicable law.   The Court declines to adjust the long-standing doctrine in this fashion.   The Eleventh Circuit's instruction on the issue that the *locus contractus* be the state where the insured executed the application—also cited by U.S. Bank in support—is phrased in the abstract.   *See Martinez*, 480 F.3d at 1059-60 (stating that location of the application execution is "generally" the *locus contractus*).   In sum, the statement that the location where the proposed insured filled out the application for insurance must necessarily be the location of contract has no support in relevant jurisprudence.   *See CNL Hotels & Resorts, Inc. v. Houston Cas. Co.*, No. 6:06CV 324 ORL 31JGG, 2007 WL 1128965, at *1 (M.D. Fla. Apr. 16, 2007) ("[Plaintiff] contends that [*Martinez*] 'mandates that the 'last act' or 'execution' of an insurance policy under Florida's *lex loci contractus* rule occurs when the policyholder signs the insurance application or the last document necessary to complete the application.'   But *Martinez*

'mandates' no such thing." (internal formatting and record citation removed)).  As noted by the Court in *Sun Capital*, the adoption of such a bright-line rule would negate the "fact-intensive" inquiry district courts are otherwise required to conduct.  *Sun Capital*, 2015 WL 4648671, at *6.

Here, the last act necessary to complete the contract was the owner's acceptance of the Malkin Policy, which indisputably occurred in Wilmington, Delaware.

As noted, "[t]he last act necessary to complete a contract is the offeree's communication of acceptance to the offeror."  *Prime*, 363 F.3d at 1093 (citation omitted).  Under the record presented, Malkin's application amounted to an offer to purchase insurance, which was countered by Sun Life's issuance of the Policy subject to the terms and conditions contained therein, which was then accepted when the owner signed the Delivery Form acknowledging the same.  In either February or March of 2006, Malkin submitted an application for life insurance to Sun Life.[18]  Thereafter, Sun Life issued the Malkin Policy.  The face of the Policy indicates that the owner has the right to return the Policy "within 10 days after receipt," at which point, the Policy is rendered void.  *See* Policy, ECF No. [19-1] at 1.  Further, on April 20, 2006, the owner, Wilmington Trust, returned the Delivery Form, a form which clearly stated that "[b]y signing

---

[18] The Court declines to address the dispute surrounding which application formed the basis for the Policy.  The Court does, however, note that U.S. Bank's portrayal of the facts in this regard is problematic.  The Policy was clearly issued based upon the March Application Document.  U.S. Bank's attempt to characterize the February Application Document as the "Original Application" and the March Application Document as the "First Alteration to the Original Application," *see* U.S. Bank SOF at ¶¶ 8, 16, is a thinly veiled attempt to mischaracterize the record in its favor. The February Application Document did not list a necessary party to the insurance, namely, the owner of the Policy.  *See* February Application Document at 2.  The March Application Document, however, was complete, listing all necessary parties, including the Policy's owner. *See generally* March Application Document.  Identifying the March Application Document as an "alteration" to the February Application Document is, at a minimum, questionable.  Additionally, the Policy defines "Application" as the one "attached hereto and incorporated herein." *See* Policy (Sun Life Version), ECF No. [95-2] at 11. U.S. Bank's version of the Policy, ECF No. [19-1], fails to attach the application.  On the other hand, Sun Life's copy does: the attached application appears to be the March Application Document.  Policy, ECF No. [95-2] at 24.

below, [the owner] confirm[s] that [it] ha[s] received, reviewed *and accepted* the policy." *See* Delivery Form, ECF No. [68-11] (emphasis added). These facts indicate that the contract was not valid or, in other words, accepted, until Wilmington Trust, acting as owner, signed the Delivery Form acknowledging that it agreed to the terms contained in the Policy. This conclusion is further supported by the Delivery Form's requirement that "further consideration" of the insured is necessary if the Policy is not accepted within forty-five days. *See id.* Consequently, the "last act" necessary to bind the parties was Wilmington Trust's execution of the Delivery Form which confirmed its acceptance of the Policy. Because this act occurred in Wilmington, Delaware, the *locus contractus* must be Delaware. *See Prime*, 363 F.3d at 1092-93 ("The determination of where a contract was executed . . . requires a determination of where the last act necessary to complete the contract was done.") (internal quotation and formatting omitted); *see also Fioretti*, 53 F.3d at 1236 (contract complete upon insured's execution of statement where insurer "expressly conditioned its approval of [the insured's] application on this one event").[19]

Nothing in either the February or March Application Documents purports to make a binding contract upon their execution. *See* February Application Document, ECF No. [62-6] at 9-10 (Declarations); March Application Document, ECF No. [66-21] at 15-16 (Declarations). The fact that Malkin *may* have signed the application upon which the Policy was based in Florida is of little to no consequence to the *lex loci contractus* discussion. *See, e.g, CNL Hotels & Resorts, Inc. v. Houston Cas. Co.*, 505 F. Supp. 2d 1317, 1320 (M.D. Fla. 2007) *aff'd in part sub*

---

[19] U.S Bank continues to dispute the fact that the Policy was delivered to Wilmington Trust in Delaware, yet provides no basis for doing so other than its conclusory disagreement. *See* U.S. Bank Response, ECF No. [98] at 11. The Delivery Form is dispositive as to this fact and U.S. Bank does not contend that the signatory contained therein, Scott A. Huff, was not a representative of Wilmington Trust.

*nom. CNL Hotels & Resorts, Inc. v. Twin City Fire Ins. Co.*, 291 F. App'x 220 (11th Cir. 2008) (rejecting relevance of the fact that policy was delivered to insured in Florida). To reach this conclusion under these facts would be illogical. As Sun Life notes, it is not bound to accept every application it receives. Under U.S. Bank's interpretation, the contract was valid when Malkin submitted her application, notwithstanding the fact that Sun Life had not offered to insure her life at that point. The undisputed facts do not support the conclusion that Florida law should apply to the Policy.[20]

U.S. Bank elects not to address the acceptance issue as raised by virtue of the Delivery Form. Instead, it implores the Court to find that delivery was not made in Delaware but, rather, in Florida based on a theory of "constructive delivery." The Court is unpersuaded that the Policy was constructively delivered in Florida. This assertion is predicated on two facts: (1) the Policy, as initially issued, contained various Florida-specific forms and designations[21]; and (2) Malkin signed the initial application in Fort Lauderdale, Florida. Both of these facts do nothing to alter the *lex loci contractus* analysis. The analysis does not, in most circumstances, require an examination of a policy's terms—to the obvious exclusion of a choice-of-law clause. Further, the location where Malkin purportedly signed the application is immaterial if her signature was

---

[20] In the alternative, Malkin's application for insurance constituted an offer to purchase life insurance, which was accepted when Sun Life issued the Policy insuring her life. Sun Life's *acceptance* was, therefore, the "last act" necessary to create a binding contract. *See Granite State Ins. Co. v. Am. Bldg. Materials, Inc.*, No. 8:10-CV-1542-T-24, 2011 WL 6025655, at *4-5 (M.D. Fla. Dec. 5, 2011) *aff'd,* 504 F. App'x 815 (11th Cir. 2013) (issuance of binder of insurance by insurance company constituted last act necessary to form valid policy). Under this transaction theory, Florida law would still remain inapplicable as Sun Life is not based in Florida.

[21] Sun Life has attempted to explain the administrative miscue leading to the initial designation of the Policy as a "FL" Policy. However, the Court questions the propriety of Sun Life's reassignment, which was undoubtedly executed after the Policy was in force for a period of several years.

not the last act required to create a contract.  As emphasized, the prescient inquiry concerns the location where the contract became binding, not the designations contained therein or any other events leading up to contract formation.[22]

Wausau Underwriters Ins. Co. v. Baillie, 281 F. Supp. 2d 1307 (M.D. Fla. 2002) does not compel a different result.  In Wausau, the Middle District of Florida recognized a corollary to the doctrine of lex loci contractus often utilized by Florida courts where strict application of lex loci contractus would not be appropriate.  Id. at 1312.  In that case, the insured's recovery was premised upon a Florida-specific uninsured motorist's provision and the court found the argument that "Florida law should be used to interpret a policy provision based upon a Florida statute" to be compelling.  Id. at 1312-13.  While the contract here contains an incontestability provision as required by Florida law, the parties' dispute does not center on application of the provision, unlike the issue presented in Wausau.  On the contrary, the ultimate conflict necessitating this protracted choice-of-law inquiry concerns whether the provision can be circumvented, that is, whether Sun Life can challenge the validity of the Policy after the 2-year contestability period has lapsed.  Additionally, this corollary was seemingly limited to situations involving the Florida uninsured motorist statute, Fla. Stat. § 627.727.  See Strochak v. Fed. Ins. Co., 109 F.3d 717, 719-20 (11th Cir. 1997) certified question answered, 717 So. 2d 453 (Fla. 1998) ("Under Florida choice of law rules, a contract for automobile insurance generally is interpreted according to the law of the state where the contract was made.  However in specifically applying § 627.727 Florida law applies.") (internal citations omitted).

---

[22] Despite the fact that Malkin, in all likelihood, did not sign the March Application Document in Delaware, Sun Life was, nevertheless, reasonable in relying on such a representation.  An insurer is not required to have intricate knowledge of the whereabouts of a potential insured.

In sum, the acceptance of the Policy by the Policy owner, Wilmington Trust, in Delaware, triggered Sun Life's obligation to provide coverage for Malkin. Thus, the last act necessary to effectuate the Policy was its acceptance, in Wilmington, Delaware on April 20, 2006, and Delaware law applies.

### ii. The Lex Loci Contractus Exception is Inapplicable

As previously indicated, in order to depart from the otherwise strictly applied dogma, there must be a need to protect Florida citizens and to enforce "some paramount rule of public policy." *Liberty Surplus*, 550 F.3d at 1033 (quoting *Roach*, 945 So. 2d at 1164) (alteration in original). The exception is exceedingly narrow, and should only be invoked where it is necessary to protect Florida's own citizens. *See Roach*, 945 So. 2d at 1168 (citations omitted). After review, the Court also rejects U.S. Bank's assertion that this Court should deviate from the *lex loci contractus* analysis because Malkin was a Florida citizen and Florida has a paramount interest in regulating the insurance of its residents.

The Florida citizen which would otherwise require protection in the instant matter, Malkin, is deceased and, accordingly, no longer in need of protection.[23] Nevertheless, to the extent U.S. Bank asserts that all Florida residents require protection in the context raised by this litigation, the Court finds the assertion puzzling given that U.S. Bank also believes that Florida law bars any challenge to an insurance policy which was allegedly procured by strangers who sought to wager on the life of a Florida senior citizen. Pending the validity of Sun Life's claims of STOLI insurance, discussed *infra*, application of Florida law would potentially stand adverse to the interests of Florida's citizens, notwithstanding the fact that certain courts in Florida and Florida's Office of Insurance Regulation have expressed concern with the practice alleged in the

---

[23] Malkin's estate is also not a party to this litigation and, therefore, also not in need of protection.

Amended Complaint. *See* Florida Office of Insurance Regulation Report, Stranger-Originated Life Insurance ("STOLI") and the Use of Fraudulent Activity to Circumvent the Intent of Florida's Insurable Interest Law (January 2009) ("It is imperative that [Florida] act to protect its seniors and all Floridians from becoming victims of fraudulent STOLI transactions."); *see also Sciarretta v. Lincoln Nat. Life Ins. Co.*, 778 F.3d 1205, 1207 (11th Cir. 2015) ("We are all, in the long view, born astride the grave. But allowing parties to use life insurance policies to bet on when an unrelated person will drop off into the grave raises public policy concerns, which have led to restrictions on the practice."). This Court is not convinced that application of the exception is necessary to protect any Florida citizen in this case and, accordingly, the exception is inapplicable. *Roach*, 945 So. 2d at 1168 ("[T]he public policy exception to the *lex loci* rule requires *both* the involvement of a Florida citizen in need of protection and the existence of a paramount Florida public policy." (emphasis in original)).

Even if U.S. Bank had identified citizens in need of protection, U.S. Bank fails to identify a "paramount public policy" that supports the application of Florida law. Although Florida maintains an "interest in protecting its own from inequitable insurance arrangements," U.S. Bank. Motion at 15 (quoting *Gillen v. United Services Automobile Ass'n*, 300 So. 2d 3, 6-7 (1974)), application of Florida law does not clearly protect that interest. As indicated, courts and Florida's agencies have recognized the procurement of STOLI policies to be an unscrupulous practice detrimental to Florida's senior citizens. Yet, the question as to whether such policies can be rendered void based on these underhanded practices remains unresolved. *See Pruco Life Ins. Co. v. Wells Fargo Bank, N.A.*, 780 F.3d 1327, 1336 (11th Cir. 2015) (certifying questions to Florida Supreme Court).

The Florida Supreme Court in *Roach* repeatedly emphasized the limited nature of the public policy exception.  Almost invariably, the cases in which the exception is applied involve transient insureds who have, in some manner, relocated to the State of Florida despite having been issued *automobile* insurance policies while residing in foreign states.  *See, e.g., Gillen v. United Services Automobile Ass'n*, 300 So. 2d 3 (1974) (residents of New Hampshire obtained automobile insurance from New Hampshire insurer and later moved to Florida); *Sturiano v. Brooks*, 523 So. 2d 1126 (Fla. 1988) (residents of New York who purchased automobile insurance in New York could not avail themselves of Florida law when not residents of Florida).  U.S. Bank cites to no authority where the exception has been expanded outside of this situation and, for this additional reason, the Court declines to apply it.

**B.**      **U.S Bank's Motion to Stay is Denied**

The Court next addresses U.S Bank's Motion to Stay, ECF No. [113], finding that, based on the holding above, a stay is unwarranted.  In *Pruco Life Ins. Co. v. Wells Fargo Bank, N.A.*, 780 F.3d 1327 (11th Cir. 2015), the Eleventh Circuit certified two questions to the Florida Supreme Court:

> 1.  Can a party challenge an insurance policy as being void *ab initio* for lack of the insurable interest required by Fla. Stat. § 627.404 if that challenge is made after expiration of the two-year contestability period mandated by Fla. Stat. § 627.455?

> 2.  Assuming that a party can do so, does Fla. Stat. § 627.404 require that an individual with the required insurable interest also procure the insurance policy in good faith?

*Id.* at 1336.  Oral Argument on this matter is currently set for March 10, 2016 at 9:00 a.m. before the Florida Supreme Court.  *See Wells Fargo Bank, N.A., et al. v. Pruco Life Ins. Co.*, No. SC15-382 (Fla. 2015).

14-CIV-62610-BLOOM/VALLE

Resolution of the aforementioned questions would undoubtedly put to rest the issue of whether Sun Life can properly challenge the validity of the Malkin Policy after the expiration of the two year contestability period under Florida law.  However, the Florida Supreme Court's resolution of this question is rendered irrelevant by this Court's determination that Delaware law applies to the Malkin Policy.  Accordingly, the Court proceeds with the final inquiry: whether the Malkin Policy was merely a wager on Malkin's life, lacking an insurable interest at inception.

## C.    The Malkin Policy was a STOLI Engagement

Delaware law explicitly provides that an individual may not procure an insurance policy on the life of another without an insurable interest in the insured's life.  Del. Code tit. 18, § 2704(a) ("[N]o person shall procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under such contract are payable to the individual insured or his or her personal representatives or to a person having, at the time when such contract was made, an insurable interest in the individual insured.").  Like with Florida law, Delaware law requires insurance contracts to contain an incontestability provision.  *Compare* Fla. Stat. § 627.455 *with* Del. Code tit. 18, § 2908 ("There shall be a provision that the policy shall be incontestable after it has been in force during the lifetime of the insured for a period of not more than 2 years after its date of issue . . . .") (exceptions omitted).  Unlike Florida law, however, the question of whether an insurance contract can be rendered void *ab initio* is not unsettled in the state of Delaware.  In *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust, ex rel. Christiana Bank & Trust Co.*, 28 A.3d 1059 (Del. 2011), the Supreme Court of Delaware unequivocally held that the expiration of the two-year contestability period does not preclude an attack on the validity of a life insurance policy based on a lack of insurable interest.  *Id.* at 1064-

65. This conclusion was predicated upon the Delaware Court's finding that an insurance policy which lacks an insurable interest at inception is void *ab initio*, meaning no insurance policy "ever legally came into effect" and, therefore, the incontestability provision in the contract was never applicable. *See id.* at 1064-68 (distinguishing between "void" and "voidable" contracts).

The case of *Price Dawe* is controlling and guides this Court's inquiry. As noted by the *Price Dawe* Court, "[t]he insurable interest requirement serves the substantive goal of preventing speculation on human life." *Id.* at 1074. Because STOLI schemes "are created to feign technical compliance with insurable interest statutes," mere technical compliance is insufficient. *Id.* Instead, "[t]he relevant inquiry is who procured the policy and whether or not that person meets the insurable interest requirements." *Id.* at 1076.

The insurable interest requirement is examined at the moment in time when the contract was made, that is, "the moment the life insurance contract becomes effective." *Id.* at 1074 (citing Del. Code tit. 18, § 2704(a)). However, simply because an insured procures a life insurance policy "with the intent to immediately transfer the benefit to an individual or entity lacking an insurable interest" does not mean the policy is invalid, so long as the third-party was not the one who actually procured the policy. *See id.* at 1068-74. Stated differently, even where the insured "did not ever intend to provide insurance protection for a person with an insurable interest in his or her life," the policy is valid "so long as the insured procured or effected the policy and the policy is not a mere cover for a wager." *Id.*

Delaware's insurable interest statute, Del. Code tit. 18, § 2704, "requires courts to scrutinize the circumstances under which the policy was issued and determine who in fact procured or effected the policy." *Id.* In order to ascertain who procured a given policy, courts look to who paid the premiums. *Id.* at 1075. In fact, Delaware law "require[s] the insured to

fund the premiums on the policy unless the payor is a charitable, benevolent, educational, or religious institution." *Id.* "Therefore, if a third party financially induces the insured to procure a life insurance contract with the intent to immediately transfer the policy to a third party, the contract lacks an insurable interest." *Id.* Under such circumstances, the policy has been procured "as a mere cover for a wager" and "the insurable interest requirement is not satisfied." *Id.*

Sun Life's primary argument is precisely this. Namely, that the Malkin Policy lacked an insurable interest at inception because it was procured not by Malkin, but by shadow investors who intended to wager on her life. *See generally* Sun Life Motion at 11-22. Therefore, Sun Life contends that the Policy is void *ab initio*. *Id.* In support of this contention, Sun Life points to Simba's business model and other evidence that Malkin had no intention to retain the Policy, as well as the fact that Malkin purportedly did not pay the premiums associated with the Policy. *See id.* In response, U.S. Bank asserts that there are genuine issues of material fact which preclude such a finding. *See* U.S. Bank's Response, ECF No. [98] at 18-19, 25-28. Specifically, U.S. Bank believes the insurable interest requirement was satisfied due to the following: (1) at the time Malkin applied for the Policy, her husband, Mr. Malkin, had an insurable interest in her life; (2) Mr. Malkin was the ultimate beneficiary of the Malkin Delaware Trust and the Policy until the Policy was sold in 2008; (3) Malkin was not bound to sell the Policy to Coventry; and (4) Malkin's funding the premiums through a non-recourse loan was not indicative of the fact that the Policy was procured by another individual or entity. *See id.*

The evidence presented in this litigation indicates that Malkin had no intention to retain the Policy from the outset; indeed, that is the service Simba offered to the majority of its clients. However, this by itself is not sufficient to conclude that Malkin was not the one who procured

the Policy.  *See Price Dawe*, 28 A.3d at 1068, 1076 ("[T]he insured's subjective intent for procuring a life insurance policy is not the relevant inquiry.").[24]  *Price Dawe* directs the Court to look to the circumstances of the overall transaction.  "[I]f a third party financially induces the insured to procure a life insurance contract with the intent to immediately transfer the policy to a third party, the contract lacks an insurable interest."  *Id.* at 1075.  This is most easily demonstrated by identifying which party was responsible for the insurance premiums.  *Principal Life Ins. Co. v. Lawrence Rucker 2007 Ins. Trust*, 869 F. Supp. 2d 556, 561 (D. Del. 2012) (citing *Price Dawe*, A.3d at 1075-76).  "If the insured was responsible for paying the premiums, then the policy is valid and freely transferable by the insured."  *Id.* (citing *Price Dawe* at 1075-76) (noting that "the insured has a right to take out a policy with the intent to immediately transfer the policy, but that right is limited to bona fide sales of that policy taken out in good faith." (internal quotation omitted)).  Even if the insured paid the premiums, the policy lacks an insurable interest and must be rendered void *ab initio* if the facts nevertheless reveal that the insured was simply as an "instrumentality" to obtain the policy.  *See id.* at 564-65 (citing *Price Dawe* at 1075-77) ("[T]he court still must determine whether a third party with no insurable interest in the life of the insured used the insured as an 'instrumentality' to obtain the policy.").  "For a policy to constitute a wager voiding any insurable interest, *both* an intent to immediately transfer the policy to a third party and a financial inducement by a third party to procure a life insurance contract on the insured are required."  *Id.* (emphasis supplied).

---

[24] Thus, the fact that Malkin memorialized her plan to sell the Policy after the two-year contestability period in the "Agreement Regarding Life Insurance Policies," ECF No. [66-7] at 4, dated June 1, 2006, does not, without more, indicate foul play.  It was legally permissible for Malkin to transfer her interest in the Policy at any point after it was procured, so long as an individual or entity with an insurable interest was the party responsible for procuring it.  *See Price Dawe*, 28 A.3d at 1068, 1076.

As noted, Sun Life avers that Malkin never paid a single premium on the Policy and that the circumstances surrounding how the Policy was obtained clearly evidence the fact that Malkin was merely used as a conduit to obtain the Policy.  These arguments are persuasive and will be addressed in turn.

Payment of premiums by the insured provides a strong indication that the policy at issue was obtained under legitimate pretenses.  *See Price Dawe* at 1076.  Sun Life directs the Court to the Loan Agreement entered into between the Malkin Sub-Trust and Coventry as evidence of the fact that Malkin was not responsible for the premiums on the Policy.  *See* Loan Agreement, ECF No. [68-7].  However, the Loan Agreement itself is inconclusive.  To reiterate, under the Loan Agreement, the Malkin Sub-Trust was to pay a total amount of $238,050.00 for financed insurance premiums and Coventry was to disburse the financed funds to Sun Life.  *Id.* at 2, 9. The Loan was non-recourse, in that Malkin pledged the Policy as the sole collateral for the Loan and was otherwise not personally liable.  *See id.* at 5.  In a vacuum, this would be insufficient to find that Malkin never paid the premiums on the Policy.  An insured is not foreclosed from paying premiums through a financing arrangement.  *See Lawrence Rucker*, 869 F. Supp. 2d at 563 ("*Price Dawe* does not foreclose an insured from borrowing money to pay for premiums.").

Additionally, the fact that the Loan was non-recourse does not indicate that the Malkin Sub-Trust had no obligation to repay the debt.  Where there is no obligation to repay borrowed funds, the loan raises questions concerning whether the insured has actually funded the policy. *See Lawrence Rucker*, 869 F. Supp. 2d at 563 ("[B]orrowing money *with an obligation to repay* would also qualify as an insured procuring a policy.") (emphasis supplied).  In making this argument, Sun Life appears to mischaracterize what non-recourse debt actually is.  Non-recourse debt simply means that the lender's remedies are limited, to wit, upon default the lender is

precluded from seeking the borrower's assets, with the exception of the collateral explicitly named in the loan. Contrary to Sun Life's representation, the Loan Agreement did not state that Malkin "had no obligation to repay," Sun Life Reply, ECF No. [124] at 7; the Loan Agreement explicitly provides that if Malkin fails to perform her obligations under the Agreement, including the "pay[ment] [of] the amounts due," Coventry would appropriate or "foreclose" on the Policy, changing the beneficial ownership thereunder. *See* Loan Agreement at 5. While a non-recourse financing arrangement may be indicative of a STOLI plan, Sun Life provides no authority that this manner of financing is a *de facto* signal that the funding was obtained as part of a STOLI scheme.

Coventry's confirmation that a $238,050.00 transfer was made to Sun Life on May 25, 2006 fails to corroborate the assertion that the Malkins never paid premiums associated with the Loan. *See* Coventry Memo dated May 25, 2006, ECF No. [68-14]. On its face, this document merely indicates that a premium payment was sent to Sun Life on May 25, 2006, seemingly in accord with Coventry's obligations under the Loan Agreement. *See id.* ("The premium payment in the amount of $238,050.00 was sent via wire to Sun Life of Canada."). As per the Loan Agreement, Coventry, not Malkin, was to pay Sun Life the premiums on the Policy. *Id.*

With that said, the individual responsible for arranging the Malkin Policy, Larry Bryan, attests to the fact that "[t]he Malkins, like the other Simba clients who did Coventry deals before them, paid no premium payments (or anything else for that matter) and took no risk." Bryan Statement at 6. U.S Bank has failed to refute Bryan's contention with competent evidence. *Compare* Sun Life SOF at ¶ 145 *with* U.S. Bank Response to Sun Life SOF at ¶ 145. Bryan's disclosure is further corroborated by Guarnero's attestations, which also remain unrefuted. Guarnero, an individual with personal knowledge of Malkin's affairs, confirms that Malkin did

not have the means to pay the premiums on the Policy. *See* Sun Life SOF at ¶ 156; Guarnero Decl. at 1. Indeed, as relayed by Guarnero, "[Malkin] would not be responsible for the payment of the insurance nor could she afford the payment of the insurance." Guarnero Decl. at 1. After "scrutiniz[ing] the circumstances under which the [P]olicy was issued" and, more importantly, how the Policy was paid for, it is clear that the record evidence substantiates Sun Life's contention that neither Malkin nor any other individual or entity with an insurable interest in Malkin's life was responsible for the premium payments on the Policy. *See Price Dawe*, 28 A.3d at 1076 (noting that Delaware law "requires courts to scrutinize the circumstances under which the policy was issued and determine who in fact procured or effected the policy" by examining who paid the premiums as a life insurance policy "do[es] not come into effect without premiums").

Despite conducting ample discovery, U.S. Bank is unable to produce a modicum of evidence indicating that the Malkins were responsible for the premium payments and that Coventry's payment under the Loan Agreement was not simply smoke and mirrors meant to obscure the identity of the party responsible for procuring the Policy. Given that Malkin was financially incapable of making the premium payments on her own, she was obligated to obtain funding from a third-party, Coventry. Here, the entity that allowed Malkin to obtain the Policy by providing her with the financial means to do so was the same entity that dictated the deal from its inception and ultimately purchased the Policy. *See, e.g., Lawrence Rucker*, 869 F. Supp. 2d at 565 (observing that situations where the entity paying the premiums or loaning money to the insured to cover the premiums is also the entity who purchases the policy, provides "clear evidence of an agreement for [the insured] to later sell the [p]olicy to [the third-party]"). In other words, "a third party fund[ed] the premium payments by providing [Malkin] the financial means

to purchase the policy" and, therefore, Malkin "[did] not procure or affect the policy." *Price Dawe* at 1076.

Other undisputed facts affirm that the Malkin Policy was a wagering instrument. The company through whom Malkin obtained the Policy, Simba, had a clear and well-advertised practice of engaging in STOLI transactions, or "life insurance capacity transactions," as such matters were referenced in Simba's marketing materials. The transactions Simba orchestrated were overwhelmingly arranged and governed by third-parties, such as Coventry. In fact, Simba and Coventry maintained a written agreement whereby Coventry was to provide financing for Simba's clients after Simba had reeled them in with their promises of "cash now" payments. The Malkin Policy was the result of one such transaction. Simba coordinated with Coventry to obtain the Policy, requesting a life expectancy report from underwriters and contacting insurers regarding potential policies for Malkin that were of interest to Coventry. Malkin had no control over what policies were procured and, in fact, granted Coventry an expansive power of attorney. This power of attorney allowed it to originate and service any insurance policies on her life, as well as the authority to execute applications and other documents related to the maintenance or liquidation of the same. In the same vein, the Malkins had no control over the trust documents used to create the various trusts employed by Coventry in obtaining the Policy, nor were they able to negotiate the terms of the Loan utilized to fund the premiums, engaging in a loan that bordered on usurious under Florida law and was patently usurious under Illinois law.[25] *See* Fla. Stat. § 687.02 (providing maximum interest rate of 18 percent per annum for loans below $500,000); 815 Ill. Comp. Stat. 205/4 (providing maximum interest rate of 9 percent per

---

[25] The Loan Agreement contains a choice of law provision dictating that Illinois law governs its terms. *See* Loan Agreement at 6.

annum).[26]  Coventry, along with its right hand, Simba, dictated every aspect of the transaction.

Malkin was simply the conduit.  *See generally Grigsby*, 222 U.S. at 156 ("[A] person having an

interest lends himself to one without any, as a cloak to what is, in its inception, a wager . . . .").

The facts of *Pruco Life Ins. Co. v. Brasner*, No. 10-80804-CIV, 2011 U.S. Dist. LEXIS

156297 (S.D. Fla. Nov. 14, 2011) is remarkably similar to the instant case.  Assessing whether a

policy was void *ab initio* for want of an insurable interest under Florida law, the Court in

*Brasner*, found the insured's testimony that she never intended to maintain the policy nor had

any intention to pay any premium for the policy to be conclusive evidence that the policy was

procured in bad faith.  *See id.* at *24-32.  Here, the record supports a similar conclusion, namely

that Malkin had no need for the insurance, would not have been able to procure such a

considerable policy on her own merit given her financial position, and was able to obtain the

Policy only with Coventry's blessing and financial assistance.  *See id.* at *3-12.

U.S. Bank attempts to obscure this unavoidable conclusion with the fact that Malkin

received coverage for two years and was not bound to sell the Policy to Coventry at the end of

the Loan.  These inquiries are irrelevant. The question must always be who procured the policy

at issue and not what the formal consequences are of obtaining a life insurance policy.  Indeed,

this is part and parcel of the gamble.  If the insured succumbs to the inevitable at a time prior to

the expiration of the contestability period, the funding entity loses the wager.  The facts and

circumstances of this case plainly expose the STOLI enterprise Malkin engaged in through

Simba and Coventry.  As a result, the Malkin Policy lacked an insurable interest at its inception

and is rendered void *ab initio*.

---

[26] Delaware, on the other hand, does not have a usury rate for the loan or use of money, "where the amount of money loaned or used exceeds $100,000, and where repayment thereof is not secured by a mortgage against the principal residence of any borrower."  Del. Code tit. 6, § 2301.

**D.**     **Sun Life Must Return the Premiums Paid on the Malkin Policy**

Sun Life contends that the Court must "leave the parties where it found them" and argues

that U.S. Bank is not entitled to the return of premium payments made during the life of the

Policy.   Several Florida courts have found that "[w]here a party wrongfully procures a life

insurance policy on an individual in whom it has no insurable interest, the party is not entitled to

a return of premiums paid for the void policy.  *TTSI Irrevocable Trust v. ReliaStar Life Ins. Co.*,

60 So. 3d 1148, 1150-51 (Fla. 5th DCA 2011); *see also Brasner*, 2011 U.S. Dist. LEXIS 156297,

at *39-44 (relying on *TTSI* to find that defendant was not entitled to the return of premiums).

Delaware courts, on the other hand, have held the opposite.  For instance, in *Sun Life Assur. Co.*

*of Canada v. Berck*, 719 F. Supp. 2d 410 (D. Del. 2010), the District of Delaware found that a

plaintiff cannot have it both ways by seeking to rescind a life insurance policy as void *ab initio*

and simultaneously requesting to retain the premiums paid on the policy.  *Id.* at 418-19

(dismissing claim for retention of premiums).  Other courts interpreting Delaware law have

followed suit.  *See, e.g., Principal Life Ins. Co. v. Lawrence Rucker 2007 Ins. Trust*, 774 F. Supp.

2d 674, 682 (D. Del. 2011) ("[I]t is clear . . . that under Delaware law [plaintiff's] argument that

it may retain premiums received on the Policy that this court held to be void *ab initio* for lack of

an insurable interest at inception necessarily fail."); *Lincoln Nat. Life Ins. Co. v. Snyder*, 722 F.

Supp. 2d 546, 564-65 (D. Del. 2010).

Because this Court has found that Delaware applies to the Policy, it elects to adhere to the

Delaware courts' reasoning on the issue.  "If an insurance company could retain premiums while

also obtaining rescission of a policy, it would have the undesirable effect of incentivizing

insurance companies to bring rescission suits as late as possible, as they continue to collect

premiums at no actual risk." *Berck*, 719 F. Supp. 2d at 418-19.  Accordingly, U.S. Bank is entitled to a return of the premiums associated with the Malkin Policy.

**E.**     **U.S. Bank's Affirmative Defenses Do Not Preclude Judgment**

"A district court should not grant summary judgment where genuine issues of material fact exist about an affirmative defense."  *Bryant v. Rich*, 530 F.3d 1368, 1380 (11th Cir. 2008) (citing Fed. R. Civ. P. 56(c)) (further citations omitted); *Singleton v. Dep't of Corr.*, 277 F. App'x 921, 923 (11th Cir. 2008) ("Summary judgment is not appropriate where a genuine issue of material fact exists about an affirmative defense.").

U.S. Bank's pleadings raise twelve threadbare affirmative defenses: (1) failure to state a claim; (2) estoppel; (3) misrepresentation and omission; (4) laches; (5) release; (6) waiver; (7) incontestability; (8) statute of limitations; (9) ratification; (10) *in pari delicto*  and imputation of the acts of Sun Life's agents; (11) unclean hands; and (12) Sun Life's alleged breach of the Policy and breach of the duty of good faith and fair dealing.  *See* U.S. Bank's Affirmative Defenses, ECF No. [19] at ¶¶ 52-63.

Additionally, U.S. Bank asserts five counterclaims: declaratory judgment that the policy contains an insurable interest and that Sun Life is estopped from contesting the validity of the Policy based on numerous representations (Count I); breach of contract by virtue of Sun Life's failure to pay the death benefit and decision to contest the Policy beyond the two-year contestability period (Count II); breach of the duty of good faith and fair dealing, also related to Sun Life's post-contestability challenge of the Policy (Count III); declaratory judgment that Sun Life is obligated to return all premium payments made concerning the Policy (Count IV); and fraudulent misrepresentations and omissions concerning Sun Life's purported intention to honor the Policy (Count V).  *See* U.S. Bank's Counterclaims, ECF No. [19] at ¶¶ 40-77.

At this juncture, it is apparent that U.S. Bank's first, seventh, and eighth affirmative defenses are without merit. The Complaint validly states a cause of action and no statute of limitations precludes Sun Life's claims. As to the claims being barred by the Policy's incontestability provision and applicable incontestability statute, such an assertion is now manifestly incorrect. The two-year contestability period in the Policy does not preclude a challenge to the Policy on the basis that the Policy lacks an insurable interest and is, therefore, void *ab initio*. *See Price Dawe*, 28 A.3d at 1064-68 ("[A]n insurer can challenge the enforceability of a life insurance contract after the incontestability period where a lack of insurable interest voids the contract.").

U.S. Bank's estoppel, ratification, *in pari delicto*, and unclean hands affirmative defenses fail as a matter of law. As noted by the court in *Denison v. Redefer*, No. CIV.A. 03C-01-002-(J, 2006 WL 1679580 (Del. Super. Ct. Mar. 31, 2006), "the doctrine of estoppel has no application to an agreement which is illegal because it violates an express mandate of law or the dictates of public policy." *Id.* at *2 (citing *Waggoner v. Laster*, 581 A.2d 1127 (Del. 1990)). Consequently, "a contract that is void *ab initio* may not be enforced equitably through estoppel . . . ." *Wilmington Sav. Fund Soc'y, FSB v. PHL Variable Ins. Co.*, No. CV 13-499-RGA, 2014 WL 1389974, at *12 (D. Del. Apr. 9, 2014). Similarly, "[o]ne cannot [] ratify a contract that never existed." *Marquess v. Pennsylvania State Employees Credit Union*, 427 F. App'x 188, 190 (3d Cir. 2011) (citing *Long v. Sears Roebuck & Co.*, 105 F.3d 1529, 1535 n.10 (3d Cir. 1997)). Because a contract rendered void *ab initio* "[n]ever legally came into effect," Sun Life's claim is not barred under the doctrine of ratification. *See Price Dawe*, 28 A.3d at 1067-68 (noting that a contract rendered void *ab initio* is void at the outset, in other words, "no [contract] ever legally came into effect").

The affirmative defense of *in pari delicto* applies where a party's losses "are substantially caused by activities the law forbade him to engage in." *Stewart v. Wilmington Trust SP Servs., Inc.*, 112 A.3d 271, 302 (Del. Ch. 2015) *aff'd*, No. 204, 2015, 2015 WL 6672222 (Del. Nov. 2, 2015) (citation omitted).   Serving two purposes, the doctrine is, in essence a public policy decision that, one, deters wrongful conduct and, two, protects judicial resources by disallowing actions among wrongdoers. *Id.* (citation omitted).  The doctrine is not "adopted [] for the benefit of either party" and is not designed "to punish"; rather, it is adopted "for the benefit of the public." *Id.* (internal citation and quotation removed).  Accordingly, courts avoid the doctrine "when another public policy is perceived to trump the policy basis for the doctrine itself." *Id.* (quoting *In re Am. Int'l Grp., Inc., Consol. Derivative Litig.*, 976 A.2d 872, 888 (Del. Ch. 2009) *aff'd sub nom. Teachers' Ret. Sys. of Louisiana v. Gen. Re Corp.*, 11 A.3d 228 (Del. 2010)). Here, the immense public policy against wagering contracts clearly trumps any possible application of the doctrine. *See Price Dawe*, 28 A.3d at 1065 (noting that "a life insurance policy lacking an insurable interest is void as against public policy").  Due to the same overriding public policy considerations, the doctrine of unclean hands is also inapplicable. *See In re HealthSouth Corp. Shareholders Litig.*, 845 A.2d 1096, 1108 (Del. Ch. 2003) aff'd, 847 A.2d 1121 (Del. 2004) ("Like its equitable counterpart the unclean hands doctrine, the *in pari delicto* defense will not be applied when its acceptance would contravene an important public policy.") (citation omitted).

Based on the discussion contained throughout this opinion, it is also evident that U.S. Bank's twelfth affirmative defense, as well as Counts I, II, III, and IV of U.S. Bank's counterclaims, do not preclude judgment in Sun Life's favor.  Counts I and IV seeking a declaratory judgment that the policy had an insurable interest at inception and that Sun Life is

required to return the premiums on the Policy, respectively, have already been addressed in detail.  *See supra* Section III.D, E.  U.S. Bank's breach of contract affirmative defense (12) and counterclaim (Count II) is predicated on Sun Life's violations of Section 4 and Section 9 of the Malkin Policy, relating to Sun Life's obligations to pay the death benefits and the proscription on challenging the Policy after it has been in force for a period of two years.  *See* U.S. Bank's Affirmative Defenses at ¶ 63; U.S. Bank's Counterclaims at ¶ 53.  However, as held by the Delaware Supreme Court in *Price Dawe*, "a life insurance policy lacking an insurable interest is void as against public policy and thus never comes into force, making the incontestability provision inapplicable."  28 A.3d at 1065.  Consequently, because the incontestability provision never came into force, a violation of that provision cannot support a breach of contract claim. The same is true for the remaining provisions of the contract, in particular, Sun Life's obligation to pay out the death benefit enumerated in the Policy.

As U.S. Bank's claim for breach of contract fails, so must its counterclaim and affirmative defense predicated upon a breach of the duty of good faith and fair dealing (Count III and twelfth affirmative defense).  Under Delaware law, "[t]he implied covenant of good faith and fair dealing inheres in every contract and 'requires 'a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' of the bargain.'"  *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005)); *see also Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 534 (D. Del. 2008) ("Delaware courts recognize an implied covenant in contracts requiring the parties to act with good faith toward the other party with respect to their contract.") (citation omitted).  "Thus, to state a claim for breach of the implied covenant, [a plaintiff] 'must allege a specific implied

contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff.'" *Kuroda*, 971 A.2d at 888 (quoting *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del.Ch. Nov.10, 1998)); *Kyle v. Apollomax, LLC*, 987 F. Supp. 2d 519, 527 (D. Del. 2013) (citing *Kuroda*, 971 A.2d at 888). Because there was no contract and, therefore, no breach, there can be no violation of the duty of good faith and fair dealing.[27]

U.S. Bank's remaining affirmative defenses are rendered moot by the holding contained herein. It is clear that U.S. Bank's remaining affirmative defenses (and counterclaims), are predicated upon Sun Life's purported failure to investigate the validity of the Malkin Policy at an earlier date and the inequality that would result if Sun Life is permitted to retain the benefit of the Policy, to wit, the premiums. *See* U.S. Bank's Response, ECF No. [98] at 34 (contending that the affirmative defenses must apply because, if they do not, insurers would be incentivized to obtain profits through premiums knowing full well that those policies could be rendered void at a later date); *id.* at 35-36 (noting that "U.S. Bank relied to its detriment on these representations by continuing to make premium payments"); *id.* at 37 ("Sun Life cannot be permitted to ignore potential red flags that existed at the time the Policy was applied for and issued, [and] collect hundreds of thousands of dollars in premium payments . . . ."); *see also* U.S. Bank's Counterclaims, ECF No. [19] at ¶ 5-6 (seeking damages as a result of Sun Life's failure to honor its obligations under the Policy after "induc[ing]" U.S Bank to make premium payments and "accepting" said payments); *id.* at ¶ 36-37, 54, 60-61, 75. Regardless of whether Sun Life was cognizant of the possibility that the Malkin Policy was part of a STOLI scheme, Delaware

---

[27] Florida law yields the same result. *See Senter v. JPMorgan Chase Bank, N.A.*, 810 F. Supp. 2d 1339, 1361 (S.D. Fla. 2011) ("A breach of the implied covenant of good faith and fair dealing is not an independent cause of action, and cannot be maintained under Florida law in the absence of a breach of an express term of a contract." (citing *Burger King Corp. v. E–Z Eating, 41 Corp.*, 572 F.3d 1306, 1313 n.10 (11th Cir. 2009))).

law requires that Sun Life return the premiums paid on the Policy, see *supra* Section III.D, thereby rendering any issue concerning the resulting inequality argued by U.S. Bank to be moot. U.S. Bank is entitled to a return of the premiums in order to prevent manifest inequity. *See Berck*, 719 F. Supp. 2d at 418-19.

## IV. CONCLUSION

The undisputed record in this action unequivocally reveals that the Malkin Policy lacked an insurable interest at its inception. The Malkin Policy is, therefore, void *ab initio* under the applicable Delaware law. Accordingly, based on the discussion contained herein, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Defendant U.S. Bank's Motion to Stay Case, ECF No. [113], is **DENIED.**

2. Defendant U.S. Bank National Association's Motion for Summary Judgment, ECF No. [60], is **DENIED**.

3. Plaintiff Sun Life Assurance Company of Canada's Motion for Summary Judgment, **ECF No. [65]**, is **GRANTED IN PART** and **DENIED IN PART**:

   a. The Motion is **GRANTED** with respect to Sun Life's declaratory judgment claims as the Malkin Policy lacked an insurable interest at its inception and was clearly a disguised wager on the life of Phyllis Malkin;

   b. The Motion is **DENIED** as to Sun Life's claim that it be permitted to retain the premiums paid pursuant to the Policy.

4. Accordingly, summary judgment is entered in favor of Plaintiff Sun Life Assurance Company of Canada and against Defendant U.S. Bank National Association.

5. However, judgment is also entered in favor of U.S. Bank and against Sun Life as to Count IV of U.S. Bank's Counterclaims. *See supra* Section III.D.

14-CIV-62610-BLOOM/VALLE

6.  Pursuant to Rule 58(a) of the Federal Rules of Civil Procedure, the Court will enter

final judgment by separate order.

**DONE AND ORDERED** in Miami, Florida, this 13th day of January, 2016.

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:
Counsel of Record